1  Hart L. Robinovitch (AZ SBN 020910)
   ZIMMERMAN REED, LLP
2  14646 N. Kierland Blvd., Suite 145
   Scottsdale, AZ  85254-2762
3  Telephone:  (480) 348-6400
   Facsimile: (480) 348-6415
4  Email: Hart.Robinovitch@zimmreed.com

5  Samuel H. Rudman
   Mary K. Blasy
6  ROBBINS GELLER RUDMAN
   & DOWD LLP
7  58 South Service Road, Suite 200
   Melville, NY  11747
8  Telephone:  (631) 367-7100
   Facsimile (631) 367-1173
9
   *Attorneys for Plaintiff*
10
   (Additional counsel appear on signature page)
11

12                 UNITED STATES DISTRICT COURT

13                      DISTRICT OF ARIZONA

14  Rameses Te Lomingkit,                  )  Case No.
    individually and on behalf of all others )
15  similarly situated,                    )  CLASS ACTION
                                           )
16                          Plaintiff,     )  COMPLAINT FOR VIOLATIONS OF
                                           )  THE FEDERAL SECURITIES LAWS
17           vs.                           )
                                           )
18  Apollo Education Group, Inc. (f/k/a Apollo )
    Group, Inc.), Peter V. Sperling, Gregory W. )
19  Cappelli, Brian L. Swartz, Joseph L.   )
    D'Amico and Gregory J. Iverson,        )
20                                         )
                            Defendants.    )
21  _____ )  DEMAND FOR JURY TRIAL
                                           )
22

23

24

25

26

27

28

Plaintiff Rameses Te Lomingkit, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against Defendants (as defined below), alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Apollo Education Group, Inc. ("Apollo" or the "Company"), as well as media and analyst reports about the Company, conference call transcripts, various agreements and communications with the U.S. Department of Defense ("DoD") and pleadings in lawsuits filed against the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all purchasers of the Class A common stock of Apollo between June 26, 2013 and October 21, 2015, inclusive (the "Class Period"), seeking remedies pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act").

2.    Apollo owns and operates several for-profit educational institutions throughout the United States.  Its largest is the University of Phoenix, which the Company characterizes as "the nation's largest regionally accredited private university."

3.    Throughout the Class Period, Apollo reported generating billions of dollars in revenues while concealing that a substantial portion of those revenues were being derived through recruiting tactics being undertaken at U.S. military bases across the country that contradicted an Executive Order signed into law by President Barrack Obama on April 27, 2012.  The express intent of the Executive Order, which had been implemented in large part by the spring of 2013, was to stop for-profit secondary education providers like the University of Phoenix from continuing to take advantage of present and former members of the U.S. military.  During the Class Period, Defendants also concealed that Apollo was using improper recruiting tactics that likely violated the express terms of the contractual

agreements the Company had entered into with the DoD in February 2012 and July 2014 to permit the University of Phoenix to continue to participate in the DoD's tuition assistance ("TA") programs.

4.      In June 2014 Apollo reported having "successfully transitioned [its] online classroom platform to an ***industry-leading*** private cloud infrastructure, ***offering enhanced scalability, reliability and performance***," which Apollo promised would "allow[] [it] to increase [its] advanced data analytics capabilities to support how [it] serve[d] students." However, unbeknownst to investors, from its inception the new platform was not functioning as designed due to software compatibility problems that prevented students from signing onto their online courses, which had dramatically increased student drop-out rates. Adding insult to injury, in addition to repeatedly minimizing the true extent of the software compatibility problems, even when later being questioned about them by stock analysts, Defendants hid from the investment community the deleterious impact the software compatibility problems were having not only on ***retention rates*** but on ***new student enrollment***.

5.      As a result of Defendants' false statements during the Class Period, which emphasized Apollo's financial successes and strong financial prospects, the price of Apollo's Class A common stock traded at artificially inflated levels, reaching a Class Period high of $35.92 per share in intraday trading on January 22, 2014. With the price of the Class A common stock artificially inflated, certain of Apollo's senior executives cashed in, selling almost ***$42 million*** of their personally held shares at artificially inflated prices.

6.      On January 8, 2015, Apollo announced that the "conversion to a brand new platform was more challenging than [they had] originally anticipated" and had "resulted in a greater than expected impact on ***retention***." However, Apollo emphasized that the problem was being fixed "as quickly as possible," representing that Apollo's "teams ha[d] already made substantial progress" and were then "on track with [their] plan to aggressively address the technical issues related to the classroom" and had actually "accelerated the future enhancements," including "***ensuring the classroom [was] compatible with a broader range***

1    *of browsers and other operating systems at all times*; and that course content [was] more

2    readily accessible when accessed through third-party providers." The price of Apollo stock

3    declined moderately on these disclosures. However, due to Defendants' other more positive

4    statements, including that the Company was experiencing strong ongoing enrollment and

5    profitability trends, the price of Apollo stock remained artificially inflated.

6         7.    On March 25, 2015, Apollo finally disclosed that it had actually "experienced a

7    *significant disruption* with respect to [the] new online classroom platform," which had not

8    only "adversely impacted retention," but had actually decreased "second quarter *new*

9    *degreed enrollment*," with Defendants conceding that due to having "an issue that[] [was]

10   impacting students," Apollo had not wanted to "spend a whole lot of money on advertising to

11   attract more students into a classroom where there ha[d] been some problems." As a result,

12   Apollo disclosed that the number of new students registering for courses in the quarter had

13   actually *declined 13%* from the same quarter in 2014, forcing Apollo to cut its annual

14   revenue forecast.

15        8.    Then, on June 30, 2015, the Center for Investigative Reporting ("CIR")

16   published an exposé entitled "University of Phoenix sidesteps Obama order on recruiting

17   veterans." In its exposé, CIR detailed how the University of Phoenix, "the proprietary

18   college that is far and away the largest recipient of taxpayer money under the post-9/11 GI

19   Bill," was violating President Obama's Executive Order, as well as the contractual

20   agreements the University of Phoenix had entered into with the DoD in order to continue

21   participating in the DoD's TA programs, by, among other things, engaging in unpermitted

22   on-base recruiting by paying the military to allow it to sponsor hundreds of events on

23   military bases across the country, from rock concerts to Super Bowl parties and father-

24   daughter dances, that gave it access to recruiting on base without obtaining the required

25   approval; engaging in recruitment drives disguised as résumé workshops; paying incentives

26   to its recruiters based on their on-base recruiting successes; financially incentivizing

27   veterans' organizations such as the American Legion to lobby for additional for-profit

28

1  educational spending from Congress; and utilizing military insignias in school marketing
2  without obtaining the required prior permission.

3      9.     Also on June 30, 2015, U.S. Senator Richard J. Durbin sent a letter to Secretary
4  of Defense Ashton Carter bringing the matters raised in the CIR exposé to his attention and
5  calling for the military to investigate and put an end to the illicit recruiting tactics.

6      10.    On October 7, 2015, the DoD formally placed the University of Phoenix on
7  probation, barring it from recruiting on military bases and preventing troops from using
8  federal funds for its classes, based in large part on the issues raised in the CIR exposé,
9  Senator Durbin's letter, a Civil Investigative Demand issued by the U.S. Federal Trade
10 Commission ("FTC") to the University of Phoenix in July 2015 seeking information relating
11 to advertising, marketing, and sale of secondary or postsecondary educational products or
12 services or educational accreditation products or services, and an Investigative Subpoena
13 issued by the California Attorney General's office in August 2015 seeking information
14 relating to the recruiting of U.S. military and California National Guard personnel and
15 related matters and the use of U.S. military logos and emblems in marketing.

16     11.    On October 9, 2015, *The Wall Street Journal* disclosed that the U.S. Justice
17 Department ("DoJ") and the Department of Education ("DoE") were coordinating ongoing
18 investigations of the University of Phoenix's recruitment practices.

19     12.    On October 22, 2015, the Company disclosed that its fourth quarter and fiscal
20 year 2015 results had been negatively impacted by actions the Company had been forced to
21 take to bring its operations into compliance with the law.  The Company also disclosed that
22 its efforts to address the prior misconduct would adversely affect its revenues and profits for
23 the foreseeable future.

24     13.    As the market learned of the above revelations, Apollo common stock was
25 hammered by massive sales, sending its share price down approximately ***80%*** from its Class
26 Period high – or nearly ***$29*** per share – and erasing ***more than $3 billion*** in market
27 capitalization.

28

14.     Apollo would subsequently disclose that revenues for its first quarter 2016 (ended November 30, 2015) were also significantly diminished and the Company would report a massive operating loss after having reported an operating profit in its first quarter 2015.  At approximately the same time the Company reported these dismal results in January 2016, it disclosed that it was undertaking efforts to sell itself.

15.     While the Company has since reported that it has sold itself to a private equity fund and that the DoD has lifted the ban on troops using federal funds for University of Phoenix courses, the Company remains on formal probation with the DoD and under intense scrutiny.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

17.     Venue is proper in this district pursuant to §27 of the 1934 Act.  Apollo is headquartered in this District and certain acts and transactions giving rise to the violations of law complained of occurred here.

## THE PARTIES

18.     Plaintiff Rameses Te Lomingkit purchased Apollo common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

19.     Defendant Apollo is an Arizona corporation with its principal place of business located at 4025 South Riverpoint Parkway, Phoenix, Arizona.  Effective November 15, 2013, the Company formally changed its name from Apollo Group, Inc. to Apollo Education Group, Inc.  During the Class Period, Apollo had approximately 108 million shares of its Class A common stock outstanding, which shares traded in an efficient market on the NASDAQ under the ticker symbol "APOL."  The Company also had approximately 475,000 shares of its Class B common stock, its only voting stock, issued and outstanding.  All of the

1   voting stock is owned by Apollo executives and insiders, primarily by defendant Peter V.

2   Sperling.

3       20.    Defendant Peter V. Sperling ("Peter Sperling") was, throughout the Class

4   Period, Chairman of the Apollo Board of Directors.  Peter Sperling is the son of non-party

5   John Sperling, who founded Apollo in 1976 and served as a member of its Board of

6   Directors and its Chairman Emeritus until his death in August 2014.

7       21.    Defendant Gregory W. Cappelli ("Cappelli") was, throughout the Class Period,

8   Apollo's Chief Executive Officer ("CEO") and a member of its Board of Directors.

9       22.    Defendant Brian L. Swartz ("Swartz") served as a Senior Vice President and

10  the Chief Financial Officer ("CFO") of Apollo from 2007 until May 15, 2015.

11      23.    Defendant Joseph L. D'Amico ("D'Amico") served as Apollo's interim CFO

12  between May 15, 2015 and October 26, 2015 and has served as a senior advisor to Apollo's

13  CEO since October 26, 2015.

14      24.    Defendant Gregory J. Iverson ("Iverson") has served as Apollo's CFO since

15  October 26, 2015 and as its Vice President – Finance, Chief Accounting Officer and

16  Treasurer since 2007.

17      25.    Defendants Peter Sperling, Cappelli, Swartz, D'Amico and Iverson are

18  sometimes referred to herein as the "Individual Defendants."  The Individual Defendants and

19  Apollo are collectively referred to herein as "Defendants."

20      26.    During the Class Period, the Individual Defendants ran Apollo as "hands-on"

21  managers, overseeing Apollo's operations and finances, and made the materially false and

22  misleading statements described herein.   The Individual Defendants were intimately

23  knowledgeable about all aspects of Apollo's financial and business operations, as they

24  received daily reports and had access to computerized information regarding revenues, costs

25  and expenses and regulatory and legal proceedings.  They were also intimately involved in

26  deciding which disclosures would be made by Apollo.  Indeed the Individual Defendants

27  made various public statements for Apollo during the Class Period, and participated in Class

28  Period investor conferences.  The Individual Defendants also signed Apollo's filings with the

1  SEC during the Class Period, with defendants Peter Sperling, Cappelli, Swartz and Iverson
2  signing the annual reports on Form 10-K for fiscal years 2013 and 2014, and defendants
3  Iverson, Swartz and D'Amico signing the Company's interim quarterly financial reports on
4  Form 10-Q and defendants Cappelli, Swartz and D'Amico certifying the veracity of the
5  Company's publicly reported financial reports under the Sarbanes Oxley Act of 2002.

**BACKGROUND**

7       27.    Apollo is the holding company that owns the University of Phoenix and a
8  group of other for-profit universities.  Though Apollo has operated several for-profit schools
9  over the years, historically 80% or more of its revenues – and 100% of the Company's total
10  consolidated operating income – has been derived from the University of Phoenix.

11       28.    On February 10, 2012, the University of Phoenix entered into an Alliance
12  Memorandum of Understanding with the DoD (the "2012 DoD MOU"), which governed the
13  school's rights to continue participating in the DoD's TA programs.  One of the General
14  Terms and Conditions of the 2012 DoD MOU prohibited the University of Phoenix from
15  using the DoD's or its affiliates' "name and logo in writing."  While the school could "use
16  the [Defense Acquisition University's ("DAU")] name or logo in published materials (*e.g.*,
17  Web site and catalog) to reference [the 2012 DoD MOU] or contact information/links to
18  DAU," the "[c]ontent and text of all such promotional information [had to be expressly]
19  approved by DAU prior to the release."  Another provision of the 2012 DoD MOU expressly
20  mandated that the University of Phoenix "abide by all applicable federal and state laws."

21       29.    On April 27, 2012, President Barrack Obama signed into law Executive Order
22  13607, "Establishing Principles of Excellence for Educational Institutions Serving Service
23  Members, Veterans, Spouses, and Other Family Members," which expressly banned all
24  deceptive and aggressive recruiting practices by for-profit colleges ("Exec. Ord. 13607").
25  The University of Phoenix was bound to comply with Exec. Ord. 13607, particularly in light
26  of the school's having entered into the 2012 DoD MOU, expressly agreeing to "abide by all
27  applicable federal and state laws" in order to continue participating in the DoD's TA
28  programs.

30.     Section 1 of Exec. Ord. 13607, "Policy," emphasized that one of the new law's primary purposes was to prevent aggressive and misleading marketing by for-profit schools, especially on military bases, stating in pertinent part as follows:

> Since the Post-9/11 GI Bill became law, there have been reports of aggressive and deceptive targeting of service members, veterans, and their families by some educational institutions. For example, some institutions have recruited veterans with serious brain injuries and emotional vulnerabilities without providing academic support and counseling; encouraged service members and veterans to take out costly institutional loans rather than encouraging them to apply for Federal student loans first; ***engaged in misleading recruiting practices on military installations***; and failed to disclose meaningful information that allows potential students to determine whether the institution has a good record of graduating service members, veterans, and their families and positioning them for success in the workforce.

31.     In order to formally implement Exec. Ord. 13607, §2, "Principles of Excellence for Educational Institutions Serving Service Members, Veterans, Spouses, and Other Family Members," directed the DoD, Department of Veterans Affairs ("DoVA") and DoE to "establish Principles of Excellence . . . to apply to educational institutions receiving funding from Federal military and veterans educational benefits programs, including benefits programs provided by the Post-9/11 GI Bill and the [TA] Program," one of which was to "ensure that these educational institutions . . . ***prevent abusive and deceptive recruiting practices that target the recipients of Federal military and veterans educational benefits***."

32.     Section 4 of Exec. Ord. 13607, "Strengthening Enforcement and Compliance Mechanisms," expressly directed that "[w]ithin 90 days of the date of [the] order, the Secretaries of Defense and Veterans Affairs, in consultation with the Secretary of Education and the Director of the CFPB, as well as with the Attorney General, as appropriate, [were to] submit to the President a plan to strengthen enforcement and compliance mechanisms," including proposals expressly designed to restrict the access of for-profit school recruiters to military bases and preclude them from engaging in any deceptive marketing practices directed at current or former members of the military, requiring, in pertinent part, that they

> [2](c) ***end fraudulent and unduly aggressive recruiting techniques on and off military installations, as well as misrepresentation, payment of incentive compensation***, and failure to meet State authorization requirements, consistent with the regulations issued by the Department of Education (34 C.F.R. 668.71–668.75, 668.14, and 600.9);

\*        \*        \*

[4](e) establish new uniform rules and strengthen existing procedures for access to military installations by educational institutions. These new rules should ensure, at a minimum, that only those institutions that enter into a memorandum of agreement pursuant to section 3(a) of this order are permitted entry onto a Federal military installation for the purposes of recruitment. ***The Department of Defense shall include specific steps for instructing installation commanders on commercial solicitation rules and the requirement of the Principles outlined in section 2(c) of this order***; and

[4](f) ***take all appropriate steps to ensure that websites and programs are not deceptively and fraudulently marketing educational services and benefits to program beneficiaries, including initiating a process to protect the term "GI Bill" and other military or veterans-related terms as trademarks, as appropriate***.

33.     On May 31, 2012, the DoVA sent a letter attaching Exec. Ord. 13607 to all for-profit education providers, including the University of Phoenix.  The DoVA's May 31, 2012 letter required "that all schools provide a written response stating their intention to comply with the Principles of Excellence" by the end of academic year 2012-2013, and "not later than June 30, 2012."

34.     On June 26, 2012, the University of Phoenix sent a letter to the DoVA signed by William Pepicello, its President, purporting to express the intent of "the entire University of Phoenix community" "to comply with" Exec. Ord. 13607, which stated in pertinent part as follows:



Office of the President
4615 East Elwood Street
Phoenix, AZ 85040

June 26, 2012

Curtis L. Coy
Deputy Under Secretary, Office of Economic Opportunity
U.S. Department of Veterans Affairs (VA)
Veterans Benefits Administration
Washington, D.C. 20420

Cc:     U.S. Department of Justice: Office of the Attorney General
        U.S. Department of Defense
        U.S. Department of Education
        Bureau of Consumer Financial Protection

Dear Deputy Under Secretary Coy:

I write today on behalf of the entire University of Phoenix community, to express support of, and state our intent to comply with, the President's Executive Order 13607—Establishing Principles of Excellence for Educational Institutions Serving Service Members, Veterans, Spouses, and Other Family Members.

35.     In November 2012, the DoE held its 2012 Fall Conference, entitled "Principles of Excellence – Executive Order 13607," which detailed the ongoing efforts to implement Exec. Ord. 13607.  During that conference, it was represented that beginning in the Spring of 2013, the DoD would be enforcing the following policies at U.S. military installations to limit for-profit education providers' recruiting efforts:

- ***Institutions may access military bases to provide education, guidance, and training opportunities ONLY***

- Marketing firms or ***companies that own and operate higher-learning institutions will not have access to the bases***

- ***May have access to military bases to provide education guidance to their students***:

Access ***only*** through the base education officer via a written proposal

     (a)     ***Have a signed MOU with DoD***;

     (b)     Be chartered or licensed by the State government in which the services will be rendered;

     (c)     Be State approved for the use of veteran's education benefits;

     (d)     Course offering must be provided by postsecondary institution accredited by a national or regional accrediting body recognized by the U.S. Department of Education; and

     (e)     Have an on base student population of at least 20 active duty military students

36.     In order to complete the implementation of Exec. Ord. 13607, additional, more specific DoD rules were proposed and published in the Federal Register (78 F.R. 49382, 49383) on August 14, 2013.  These additional rules included express prohibitions against "us[ing] unfair, deceptive, and abusive recruiting practices" and the "[i]mplement[ation] [of] rules to strengthen existing procedures for access to military installations by educational institutions."  After the comment period expired, on May 15, 2014 the final version of these additional rules for Voluntary Education Programs was published in the Federal Register (79 F.R. 27732), which would to go into effect on July 14, 2014, requiring that voluntary educational institutions sign new MOUs within 60 days.

37.     The final rules "[i]mplement[ed] policy, assign[ed] responsibilities, and prescribe[d] procedures for the operation of voluntary education programs in the DoD." They "[e]stablishe[d] policy stating the eligibility criteria for tuition assistance (TA) and the requirement for a memorandum of understanding (MOU) from all educational institutions providing educational programs through the DoD TA Program," and expressly "[e]stablish[ed] policy" that "[a]ll educational institutions providing education programs through the DoD Tuition Assistance (TA) Program" would "***not use unfair, deceptive, and abusive recruiting practices***."  They also expressly "[c]reate[d] rules to strengthen existing procedures for access to DoD installations by educational institutions."

38.     In order to implement the final DoD rules, the agency published its Information No. 1322.25, dated March 15, 2011, Incorporating Change 3, Effective July 7, 2014 ("DoDI 1322.25"), which dictated certain "Procedures for the Responsible Education Advisor, on Behalf of the Installation Commander, to Provide Voluntary Education Programs and Services from Postsecondary Educational Institutions," to control the access of for-profit educational providers to conduct on-base recruiting.  The new procedures included the following, in pertinent part:

> b.     The responsible installation education advisor will limit DoD installation access to educational institutions or their agents meeting the requirements as stated in the policy section of this instruction and in compliance with the DoD Voluntary Education Partnership MOU. Agents representing education institutions in the performance of contracted services are permitted DoD installation access ***only in accordance with the requirements of their contract and/or agreement***.

> c.     Educational institutions interested in providing education, guidance, training opportunities, and participating in sanctioned education fairs on a DoD installation ***will provide their requests to the responsible education advisor, who will review and analyze these requests on behalf of the installation commander***.

39.     The "Procedures for the Responsible Education Advisor, on Behalf of the Installation Commander, to Provide Voluntary Education Programs and Services from Postsecondary Educational Institutions" also provided that the responsible installation education advisor would:

e.     Monitor educational institutions and its agents granted access to a DoD installation *to ensure they do not*:

(1)     *Use unfair, deceptive, abusive or fraudulent devices, schemes, or artifices, including misleading advertising or sales literature*.

(2)     *Engage in unfair, deceptive, or abusive marketing tactics, such as during unit briefings or assemblies; engaging in open recruiting efforts; or distributing marketing materials on the DoD installation at unapproved locations or events*.

40.     DoDI 1322.25's "Requirements and Procedures for Educational Institutions Seeking Access to the DoD Installation Solely to Provide Academic Counseling or Student Support Services to Students" further provided, in pertinent part, that "[e]ducational institutions must request access *through the responsible education advisor via a written proposal*," that the "responsible education advisor [would] review and analyze the request on behalf of the installation commander," and that "[i]f a DoD installation grant[ed] access to an educational institution to provide guidance to their students, *the educational institution and its agents [would]*: . . . *[o]nly advise or counsel students at the education center or at a location approved by the responsible education advisor*."

41.     On or about July 20, 2014, the University of Phoenix entered into an additional MOU with the DoD entitled the "Department of Defense (DoD) Voluntary Education Partnership Memorandum of Understanding" ("2014 DoD MOU").  As the 2012 DoD MOU had, the 2014 DoD MOU "articulate[d] the commitment and agreement educational institutions provide to the Department of Defense by accepting funds via each Service's tuition assistance (TA) program in exchange for education services."  The 2014 DoD MOU further provided that "[e]ducational institutions failing to comply with the requirements set forth in this MOU may receive a letter of warning, be denied the opportunity to establish new programs, have their MOU terminated, be removed from the DoD installation, *and may have the approval of the issuance of TA withdrawn by the Service concerned*."  The 2014 DoD MOU expressly stated, in pertinent part, that in order to continue participating in the DoD's TA program, the University of Phoenix had to:

j.    Have policies in place compliant with program integrity requirements consistent with the regulations issued by ED (34 C.F.R 668.71-668.75 and 668.14) related to *restrictions on misrepresentation, recruitment, and payment of incentive compensation*. This applies to the educational institution itself and its agents including third party lead generators, marketing firms, or companies that own or operate the educational institution. *As part of efforts to eliminate unfair, deceptive, and abusive marketing aimed at Service members, educational institutions will:*

(1)    *Ban inducements, including any gratuity, favor, discount, entertainment, hospitality, loan, transportation, lodging, meals, or other item having a monetary value of more than a de minimis amount, to any individual or entity, or its agents* including third party lead generators or marketing firms other than salaries paid to employees or fees paid to contractors in conformity with all applicable laws for the purpose of securing enrollments of Service members or obtaining access to TA funds. Educational institution sponsored scholarships or grants and tuition reductions available to military students are permissible

(2)    *Refrain from providing any commission, bonus, or other incentive payment based directly or indirectly on securing enrollments or federal financial aid (including TA funds) to any persons or entities engaged in any student recruiting, admission activities, or making decisions regarding the award of student financial assistance*.

(3)    Refrain from high-pressure recruitment tactics such as making multiple unsolicited contacts (3 or more), including contacts by phone, email, or in-person, and engaging in same-day recruitment and registration for the purpose of securing Service member enrollments[.]

42.    Continuing its prior aggressive recruiting efforts on military bases that exposed the University of Phoenix to being accused of circumventing Exec. Ord. 13607, DoDI 1322.25, the 2012 DoD MOU and the 2014 DoD MOU until exposed in June 2015, the University of Phoenix:

(a)    engaged in recruitment drives disguised as résumé workshops on military installations;

(b)    paid the U.S. Chamber of Commerce Foundation to allow the University of Phoenix to be the sole educational institution presenting employment workshops and "Hiring Our Heroes" job fairs around the country, many of them on military bases, in order to market its services to current and former members of the military;

(c)    used figures such as the number of leads each of its national defense recruiting employees generated, along with the percentage of those leads who eventually

- 13 -

1  enrolled, to evaluate and compensate those recruiters in a fashion that has been equated to

2  paying "sales incentives";

3        (d)    cultivated relationships with veterans' organizations such as the

4  American Legion – which had previously criticized the for-profit education industry's

5  gouging of active military and veterans – using financial incentives to entice them into

6  opposing congressional efforts to regulate or restrict the flow of GI Bill money to for-profit

7  schools such as the University of Phoenix;

8        (e)    utilized military insignias – including custom engraved "challenge

9  coins" that have held a special place in military culture for decades, with the University of

10  Phoenix logo on one side and the seals of the DoD and every branch of the military on the

11  other – in marketing activities targeted at military personnel, including having recruiters

12  hand them out on military bases, without the required prior permission; and

13        (f)    paid the military an estimated $1 million between 2010 and 2015 to

14  sponsor hundreds of events on military bases across the country, including 89 events held

15  between June 2012 and June 2015 alone, ranging from briefings for soldiers newly stationed

16  at Fort Carson in Colorado, a chocolate festival, a fashion show, a "Brunch with Santa," an

17  Easter egg hunt at Fort Hood in Texas, rock concerts, Super Bowl parties, and father-

18  daughter dances, without obtaining the permission from the bases' responsible education

19  advisors and while prominently displaying banners with the schools' names claiming "30+

20  years of proud service to our military community," in what has been called a "deliberate

21  effort to create the impression that the college is sanctioned and even recommended by the

22  armed forces."

### DEFENDANTS' FALSE AND MISLEADING
### CLASS PERIOD STATEMENTS

23

24        43.    The Class Period starts on June 26, 2013.  On June 25, 2013, after the close of

25  trading, Apollo issued a press release announcing its financial results for its third quarter of

26  2013 ("3Q 2013"), ended May 31, 2013.  In addition to reporting net revenues of $946.8

27  million and income from continuing operations of $80 million, or $0.71 per share, the release

28

provided the Company's "Business Outlook," purportedly based on then-present trends, and

quoted defendant Cappelli on how the Company was on track to achieve that Business

Outlook, stating in pertinent part as follows:

> "This is a time of extraordinary change in higher education. At Apollo Group we are creating a more nimble organization and reengineering our learning solutions **to better support our student's needs and meet the demands of employers**. We are focused on making the necessary changes to deliver **an improved set of educational offerings**," said Apollo Group Chief Executive Officer Greg Cappelli. "As education evolves, the transfer of knowledge and the acquisition of skills for working adults will be delivered in new and different ways. **We are working directly with employers to define the skills students must bring to the workplace to more effectively compete in a global economy**. The repositioning of higher education–also reflected in Apollo Group's mission to create a more educated global workforce – has perhaps never been more important."

> \*       \*       \*

> **Business Outlook**

> The Company offers the following outlook for fiscal year 2013 based on the business trends observed during the second quarter 2013, as well as management's current expectations of future trends.

> - **Net revenue of $3.65 – $3.75 billion**; and

> - **Operating income of $500.0 – $550.0 million**, excluding the impact of special items and restructuring and other charges.

> **The Company continues to reengineer business processes and refine its educational delivery structure. These restructuring activities are expected to favorably impact annual operating expenses by at least $400 million by fiscal year 2014, when compared to fiscal year 2012. This is a $50 million increase in anticipated savings from the Company's previous outlook**.

44.     Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

45.     On October 22, 2013, Apollo issued a press release announcing its financial results for its 4Q 2013 and fiscal year ("FY") 2013, ended August 31, 2013.  In addition to reporting 4Q 2013 revenues of $845 million and income from continuing operations of $21.6 million, or $0.19 per share, and reporting FY 2013 revenues of $3.7 billion and income from continuing operations of $248.5 million, or $2.19 per share, the release provided the Company's "Business Outlook," purportedly based on then-present trends, and quoted

defendant Cappelli on how the Company was on track to achieve that Business Outlook, stating in pertinent part as follows:

> "We set out this year to differentiate University of Phoenix, diversify Apollo Group and build a more efficient organization. **We have made meaningful progress in each of these areas**. With hundreds of millions of worldwide learners in need of higher education in this decade alone, **we are well positioned for 2014 and beyond to help create a more educated global workforce and strengthen our great partnerships across four continents**."

> \*       \*       \*

> **Business Outlook**

> The Company offers the following outlook for fiscal year 2014 based on the business trends observed during the fourth quarter of fiscal year 2013, as well as management's current expectations of future trends.

> - **Net revenue of $2.95 - $3.05 billion**; and

> - **Operating income of $375 - $450 million**, excluding the impact of special items including restructuring and other charges.

> In fiscal year 2014, the Company expects to further reduce its fixed operating costs by a minimum of $300 million, which would result in a total decline of $650 million, or 18%, compared to the fiscal year 2012 cost base.

46.    Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.  During the Q&A session, defendants Cappelli and Swartz expressly refused to divulge any "quantification of how big [military education spending aid was] as a portion of enrollment."

47.    On October 22, 2013, Apollo also filed its 2013 annual financial report on Form 10-K with the SEC, which was signed by defendants Peter Sperling, Cappelli, Swartz and Iverson and certified as to veracity under the Sarbanes Oxley Act of 2002 by defendants Swartz and Cappelli.  Concerning the Company's regulatory compliance, and specifically its compliance with Exec. Ord. 13607, while the Form 10-K stated that compliance "**could** increase **the cost** of delivering educational services to . . . military and veteran students," it concealed that the Company **was then in violation** of Exec. Ord. 13607, and thus its 2012 DoD MOU, and that the Company was then deriving substantial **revenues** as a result of its

1   non-compliance – revenues that Apollo would not have access to if it complied with the law.

2   The Form 10-K stated in pertinent part as follows:

3       *Executive Order on Military and Veterans Benefits Programs.* In April
        2012, President Obama issued an executive order regarding the establishment
4       of principles for educational institutions receiving funding from federal
        military and veterans educational benefits programs, including those provided
5       by the Post-9/11 Veterans Educational Assistance Act of 2008, as amended
        (the "Post-9/11 GI Bill") and the Department of Defense Tuition Assistance
6       Program. The executive order requires the Departments of Defense, Veterans
        Affairs and Education to establish and implement "Principles of Excellence"
7       to apply to educational institutions receiving such funding. The goals of the
        Principles are broadly stated in the order and relate to disclosures of costs and
8       amounts of costs covered by federal educational benefits, marketing standards,
        state authorization, accreditation approvals, standard institutional refund
9       policies, educational plans and academic and financial advising. Various
        implementation mechanisms are included and the Secretaries of Defense and
10      Veterans Affairs, in consultation with the Secretary of Education and the
        Director of the Consumer Financial Protection Bureau, submitted a plan to
11      strengthen enforcement and compliance in July 2012. These Principles could
        increase the cost of delivering educational services to our military and veteran
12      students.

13      48.     On January 7, 2014, Apollo issued a press release announcing its financial

14   results for its 1Q 2014, ended November 30, 2013.  In addition to reporting net revenues of

15   $856.3 million and income from continuing operations of $98.9 million, or $0.87 per share,

16   the release provided the Company's "Business Outlook," purportedly based on then-present

17   trends, and quoted defendant Cappelli on how the Company was on track to achieve that

18   Business Outlook, stating in pertinent part as follows:

19      "At Apollo Education Group, *we are making good progress on our*
        *strategic plan to differentiate University of Phoenix, diversify Apollo and*
20      *drive operational excellence throughout our organization*," said Apollo
        Education Group Chief Executive Officer Greg Cappelli. "To support our
21      strategy, we continue to innovate, roll out new and differentiated programs
        that lead to careers of choice, expand our footprint globally *while sharing best*
22      *practices to leverage our growing network and become a more efficient*
        *company*."

23                          *       *       *

24      **Business Outlook**

25      The Company offers the following outlook for fiscal year 2014 based
26   on the business trends observed during the first quarter 2014, as well as
        management's current expectations of future trends.

27      •   *Net revenue of $3.0 - $3.1 billion*; and

28

                                    - 17 -

- ***Operating income of $400 - $450 million***, excluding the impact of special items and restructuring and other charges.

49.     Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

50.     The price of Apollo common stock reached a Class Period high on January 22, 2014, trading as high as $35.92 per share in intraday trading.

51.     On April 1, 2014, Apollo issued a press release announcing its financial results for its 2Q 2014, ended February 28, 2014.  In addition to reporting net revenues of $679.1 million and income from continuing operations of $14.6 million, or $0.13 per share, the release provided the Company's "Business Outlook,"  purportedly based on then-present trends, and quoted defendant Cappelli on how the Company was on track to achieve that Business Outlook, stating in pertinent part as follows:

> "At Apollo Education Group ***we are continuing to make progress on our long-term strategic plan which includes providing our students with a differentiated and high-quality experience, diversifying our company and becoming a more efficient organization through operational excellence***," said Apollo Education Group Chief Executive Officer Greg Cappelli. "As the global community becomes more competitive, so does the need for a more competitive workforce. ***Our institutions are committed to improving student outcomes, delivering differentiated programs, and providing students with the right form of postsecondary education to help them prepare for career success globally***."

                                *       *       *

**Business Outlook**

> The Company offers the following outlook for fiscal year 2014 based on the business trends observed during the second quarter 2014, as well as management's current expectations of future trends.

- ***Net revenue of $3.0 - $3.1 billion***; and

- ***Operating income of $400 - $450 million***, excluding the impact of special items.

52.     Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

53.     On April 8, 2014, Apollo conducted its 2014 Investor & Analyst Meeting. During his opening remarks, defendant Cappelli represented that Apollo was "rolling out a new learning platform" that was "exciting," and that it had the "tools, the faculty members and students that [it] never had before and other new retention initiatives to support the success of [Apollo's] students."   Later during the call, Jerrad Tausz, Apollo's Chief Operating Officer, provided additional detail about the new online classroom platform, which he explained was one of "many different components" Apollo was rolling out "to be able to make sure that the students [at the University of Phoenix were] successful, all the way through the entire lifecycle of that student," and stating in pertinent part as follows:

> *[T]he learning platform . . . is the next key element. And what this new learning platform does, . . . I really think it makes things simple for the students. It is an intuitive system that we allow a lot more multimedia, a lot more engagement and interaction in the online classrooms as well as its components can be used in the ground classroom as well to interact with both the faculty members as well as other students.*

54.     On June 25, 2014, Apollo issued a press release announcing its financial results for its 3Q 2014, ended May 31, 2014.  In addition to reporting net revenues of $799.9 million and income from continuing operations of $84.9 million, or $0.76 per share, the release provided the Company's "Business Outlook," purportedly based on then-present trends, and quoted defendant Cappelli on how the Company was on track to achieve that Business Outlook, stating in pertinent part as follows:

> "*We have made meaningful progress on our strategy to differentiate University of Phoenix and all of our institutions, diversify Apollo Education Group, and build a more efficient organization focused on operational excellence*," said Greg Cappelli, Chief Executive Officer, Apollo Education Group. "*During the third quarter, we continued our plan to realign the University of Phoenix by implementing our college-based strategy and also completed the rollout of our new learning platform across the university*. We further expanded our global network to South Africa and are now serving students on six continents through Apollo Global. *Our teams are helping students ensure their education is linked to careers in growing areas and are working with employers to address their needs for access to high-quality talent with the most relevant job skills*."

\*          \*          \*

**Business Outlook**

> The Company offers the following outlook for fiscal year 2014 based on the business trends observed during the third quarter 2014, as well as management's current expectations of future trends.

- ***Net revenue of $3.04 - $3.06 billion***; and

- ***Operating income of $420 - $435 million***, excluding the impact of special items.

55.     Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

56.     During the conference call, concerning the new online classroom platform, defendant Cappelli emphasized that Apollo had "successfully transitioned [its] online classroom platform to an ***industry-leading*** private cloud infrastructure, ***offering enhanced scalability, reliability and performance***," which Defendants promised would "allow[] [it] to increase [its] advanced data analytics capabilities to support how [it] serve[s] students."

57.     On October 21, 2014, after the close of trading, Apollo issued a press release announcing its financial results for its 4Q 2014 and FY 2014, ended August 31, 2014.  In addition to reporting revenues of $709.7 million and income from continuing operations of $37.2 million, or $0.34 per share, for the quarter, and revenues of $3 billion and income from continuing operations of $277.3 million, or $2.46 per share, for FY 2014, the release provided the Company's "Business Outlook," purportedly based on then-present trends, and quoted defendant Cappelli on how the Company was on track to achieve that Business Outlook, stating in pertinent part as follows:

> "***In 2014, we made significant progress on our ambitious plans to differentiate the University of Phoenix, diversify Apollo Education Group, and build a more efficient organization***," said Greg Cappelli, Chief Executive Officer, Apollo Education Group. "Our teams worked to realign the University of Phoenix around our distinct college-based strategy, expanded the Apollo Global network to now serve students on six continents, ***while maintaining a healthy balance sheet with ample capital to deploy our long-term strategic plan***."

*     *     *

**Business Outlook**

> The Company offers the following outlook for fiscal year 2015 based on the business trends observed during the fourth quarter of fiscal year 2014, as well as management's current expectations of future trends.

- ***Net revenue of $2.80 to $2.85 billion***; and

- ***Operating income of $300 to $325 million***, excluding the impact of special items.

> The Company also provides the following outlook for the first quarter of fiscal year 2015.

- ***Net revenue of $720 to $730 million***; and

- ***Operating income of $70 to $75 million***, excluding the impact of special items.

58. Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

59. On October 21, 2014, the Company filed its 2014 annual financial report on Form 10-K with the SEC, which was signed by defendants Peter Sperling, Cappelli, Swartz and Iverson and certified as to veracity under the Sarbanes Oxley Act of 2002 by defendants Swartz and Cappelli. The Form 10-K represented that "qualifying U.S. active military and veterans and their family members ***are eligible for federal student aid*** from various Departments of Defense and Veterans Affairs programs," referring to "the financial aid programs administered by these Departments as 'military benefit' programs."

60. On January 8, 2015, Apollo issued a press release announcing its financial results for its 1Q 2015, ended November 30, 2014. In addition to reporting net revenues of $719.1 million and income from continuing operations of $47.8 million, or $0.44 per share, the release provided the Company's "Business Outlook," purportedly based on then-present trends, and quoted defendant Cappelli on how the Company was on track to achieve that Business Outlook, stating in pertinent part as follows:

> "Apollo Education Group is committed to leading the ***positive transformation of higher education to more effectively connect students' education with their career aspirations***," said Greg Cappelli, Chief Executive Officer, Apollo Education Group. "***Our strategy is designed to provide an***

*outstanding student experience through innovative and engaging curriculum delivered with a focus on meeting the needs of today's busy working learners. We also are dedicated to helping employers identify, recruit and develop a more skilled workforce globally*."

\*       \*       \*

**Business Outlook**

The Company offers the following outlook for fiscal year 2015 based on the business trends observed during the first quarter of fiscal year 2015, as well as management's current expectations of future trends.

- *Net revenue of $2.74 to $2.80 billion*; and

- *Operating income of $250 to $290 million*, excluding the impact of special items.

The Company also provides the following outlook for the second quarter of fiscal year 2015.

- *Net revenue of $580 to $595 million*; and

- *Operating loss of $25 to $35 million*, excluding the impact of special items.

61.     Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

62.     On March 25, 2015, Apollo issued a press release announcing its financial results for its 2Q 2015, ended February 28, 2015.  In addition to reporting net revenues of $578.6 million and a loss from continuing operations of $10.4 million, or $0.10 per share, the release provided the Company's "Business Outlook," purportedly based on then-present trends, and quoted defendant Cappelli on how the Company was on track to achieve that Business Outlook, stating in pertinent part as follows:

"While we faced challenges in the second quarter, *we believe Apollo Education Group has the right long-term strategy in place*," said Greg Cappelli, Chief Executive Officer, Apollo Education Group. "In a time of unprecedented change in the higher education industry, *we are focused on enhancing outcomes through a deep understanding of student and employer needs*. This includes differentiating University of Phoenix through its program-based colleges and diversifying our organization *with the expansion of Apollo Global and other targeted growth initiatives. We are aligning education to careers, offering students tangible skills and helping employers develop a high-performance workforce*."

- 22 -

\*       \*       \*

**Business Outlook**

The Company offers the following outlook for fiscal year 2015 based on the business trends observed during the second quarter of fiscal year 2015, as well as management's current expectations of future trends.

- ***Net revenue of $2.63 to $2.68 billion***; and

- ***Operating income of $200 to $230 million***, excluding the impact of special items.

The Company also provides the following outlook for the third quarter of fiscal year 2015.

- ***Net revenue of $690 to $705 million***; and

- ***Operating income of $85 to $95 million***, excluding the impact of special items

63.    Later that afternoon, defendants Cappelli and Swartz conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

64.    On April 28, 2015, Apollo announced that defendant Swartz was resigning as Apollo's CFO effective May 15, 2015, to be replaced by defendant D'Amico, who would serve as its interim CFO until a permanent CFO could be located.

65.    On June 29, 2015, Apollo issued a press release announcing its financial results for its 3Q 2015, ended May 31, 2015.  In addition to reporting net revenues of $681.5 million and income from continuing operations of $57.5 million, or $0.53 per share, the release provided the Company's "Business Outlook," purportedly based on then-present trends, and quoted defendant Cappelli on how the Company was on track to achieve that Business Outlook, stating in pertinent part as follows:

"At Apollo Education Group, ***we are building a diversified global network committed to academic excellence and strong student support***, as we work to change lives through higher education," said Greg Cappelli, Chief Executive Officer, Apollo Education Group. "In a time of transformation, University of Phoenix, our largest subsidiary, is working to become a more focused, higher retaining and less complex institution. ***Our commitment across all of our institutions is to deliver world-class experiences and outcomes, connecting students' education with their career aspirations, and helping employers recruit, retain, and develop a highly engaged and productive workforce***."

\*      \*      \*

**Business Outlook**

The Company offers the following revised outlook for fiscal year 2015 based on the business trends observed during the third quarter of fiscal year 2015, as well as management's current expectations of future trends.

- ***Net revenue of $2.60 billion to $2.62 billion***; and

- ***Operating income of $190 to $200 million***, excluding the impact of special items.

66.     Later that afternoon, defendants Cappelli and D'Amico conducted a conference call with analysts and investors providing additional positive commentary about the Company's then-present business trends and its strong financial prospects.

67.     The statements referenced above in ¶¶43-66 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the University of Phoenix had exposed itself to being accused of violating Exec. Ord. 13607, and thus its 2012 and 2014 DoD MOUs to comply with the law in order to continue its participation in DoD TA programs, through its aggressive enrollment campaigns, by repeatedly paying the military for exclusive access to bases for recruiting purposes; holding recruitment events disguised as résumé workshops on military bases; paying what has been characterized as "incentive pay" to recruiters to recruit on military bases; financially incentivizing entities such as the American Legion to lobby Congress for additional spending on for-profit education; and using military insignias in school marketing without obtaining the required prior permission;

(b)     that Apollo had been deriving substantial revenues from the University of Phoenix's participation in TA programs as a result of its improper recruiting efforts potentially in violation of Exec. Ord. 13607, the 2012 and 2014 DoD MOUs, and DoDI 1322.25 – revenues that it would not have obtained had it not engaged in these aggressive recruitment tactics;

1        (c)      that Apollo's new online classroom platform was not functioning as

2 designed from inception due to software compatibility problems that precluded students from

3 signing on, which was dramatically increasing student drop-out rates;

4        (d)      that in addition to repeatedly minimizing the true extent of the software

5 compatibility problems, even when later questioned about them by stock analysts,

6 Defendants were concealing the deleterious impacts being experienced not only on ***retention***

7 but on ***enrollment***, as Apollo had been forced to cut back on marketing the new online

8 platform while it remained essentially inaccessible to large numbers of potential students;

9 and

10        (e)      that as a result of the foregoing, the Company's ability to maintain its

11 revenues and profits was significantly diminished and the Company was not on track to

12 achieve the results it had led the investment community to expect during the Class Period.

13 **THE FRAUD BEGINS TO BE REVEALED**

14        68.      On October 21, 2014, Apollo disclosed that it had "experienced a short-term

15 disruption with the massive student conversion from [the] old online classroom" that had

16 caused a moderate decline in the Company's reported revenue per student ("RPS"), but

17 thoroughly downplayed the actual impact.  In addition to concealing the adverse impact on

18 new student enrollment, Defendants mischaracterized the software compatibility problem as

19 being just "a few bugs and things in the system that are being worked out," emphasizing that

20 "remediating these issues" was the Company's "top ***near-term*** priority" and that "[t]his

21 [was] not a huge part of the student body, by any means."  Defendants equated the online

22 platform transition to the experience of upgrading from an analog phone to an IPhone,

23 stating that RPS would decline a little in the short-term due to the fact that students were

24 attending class fewer nights on the new platform, but promising that RPS would "stabilize as

25 the year moves on."  As intended, Defendants' strong statements about the Company's

26 improving enrollment and profitability trends mollified investors and the market took little

27 notice of the issue.

28

69.     On January 8, 2015, Defendants disclosed that the "conversion to a brand new platform was more challenging than [they] had originally anticipated" and had "resulted in a greater than expected impact on *retention*."  However, they continued to emphasize that the problem was being fixed "as quickly as possible," stating that Apollo's "teams ha[d] already made *substantial progress*" and were then "on track with [their] plan to aggressively address the technical issues related to the classroom" and had actually "accelerated the future enhancements," including "*ensuring the classroom [was] compatible with a broader range of browsers and other operating systems at all times*; and that course content *[was] more readily accessible* when accessed through third-party providers."  Defendants also stated that "[b]eginning in January," Apollo had already "started to roll out a focused effort to help bring some of those students impacted by the classroom back into the university."

70.     While the price of Apollo stock declined moderately on these disclosures, *falling approximately $4 per share* on January 8, 2015 to close at $27.55 per share, due to Defendants' other more positive statements, including that the Company was experiencing strong ongoing enrollment and profitability trends, the price of Apollo stock remained artificially inflated.

71.     When, however, Apollo finally disclosed on March 25, 2015 that it had actually "experienced a significant disruption with respect to [the] new online classroom platform" that had not only "adversely impacted retention and reduced the effect of [Apollo's] retention initiatives over the past year," but had actually decreased "second quarter *new degreed enrollment*," Defendants conceded that due to having "an issue that [was] impacting students," Apollo had not wanted to "spend a whole lot of money on advertising to attract more students into a classroom where there ha[d] been some problems." As a result, Apollo disclosed that the number of new students registering for courses in the quarter had actually *declined 13%* from the same quarter in 2014, forcing Apollo to cut its annual revenue forecast for the year ending August 31, 2015 down from its prior target of between $2.74-$2.8 billion to a new target of between $2.63-$2.68 billion.

72.     On this news, the price of Apollo common stock plummeted, ***falling approximately $8 per share***, *or 28%*, to close at $20.04 per share on unusually high volume of more than 15 million shares traded, or more than 21 times the average daily volume over the preceding ten trading days.

73.     On June 9, 2015, two former University of Phoenix recruiters, a/k/a "military liaisons," Marlena Aldrich, a National Defense Liaison ("Aldrich"), and Kristen Nolan, a National Defense Liaison Manager ("Nolan"), filed a class action lawsuit in a Kentucky circuit court against the University of Phoenix alleging that they had been improperly fired.[1] The former recruiters alleged that they were both fired during 2014 for failing to adhere to the University of Phoenix's demands that they lie to recruits and recruit enough service members, alleging in pertinent part that the University of Phoenix "knowingly engages in substantial misrepresentation and other unlawful behavior in the course of its recruitment activities" and "requires and/or directs its military liaisons to engage in substantial misrepresentation or other unlawful behavior in the course [of] their employment as recruiters" under threat of termination, and that the "failure of the military liaison to meet his/her recruitment goal results in termination."

74.     Aldrich and Nolan also disclosed that a University of Phoenix resume workshop program, Hiring Our Heroes, was actually a cover designed to skirt the ban on on-base recruiting by permitting University of Phoenix recruiters to recruit on U.S. military bases.  They alleged that they were "expressly required to utilize the job fair as a vehicle for recruitment."   Aldrich and Nolan also alleged that they were "required to operate stealthfully," as they used the job fair "not to aid the soldier/veteran in finding employment as represented but as a tool for surreptitiously obtaining personal information and/or

---

[1]    Aldrich was employed at the University of Phoenix from 2007 through January 2013 as an enrollment advisor when she was promoted to National Defense Liaison in the school's military division, where she was employed through June 2014.  Nolan was employed at the University of Phoenix from July 2006 through October 2008 as a corporate liaison, then from October 2008 through September 2009 as a National Defense Liaison and was promoted in September 2009 to National Defense Liaison Manager where she served through July 2014.

- 27 -

prohibited recruitment activity."  The two plaintiffs alleged that other "high pressure" sales tactics they were forced to employ by the school included a sales ploy called "'poking the pain,'" which entailed intentionally drawing out potential recruits' deepest insecurities and then using that fear to motivate enrollment in classes.  Aldrich alleged the University of Phoenix required that she violate an express ban against recruiting at Ft. Knox, which ban was required as a term of her being allowed on the base for other purposes, and both alleged that the University of Phoenix "carefully tracked the on base recruitment activity of the liaisons even though fully aware that on base recruitment was unauthorized and prohibited."  As an extra enrollment inducement, Aldrich and Nolan alleged they were required to encourage potential recruits to apply for loans above and beyond what was needed to fund their education in order to obtain extra cash to be used for consumer spending.

75.    On June 30, 2015, the CIR published its exposé entitled "University of Phoenix sidesteps Obama order on recruiting veterans."  The CIR exposé detailed how the University of Phoenix, "the proprietary college that is far and away the largest recipient of taxpayer money under the post-9/11 GI Bill," was engaging in aggressive recruiting tactics that exposed to being accused of violating Exec. Ord. 13607 and its DoD MOUs by, among other things, paying the military to sponsor hundreds of events on military bases across the country, from rock concerts to Super Bowl parties and father-daughter dances, in order to sidestep the ban on recruiting directly on military bases, engaging in recruitment drives on bases disguised as résumé workshops, paying what was characterized as incentive pay to recruiters working on military bases, cultivating veterans' organizations through financial inducements to lobby Congress for for-profit education spending, and utilizing military insignias in school marketing without obtaining the required prior permission.  Specifically, according to the CIR exposé, the University of Phoenix had:

- spent an estimated $250,000 sponsoring an estimated 89 concerts and other large gatherings on military bases over the prior three-year period (commencing in June 2012) that were essentially large recruiting events;

- sponsored job fairs and résumé writing workshops on military bases along with the U.S. Chamber of Commerce under the "Hiring Our Heroes" banner

during the prior two-year period (commencing June 2013) that were in reality recruiting events;

- charted, tracked and paid incentive pay to recruiters during at least 2014;

- engaged in lobbying efforts with the American Legion and other military alumni organizations beginning in October 2013 that were designed to financially induce those institutions to support additional federal funding for for-profit education; and

- distributed "challenge coins" that improperly used DoD insignias to make it appear that the DoD endorsed the University of Phoenix's for-profit educational offerings.

76.     On June 30, 2015, Senator Richard J. Durbin sent a letter to Secretary of Defense Ashton Carter addressing the matters raised in the CIR exposé and asking that the DoD take action, which stated in pertinent part as follows:

I am writing to bring to your attention a deeply troubling investigation by the Center for Investigative Reporting published today which documents University of Phoenix's deceptive marketing practices and its infringement on military trademarks. I am astonished at the Department's willingness to accept payment for access, in violation of the spirit of Executive Order 13607, and disappointed in the conduct of its personnel, shielding the company from public scrutiny. I urge you to investigate these allegations swiftly and take immediate steps to bar the company from further access to service members until these issues are resolved.

The University of Phoenix is a for-profit company that makes much of its money off of service members and veterans, including $1.2 billion in GI Bill benefits alone since 2009. In return, the company offers degrees of questionable value, below-average graduation rates, and a student loan default rate almost forty percent higher than the national average. As multiple witnesses documented at a March 2013 hearing of the Defense Appropriations Subcommittee, these profit motives drive many for-profits to engage in aggressive, deceptive, or abusive marketing and recruiting practices. In response, the President issued Executive Order 13607 and the Department issued DoDi 1322.25 to protect service members from abuse.

It is clear from the article that the Department has not taken this threat or its own regulations seriously. According to the Center for Investigative Reporting (CIR), the company has evaded these regulations through paid sponsorship of briefings and events on military installations across the country. When a CIR reporter asked about these activities at an October concert featuring one of the company's recruiters on stage, a military public affairs officer removed the reporter from the base. While the article cites $1 million of paid event sponsorships at five military bases in the last five years, it is not publicly known how pervasive this technique has become.

The company has also paid an undisclosed sum to have its staff serve as the exclusive resume advisors in Hiring Our Heroes job fairs and workshops, many on military bases. A CIR hidden camera documents that all of the resume workshop materials, presentation slides, and sample successful resumes are labeled with University of Phoenix marketing, and trainers urge attendees to go to their website for additional information. Documents obtained by CIR show these actions are part of a concerted strategy of stealth recruiting by the company to evade Department scrutiny.

Finally, the company also appears to be distributing a mock military challenge coin on bases carrying the official seals of the Department of Defense and every branch of the military alongside its company logo. A military spokesperson indicated that the Department had not given permission for the use of its trademark.

In light of this deeply troubling series of allegations, I request that you take the following steps:

1) Investigate whether the company's conduct violates its memorandum of understanding (MOU) with the Department.

2) Suspend the company from participating in Department of Defense voluntary military education programs until that investigation concludes.

3) Investigate and prosecute the company for its infringement of Department of Defense trademarks through its mock "challenge coins."

4) Halt the company's access to military personnel through the Hiring Our Heroes job fair program.

5) Issue corrective guidance to all base commanders to bar the company from *any* further access to military bases until these matters are resolved.

(Emphasis in original.)

77.     Also on June 30, 2015, the Company issued a release responding to the CIR exposé and Senator Durbin's June 30, 2015 letter, entitled "University of Phoenix has unconditionally and unilaterally supported the President's Executive Order 13607 of 2012," in which Apollo adamantly refuted the CIR exposé's findings, defended its Hiring Our Heroes program and claimed to be in full compliance with all DoD regulations, maintaining that the University of Phoenix had "unconditionally and unilaterally supported the President's Executive Order."  The Company also linked the 2012 DoD MOU to the version of the release posted on its online website, stating the Company was in full compliance with the 2012 DoD MOU.

78.     Though the price of Apollo Class A common stock fell by $2.66 per share, or 17% on June 30, 2015 on unusually high volume of more than 12.8 million shares traded, or more than five times the average daily volume over the preceding ten trading days, due to Defendants' adamant refutation of the issues raised in the CIR exposé, the market price of Apollo Class A common stock remained artificially inflated.

79.     Thereafter, on July 24, 2015, the *PBS News Hour* presented an exposé entitled "Are for-profit universities taking advantage of veterans?" based on the CIR exposé and investigation.  The *PBS News Hour* exposé opened showing President Obama's address at Fort Stewart, Georgia on April 26, 2012, where he announced that he was signing Exec. Ord. 13607 and stating that it would stop for-profit schools from taking advantage of service members and veterans: "They are trying to swindle and hoodwink you. And, today, here at Fort Stewart, ***we're putting an end to it***."   The *PBS* commentator explained that the President was responding to reports that for-profit colleges enjoyed virtually unrestricted access to U.S. military bases, where they enrolled new students and profited from taxpayer money, and stated that Exec. Ord. 13607 placed restrictions on for-profit schools designed to prohibit deceptive recruitment practices.  Flashing back to Obama's April 26, 2012 speech, the *PBS* exposé quoted the President stating: "We're going to up our oversight of improper recruitment practices.  We're going to strengthen the rules about who can come on post and talk to service members."  On the *PBS News Hour*, reporter Aaron Glantz went on to detail the Company's violations of Exec. Ord. 13607, stating in pertinent part as follows:

> Under President Obama's 2012 order, schools are allowed to recruit on base only as part of official regulated education activities.
>
> Documents from five military bases obtained using the Freedom of Information Act show the University of Phoenix sponsored events that had little to do with education, hundreds of events over the last five years. The question remains, was the University of Phoenix recruiting at these events?
>
> At the five bases we looked at, it paid the military about a million dollars for this access.  The investment is dwarfed by the $345 million in G.I. Bill money it received last year, and, according to the Department of Veterans Affairs, which oversees the program, more than $1.2 billion since 2009, when the new GI Bill went into effect.

80.     The *PBS News Hour* exposé also addressed allegations that the University of Phoenix had been producing a coin that its representatives were handing out on military bases that improperly included the insignias of every branch of the service on one side and the University of Phoenix logo on the other:



Quoting Robert Muth, a former officer in the Marine Corps, the exposé went on to explain that "[t]here's a long tradition within the military of commanders providing challenge coins to individual troops who've done something great.  If I'm a 19-year-old lance corporal and I see that coin, I assume the Department of Defense has viewed and vetted that organization and approved them in some way to provide me with an education."  Reporter Aaron Glantz explained that they had found that the University of Phoenix was using the military insignias without authorization.

81.     The *PBS News Hour* exposé also detailed that certain internal "documents show the University of Phoenix ha[d] been tracking recruitment numbers on military bases, including at job fairs and entertainment events, where recruiting is supposed to be banned by military regulations."  It also emphasized that "even as the University of Phoenix lost half its students amid scrutiny from Congress and the media, the number of Iraq and Afghanistan veterans using the G.I. Bill there tripled."

82.     On this news, the market price of Apollo Class A common stock continued declining, closing down at $13.42 per share on July 24, 2015.

83.     As the market learned of additional regulatory inquiries, including that on July 29, 2015 Apollo had received a Civil Investigative Demand from the FTC relating to an "investigation [of potential] deceptive or unfair acts or practices in or affecting commerce in the advertising, marketing, or sale of secondary or postsecondary educational products or services or educational accreditation products or services" seeking documentation dating back to January 1, 2011, and that on August 7, 2015 Apollo had "received an Investigative Subpoena from the Office of the Attorney General of the State of California" relating to "the business and practices of [the] University of Phoenix, Inc., relating to members and former members of the U.S. military and California National Guard, including marketing, recruiting, billing, financial aid, accommodation and other services for military personnel, compliance with Executive Order 13607 . . . , and use of U.S. military logos and emblems in marketing," seeking documentation dating back to July 1, 2010, the price of Apollo Class A common stock continued declining, reaching an intraday low of $10.20 per share by August 24, 2015.

84.     On October 5, 2015, Apollo announced that defendant D'Amico was resigning as interim CFO and would be replaced by defendant Iverson.

85.     On October 7, 2015, the DoD placed the University of Phoenix on probation, barring it from recruiting on military bases, preventing troops who were not already enrolled from using federal funds for its classes and threatening a permanent termination from the TA program.  The DoD's October 7, 2015 letter to the University of Phoenix stated in pertinent part as follows:

> On June 20, 2014, William Pepicello, President of the University of Phoenix, signed the Department of Defense (DoD) Voluntary Education Partnership Memorandum of Understanding (DoD MOU). In response to allegations published by the Center for Investigative Reporting on June 30, 2015 (*see* https://www.revealnews.org/article/university-of-phoenix-sidesteps-obama-order-on-recruiting-veterans/), the Department has conducted a review of the agreements between the University of Phoenix and the DoD, as reflected in the DoD MOU. This review revealed several violations of the DoD MOU attributed to the University of Phoenix, including, but not limited to, transgression of Defense Department policies regarding use of its official seals or other trademark insignia and failure to go through the responsible

education advisor for each business related activity requiring access to the DoD installations identified in the aforementioned article (i.e., Navy Operational Support Center, Fort Worth, TX; Fort Bragg, NC; Fort Carson, CO; Fort Hood, TX; and Fort Campbell, KY). Although the University of Phoenix has responded to these infractions with appropriate corrective action at this time, the frequency and scope of these previous violations of the DoD MOU is disconcerting.

Now it has come to our attention that the University of Phoenix is under review by both the Federal Trade Commission (FTC) and the California State Attorney General. University of Phoenix, Inc. is a wholly-owned subsidiary of The Apollo Education Group, Inc., which on July 29, 2015 filed a Form 8-K Report with the United States Securities and Exchange Commission noting that it received a Civil Investigative Demand from the FTC, which requested documentation to determine if the University of Phoenix ". . . engaged or are engaging in deceptive or unfair practices in or affecting commerce in the advertising, marketing, or sale of secondary or postsecondary educational products or services or education accreditation products or services." The Apollo Education Group, Inc. also disclosed that the California State Attorney General issued an investigative subpoena requiring it to turn over information "relating to members and former members of the U.S. military and California National Guard, including marketing, recruiting, billing, financial aid, accommodation and other services for military personnel." The information requested dates back to July 1, 2010 regarding the University of Phoenix's use of U.S. military logos and emblems in marketing and its compliance with Executive Order 13607, "Establishing Principles of Excellence for Educational Institutions Servicing Service Members, Veterans, Spouses, and Other Family Members."

The allegations associated with these inquiries, if substantiated, would violate several additional provisions of the University of Phoenix MOU with DoD, specifically, but not limited to: section 3a(2), for failing to comply with governing Federal law and the requirements set forth in the DoD MOU; and section 3j and its subsections, which seek to eliminate unfair, deceptive and abusive marketing. Further, while we note that you are a participating member in Servicemembers Opportunity Colleges (SOC), the allegations also raise a concern regarding the University of Phoenix's adherence to SOC Principles and Criteria and the Military Student Bill of Rights, as required by section 3m(l) of the DoD MOU.

Please be advised that, as of the date of this letter, we have placed the University of Phoenix in probationary status and we are considering whether to terminate our MOU with you pursuant to paragraphs l.r(l) and 6(f) of the MOU. Such termination would preclude your participation in the DoD Tuition Assistance (TA) program. While in a probationary status, and with a view to minimizing harm to students, the University of Phoenix will be permitted to "teach-out." This means that a current University of Phoenix student receiving DoD TA will be permitted to complete courses already in progress and enroll in new courses deemed to be part of that student's established academic program. However, other than as required to complete the "teach-out" process for current students, the University of Phoenix will not be authorized access to DoD installations for the purposes of participating in any recruitment-type activities, including but not limited to job training, and career events and fairs. Further, no new or transfer students at your institution will be permitted to receive DoD TA.

86.     Beyond losing the TA revenues derived from new military admissions at the University of Phoenix, as a result of the ban on participation in the DoD's TA program, Apollo also faced having to address the implications of the ban on its ability to comply with the federal 90/10 rule mandate.  The 9/10 rule expressly prohibits for-profit colleges from deriving more than 90% of their revenue from federal student aid.  Military funds are not counted as federal student aid.  So the University of Phoenix would now be faced with confronting two issues simultaneously: how to attract students who are not paying with federal funding now that it cannot actively recruit military personnel, and how to ensure it does not breach its 90/10 threshold with regards to the rest of its tuition funding.

87.     On October 9, 2015, *The Wall Street Journal* disclosed that the DoJ and DoE were coordinating ongoing investigations of the University of Phoenix's aggressive recruitment practices.

88.     As the market learned of and incorporated the disclosures made between Wednesday, October 7, 2015 and Friday October 9, 2015 into the stock price, the price of Apollo Class A common stock declined further, falling from a close of $11.78 per share on October 7, 2015 to a close of $10.52 per share on Monday, October 12, 2015.

89.     Then on October 22, 2015, before the open of trading, Apollo announced its 4Q 2015 and FY 2015 financial results for the year ended August 31, 2015.  New enrollment at the University of Phoenix had fallen by nearly one-third in the quarter and total enrollment was almost 20% lower than in the same period in 2014.  Rather than the $621 million in revenues the Company had led the investment community to expect, revenues ***declined 14%*** to $600.29 million compared to 4Q 2014.  Rather than the ***net profit*** of $0.18 per share the Company had led investors to expect, Apollo reported a ***net loss*** of $10.2 million, or $0.09 per share.  For its recently started fiscal year, the Company projected revenues of just $2.18 billion to $2.23 billion, well below estimates of analysts polled by *Thomson Reuters* for $2.24 billion.

90.     During the conference held with investors and analysts later that day, commenting on what had negatively impacted the Company's 4Q 2015 revenues, and

1   specifically referencing the "current regulatory environment," defendant Cappelli

2   emphasized that Apollo was "dealing with a number of recent issues." He further stated in

3   pertinent part that the Company had "redoubled [its] commitment to ethics, compliance, and

4   student protections," specifically having "increased transparency around the cost of college"

5   and "promoting affordability with University of Phoenix tuition fees," which he claimed

6   were then "reported below the national average for private schools." Defendant Cappelli

7   also conceded that while "[n]o institution [was] completely insulated from mistakes," "when

8   [Apollo] identif[ied] or [was] alerted to them, [the Company had] fix[ed] them." Defendant

9   Cappelli further stated that "[t]he actions that [he had] updated . . . on [that ]day as well as

10  external factors *[would] put pressure on new student enrollment, revenue and operating*

11  *margin in fiscal year 2016*." Speaking directly to how the ban on participating in the

12  military TA programs would impact revenues and profits going forward, defendant Cappelli

13  stated in pertinent part as follows:

> Our 2016 outlook, based on our current view, includes net revenue of $2.18 to $2.23 billion and operating profit of $115 million to $140 million. We continue to anticipate ending fiscal year 2016 with about 150,000 students at University of Phoenix and beginning to stabilize in 2017.
>
> As we committed last quarter, to offset this decline in enrollment, we are in the process of taking appropriate cost actions to better align our costs with expected revenue until retention begins to improve and enrollment stabilizes. Over the next three to five years, we are targeting a consolidated operating margin of 15% to 20%. *While we are working to ensure we have the ability to continue to serve active duty military students, our new outlook range does include some impact from the recent Department of Defense action, as we can't be certain as to the timing of reinstatement*.

21  91.   On this news, the price of Apollo Class A common stock plummeted even

22  further, closing down *$3.67* per share – or *more than 33%* – from a close of $10.86 per share

23  on October 21, 2015 to a close of $7.19 per share on October 22, 2015, on unusually high

24  volume of more than 14.2 million shares traded, or approximately eight times the average

25  daily volume over the prior seven trading days.

26  92.   As a result of Apollo's false statements during the Class Period, Apollo Class

27  A common stock traded at artificially inflated prices. However, after the above revelations,

28  the Company's shares were hammered by massive sales, sending them down approximately

1     *80%* from their Class Period high – nearly *$29* per share – and erasing ***more than $3 billion***

2     in market capitalization.

3        93.     In early January 2016, Apollo was rumored to be putting itself up for sale.

4        94.     On January 11, 2016, the Company issued a release announcing its results for

5     the quarter ended November 30, 2015.  Revenue for 1Q 2016 was $586 million, down

6     substantially from 1Q 2015 revenues of $714 million.  Apollo reported an operating ***loss*** for

7     1Q 2016 of $45.2 million, compared to operating ***income*** of $64.2 million for 1Q 2015.

8     Excluding special items, income from continuing operations in 1Q 2016 was $31.3 million,

9     down 37% from the $49.9 million reported in 1Q 2015.  The Company blamed a shrinking

10     number of campuses, layoffs and tumbling enrollment.  The release quoted defendant

11     Cappelli as stating, in pertinent part, that "'Apollo [was] taking the necessary steps to

12     enhance long-term shareholder value through a series of strategic actions which include

13     transforming University of Phoenix into a higher retaining, more trusted provider of career

14     relevant higher education," and that "implementing major components of its transformational

15     plan as quickly as possible . . . [was] having a near-term negative impact on revenue."

16        95.     On January 15, 2016, the Company filed a Current Report on Form 8-K with

17     the SEC disclosing that the "University of Phoenix, Inc., was notified by the U.S.

18     Department of Defense ('DoD') that the University's probationary status in respect of its

19     participation in the DoD Tuition Assistance Program for active duty military personnel ha[d]

20     been lifted, effective immediately," stating that the "Department determined that the removal

21     of probationary status was warranted based on the Department's internal review, the

22     University's response to the Department's concerns, and the active engagement and

23     cooperation by representatives of the University."  However, the Company also disclosed

24     that the University of Phoenix would remain "subject to a heightened compliance review for

25     a period of one-year following the removal of probationary status" and that "[d]uring this

26     period, the University [would] continue to engage with the Department and complete the

27     production of information and documents previously requested by the Department" and

28     would "be subject to an enhanced compliance review in fiscal year 2017."

96.     Thereafter, on February 5, 2016, the Company filed a Current Report on Form 8-K with the SEC disclosing in pertinent part that:

> On February 4, 2016, we received a Second Investigative Subpoena from the Office of the Attorney General of the State of California in the Matter of the Investigation of For-Profit Educational Institutions, following the Investigative Subpoena we received in August 2015. The Second Investigative Subpoena seeks the production of documents and information regarding a broad spectrum of the business and practices of Apollo Education Group, Inc. and each of our subsidiaries, including University of Phoenix, Inc., relating to marketing, recruiting, compensation of enrollment advisors, complaints, financial aid, compliance, accreditation, other governmental investigations, private litigation and other matters, as well as additional information relating to marketing and services to members and former members of the U.S. military and California National Guard, for the time period of July 1, 2010 to the present. We are cooperating with the Attorney General in this investigation. We cannot predict the eventual scope, duration or outcome of the investigation at this time.

97.     Finally, on February 8, 2016, Apollo announced that it had agreed to be taken private.  The Company would be acquired by a consortium of private investors, led by The Vistria Group, who would pay just $9.50 per share for all outstanding Class A and B shares. Quoting Senator Richard Durbin, *The New York Times* reported that day that "'[t]he sale of Apollo Education Group under the terms reported today means that the largest for-profit college chain in America is essentially going dark. . . .  We'll know less than ever about the operations of one of the most heavily subsidized universities in America.'"

**NO SAFE HARBOR**

98.     Apollo's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

99.     The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of

- 38 -

Apollo who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

100.   As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Apollo, their control over, and/or receipt or modification of Apollo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Apollo, participated in the fraudulent scheme alleged herein.

101.   Additionally, with the price of Apollo stock artificially inflated due to their false and misleading statements, certain of the Individual Defendants and John Sperling cashed in, selling more than 1.4 million shares to the investing public at fraud-inflated prices and receiving almost $42 million in proceeds as follows:

| SELLER | DATE | SHARES SOLD | PRICE | PROCEEDS |
|--------|------|-------------|-------|----------|
| Iverson | 29-Jan-2014 | 1,195 | $31.74 | $37,929 |
| | 23-Apr-2014 | 1,196 | $28.46 | $34,038 |
| | 23-Jul-2014 | 1,392 | $29.15 | $40,577 |
| | 22-Oct-2014 | 1,373 | $26.77 | $36,755 |
| | 02-Jan-2015 | 6,667 | $33.50 | $223,345 |
| | | 11,823 | | *$372,644* |

| | | | | |
|---|---|---|---|---|
| Swartz | 10-Jan-2015 | 50,500 | $30.49 | ***$1,539,745*** |
| Peter Sperling | 28-Oct-2013 | 100,000 | $27.83 | ***$2,783,000*** |
| John Sperling | 25-Oct-2013 | 1,555 | $28.44 | $44,224 |
| | 25-Oct-2013 | 248,445 | $27.69 | $6,879,442 |
| | 28-Oct-2013 | 250,000 | $27.83 | $6,957,500 |
| | 10-Jan-2014 | 100,000 | $30.39 | $3,039,000 |
| | 04-Apr-2014 | 35,000 | $31.90 | $1,116,500 |
| | 04-Apr-2014 | 500,000 | $31.87 | $15,935,000 |
| | 11-Aug-2014 | 120,000 | $26.65 | $3,198,000 |
| | | 1,255,000 | | ***$37,169,666*** |
| ***Totals*** | | ***1,417,323*** | | ***$41,865,055*** |

102.    These sales were unusual both as to scope and timing when compared to Defendants' previous stock sales.  Indeed, on April 9, 2012, just as President Obama prepared to sign Exec. Ord. 13607, the Company disclosed that it had increased its Class A common share repurchase program to $300 million.  The Company stated that in addition to open-market purchases, the Company could purchase shares through "privately negotiated transactions pursuant to applicable Securities and Exchange Commission rules," which it said "may include repurchases pursuant to Securities and Exchange Commission Rule 10b5-1 nondiscretionary trading programs," permitting Apollo to purchase shares from its senior executives and directors.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

103.    At all relevant times, the market for Apollo's common stock was an efficient market for the following reasons, among others:

(a)    Apollo's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As of October 15, 2015, the Company had more than 107.9 million shares of its Class A common stock issued and outstanding.  During the Class Period, on average, more than 2 million shares of Apollo Class A common stock were traded on a daily

1  basis, demonstrating a very active and broad market for Apollo stock and permitting a very

2  strong presumption of an efficient market;

3          (c)     Apollo claims to be qualified to file the less comprehensive Form S-3

4  registration statement with the SEC that is reserved, by definition, to well-established and

5  largely capitalized issuers for whom less scrutiny is required;

6          (d)     as a regulated issuer, Apollo filed periodic public reports with the SEC;

7          (e)     Apollo regularly communicated with public investors via established

8  market communication mechanisms, including regular the dissemination of press releases on

9  the national circuits of major newswire services, the Internet and other wide-ranging public

10 disclosures, such as communications with the financial press and other similar reporting

11 services;

12         (f)     Apollo was followed by many securities analysts who wrote reports that

13 were distributed to the sales force and certain customers of their respective firms during the

14 Class Period.   Each of these reports was publicly available and entered the public

15 marketplace;

16         (g)     numerous National Association of Securities Dealers member firms

17 were active market-makers in Apollo stock at all times during the Class Period; and

18         (h)     unexpected material news about Apollo was rapidly reflected in and

19 incorporated into the Company's stock price during the Class Period.

20 104.    As a result of the foregoing, the market for Apollo common stock promptly

21 digested current information regarding Apollo from publicly available sources and reflected

22 such information in Apollo's stock price.   Under these circumstances, all purchasers of

23 Apollo common stock during the Class Period suffered similar injury through their purchase

24 of Apollo common stock at artificially inflated prices, and a presumption of reliance applies.

25                          **LOSS CAUSATION**

26 105.    During the Class Period, as detailed herein, Defendants made false and

27 misleading statements and omitted material information concerning Apollo's business

28 fundamentals and engaged in a scheme to deceive the market.   Defendants knowingly

1   overstated the Company's business metrics and financial prospects to improve the market's

2   perception of Apollo's worth to keep Apollo's stock price inflated and to allow the

3   Individual Defendants to sell their stock at artificially inflated prices.

4       106.   By artificially inflating and manipulating Apollo's stock price, Defendants

5   deceived plaintiff and the Class and caused them losses when the truth was revealed.  When

6   Defendants' prior misrepresentations and fraudulent conduct became apparent to the market

7   during the second half of 2015, it caused Apollo's stock price to fall precipitously as the

8   prior artificial inflation came out of the stock price.  As a result of their purchases of Apollo

9   common stock during the Class Period, plaintiff and other members of the Class suffered

10  economic loss, *i.e.*, damages, under the federal securities laws.

11                      **CLASS ACTION ALLEGATIONS**

12      107.   This is a class action on behalf of all purchasers of Apollo Class A common

13  stock during the Class Period, excluding Defendants (the "Class").  Excluded from the Class

14  are officers and directors of the Company as well as their families and the families of the

15  Defendants.  Class members are so numerous that joinder of them is impracticable.

16      108.   Common questions of law and fact predominate and include: (a) whether

17  Defendants violated the 1934 Act; (b) whether Defendants omitted and/or misrepresented

18  material facts; (c) whether Defendants knew or recklessly disregarded that their statements

19  were false; (d) whether Defendants artificially inflated the price of Apollo Class A common

20  stock; and (e) the extent of and appropriate measure of damages.

21      109.   Plaintiff's claims are typical of those of the Class.  Prosecution of individual

22  actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the

23  interests of the Class.  A class action is superior to other available methods for the fair and

24  efficient adjudication of this controversy.

25

26

27

28

**COUNT I**

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

110.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

111.    Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Apollo common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

112.    During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Apollo Class A common stock; (b) deceive the investing public, including plaintiff and other Class members, as alleged herein; (c) cause plaintiff and other members of the Class to purchase Apollo Class A common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

113.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, Defendants had a duty to promptly disseminate truthful information with respect to Apollo's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete

1  and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17

2  C.F.R. §229.10, *et seq*.).

3        114.    Defendants had actual knowledge of the misrepresentations and omissions of

4  material facts set forth herein or acted with reckless disregard for the truth in that they failed

5  to ascertain and disclose such facts, even though such facts were either known or readily

6  available to them.

7        115.    As a result of the dissemination of the materially false and misleading

8  information and failure to disclose material facts as set forth above, the market price of

9  Apollo Class A common stock was artificially inflated during the Class Period.  In ignorance

10  of the fact that the market price of Apollo Class A common stock was artificially inflated,

11  and relying directly or indirectly on the false and misleading statements made knowingly or

12  with deliberate recklessness by Defendants, or upon the integrity of the market in which the

13  shares traded, plaintiff and other members of the Class purchased Apollo Class A common

14  stock during the Class Period at artificially high prices and, when the truth was revealed,

15  were damaged thereby.

16        116.    Had plaintiff and the other members of the Class and the marketplace known of

17  the true facts, which were knowingly or recklessly concealed by Defendants, plaintiff and the

18  other members of the Class would not have purchased their Apollo Class A common stock

19  during the Class Period, or if they had acquired such shares during the Class Period, they

20  would not have done so at the artificially inflated prices that they paid.

21        117.    By virtue of the foregoing, Defendants have violated §10(b) of the 1934 Act

22  and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

### COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

26        118.    Plaintiff repeats and realleges the above paragraphs as though fully set forth

27  herein.

28

119.   The Individual Defendants had control over Apollo and made the materially false and misleading statements and omissions on behalf of Apollo within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their controlling shareholder status (*in particular their control of all of Apollo's Class B voting stock*), executive positions, board membership, and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

120.   In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

121.   By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's Class A common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.   Determining that this action is a proper class action, designating plaintiff as a Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

1    B.    Awarding compensatory damages in favor of plaintiff and the other Class

2  members against all Defendants, jointly and severally, for all damages sustained as a result

3  of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4    C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred

5  in this action, including counsel fees and expert fees; and

6    D.    Awarding such other and further relief as the Court may deem just and proper.

7                          **JURY DEMAND**

8    Plaintiff demands a trial by jury.

9

10                          Respectfully submitted,

11

12                          ZIMMERMAN REED, LLP

13  Dated: March 14, 2016        By:    s/ Hart L. Robinovitch
                                        Hart L. Robinovitch
14                                      14646 N. Kierland Blvd., Suite 145
                                        Scottsdale, AZ 85254
15                                      Tel. 480-348-6400
16                                      Fax: 480-348-6415
                                        Email: Hart.Robinovitch@zimmreed.com
17

18                                      Carolyn G. Anderson
                                        1100 IDS Center, 80 South 8th Street
19                                      Minneapolis, MN 55402
                                        Tel. 612-341-0400
20                                      Fax: 612-341-0844
21                                      Email: Carolyn.Anderson@zimmreed.com

22                                      ROBBINS GELLER RUDMAN & DOWD, LLP
23                                      Samuel H. Rudman
                                        Mary K. Blasy
24                                      58 South Service Road, Suite 200
                                        Melville, NY 11747
25                                      Tel. 631-367-7100
26                                      Fax 631-367-1173
                                        Email: srudman@rgrdlaw.com
27                                      Email: mblasy@rdrdlaw.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLZER & HOLZER, LLC
Corey Holzer
Marshall Dees
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Tel. 770-392-0090
Fax 770-392-0029
Email: cholzer@holzerlaw.com
Email: mdees@holzerlaw.com

*Attorneys for Plaintiff*