1  TIFFANY & BOSCO P.A.
   RICHARD G. HIMELRICK (State Bar No. 004738)
2  2525 East Camelback Road, Seventh Floor
   Phoenix, AZ 85016
3  Tel:   (602) 255-6000
   rgh@tblaw.com
4

5  *Local Counsel for Lead Plaintiff*
   *Government of Guam Retirement Fund*
6
   BERNSTEIN LITOWITZ BERGER
7     & GROSSMANN LLP
   BLAIR A. NICHOLAS (*pro hac vice*)
8  DAVID R. STICKNEY (*pro hac vice*)
   BRANDON MARSH (*pro hac vice*)
9  RACHEL FELONG (*pro hac vice*)
   12481 High Bluff Drive, Suite 300
10 San Diego, CA 92130
   Tel:   (858) 793-0070
11 blairn@blbglaw.com
   davids@blbglaw.com
12 brandon.marsh@blbglaw.com
   rachel.felong@blbglaw.com
13
   *Counsel for Lead Plaintiff*
14 *Government of Guam Retirement Fund*
   *and Lead Counsel for the Class*
15

16           UNITED STATES DISTRICT COURT

17               DISTRICT OF ARIZONA

18 Rameses Te Lomingkit, Individually And      No. 2:16-cv-00689-DLR
   On Behalf Of All Others Similarly
19 Situated,                                   **CONSOLIDATED CLASS
                                               ACTION COMPLAINT FOR
20              Plaintiff,                      VIOLATIONS OF THE
                                               <u>FEDERAL SECURITIES LAWS</u>**
21
22         v.
23 Apollo Education Group, Inc. (F/K/A         **CLASS ACTION**
   Apollo Group, Inc.); Peter V. Sperling;
24 Gregory W. Cappelli; Brian L. Swartz; and  **JURY TRIAL DEMANDED**
   William Pepicello,
25
26              Defendants.
27
28

# <u>TABLE OF CONTENTS</u>

Page

I.      NATURE OF THE ACTION ................................................................ 2

II.     JURISDICTION AND VENUE ........................................................... 6

III.    THE PARTIES ..................................................................................... 7

        A.      Plaintiffs ................................................................................... 7

        B.      Defendants ................................................................................ 8

IV.     SUMMARY OF THE ACTION .......................................................... 9

        A.      Background To Apollo ............................................................. 9

                1.      Student Enrollment And Retention ................................ 9

                2.      Apollo Receives Nearly All Of Its Funding From
                        Federal Sources ........................................................... 11

        B.      Apollo's Online Classroom .................................................... 11

                1.      As Apollo's Enrollment Declined, The  Company
                        Promoted Its $1 Billion "Online Classroom" ................ 11

                2.      Apollo's $1 Billion New Online Classroom Was
                        Consistently Dysfunctional Amid Widespread Outages ................ 17

                3.      Ongoing Layoffs In Apollo's IT Department
                        Exacerbated The New Classroom's Failures ................... 21

                4.      Apollo's Senior Management Was Made Aware  Of
                        The New Classroom's Serial Disruptions  Through
                        Reports, Complaints, And Conference Calls ................... 23

                5.      Apollo's Senior Management  Decides To Scrap The
                        New  Classroom Long Before Informing Investors ........................ 27

        C.      Apollo's Military Recruiting And The 90/10 Rule ................... 30

                1.      Apollo Depends On A Loophole In The 90/10 Rule ...................... 31

                2.      The Executive Order And The MOUs ............................ 38

                3.      Apollo Violated The Executive Order And Its MOUs ................... 44

                        a)      Apollo Held Recruitment Events On Military
                                Bases And Elsewhere Disguised As Hiring
                                Workshops ....................................................... 44

                        b)      Apollo Based Employment Decisions On
                                Recruitment ...................................................... 47

              c)      Apollo Misused Armed Forces' Insignias ............................ 52

              d)      Additional Violations Of  The Executive Order And The MOUs ........................................................................ 54

    D.     During The Class Period, Apollo Promotes Its "Online Classroom" And Reiterates Its Purported Compliance  With Governing Regulations, Including The Executive Order ........................... 58

    E.     The Truth Begins To Emerge ............................................................ 65

        1.     Apollo Reveals The Truth About Its Online Classroom Through Partial Disclosures ................................................. 65

        2.     Apollo's Undisclosed Military Recruiting  Practices Are Revealed Through Partial Disclosures ...................................... 71

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................................................. 79

    A.     False And Misleading Statements And Omissions Regarding Apollo's Online Classroom ..................................................................... 79

    B.     False And Misleading Statements And Omissions Regarding Apollo's Military Recruiting ....................................................................... 88

        1.     Statements In SEC Filings, Conference Calls, And Other Media ................................................................................. 88

        2.     Statements Published On Apollo's Website During The Class Period ............................................................................. 92

VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ................... 94

VII.   LOSS CAUSATION ....................................................................................... 100

VIII.  PRESUMPTION OF RELIANCE .................................................................. 103

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....................................................... 104

X.     CLASS ACTION ALLEGATIONS .................................................................. 105

XI.    CLAIMS FOR RELIEF .................................................................................. 107

COUNT I  For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder (Against Defendants Apollo, Cappelli, Swartz, And Pepicello) ....................................................................... 107

COUNT II  For Violations Of Section 20(a) Of The Exchange Act (Against Defendants Cappelli, Swartz, And Sperling) ......................................................... 109

XII.   PRAYER FOR RELIEF ................................................................................ 110

XIII.  JURY DEMAND ............................................................................................ 111

Lead Plaintiff, the Government of Guam Retirement Fund, and additional plaintiffs Rameses Te Lomingkit and National Shopmen Pension Fund (collectively with the Lead Plaintiff, "Plaintiffs"), bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all other persons or entities who purchased or otherwise acquired Class A common stock of Apollo Education Group, Inc. ("Apollo" or the "Company") during the period from October 22, 2013 through October 21, 2015, inclusive (the "Class Period") and were damaged thereby (the "Class").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on the ongoing independent investigation of their undersigned counsel.  This investigation includes a review and analysis of: (i) Apollo's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Apollo's conference calls with analysts and investors and accompanying slide presentations; (iv) Company presentations, press releases, and reports; (v) news and media reports, both written and video, concerning the Company and other facts related to this action; (vi) data reflecting the pricing of Apollo securities; (vii) information from consultations with relevant experts; (viii) information provided by former Apollo employees; (ix) Congressional hearings and findings; (x) pleadings and declarations filed in lawsuits against the Company; and (xi) other material and data concerning the Company, as identified herein. Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

I.      **NATURE OF THE ACTION**

1.      Apollo is a for-profit education company that sells online and on-campus degree and certification programs.  The largest of Apollo's universities is the University of Phoenix, accounting for about 90% of enrollment and revenues.  After many years of impressive growth before the Class Period, the number of students enrolled at the University of Phoenix started to decline in 2010.  Defendants publicly attributed the decline to increased competition and regulations. By 2013, Defendants represented that they had restructured Apollo, reformed past practices and offered an education experience that differentiated Apollo from its competition.

2.      During the Class Period, Apollo and its top officers – Chief Executive Officer, Gregory W. Cappelli; Chief Financial Officer, Brian L. Swartz; and President of the University of Phoenix, Bill Pepicello – made false and misleading statements to investors, and omitted material facts, regarding (i) the status of the Company's $1 billion online classroom; and (ii) the Company's undisclosed violations of regulations, an Executive Order, and the Company's contract with the Department of Defense.   In response to Defendants' statements, the price of Apollo's shares traded at artificially-inflated levels, reaching a high of almost $36 per share during the Class Period.  When the truth emerged, the price plunged to less than $7.50 per share and never recovered.

3.      Before and during the Class Period, Defendants repeatedly emphasized to investors the importance of Apollo's new online classroom, its successful rollout, and its benefits to Apollo.  Every University of Phoenix student used the online classroom, and the Company was "pouring money" into "the classroom of the future."  The platform would, for instance, "get to know" each of Apollo's students personally and adapt to accommodate their individual "learning DNA."  Defendant Cappelli stated that "*[d]uring the third quarter [of 2014], we . . . completed the rollout of our new learning platform across the university*" and that the new classroom had been "greatly enhanced and

provides a more efficient and user friendly experience."[1]

4.     In truth, however, the new platform was a catastrophe from the outset, leading to rampant complaints and causing students to quit the university altogether.  The new classroom experienced constant and pervasive software problems – including frequent "disruptions" and "widespread blackouts."  Apollo's former employees have confirmed that the new online classroom was problematic beginning in 2012, from "the day we rolled it out," as the new classroom was "constantly kept in turmoil" and "never got better."  Students attempting to use the new classroom reported widespread log-in problems, that the new classroom caused them to fail classes because the new classroom would not let them turn in assignments on time, and that the software was so deficient that students were essentially "beta testers" for it.

5.     Defendants, meanwhile, were not kept in the dark about the severe problems.  They received, for example, real-time reports and complaints of the rampant problems and failures.  Also unknown to investors at the time, Defendants secretly worked to replace the new classroom with "off-the-shelf" technology even while publicly promoting the supposed successful rollout.

6.     The truth about the online classroom was revealed to investors through partial disclosures between January 8, 2015 and October 22, 2015, causing the share price to drop repeatedly:

- On January 8, 2015, Defendant Cappelli disclosed, among other things, that the online classroom suffered from browser incompatibility and had an "impact on retention."  In response, the price of Apollo stock dropped 13.5% to close at $27.55 per share, erasing over $465 million in shareholder value.  Defendants reassured investors, however, that the disruption with the online classroom was "fixed."

---

[1] Unless otherwise noted, all emphasis is added.  In public statements, Apollo used the terms "online classroom," "Learning Management System," and "online learning platform" interchangeably.  Apollo's Release Engineer from January 2012 to mid-October 2015 also confirmed that the terms "Learning Management System" and "new classroom" referred to the same technology.

- On March 25, 2015, however, Cappelli further admitted that, contrary to his prior statements, the disruption was "significant" and had impacted not only student retention, but also new enrollments. The price of Apollo stock dropped 28.4% to close at $20.04 per share, erasing another $852 million in shareholder value.

- On June 29, 2015, Apollo's Form 10-Q revealed for the first time that Apollo was junking the new classroom entirely for a third-party, off-the-shelf system. Apollo's stock price declined nearly 20% in response.

7.     At the same time that Defendants made their false and misleading statements about the new online classroom, they also misrepresented that the Company was in compliance with regulations governing the recruitment of military personnel, the Company's contract with the Department of Defense, and a Presidential Executive Order regarding military recruiting.

8.     Military recruiting was particularly important to Apollo because of the Company's dependence on federal funds. Apollo's ability to continue receiving federal funds hinges on the "90/10 Rule." Under the 90/10 Rule, Apollo is ineligible to receive funds from Title IV of the Higher Education Act ("Title IV") if the Company derives more than 90% of its revenue from Title IV programs. An important loophole in the 90/10 Rule, however, is that funds received from the military through the Department of Defense Tuition Assistance Program ("TA") are ***not*** considered Title IV funds. Military students were thus particularly attractive prospects to Apollo.

9.     Because Apollo was close to breaching the 90% level and because the loss of Title IV funds would be catastrophic for Apollo, investors and analysts focused on that metric. Defendants promoted as favorable news even slight decreases in the percentage of Title IV funding. For example, on October 22, 2013 – the first day of the Class Period – Defendant Swartz announced that "for the past three years, the University of Phoenix has experienced declines in its 90/10 percentage. In fiscal year 2013, 90/10 decreased by 100 basis points to 83%."

10.     Defendants claimed to have achieved such 90/10 percentages while

complying with the rules for recruiting military personnel.  When signing the Executive Order, President Obama explained that for-profit education companies "are trying to swindle and hoodwink you.  And, today, here at Fort Stewart, we're putting an end to it."  Prohibited practices include, for example, recruiting at events not designated as recruiting events, using military insignia, and employing aggressive sales tactics.

11.    Apollo's use of prohibited practices was well-known within the Company and easy even for outsider third parties, such as journalists, to discover.  On June 30, 2015, the Center for Investigative Reporting published a report, "University of Phoenix sidesteps Obama order on recruiting veterans" (the "CIR Report"), exposing many of the Company's practices.  The report is corroborated by former employees in the military division, whistleblower complaints and additional sources.  Indeed, when placing the University of Phoenix on probation in October 2015, the Defense Department highlighted the number and "disconcerting" "frequency and scope" of the violations.

12.    The truth about Apollo's military recruitment was revealed through partial disclosures, starting with the revelations in the June 30, 2015 CIR Report.  In response to these disclosures, Apollo's stock price declined from approximately $15 to $7.  Additional disclosures are set forth below:

- On October 9, 2015, Apollo disclosed that the Department of Defense had placed the University of Phoenix on probation after reports of Apollo's military recruiting misconduct.  In response, Apollo's share price fell nearly 15%, erasing over $197 million in shareholder value.

- On October 22, 2015, Defendants revealed further enrollment declines at the University of Phoenix, due in part to the dysfunction of the Company's online classroom and the University of Phoenix's probationary status.  In response, the price of Apollo's common stock fell by more than 32% in one day.

13.     In total, the Company's share price declined approximately 80% from its Class Period high of nearly $36 per share, erasing more than $2.9 billion in market capitalization.  The chart below shows the movement of the Company's stock during the Class Period:



14.     In the aftermath, Apollo's share price never recovered.  The Federal Trade Commission, the California Attorney General, the Department of Justice and the Department of Education launched investigations.  Following the Class Period, the Company revealed that its Board of Directors had sought since December 2014 to sell Apollo, reaching an agreement in early 2016 to sell Apollo to private investors for $9.50 per share.

15.     By this action, Plaintiffs seek redress for Defendants' violations of the federal securities laws.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil

action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.   Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

18.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.     THE PARTIES

### A.     Plaintiffs

19.     On June 16, 2016, the Court appointed Government of Guam Retirement Fund as Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B).   The Guam Retirement Fund is a defined-benefit pension plan, providing lifetime retirement benefits and disability benefits to employees of the Government of Guam and employees of certain public corporations, and in certain cases, benefits to qualified survivors if the plan member dies.   As set forth in the attached certification, the Guam Retirement Fund purchased Apollo common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

20.     Additional Plaintiff Rameses Te Lomingkit purchased Apollo common stock during the Class Period, as detailed in its previously submitted certification, and suffered damages.

21.     Additional Plaintiff National Shopmen Pension Fund ("NSPF") is a multi-employer defined benefit plan with headquarters in Washington, D.C.   NSPF purchased Apollo common stock during the Class Period, as detailed in its previously submitted certification, and suffered damages.

1

**B.**   **Defendants**

2      22.    Defendant Apollo Education Group, Inc., is an Arizona corporation with its

3    principal place of business located at 4025 South Riverpoint Parkway, Phoenix, Arizona.

4    Effective November 15, 2013, the Company formally changed its name from Apollo

5    Group, Inc. to Apollo Education Group, Inc.   During the Class Period, Apollo had

6    approximately 108 million shares of its Class A common stock outstanding.   The shares

7    traded in an efficient market on the NASDAQ under the ticker symbol "APOL."   The

8    Company also had approximately 475,000 shares of its Class B common stock, its only

9    voting stock.   All of the voting stock is owned by Apollo executives and insiders,

10   primarily by defendant Peter V. Sperling.

11      23.    Defendant Gregory W. Cappelli ("Cappelli") was Apollo's CEO and a

12   member of its Board of Directors throughout the Class Period.   Cappelli also serves as a

13   member of the University of Phoenix Board of Trustees.   Before joining Apollo, Cappelli

14   was a stock analyst at investment bank Credit Suisse.   Cappelli joined Apollo on April 2,

15   2007 as an Executive Vice President of Global Strategy and Assistant to Executive

16   Chairman of Apollo Group.   He served as Co-Chief Executive Officer of Apollo from

17   April 2009 until August 2012.   Cappelli became CEO of Apollo on August 26, 2012.

18   Defendant Cappelli signed Apollo's annual reports on Form 10-K for fiscal years 2013,

19   2014, and 2015, and also signed the Company's interim quarterly financial reports on

20   Form 10-Q throughout the Class Period.

21      24.    Defendant Brian L. Swartz ("Swartz") was a Senior Vice President and the

22   CFO of Apollo from 2007 until May 15, 2015.   The Company announced in a press

23   release on April 28, 2015 that Swartz was leaving the Company "to pursue a new

24   direction."   Defendant Swartz signed Apollo's annual reports on Form 10-K for the fiscal

25   years 2013 and 2014, and also signed the Company's interim quarterly financial reports

26   on Form 10-Q throughout the Class Period until his departure.

27      25.    Defendant William Pepicello ("Pepicello") was a member of Apollo's

28   "executive management" and University of Phoenix's President from September 25, 2006

through June 20, 2014.

26.     Defendant Peter V. Sperling ("Sperling") was, throughout the Class Period, Chairman of the Apollo Board of Directors.  Peter Sperling is the son of John Sperling, who founded Apollo in 1976 and served as a member of its Board of Directors and its Chairman Emeritus until his death in August 2014.  Defendant Sperling owns 49% of outstanding Class B voting stock through a revocable grantor trust.  The remaining 51% of the voting stock is held in an irrevocable trust, of which Defendant Sperling is one of three trustees.  Accordingly, "the Class B Trust and Mr. Peter Sperling together control the election of all members of [the] Board of Directors and substantially all other actions requiring a vote of [the] shareholders."  Defendant Sperling signed Apollo's annual reports on Form 10-K for the fiscal years 2013, 2014, and 2015.

27.     Defendants Cappelli, Swartz, Pepicello, and Sperling are referred to herein as the "Individual Defendants."

## IV.     SUMMARY OF THE ACTION

### A.     Background To Apollo

#### 1.     Student Enrollment And Retention

28.     Apollo operates the University of Phoenix, the nation's largest for-profit university.  During the Class Period, the Company derived all or nearly all of its operating income from its University of Phoenix business.  In its October 22, 2013 Form 10-K, for instance, Apollo disclosed that it generated 90% of its net revenue and more than 100% of its operating income in fiscal 2013 from the University of Phoenix.

29.     The University of Phoenix was founded in 1976 as a small for-profit university.  In 1989, the university launched its online program – long before most other universities offered any online courses.   In 1994, Apollo became a publicly-traded company.  The Company experienced impressive growth for more than a decade, with the number of students enrolled in its courses growing by more than 25% per year.  The Company not only expanded the university's online presence as the Internet became more widely available and easier to use, but also built numerous physical campuses.

30.     As a for-profit university, University of Phoenix's revenues and profits depend heavily on the number of students enrolled in its classes.  As U.S. Senator Tom Harkin, former Chairman of the Senate committee overseeing federal education policy, has explained, "[w]hat drives the profits is how many students they enroll."  Defendant Cappelli agreed that "[e]nrolling new students is important for the health of our overall organization."

31.     The Company closely tracks the numbers of new enrollments, *i.e.*, the number of students enrolling for the first time in the most recent financial period, as well as the number of total enrollments.  New enrollments are important to Apollo because they generate immediate revenue regardless of whether the student remains enrolled over the longer term and obtains a degree.  As Senator Harkin explained, it is often the case that the for-profit school "gets the money . . . [a]nd the student drops out and has this debt hanging over his or her head for the rest of their life . . . It's unfair."  With such a business model focused on signing up as many students as possible, the dropout rate was high.  In September 2013, analyst Royden Summers from Fine Capital reported that University of Phoenix had "enormous turnover."

32.     Apollo obtains new students by spending heavily on marketing.  In fiscal year 2014, for instance, Apollo spent over $760 million on "marketing" and "admissions advisory" costs – over 25% of Apollo's net revenues.  Apollo recognized in its SEC filings that it "expend[ed] significant resources on marketing" and that "the substantial majority of [marketing expense] represented advertising."  At the same time, Apollo spent less than half of its net revenues (42.8%) on "instruction and student advisory" costs.

33.     "Retentions," *i.e.*, the number of students who remain enrolled without dropping out, are also important for Company profits.  The Company closely tracked its retention figures.  Defendant Cappelli told securities analysts that retention was the Company's "top priority" during the Class Period.  Defendant Swartz emphasized the importance of retention: "Retention, from a financial point view, is even [more] important, or is a bigger lever. . . .  [I]f we could keep all of our students at the University

of Phoenix for one course longer, which is about five weeks, it would add hundreds of millions of dollars to our bottom line."   Securities analysts focused on both new enrollment and retention.   When asked, however, Apollo refused to disclose its actual retention figures during the Class Period and instead offered "color" on retention and its initiatives to improve retention.

**2.      Apollo Receives Nearly All
Of Its Funding From Federal Sources**

34.     Before and throughout the Class Period, Apollo depended overwhelmingly on federal funds.  Apollo obtained the funds by recruiting students who received federal student aid.   Each year during the Class Period, at least 80% of the University of Phoenix's revenue came from the receipt of Title IV of the Higher Education Act ("Title IV") alone.

35.     Apollo received federal funds primarily through one of two federal programs.   First, the Higher Education Act of 1965, and the regulations promulgated under the Act by the U.S. Department of Education, governed the participation by the University of Phoenix in federal student financial aid programs under Title IV.   Second, Apollo received significant additional funding through federal financial aid programs for military students, including the Department of Defense TA Program.   The TA Program provides financial assistance for voluntary off-duty civilian education programs in support of a military member's professional and personal goals.   As explained further below, it was critical that Apollo receive federal funds through the TA Program in order to maintain its compliance with the "90/10 Rule."

**B.      Apollo's Online Classroom**

**1.      As Apollo's Enrollment Declined, The
Company Promoted Its $1 Billion "Online Classroom"**

36.     After rising steadily for years, the number of students enrolled at the University of Phoenix started to decline in 2010.  Apollo's filings with the SEC reported that enrollments peaked in the third quarter of 2010, then declined precipitously

thereafter.  While Apollo reported having 460,900 "degreed enrollment" students in fiscal 2010,[2] that number fell to 418,700 students in 2011; 356,900 students in 2012; and 301,100 students in 2013.   During the same period, Apollo's revenues and profits declined.  Net revenues fell from $4.9 billion in 2010 to $3.7 billion in 2013, while net income fell even more dramatically, from $522 million to $249 million over the same period.

37.     Apollo attributed its falling enrollments and revenues to stricter regulations and increased public scrutiny, which harmed University of Phoenix's reputation.  For instance, Defendant Cappelli stated during an October 16, 2012 conference call with investors that "the biggest hurdle . . . that we've had to get to overcome over the past couple years, is a reputation that we took a hit on."  Apollo also attributed its decline to competition from other for-profit universities, as well as traditional public and private universities, who increasingly offered online education options.   During a March 26, 2012 conference call with investors, for instance, Defendant Cappelli stated that "[t]here's more competition today than there was a year ago," and, in particular, "there's more online competition now."  Defendant Cappelli further noted that "if you look at the not-for-profits, more of them are online doing what we used to do."

38.     In this competitive landscape, University of Phoenix's new "online classroom" was critically important to Apollo's financial success.  The online classroom was the University of Phoenix's online platform that instructors used to teach classes and distribute learning materials, and that students used to access their accounts, receive the educational content for their courses, and turn in their assignments.  As Defendant Swartz explained during a November 13, 2013 JPMorgan Ultimate Services Investor Conference, every University of Phoenix student used the online classroom, regardless of whether they attended classes in physical campuses or solely online:  "All of our students

---

[2] Apollo's fiscal year runs from September 1 to August 31 each year.  Fiscal 2010 is thus September 1, 2009 through August 31, 2010.

today, regardless if they are ground student or online students, get all of their content and all of their textbooks through our online learning management system."

39.     Leading up to the Class Period, Apollo announced a major reworking of its online classroom, promising thorough technology enhancements that would differentiate the University of Phoenix's online classroom from the competition's offerings, attracting more students to mitigate the Company's enrollment declines.  As the *Chronicle of Higher Education* reported, Apollo determined in 2009 "that its software for students was outdated," so it "installed a team of more than 100 people . . . to rebuild the college's online learning environment from scratch."

40.     Defendants repeatedly emphasized the importance of the new online classroom to investors.  For example, Defendant Cappelli stated during an October 13, 2010 conference call that Apollo has "been investing heavily in both technology and talent as part of [the] new learning platform."  At the William Blair & Company, LLC Global Services Growth Stock Conference on December 7, 2010, Cappelli stated that "[w]e have to continue to innovate at Apollo Group and the University of Phoenix . . . That's why we're investing in technologies, why we're investing into the classroom in record numbers."  At the same conference a year later, on December 7, 2011, Cappelli stated "I told you we're spending $1 billion on the classroom of the future.  That's in our financials.  We've been pouring that money in there."  The Company further stated that it was building a new online classroom that would "get to know" each of Apollo's 400,000 students personally and adapt to accommodate the idiosyncrasies of their "learning DNA."

41.     Apollo also announced it intended to sell the new online classroom technology to other universities.  At the May 12, 2011 Barclays Capital Inc. Global Services Conference, Defendant Cappelli discussed the Company's creation of a "new division, a services business" to sell its technology.  He explained that "because we are investing hundreds of millions of dollars . . . into the classroom of the future . . . we want to be able to take those capabilities to traditional schools both here and abroad."

Similarly, during the September 15, 2011 BMO Capital Markets Back to School Education Conference, Defendant Cappelli said that selling the technology would "allow community colleges, state schools and other proprietary schools to leverage off our platform going forward."

42.     Defendants' positive representations regarding the online classroom continued in 2012.  During an investor conference call on January 5, 2012, Defendant Cappelli described the Company's progress with the new online platform, saying that Apollo "continue[d] to expand course offerings on our new learning platform and pilot our new classroom concept."  On February 29, 2012, Defendants Cappelli and Swartz represented Apollo at the Robert W. Baird and Co., Inc. Business Solutions Conference. During his presentation, Swartz told investors that Apollo was "in the process of building and rolling out a new classroom platform" as part of its efforts to "invest[] heavily in technology."   During Apollo's investor conference call held on March 26, 2012, Defendant Cappelli described the "new education platform" as an "initiative[] that [would] enhance our student's experience and support our value proposition" and told investors that it would begin to be rolled out "later in the year, starting in [the] business program."  Cappelli further explained during a March 26, 2012 conference call with investors that the new classroom was at the core of Apollo's plans to differentiate University of Phoenix amid increased competition, reiterating that Apollo needed to "have new innovations that are available in the marketplace to differentiate [itself]."

43.     On September 13, 2012, at the BMO Capital Markets Back to School Education Conference, Cappelli informed analysts and investors that the new online platform "is being rolled out this fall."  Cappelli reiterated to investors that the Company was "invest[ing] upwards of $1 billion into what we call the classroom of the future," explaining that "a lot of that investment's already been made" as the Company had "been spending and investing hundreds of millions of dollars to innovate in the classroom from adaptive learning to many areas of education to careers."  Cappelli assured investors that "this is the year for us to execute, get those investments into the marketplace whether it's

our new Learner Management System platform that has all kinds of capabilities we didn't have before, adaptive learning and other recent innovation that we've been working on."

44.   Journalists reported that Apollo's online classroom was taking on added significance amid Apollo's increased focus on online education and decision to close 155 of its 240 brick-and-mortar University of Phoenix campuses.  An October 16, 2012 article cited the Company's statements that the closures would generate $300 million in cost savings, and noted that the $300 million would be used to "invest more heavily in the company's online learning platform," among other things.

45.   In 2013, Defendants continued to emphasize that the online classroom differentiated the University of Phoenix from other universities.  During the February 26, 2013 Robert W. Baird and Co., Inc. Business Solutions Conference, Defendant Swartz explained that Apollo's "new learning platform that [the Company] ha[s] been investing in for several years is just now rolling out to many of the courses and the plan is to roll that out through the end of this fiscal year through the end of August."  In response to a question from Jeff Mueller, a Robert W. Baird analyst, about the advantages of the new online platform, Defendant Swartz called it a "significant kind of leapfrog better than where we have been in the past" and explained that "it is a whole new interface for students.  It is much more user-friendly . . . It is just obviously a more user-friendly experience, which is important."

46.   On March 11, 2013, at a presentation at the Credit Suisse Global Services Conference, Defendant Swartz discussed how the Company had "put a lot of money into our new platforms and technology.  The first, just to start off with, is our new . . . learning platform which is just now rolling out to students."  In response to a question from analyst Kelly Flynn regarding to what extent "innovations and market differentiation" "will drive growth again" for the Company, Defendant Swartz emphasized how the new online classroom would attract students and increase enrollments because it was a key "value proposition for students."  Swartz told Flynn that "what we are really focused on is providing a product and a service, an educational experience that is valued by students.

So we've been investing for several years here."  Swartz echoed Cappelli's statements that 2013 is "the year of execution."

47.     On June 25, 2013, Apollo held an investor conference call to address its third quarter results.  Defendant Cappelli told investors that "a 25% decline in new enrollments at University of Phoenix is difficult to accept," reiterating that the Company had devised a plan to differentiate University of Phoenix for students through "simplicity of use, functionality, flexibility to adapt to the changing educational landscape, speed to market with new offerings, and an enhanced overall experience."  He told investors that Apollo "clearly understand[s] the need to . . . have competitive products in the market to attract new students."  As an example of the retention efforts Apollo was using to keep students, Defendant Cappelli listed "of course, adaptive learning," which was a component of the new classroom.  Cappelli emphasized the Company's efforts to "creat[e] a more nimble organization focused on operational excellence" by "reengineering the educational experience at our institutions."  Defendant Swartz highlighted how, "[o]n the Learning Management System, by the end of this fiscal year – so, the next few months – we expect it to be rolled out to most of the graduate level programs and colleges.  With respect to the undergraduate level, there will be a staggered rollout through fiscal 2014 – mostly in the first half of '14."

48.     Given the Company's representations, analysts and investors perceived the Company's new online platform as valuable watershed technology.  For example, on March 5, 2013, analysts from Deutsche Bank labeled the new "LMS," *i.e.*, the online classroom, a "tech asset . . . worth $2 to $6 per share."  The analysts thus valued the online classroom to be worth as much as 37% of the market's then-current valuation of the entire Company at $16.20 per share.

49.     As explained below, however, the new online classroom's consistent technical failures caused Apollo's students to drop out or not enroll, lowering Apollo's key retention and enrollment figures.  New classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and

conference calls.  In addition, new classroom's problems and effects on retention and enrollments were so severe that senior management secretly began searching for a replacement system while publicly assuring investors of new classroom's purported progress.

### 2. Apollo's $1 Billion New Online Classroom Was Consistently Dysfunctional Amid Widespread Outages

50.     Despite Apollo's positive representations to investors, by 2013 the new classroom was experiencing numerous, consistent, long-lasting disruptions, which never improved.  Students lodged numerous complaints, dropped out of their classes, and stopped signing up for new classes, impacting Apollo's critical metrics of retentions and enrollments.  The impact of the new online classroom on retention, and enrollment of new students, was well-known internally at Apollo.  Although Apollo would claim publicly that it was devoting "every necessary asset" to the new classroom, in truth Apollo's rolling layoffs of IT engineers depleted Apollo's ability to prevent and respond to new classroom disruptions.  The disruptions were known inside the Company through "escalation reports," "RATD reports," conference calls, regularly-timed email reports, and "tech bridges."

51.     The new online classroom experienced a great number of disruptions, starting from its inception.[3]  Apollo's Release Engineer from January 2012 to mid-October 2015 explained that the new classroom was problematic beginning in 2012 and continuing on a daily basis thereafter, from "the day we rolled it out," as the classroom was "constantly kept in turmoil" and "never got better" in his tenure at the Company.[4]

---

[3] As Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 (see footnote 5) explained, "disruption" meant that a technical issue with the new classroom software impacted the students and changed something intrinsic as part of that impact.

[4] Apollo's Release Engineer from January 2012 to mid-October 2015 was involved in the deployment of Apollo's software for various purposes.  He worked on deploying software related to Apollo's Learning Management System, and worked with engineers who were involved in developing the Learning Management System.  His experience

He recalled that the new classroom was "going to hell" in or around the summer of 2014. Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 similarly confirmed that there was a steady stream of issues with getting the new online classroom in place, and his team started reporting issues with the new online classroom almost immediately.[5]  University of Phoenix's Enrollment Manager from October 2009 until June 2015 also confirmed that the new classroom problems started immediately after implementing the system.[6]

52.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 has worked in information technology for approximately 30 years, many of them as a release engineer, and stated that the disruptions with new classroom seemed to be coming at a higher rate than he would have expected.  He estimated that there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014, but that the true number was probably higher.

53.  Apollo's Release Engineer from January 2012 to mid-October 2015 similarly explained that the new online classroom suffered from recurring problems over

---

before joining Apollo included 11 years as a Lead Release Engineer for Verizon. Altogether, he had 20 years of experience doing direct release management.

[5] Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 stated that he led the release team, and was responsible for releasing the new classroom into production and Quality Assurance.  Anything that went into production and Quality Assurance would go through his team, he explained.  He confirmed that he was responsible for dealing with technical issues and problems that arose with software, and that his team would encounter and address any issues with installation.  They would react to the issues that involved the installation of the new classroom, and his team was involved in rolling software back.

[6] University of Phoenix's Enrollment Manager from October 2009 until June 2015 was also a University of Phoenix Enrollment Counselor from July 2006 to September 2009. She was responsible for the training and development of her team of enrollment managers.  Her team spoke with potential and current students, and she would interact with students and help with the enrollment process if necessary.   Students who experienced difficulty with the new classroom called in and were upset about the New Platform.  Because she interacted with students, she knew that they were complaining about the new classroom.

the course of its deployment.  There were "pretty much constant problems."  It was "one thing after another."   The situation "never improved."   He described the Apollo employees as constantly doing fixes and having to deal with emergencies, and agreed that the Learning Management System amounted to "death by a thousand cuts."  According to him, in his decades of experience, the problems with new classroom were unusually bad. There were "[f]our or five emergencies every day and which took priority over everything else" and that was "new to me."  He further described how the disruptions were "common knowledge" within Apollo.  In fact, the new classroom was dysfunctional on such a frequent basis that it was an ongoing joke of "how many emergencies" would the new online classroom face in any given day.

54.     Among the many disruptions were widespread blackouts.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 stated that sometimes a widespread blackout meant that logged-in users could continue working while logged in, while those trying to log in were precluded from doing so.  Other times, every user was disconnected from the new classroom and no one was allowed to log in. He confirmed that widespread outages such as these were more common with new classroom and tended to be more widespread.  He specified that there was a number of outages that lasted between 12 and 36 hours.  Apollo's Principal Systems Engineer from January 2012 to October 2015 similarly confirmed that there were severe outages, such as when new classroom went down for a couple of days, students could not log in, and "it was ugly."[7]  She recalled, for instance, when the HP Hypervisor in charge of a major portion of new classroom went down and took several days to get back up.  No one could

---

[7] Apollo's Principal Systems Engineer from January 2012 to October 2015 led a team of approximately 12 employees who were part of Apollo's release team and who handled all of the production releases and most of the Quality Assurance releases as well, including those for the new classroom.   She spent all of her time in the Release group, was responsible for installing and updating, and reported to Apollo's IT Engineering Manager and Release Manager, identified at footnote 5 herein.  She explained that within the new release group, there were 6-7 people dedicated entirely to the new classroom for several years, and that she managed employees who were solely dedicated to new classroom. She agreed that she held an important role in managing IT systems at Apollo.

access the new classroom during that time, so it affected pretty much the entire student body. Anyone on the old classroom, however, was still able to work.[8] Apollo's Release Engineer from January 2012 to mid-October 2015 confirmed that outages sometimes lasted for as long as a day or more.

55.  In addition to widespread blackouts, there were other substantial disruptions for students. As Apollo's Principal Systems Engineer from January 2012 to October 2015 explained, outages varied in severity. Some outages meant that students could log in but could not use the library, or anyone in a specific degree program would not be able to work. Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 recalled that there were quite a number of times in which the systems were down for repair or adjustments or releases took too long, and it impacted the students' ability to meet their class deadlines. He confirmed that he stayed in contact with several of the engineers on his release team after he left Apollo, and they informed him that there were additional issues with new classroom after he left. He stated that there were certainly major issues with the transition of the platform, that new classroom was the biggest push in engineering for years, and that it kept running into issues.

56.  Apollo's National Defense Liaison from March 2012 to June 2014, who took a class on the new classroom platform as a student from February 2014 through April 2014, stated that he experienced log-in problems 50% of the time that he tried to access the new classroom, there was a constant struggle to log in, and once he was logged in, the system was still "atrocious."[9] Technical problems such as these, he explained, led

---

[8] Internally at Apollo, the new online classroom that was being developed was referred to as "new classroom," while the then-current online classroom it was replacing was referred to as "old classroom."

[9] Apollo's NDL from March 2012 to June 2014 worked in the Missouri region and was responsible for reaching out to the military community through a series of events. He developed relationships with the military bases to be allowed to attend or sponsor events on the military bases. He personally tried a class on the new classroom platform between February 2014 and April 2014, and the Company asked him to perform an audit of the course and provide feedback. He found the new classroom to be "horrendous."

students to fail classes because the new classroom would not let them turn in assignments on time, and the university would then fail the students.  He stated that, while at University of Phoenix, he heard in a meeting that 40% of enrolled students would dis-enroll after their first class because of issues such as these on the "horrendous" platform. He agreed that the problem was not due to inadequate training of the students, but rather, it was due to the new classroom technology.  University of Phoenix's Military Enrollment Advisor and NDL from April 2009 through June 2013 also stated that friends of his who were taking classes on the new classroom platform had major issues, including being unable to upload their homework.[10]

57.   Apollo's Principal Systems Engineer from January 2012 to October 2015 described some of the complexity of Apollo's software.  When she started at the Company in 2012, Apollo had about 800 applications running, a number so large that she called it "insane" because it prevented technical employees from knowing what they were doing.  Over the course of her years with the Company, Apollo eliminated at least 260 applications, but even that, she explained, is still a large number of applications that all require care and all have costs associated with them.

### 3.   Ongoing Layoffs In Apollo's IT Department Exacerbated The New Classroom's Failures

58.   The numerous technological failures with the new classroom were exacerbated by several rounds of layoffs in Apollo's information technology department. As Apollo's IT Engineering Manager and Release Manager from October 2011 to July

---

[10] University of Phoenix's Military Enrollment Advisor and NDL from April 2009 through June 2013 served as an enrollment officer from April 2009 until April 2010, then worked as an NDL from April 2010 until June 2013.  The NDL's territory was New England, which included air bases, National Guard units, and reserve units in Massachusetts, Vermont, New Hampshire, Maine, and sometimes Rhode Island.  The NDL reported to Ryan Harkey, the NDL Manager for New England.  Harkey reported to Ryan Harrah, whom University of Phoenix's Military Enrollment Advisor and NDL from April 2009 through June 2013 believes was the NDL Manager for all of the territories. The NDL visited bases in his assigned area, giving presentations with the goal of recruiting military servicemembers to attend the University of Phoenix.

2014 recounted, there were rounds of significant layoffs in his last 12 to 18 months with Apollo, in 2013 and 2014, during which his release team was reduced from 27 release engineers down to about 21 at the end of 2013, then reduced further to about 14 to 17 release engineers when he left the Company in July 2014.  After his departure, he kept in touch with engineers on his team, and his team was cut twice more, so that by about mid-2015 Apollo had laid off nearly the entirety of his team and the team was basically eliminated.

59.    He further confirmed that the layoffs "cut across everybody" in the IT department.   "There were teams that were hit harder than us, but they were pretty significant, and they cut pretty deep," he explained.  As he recounted, the layoffs affected the company's ability to respond to issues, as it did not have the horsepower, and in some cases, Apollo had lost specific intelligence about parts of the system.   Apollo lost database people, engineers, software developers, and project managers in the layoffs.  He specified that there was a round of layoffs in the IT department in September or October of 2013, and "the cuts were deep even before I left [in July 2014] and, of course, much deeper after I left."  He explained that the layoffs led to loss of institutional knowledge, and that his team became "so decimated."

60.    Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 also explained how the layoffs that occurred throughout 2014 and into early 2015 made it difficult to keep in place controls related to the new classroom, and because those controls were no longer in place, more problems were introduced into the software's production than would have otherwise been introduced.  The number of teams working on a given release was reduced, and when the product went into production, it failed.  The layoffs not only affected the release team, but also the "development" team, which included the coders who developed the system before it was implemented.  As he explained, the development team was on a timeline to deliver certain pieces of new classroom, and critical people for developing these pieces were no longer there.  The development team repeatedly warned that they needed more time, and these warnings

went up to executives, including Apollo's Chief Information Office, Mike Sajor.

61.     Apollo's layoffs not only introduced new failures into production, but also depleted the Company's ability to respond to disruptions with the new classroom.  As Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 explained, when disruptions occurred, a "war room" would be called.  The war room would include at least 1-2 people from the release team, members of the development team, members of the database team, and probably one or two people from operations. He recounted how, as time went on, as a result of the layoffs, Apollo could not fully staff a war room.  There were simply not enough people, making it difficult to address the technical issues of the new classroom.  As Apollo was no longer able to staff the war rooms, he explained, it became more difficult to find the source of the technical issue and more challenging to get a solution moved into production.  "[T]he war rooms were kind of broken" and "[t]hey couldn't function as war rooms anymore," so it was harder to get the resources that were necessary.

### 4.     Apollo's Senior Management Was Made Aware Of The New Classroom's Serial Disruptions Through Reports, Complaints, And Conference Calls

62.     Apollo's Principal Systems Engineer from January 2012 to October 2015, who stated that she was one of the people actively working on trying to fix new classroom outages, explained that upper management "absolutely" knew about the major disturbances when the new classroom went down for a couple of days, causing a substantial disruption for students.  Apollo had to do a root cause analysis and had a process around any type of outage.  She explained that the CEO of Apollo (*i.e.*, Defendant Cappelli) would "absolutely" be aware when these disruptions occurred, and that when you have a system down, escalation procedures drop into play automatically. Everyone from the CEO on down would be informed on a half hour to hourly basis of what is down, for how long, how many students were affected, and estimated time to recovery.  In general, everyone would get an email on a regular basis on the status of the outage.  At times, there were also "tech bridges" that were started immediately.  Apollo's

Release Engineer from January 2012 to mid-October 2015 attempted to quantify the number of escalations, stating that the release team was tasked to handle five to ten escalations per week, of which at least a third, and probably closer to half, related to the new classroom.  He referred to escalations as "emergencies" that had "priority focus" because they were problems that needed to be resolved right away.

63.    Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 similarly confirmed the escalation reports relating to disruptions on the new classroom.  Part of his role was to initiate such a report if there needed to be an escalation about a release.  The person experiencing the issue would inform his supervisor or manager, who would then create the report with a timeline on it.  Issues that were sufficiently severe would be elevated to the attention of the Chief Information Officer and the CEO, Defendant Cappelli.  In addition, Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 explained, it was up to the Chief Information Officer to inform the CEO of such issues.  He stated that he knew there were occasions when the CEO would be informed of disruptions.  As Apollo's Release Engineer from January 2012 to mid-October 2015 recalled, the extent of new classroom's problems was "no big secret" within the Company.

64.    In addition to escalation reports, there were "RATD reports."  Apollo's Release Engineer from January 2012 to mid-October 2015 explained that Apollo had a proprietary software called RATD that was used to track and install various applications, which also included a built-in reporting function of the applications that failed.  He stated that he was sure that Apollo's directors received RATD reports.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 also stated that he heard both before and after leaving Apollo that, in addition to the release team initiating reports, "the development side," *i.e.*, the coders who deployed system features before they were implemented, "was pushing warnings upward."

65.    Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 explained that Apollo maintained a call center that received complaints from

1    students and teachers regarding disruptions with the new classroom, and that the
2    complaints arrived via phone calls and emails.  The complaints sometimes came in to be
3    part of the war room.  In addition, issues regarding the new classroom would be
4    forwarded to specific directors who would either send it to the appropriate team or
5    escalate it upwards.  He stated that, generally, the flow of communication was fairly
6    direct, and directors would cross departmental boundaries.

7         66.    Additional former Apollo employees confirmed that Apollo received
8    frequent complaints from students regarding the new online platform.  University of
9    Phoenix's Enrollment Manager from October 2009 until June 2015 explained that in her
10   role as an enrollment manager, she interacted with students and was aware that they were
11   complaining about the new online classroom.   Similarly, University of Phoenix's
12   Compliance Officer and Director of Operations, Financial & Student Services from
13   January 2008 to November 2013 described that she had friends and family members that
14   were also students, who withdrew because new online classroom was so horrible.[11]
15   University of Phoenix's Executive Enrollment Sales Representative from September
16   2006 until November 2015 recalled receiving complaints about the new classroom from
17   students whom she had enrolled, and a few of those students dropped out of the
18   University of Phoenix entirely.[12]  Her impression from these conversations was that the
19   system never worked correctly after it was implemented.

20

21

22   [11] University of Phoenix's Compliance Officer and Director of Operations, Financial &
23   Student Services from January 2008 to November 2013 held numerous positions during
     her employment at University of Phoenix from 2000 until 2013, including Director of
24   Operations, Financial & Student Services; Compliance Officer; Project Lead/Manager;
     Adjunct Faculty; Associate Director of Student Services; and Manager of Academics.
25   She was based in Houston, Texas, and managed six campuses in Houston, one in Austin,
26   and one in McAllen.  She was responsible for the management of the students from their
     enrollment through matriculation.  She also performed audits for military financial aid
27   and managed the financial aid process.

28   [12] University of Phoenix's Executive Enrollment Sales Representative from September
     2006 until November 2015 was a team lead at the call center in Phoenix.

67.     University of Phoenix students who were unable to log into the new classroom authored numerous online complaints.  For example, a complaint dated June 25, 2013, states:

> University of Phoenix just released a new online classroom environment that is ***horrible to navigate, and very little of it works***. I am taking my last class there for the MBA program and do not believe I will follow up with anymore to complete a concentration.  First, their program is mundane. You have to write in the classroom environment a minimum of four days a week, twice each of those four days. Why they make you write twice each of those four days I don't know, but I was getting tired of it. They could have required a minimum of eight total posts a week over a minimum of four days, which would give you more flexibility, but they didn't.

> My main complaint is with the new environment.  They completely revamped the look and function of their website. I do not believe they tested it well enough because ***when they released it, many links did not work, tests would not start, finding posts is more difficult now***.  Some students like me didn't have access to the student materials links.  You can't download the books you pay for anymore or the course syllabus, and it is not intuitive to navigate.  They tried this out on students without any warning, tutorials, or training.  The instructors are learning it along with the students, which in many ways is like the blind leading the blind.

> Basically, ***they made us the beta testers for them without asking us***, paying us, or reducing our tuition.  ***I spent hours on the phone with IT*** about the issues, as does the instructor too, and issues are still not resolved. I tried to start the Capstone 1 test (fancy word for end of program midterm) and it would not start.  I contacted IT and they said the instructor had to set it.  I contacted the instructor and he said IT had to reset.  By the time it was finally set for me, it was the following week and the period had passed for me to take the test.  ***I got a zero because of their technical issues.***[13]

68.     Similarly, a website titled "Is It Down Right Now,"[14] collected complaints regarding the University of Phoenix system.  Examples follow:

- (January 30, 2014): I'm having problems getting on. . . .  I can log on any other site. It's just University of Phoenix says the following:

---

[13] https://www.consumeraffairs.com/education/phoenix.html.

[14] http://www.isitdownrightnow.com/phoenix.edu.html#morecomments2.

"Error - Currently, we are experiencing technical difficulties with our system. Please try again later."

- (February 10, 2014): "I am getting so frickin' sick and damn tired of the constant BS with new platform, is this ever going to be fixed or should I just drop out now and save myself the constant stress of a website that never works properly?

- (August 12, 2014): I called the tech line and it said students and faculty cannot log in right now.  One is either notified by an error message or "extreme slowness."

- (November 1, 2015): They will simply say "it's not our fault." That's the tech teams [*sic*] mantra, lol. It doesn't matter what the problem is, by now, they should *know what caused it. It started on Saturday and has been on-going, only getting worse, ever since. It's not some that are locked out, ALL are.

69.     Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 and Apollo's Principal Systems Engineer from January 2012 to October 2015 confirmed that the Chief Information Officer, Mike Sajor, was informed of disruptions on new classroom through conference calls.  Apollo's Principal Systems Engineer from January 2012 to October 2015 recalled that during the conference calls – which were also attended by various Apollo vice presidents – Sajor expressed the sentiment that the Company had to "get the damn thing back up," although not in those exact words.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 also recalled conference calls involving Apollo vice presidents and Sajor.

### 5.    Apollo's Senior Management Decides To Scrap The New Classroom Long Before Informing Investors

70.     Apollo's internal reaction to the systemic disruptions afflicting the new classroom further showed its awareness that new classroom was dysfunctional.  Amid Apollo's rolling layoffs of information technology employees and ongoing serious disruptions to new classroom (*see* ¶¶50-61, above), in 2014 or early in 2015 Apollo took steps to scrap the new classroom entirely.  Apollo eventually disclosed in June 2015 that it had ***already*** signed an agreement with an outside company for them to provide an "off-

the-shelf" technology instead.   But according to Apollo's former employees, and an industry expert familiar with the matter, the decision to make that drastic change necessarily occurred much earlier.

71.   As Apollo's Principal Systems Engineer from January 2012 to October 2015 explained, when Apollo's new Chief Information Officer, Sajor, arrived at Apollo in 2012, he determined "This is crap, and I'm not dealing with it anymore; find me a better solution."  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 stated that Apollo's decision to transition from the new classroom to Blackboard was "clearly made long before it was announced," explaining that before making the announcement, Apollo needed to have already had a prototype of the new system in place, and they must have already performed a "proof of concept."  Given his experience, it takes several months to six months at a minimum for all of that to occur, as Apollo's switch to the new system (known as "Blackboard") was a drastic change.

72.   Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 further explained the "proof of concept" for such a large change.  The proof of concept involves implementing the new platform for some classrooms and is aimed at showing that the new system will work, prior to full implementation of the new system. It involved, for instance, gathering feedback from students and professors, and would have to confirm that the new system will interact with some of the backend systems and enrollment systems that are not directly tied to the classroom.  A significant amount of touch points and proof of concept work would have had to be done.  A proof of concept is not fully customized, but all of the essential parts are there.

73.   Apollo's Principal Systems Engineer from January 2012 to October 2015 similarly recounted how the decision to replace the new classroom with Blackboard was made early, and resulted in numerous layoffs.  She stated that she woke up one day in April or May 2015 to an email saying that the Company was shutting down Apollo's San Jose office, and she later realized that the transition to Blackboard was the reason for that office closure.  She explained that Apollo shut down the entire San Jose building with

well over 100 people working in that office, and the employees in the San Jose office were either relocated to Phoenix or laid off.  Apollo's Release Engineer from January 2012 to mid-October 2015 explained that earlier, in January or February of 2015, and possibly as far back as late 2014, he heard from other Apollo employees that Apollo's Learning Management System would be "going away."

74.     An industry expert familiar with Apollo's transition away from the new classroom corroborated these accounts of Apollo's former employees.  He concluded that Apollo's senior management had to be aware of the new classroom falling apart at least a year or two before they signed the contract that was disclosed in June 2015.  They had to have had the signs that something was seriously wrong with the platform, specifying that there could be no way that the problems would have been hidden from the CEO and the CFO.  In addition, the expert specified that prior to the signing of the contract disclosed in June 2015, based on his experience, the Company took approximately four to six months in evaluating between choices for a third-party provider, he was sure that the process took several months, and he would be shocked if it were quicker than that.

75.     Apollo's employees similarly confirmed the large magnitude of the decision to abandon the new classroom.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014, for instance, felt that it was a huge decision to scrap the new classroom (as well as the old classroom) and go with a third-party provider, and summarized it as an opportunity for Apollo to cast off a lot of its information technology budget.  In his view, part of what set Apollo and University of Phoenix apart was their approach to classrooms, "and essentially that was a decision to negate all of that" as "essentially Apollo gave up on any differentiation."   As University of Phoenix's Executive Enrollment Sales Representative from September 2006 until November 2015 recounted, one of the pitches that enrollment advisors were supposed to make to prospective students was that the University's system was better than Blackboard, which was supposedly "ancient."

C.     **Apollo's Military Recruiting And The 90/10 Rule**

76.     In addition to Apollo's online classroom, another key aspect of Apollo's business model is its marketing to military servicemen and veterans.  Apollo maintained a separate military division within its organization in order to recruit students specifically from the military and to access funds from the GI Bill, the program launched during World War II that pays college tuition for Iraq and Afghanistan veterans, among others. University of Phoenix is the largest recipient of money under the post-9/11 GI Bill. Apollo located University of Phoenix campuses close to military bases and assigned specialized National Defense Liaisons ("NDLs") to obtain contact information for potential enrollees – called "leads."

77.     A "lead" is the start of the sales pipeline.  The NDLs turned their leads over to specialized "enrollment advisors" focused on prospective students with military backgrounds.   Enrollment advisors worked to convert leads into new enrollments. According to University of Phoenix's NDL from 2008 until 2015, a lead was the name and contact information for someone who was interesting in learning more about the university.[15]

78.     As Apollo's revenues and enrollments declined between 2010 and 2013, Apollo stepped up its military recruiting.   During that period, Apollo's degreed enrollment figures fell approximately 35% while Apollo increased marketing to individuals associated with the military.  As PBS later reported, "even as the University of Phoenix lost half its students amid scrutiny from Congress and the media, the number of Iraq and Afghanistan veterans using the GI Bill there tripled from 2009 to 2014."  The Senate Health, Education, Labor and Pensions Committee similarly concluded that "[f]or-profit colleges are rapidly increasing the amount of TA benefits they take in" and Apollo

---

[15] The Former NDL from 2008 until 2015 worked in the state of Hawaii.  In her position, she visited military bases to get leads for prospective students.  She would then give the leads to enrollment counselors, who would call the leads and encourage them to enroll in University of Phoenix.

had one of the fastest growth rates in veteran enrollment in the industry, rising 190% from 2009-2010 to 2012-2013.

79.     Starting with its 2013 Form 10-K, filed with the SEC on October 22, 2013, Apollo stated that "[a]s the University's enrollment has declined in recent years, the proportion of its student body that . . . participate in military benefit programs[] has increased."  The Company also reported annually the percentage of Title IV funds that it received, promoting any decrease in funds to securities analysts and investors as favorable news.  On October 22, 2013 – the first day of the Class Period – Defendant Swartz announced, "for the past three years, the University of Phoenix experience declines in its 90/10 percentage.  In fiscal year 2013, 90/10 decreased by 100 basis points to 83%."

### 1.     Apollo Depends On A Loophole In The 90/10 Rule

80.     Apollo's military recruiting was important in part because Apollo's eligibility to continue receiving the critical federal funds that make up the vast majority of the Company's revenue (*see* ¶¶34-35) is dependent on its compliance with the federally-mandated 90/10 Rule.

81.     Ineligibility for such federal monies would be disastrous for the University of Phoenix.   During the Class Period, Apollo received more than 80% of its total revenues from Title IV programs.  Apollo has had one of the highest and most dangerous percentages of its funding from federal Title IV sources.  A 2012 report by the United States Senate Health, Education, Labor and Pensions Committee titled "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success" (the "2012 Senate Report") listed Apollo as one of the "for-profit education companies with [the] highest reported 90/10 share."  Apollo also recognized in its filings with the SEC that its percentage under the "90" part of the equation was "high" and close to hitting the 90% maximum.   Analysts at S&P Capital IQ further remarked on the importance of the 90/10 Rule, noting in multiple reports on Apollo each year during the Class Period that "[g]overnment regulations make an institution ineligible for Title IV

1   loans if revenues from the school's Title IV program exceed 90% for two consecutive

2   years."

3        82.    Because of its key role in for-profit colleges' financial condition, the 90/10

4   Rule was watched closely by Apollo's executives, securities analysts and regulators, and

5   lawmakers.  In January 2012, for instance, the Protecting Our Students and Taxpayers Act

6   was introduced in the U.S. Senate and, if adopted, would have reduced the 90%

7   maximum under the rule to 85%, caused tuition derived from military benefit programs to

8   be included in the 85% portion under the rule instead of the 10% portion, and imposed

9   Title IV ineligibility after one year of noncompliance rather than two.  Apollo noted that

10  "[i]f these or similar proposals are adopted, University of Phoenix may have to make

11  material changes to its business to remain eligible to participate in Title IV programs,"

12  including changes that "may reduce [Apollo's] revenue, increase [its] operating expenses,

13  or both, in each case perhaps significantly."  As Defendant Cappelli explained during a

14  June 25, 2013 conference call with investors, the Company's compliance with the 90/10

15  Rule was "something [Apollo was] watching very, very carefully."

16       83.    A key aspect of the 90/10 Rule is what the 2012 Senate Report called a

17  "loophole in the law" for military servicemember and veteran education benefits.  Under

18  this loophole, tuition derived from military benefit programs, such as the TA Program, is

19  *not* counted as federal financial aid for the purposes of the 90/10 Rule even though it is

20  federal financial aid.  Instead, the funds are counted under the 10% side of the equation.

21  Thus, such funds work to diminish the total percentage of funds counting towards the

22  90% figure.    Military students were thus particularly attractive enrollees for the

23  University of Phoenix, as they not only provided revenue, but also assisted with the 90/10

24  equation.

25       84.    The 2012 Senate Report concluded that "[s]ervicemembers, veterans,

26  spouses, and family members have become highly attractive prospects to for-profit

27  colleges" because, among other reasons, "military educational benefits are not counted

28  toward the maximum 90 percent in Federal revenues that for-profit colleges are

permitted.  Thus, these benefits provide a new tool to help for-profit colleges avoid this regulatory restriction."   One legal scholar noted that "[a]fter securing 90% of their revenue from Title IV funds, [for-profit colleges] are aggressively recruiting veterans to secure the remaining 10% of their revenue . . . ."

85.    The Senate Health, Education, Labor and Pensions Committee similarly linked rising military enrollments during the industry downturn to for-profit school's "evasions in order to comply with the 90/10 Rule."  The committee noted that "some for-profit colleges are reliant on post-9/11 GI Bill benefits to comply with the 90/10 Rule," specifically citing "large, publicly traded, for-profit education companies."   The committee highlighted how Apollo's compliance with the 90/10 Rule was dependent on its military recruiting: 48%, or nearly half, of Apollo's "10 percent" in non-Title IV revenues, came from post-9/11 GI Bill benefits.

86.    Leading up to the Class Period, Apollo's top executives were repeatedly confronted with reports of improper recruiting practices directed at military servicemembers and veterans.  These reports informed the executives of practices that federal authorities viewed as aggressive, deceptive, and abusive.

87.    For example, a 2010 report of the United States Senate Health, Education, Labor and Pensions Committee entitled "Benefitting Whom?  For-Profit Education Companies and the Growth of Military Education Benefits" (the "2010 Senate Report") highlighted how the industry "aggressively recruit[s] and market[s] to veterans and servicemembers" and discussed the industry's increasing focus on military recruiting. Two years later, the 2012 Senate Report provided a more detailed description of the companies' improper recruiting practices in a thorough report spanning approximately 200 pages.  After reviewing an extensive documentary record, the report concluded that "the recruiting process at for-profit education companies is essentially a sales process" in which a "boiler-room atmosphere" ensures "a steady stream of new student enrollees or 'starts'" adding revenue to the companies' bottom line.

88.    The Senate's investigation "found that the tactics associated with recruiting

students to enroll in for-profit colleges are widespread" and that "[i]nternal company documents, undercover recordings by the Government Accountability Office, HELP Committee staff interviews with employees and students, and testimony and statements from former recruiters all demonstrate that recruiters at many schools are trained to aggressively pursue and enroll as many students as possible, often with little regard for ethical standards or the best interests of the prospective students." The report focused on the widespread use of "tactics that misled prospective students with regard to the cost of the program, the availability and obligations of Federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, or the reputation and accreditation of the school."

89.   The 2012 Senate Report concluded that for-profit colleges prey on the vulnerable members of society.  They seek to enroll those "who are often not familiar with traditional higher education and may be facing difficult circumstances in their lives." Recruiting materials highlighted how for-profit college recruiters are instructed to "locate and push on the pain in students' lives" and to "overcome objections" of prospective students in order to secure enrollments.  The report highlighted how one company's internal manual to train recruiters "detailed the demographic subgroups that the company targets for enrollment: 'Welfare Mom w/Kids. Pregnant Ladies. Recent Divorce. Low Self-Esteem. Low Income Jobs. Experienced a Recent Death. Physically/Mentally Abused. Recent Incarceration. Drug Rehabilitation. Dead-End Jobs-No Future.'"  The manual explained that "These Students Are The Reason We're in Business!"

90.   The 2012 Senate Report highlighted particular practices regarding how and where for-profit colleges conducted military recruiting.  Apollo was put on notice that these and similar practices were considered deceptive, unfair, and improper:

- Internal documents show that some schools' pursuit of military benefits led them to recruit from the most vulnerable military populations, sometimes recruiting at wounded warrior centers and veterans hospitals.

- In addition to aggressively seeking military personnel, the investigation showed that some recruiters misled or lied to servicemembers as to whether their tuition would be fully covered by military benefits.

91. The 2012 Senate Report focused on Apollo's deceptive recruiting practices in particular, further alerting Apollo's executives to the importance of reforming its recruiting practices. As the report noted, Apollo documents instructed recruiters to use high-pressure sales tactics: "Do not tell the student we have classes running every week unless you can agree on a start date, or rolling start dates is a selling point." According to the report, Apollo "[r]ecruiters were supposed to tell every prospective student, 'It looks like I might be able to squeeze you into' the next start date. Two Apollo manuals specifically instructed recruiters not to say 'you have plenty of time to get everything in order,' because 'if the student thinks he/she has plenty of time, he/she might wait and apply later.'"

92. The 2012 Senate Report further highlighted Apollo's aggressive recruiting tactics. For instance, an Apollo manual instructed recruiters to answer objections to enrolling with questions back to the prospective student: "If the prospect said 'you're too expensive,' the recruiter was instructed to respond, 'Can you afford not to go?' or 'If student loans will match your payment to your income when you are in repayment, why do loans scare you?' or 'Why would you not want to invest in yourself?'" If a student complained that the University of Phoenix is expensive compared to other schools, the recruiter was instructed to say, "When your degree hangs on the wall in a few years . . . will you tell your friends and family you bought the cheapest degree you could find?"

93. The 2012 Senate Report continued to highlight military recruiting, emphasizing how for-profit colleges resorted to extreme conduct to pursue compliance with the 90/10 Rule: "Instead of seeking to attract cash-paying students or employers by offering quality programs, some for-profit schools have devised a number of tactics to artificially lower their reported 90/10 figure," including "questionable tactics" such as "pursuing military benefits." The 2012 Senate Report concluded that for-profit

institutions including Apollo have "strong incentives that drive the industry's pursuit of veterans' and servicemembers' benefits," noting that this "pool" of revenues "is particularly enticing to for-profit colleges eagerly looking to expand their enrollment or facing problems with meeting 90/10. . . .   These funds have a significant potential to affect compliance with the 90/10" Rule.

94.    As Hollister Petraeus, head of the Office of Servicemember Affairs at the Consumer Financial Protection Bureau, testified before the Subcommittee on Federal Financial Management, Government Information, Federal Services and International Security on September 22, 2011, the loophole for veterans' and servicemembers' benefits creates "an incentive to see servicemembers as nothing more than dollar signs in uniform, and to use some very unscrupulous marketing techniques to draw them in."  A December 9, 2010 *New York Times* article quoted Senator Harkin, Chairman of the Senate HELP Committee overseeing federal education policy, as stating that "[f]or-profit schools see our active-duty military and veterans as a cash cow, an untapped profit resource . . . .  It is both a rip off of the taxpayer and a slap in the face to the people who have risked their lives for our country."

95.    Paul Reickhoff, CEO and Founder of the Iraq and Afghanistan Veterans of America (IAVA), concluded that "IAVA members have been taken advantage of and manipulated by many for-profit 'schools,' but the University of Phoenix is constantly reported as the single worst by far.  Too many of our members have been left by the University of Phoenix with their new GI Bill burned out, loads of debt and a degree they can't use."

96.    The Company's senior management was well aware of the reports surrounding the University of Phoenix's improper recruiting practices.  The Company's annual reports repeatedly acknowledged "the increasing scrutiny in Congress" and specifically discussed both the 2010 Senate Report and the 2012 Senate Report.

97.    In anticipation of the 2012 Senate Report, Apollo's Chief of Staff and Senior Vice President of External Affairs, Mark Brenner, wrote a 19-page letter to

1    Senator Tom Harkin that disputed the criticism and defended the University of Phoenix.

2    Among other things, the letter stated that the University of Phoenix had "spent more than

3    $100 million enhancing [its] compliance systems—including large, state of the art

4    investments in digital call monitoring," so the Company had "a robust student protection

5    program in place as part of [its] routine compliance activities," including both "random[]

6    and routine[] spot-checking [the university's] own advisors to ensure full compliance

7    with [its] high standards.  This translates into our advisors giving students the best and

8    most accurate information, and helps focus them on, actively counseling students to avoid

9    unnecessary debt."

10       98.    The Company also rejected and denied reports of its improper recruiting

11   practices.  Following the release of the 2012 Senate Report, the Company posted on its

12   website a statement by Apollo's Brenner to *The New York Times*, claiming that the 2012

13   Senate Report "is designed to cast schools, including University of Phoenix, in a negative

14   light," and criticizing the report for failing to adequately "reflect [Apollo's] commitment

15   to students."  Brenner also wrote an article about the 2012 Senate Report for *The Hill*

16   entitled "Misleading the public about University of Phoenix," in which Brenner claimed

17   that "[t]he report fails to capture the truth about University of Phoenix and our students."

18   Brenner claimed to "set the record straight," citing the Company's investment of

19   "hundreds of millions of dollars in our students' learning platform and classroom

20   experience" and the Company's purported "record of responsibly providing a quality and

21   accredited education to our nation's military" and "enhance[ing] and expand[ing]

22   protections for those in the armed forces," which was "above reproach."

23       99.    The Company also attempted to deflect attention from the public reports by

24   shifting the focus away from the Company and onto its students.  In a July 28, 2012

25   "Letter to Our Students," University of Phoenix's President, Defendant Pepicello,

26   criticized the 2012 Senate Report as failing to understand University of Phoenix students.

27   "[P]olicymakers and members of the media will be writing and speaking about you" and

28   "ask[ing] whether University of Phoenix is the right place for you," he told the students,

suggesting that students could ignore the reports about University of Phoenix because "you must know that leaders in this country think of college students as teen-agers—not working adults."   Instead of addressing the specific facts of the 2012 Senate Report, Pepicello summarized that "leaders in this country . . . misunderstand University of Phoenix" and "[t]here is no one-size-fits all approach to postsecondary education."

### 2.      The Executive Order And The MOUs

100.   On February 10, 2012, the University of Phoenix entered into an Alliance Memorandum of Understanding with the Defense Department (the "2012 MOU"). Pepicello signed the 2012 MOU, which provided that University of Phoenix was required to "abide by all applicable federal and state laws" and was not permitted "to use the [Defense Department's] name and logo in writing," except "for purposes of this MOU."[16]

101.   On April 27, 2012, President Barack Obama signed into law Executive Order 13607 (the "Executive Order" or "Order").   In signing the Executive Order, the President was responding to "reports of aggressive and deceptive targeting of servicemembers, veterans, and their families by [some] educational institutions," including "engag[ing] in misleading recruiting practices on military installations."   The Order, titled "Establishing Principles of Excellence for Educational Institutions Serving Service Members, Veterans, Spouses, and Other Family Members," directed the Department of Defense, Department of Veterans Affairs and the Department of Education to "establish Principles of Excellence . . . to apply to educational institutions receiving funding from Federal military and veterans educational benefits programs, including benefits programs provided by the Post-9/11 GI Bill and the [TA] Program."   The departments were specifically instructed to craft rules to "ensure that these educational institutions . . . prevent abusive and deceptive recruiting practices that target the recipients of Federal military and veterans educational benefits."

102.   In addition, Section 4 of the Executive Order ordered the Secretaries of

---

[16] The 2012 MOU specified the Defense Acquisition University and its affiliates as the "Client" for the MOU.

Defense and Veterans Affairs to, "[w]ithin 90 days of the date of [the] order . . . establish new uniform rules and strengthen existing procedures for access to military installations by educational institutions," including rules that ensure, "at a minimum, that only those institutions that enter into a memorandum of agreement pursuant to section 3(a) of this order are permitted entry onto a Federal military installation for the purposes of recruitment."   The Executive Order also specifically addressed educational institutions' websites, directing the Secretaries "to ensure that websites and programs are not deceptively and fraudulently marketing educational services and benefits to program beneficiaries," and highlighting the importance of protecting military trademarks and logos, ordering that the departments "protect . . . military or veterans-related terms as trademarks."

103.   Section 2(c) of the Executive Order incorporated new regulations issued by the Department of Education which requires the educational institution to "end fraudulent and unduly aggressive recruiting techniques on and off military installations, as well as misrepresentation, *payment of incentive compensation*, and failure to meet State authorization requirements, consistent with the regulations issued by the Department of Education."

104.   On May 31, 2012, the Department of Veterans Affairs sent a letter attaching the Executive Order to all for-profit education providers, including the University of Phoenix.  The letter requested "that all schools provide a written response stating their intention to comply with the Principles of Excellence" by the end of academic year 2012-2013, and "not later than June 30, 2012."

105.   On June 26, 2012, Apollo responded by posting on the University of Phoenix website, www.phoenix.edu, a letter from Defendant Pepicello to the U.S. Departments of Veterans Affairs, Defense, Education, and Justice, as well as the Bureau of Consumer Financial Protection.  Pepicello stated that the "University of Phoenix embraces the accountability inherent in the Executive Order 1307 [sic]" and that he was writing "on behalf of the entire University of Phoenix community, to express support of,

and state our intent to comply with, the President's Executive Order 13607." This letter remained on the Company's website throughout the Class Period.

106.  In July 2012, Apollo again highlighted its purported support for, and compliance with, the President's Executive Order.  In "A Message to University of Phoenix Military Students," posted on the Apollo website, www.apollo.edu, the University of Phoenix's Associate Regional Vice President – Military, Garland Williams, stated that the President's Executive Order "outline[d] specific standards for schools that serve military students" and claimed that "many of the reforms included in the Executive Order were pioneered at University of Phoenix and are in place today."

107.  According to the letter from Apollo, the "University of Phoenix does more than any postsecondary educational institution to demonstrate transparency and a commitment to military students."  The July 2012 letter provided a direct weblink to view "President Bill Pepicello's letter of support" of the Executive Order dated June 26, 2012. The July 2012 letter also asserted that "University of Phoenix has . . . led the way when it comes to transparency and student protections for our military students," "University of Phoenix does more than any postsecondary educational institution to demonstrate transparency and a commitment to military students," and that "help[ing] the President and Congress ensure that our nation's military receive a quality education" was "a founding principle at University of Phoenix and a responsibility we take seriously."  The July 2012 letter remained on the Company's website throughout the Class Period.

108.  In November 2012, the Department of Education held its 2012 Fall Conference, entitled "Principles of Excellence – Executive Order 13607."  During that conference, Department of Education representatives stated that beginning in the Spring of 2013, the Department of Defense would enforce the following policies for recruitment at U.S. military installations:

- Institutions may access military bases to provide education, guidance, and training opportunities ONLY;

- Marketing firms or companies that own and operate higher-learning institutions will not have access to the bases;

- [Institutions m]ay have access to military bases to provide education guidance to their students:

    Access _**only**_ through the base education officer via a written proposal

    a) Have a signed MOU with [Department of Defense];

    b) Be chartered or licensed by the State government in which the services will be rendered;

    c) Be State approved for the use of veteran's education benefits;

    d) Course offering must be provided by postsecondary institution accredited by a national or regional accrediting body recognized by the U.S. Department of Education; and

    e) Have an on base student population of at least 20 active duty military students

109.   In order to complete the implementation of the Executive Order, Defense Department rules were proposed and published in the Federal Register (78 F.R. 49382, 49383) on August 14, 2013.  These additional rules included express prohibitions against "us[ing] unfair, deceptive, and abusive recruiting practices," as well as the "[i]mplement[ation] [of] rules to strengthen existing procedures for access to military installations by educational institutions."  After the comment period expired, the final version of these rules was published in the Federal Register (79 F.R. 27732) on May 15, 2014, and went into effect on July 14, 2014.  The final rules "[i]mplement[ed] new policy, assign[ed] responsibilities, and prescribe[d] procedures for the operation of voluntary education programs in the DoD."  They "[e]stablishe[d] policy stating the eligibility criteria for tuition assistance (TA) and the requirement for a memorandum of understanding (MOU) from all educational institutions providing educational programs through the DoD TA Program," and expressly "[e]stablish[ed] policy" that "[a]ll educational institutions providing education programs through the DoD Tuition Assistance (TA) Program" would "not use unfair, deceptive, and abusive recruiting

practices."

110.   On June 23, 2014, the University of Phoenix entered into an additional MOU with the Department of Defense entitled the "Department of Defense (DoD) Voluntary Education Partnership Memorandum of Understanding" ("2014 MOU").   The 2014 MOU was signed by Defendant Pepicello for the University of Phoenix, and Dawn Bilodeau for the Department of Defense.   The 2014 MOU was "subject at all times to Federal law and the rules, guidelines, and regulations of the Department of Defense," including the Department of Defense Information No. 1322.25.   The 2014 MOU warned that "[e]ducational institutions failing to comply with the requirements set forth in this MOU may receive a letter of warning, be denied the opportunity to establish new programs, have their MOU terminated, be removed from the DoD installation, and may have the approval of the issuance of TA withdrawn by the Service concerned."   The 2014 MOU specifically required the University of Phoenix to:

  j.   Have policies in place compliant with program integrity requirements consistent with the regulations issued by ED (34 C.F.R 668.71-668.75 and 668.14) related to restrictions on misrepresentation, recruitment, and payment of incentive compensation.  This applies to the educational institution itself and its agents including third party lead generators, marketing firms, or companies that own or operate the educational institution. As part of efforts to eliminate unfair, deceptive, and abusive marketing aimed at Service members, educational institutions will:

     (1)   Ban inducements, including any gratuity, favor, discount, entertainment, hospitality, loan, transportation, lodging, meals, or other item having a monetary value of more than a *de minimis* amount, to any individual or entity, or its agents including third party lead generators or marketing firms other than salaries paid to employees or fees paid to contractors in conformity with all applicable laws for the purpose of securing enrollments of Service members or obtaining access to TA funds. Educational institution sponsored scholarships or grants and tuition reductions available to military students are permissible

     (2)   Refrain from providing any commission, bonus, or other incentive payment based directly or indirectly on

securing enrollments or federal financial aid (including TA funds) to any persons or entities engaged in any student recruiting, admission activities, or making decisions regarding the award of student financial assistance.

(3)    Refrain from high-pressure recruitment tactics such as making multiple unsolicited contacts (3 or more), including contacts by phone, email, or in-person, and engaging in same-day recruitment and registration for the purpose of securing Service member enrollments[.]

111.   As stated above, the 2014 MOU required the University of Phoenix to comply with Department of Defense Information No. 1322.25, Incorporating Change 3, which became effective July 7, 2014 ("DoDI 1322.25").  DoDI 1322.25 required that access to Defense Department installations was "limit[ed] . . . to educational institutions . . . in compliance with the DoD Voluntary Education Partnership MOU.   Agents representing education institutions in the performance of contracted services are permitted DoD installation access only in accordance with the requirements of their contract and/or agreement."   In addition, the rules provided that such for-profit institutions could not:

(1) Use unfair, deceptive, abusive or fraudulent devices, schemes, or artifices, including misleading advertising or sales literature.

(2) Engage in unfair, deceptive, or abusive marketing tactics, such as during unit briefings or assemblies; engaging in open recruiting efforts; or distributing marketing materials on the DoD installation at unapproved locations or events.

112.   DoDI 1322.25's "Requirements and Procedures for Educational Institutions Seeking Access to the DoD Installation Solely to Provide Academic Counseling or Student Support Services to Students" further provided, in pertinent part, that "[e]ducational institutions must request access through the responsible education advisor via a written proposal," that the "responsible education advisor [would] review and analyze the request on behalf of the installation commander," and that "[i]f a DoD installation grant[ed] access to an educational institution to provide guidance to their

1    students, the educational institution and its agents [would]: . . . [o]nly advise or counsel

2    students at the education center or at a location approved by the responsible education

3    advisor."

4              **3.     Apollo Violated The Executive Order And Its MOUs**

5         113.   Apollo engaged in recruiting practices that violated the Executive Order

6    and the Company's MOUs with the Department of Defense.

7                        **a)     Apollo Held Recruitment Events**
                              **On Military Bases And Elsewhere**
8                             **Disguised As Hiring Workshops**

9         114.   The University of Phoenix was not permitted to recruit students from

10   military bases in certain locations and at certain events, such as at "Hiring Our Heroes"

11   events.  "Hiring Our Heroes" events were job fairs where employers could advertise job

12   openings to military servicemen and veterans.  Numerous former Apollo employees,

13   investigative journalists, and Apollo's own documents have confirmed that the University

14   improperly used the events to target potential recruits.

15        115.   Apollo's Enrollment Advisor from May 2013 to October 2013 explained

16   that University of Phoenix participated in Hiring Our Heroes events but had no intention

17   of hiring servicemembers or veterans.[17]  As she stated, University of Phoenix told

18   veterans and servicemembers that they were going to hire veterans and that they wanted

19   to have 30% of their positions staffed by the military, ***but in reality University of***

20   ***Phoenix was laying people off and had a hiring freeze***.  As she explained,

21   servicemembers thought they were applying for jobs, but their information was actually

22   being entered into University of Phoenix's leads database.  She recalled that there were

23   no real jobs to which to apply.  Apollo's NDL from March 2012 to June 2014 similarly

24   confirmed that while the University of Phoenix had to show that it had some jobs

25   _____
     [17]  Apollo's Enrollment Advisor from May 2013 to October 2013 worked at the
26   University of Phoenix headquarters.  In her role, she participated in a Hiring Our Heroes
     job fair in San Antonio in June 2013.  The Enrollment Advisor was responsible for
27   getting people enrolled, helping the finance advisor to walk them through FAFSA, the
     financial aid website, and getting them started through their first block and a half of
28   classes.

available in order to be allowed to participate in Hiring Our Heroes, the NDL believed that the requirements for the jobs were too high or that the jobs did not really exist.

116.    University of Phoenix's Senior NDL in North Carolina confirmed that "Hiring Our Heroes" workshops were treated like any other event and that University of Phoenix would use them to recruit servicemembers to enroll as students.[18]   He recalled having servicemembers come to his table to fill out lead cards.  Apollo's NDL from March 2012 to June 2014 likewise recalled the Hiring Our Heroes workshops as "completely recruitment," saying that he never heard of anyone getting hired from them. He confirmed that University of Phoenix representatives who attended the Hiring Our Heroes events looked at them as an opportunity to enroll students.  For the Company, he recounted, it was "all about recruitment and the numbers" because "that's how the money comes in."  Any event that they attended was "predominately for recruiting purposes," although according to Apollo's NDL from March 2012 to June 2014, they were "good at disguising it."

117.    As discussed further below (see ¶¶126, 141-42), two former University of Phoenix employees, Marlena Aldrich and Kristen Nolan, filed a whistleblower lawsuit against the university on July 1, 2015.  The lawsuit alleged based on personal experience that while the university claimed Hiring Our Heroes events were job fairs to aid veterans in finding employment, they were in reality nothing more than a "tool for surreptitiously obtaining personal information and/or prohibited recruitment activity."[19]   They further

[18] University of Phoenix's Senior National Defense Liaison in North Carolina held that position for about the final two years of his tenure at University of Phoenix, which lasted from February 2007 until March 2013.  He had responsibility for all the bases in North Carolina for all four branches of the military.   He was responsible for building relationships within the civilian and military communities, ensuring that UOPX was taking care of servicemembers, and creating opportunities for servicemembers to be successful when they got out of the military and while they were in it.

[19] Aldrich worked as an enrollment advisor at the University of Phoenix from 2007 through January 2013, when she was promoted to the position of National Defense Liaison.  She served as a National Defense Liaison until June 2014.  Kristen Nolan was employed at the University of Phoenix from July 2006 through October 2008 as a

alleged that upon gaining access to military bases under false pretenses, such as for employment or resume workshops, University of Phoenix employees were required to conduct recruitment and enrollment under the guise of lawful activities.  Counsel for Alrich and Nolan sent a copy of the complaint to University of Phoenix's General Counsel about five months before filing the lawsuit.

118.   On June 30, 2015, the Center for Investigative Reporting released a report titled "University of Phoenix sidesteps Obama order on recruiting veterans," exposing many of the Company's recruiting practices.  The CIR Report explained that University of Phoenix paid an undisclosed sum in order to be the sole educational institution present at these "job fairs."   While the events were designed to "provide an education in employment" to servicemembers and veterans, the University of Phoenix instead used them as an opportunity to collect leads and direct attendees to its website in order to "fulfill expectations" of "market penetration."   The CIR Report recounted, for instance, how University of Phoenix representatives used a PowerPoint presentation to advertise the university's various programs, encouraged attendees to visit the University of Phoenix website, and used fake resumes to show that a bachelor's degree at the University of Phoenix makes job candidates more likely to succeed.

119.   The CIR Report further showed how even though the military regulations adopted as a result of the Executive Order "ban inducements, including any gratuity, favor, discount (or) entertainment" for the "purpose of securing enrollments of Servicemembers," University of Phoenix sponsored hundreds of events on military bases across the country in order to recruit, from rock concerts to Super Bowl parties and father-daughter dances.  According to the CIR Report, the Company spent millions of dollars to sponsor events on military bases while dispatching its recruiters to these events.

---

corporate liaison.  From October 2008 through September 2009, she was employed as a National Defense Liaison, and in September 2009 she was promoted to National Defense Liaison Manager.  She served in that position until July 2014.

---

120.   In a July 24, 2015, report entitled "Are for-profit universities taking advantage of veterans?," PBS *News Hour* presented hidden camera footage showing the University of Phoenix engaging in recruiting activities during Hiring Our Heroes events, instead of simply educating veterans about the job market.  The video footage shows that the University of Phoenix put its logo on numerous documents at Hiring Our Heroes events and repeatedly encouraged veterans to visit the University of Phoenix website.

121.   *PBS News Hour* reporter Aaron Glantz detailed violations of the Executive Order:

> Under President Obama's 2012 order, schools are allowed to recruit on base only as part of official regulated education activities.  Documents from five military bases obtained using the Freedom of Information Act show the University of Phoenix sponsored events that had little to do with education, hundreds of events over the last five years. . . . .

The *PBS News Hour* exposé further presented "documents show[ing] the University of Phoenix ha[d] been tracking recruitment numbers on military bases, including at job fairs and entertainment events, where recruiting is supposed to be banned by military regulations."

### b)    Apollo Based Employment Decisions On Recruitment

122.   The federal government banned incentive compensation for for-profit recruiters in 2010.   Prior to 2010, for-profit colleges explicitly based recruiter compensation on enrollment numbers in order to financially incentivize them to enroll as many students as possible.  With this incentive, for-profit college recruiters engaged in a host of troubling recruiting practices, including recruiting at homeless shelters and hospitals, failing to adequately inform prospective students of educational costs and financial aid terms, and misrepresenting the length of degree programs.

123.   These and other practices led to increased enrollments and profits for Apollo and other for-profits, but also contributed to a large number of student dropouts with no degree and burdensome financial aid debt. As the United States Senate's Health, Education, Labor And Pensions Committee later summarized, Apollo was one of the

"worst performing programs" in the nation in terms of student withdrawals, with, for instance, 66 out of every 100 students enrolled in the Associate Degree program withdrawing from the program.  The U.S. Department of Education calculated that the University of Phoenix's main online campus had a graduation rate of just 7.3% during the Class Period, and eleven United States Senators noted that "[o]nly one in five of students in University of Phoenix's online programs, those heavily used by servicemembers and veterans, actually graduate."

124.   To combat such troubling aspects of for-profit university recruiting practices, in 2010, the U.S. Department of Education promulgated new regulations under the Higher Education Act of 1965 to manage incentive compensation.   The new regulations prohibit incentive-based compensation for those employees at for-profit colleges engaged in the recruiting or enrollment processes.   Defendant Cappelli characterized these changes in the industry during a conference call with securities analysts in 2015, "[i]n 2010 our sector received a wake-up call on the regulatory front with a relentless pounding of the issues focused on reining in any bad actors.  Some of the criticism of the industry was well-founded. . . ." According to Cappelli, "the reputation at the University of Phoenix was tarred by the broader environment and damaged in the public eye."  Apollo stated in is March 29, 2011 Form 10-Q that it had "developed [a] new structure, which we believe complies with the Department's new rule, over the past twelve months and implemented it on a broad scale during the first quarter of fiscal year 2011."  The Company claimed that it had "eliminated enrollment results as a component of compensation for our admissions personnel effective September 1, 2010."

125.   In truth, however, former University of Phoenix employees, investigative reports and their source material establish that University of Phoenix recruiters continued to be pressured during the Class Period to either enroll more students or lose their jobs, and that a recruiter's pay depended on the number of individuals enrolled.

126.   Aldrich and Nolan, for example, have stated that the University of

Phoenix's enrollment advisors were evaluated "solely in terms of enrollments, recruitment, and recruitment activity." Nolan, who worked at the University of Phoenix managing a team of military liaisons, explained that she was "expressly advised to use code words such as 'competencies'" to disguise the fact that the employees she managed were evaluated "completely and solely" on the number of servicemembers and veterans that they recruited. They also described how University of Phoenix employees were required by the Company to "engage in substantial misrepresentation or other unlawful behavior in the course of their employment as recruiters" in order to meet certain military recruitment goals. If the employee failed to meet his or her recruitment goals, he or she would be terminated by the University of Phoenix.

127. The *PBS News Hour* showed internal Company documents revealing how the Company tracked the rate at which its recruiters converted leads into enrolled students, *i.e.*, "conversion" rates – a practice prohibited throughout the Class Period:



128. As Apollo's NDL from March 2012 to June 2014 explained, these conversion metrics were discussed with NDLs, their managers, and other superiors

1  during weekly conference calls and semi-annual conferences at the University of Phoenix

2  headquarters that "absolutely everyone" in the division would attend, up to the director of

3  the division, Garland Williams, and his "second in command," John Ramirez.[20]  Apollo's

4  NDL from March 2012 to June 2014 similarly confirmed that reports were prepared that

5  kept track of leads generated and the conversion rates of the NDLs.  As he recalled, these

6  reports were discussed in weekly conference calls and stored in a system that everyone in

7  the military group at the University of Phoenix would be able to access.

8       129.   Apollo's NDL from March 2012 to June 2014 further described a twice-

9  yearly military division meeting in Phoenix, during which the reports containing NDL

10  conversion numbers would be discussed.  During these conferences, the NDLs with the

11  best conversion numbers would be recognized by management.  University of Phoenix's

12  Senior NDL in North Carolina similarly recalled that the military division had nationwide

13  meetings three time per year, and the VPs and operations manager, and some campus

14  directors would attend.  Reports were generated to track and report the number of leads

15  and successful enrollments made by University of Phoenix employees.  The managers,

16  military operations manager, the operations manager, the VP, and the president had access

17  to these reports; in fact, these reports went up to the top executives in Phoenix.

18  University of Phoenix's Enrollment Manager from October 2009 until June 2015 also

19  confirmed the existence of reports tracking retention and enrollment of University of

20  Phoenix employees.  There were systems that contained this information, and all of the

21  higher-ups would have access to those reports, with the executives in Phoenix likely

22  having access to even more comprehensive reports.

23

24

---

25  [20] Garland Williams is University of Phoenix's Vice President of Military Relations.
Williams has been with the Company since March 2010.  John Ramirez has worked at
26  University of Phoenix from November 2004.  He is currently Dean of Operations, School
of Advanced Studies, and has served in that role since November 2013.  Ramirez was
27  previously Vice President, External Military Operations from October 2011 until
November 2013.  Before that, he was an Associate Campus Director, School of
28  Advanced Studies, and Director of Operations with the Company.

130.   Recruiters and enrollment officers were at a high risk of losing their jobs if management was disappointed in their enrollment numbers.  University of Phoenix's Military Enrollment Representative from February 2014 until June 2015 said that "good ethical reps" were often laid off because of the Company's focus on "statistical" performance.[21]   He stated that even if an employee performed well in certain areas, superior performance in these areas did not matter if the employee was not achieving enrollments.  He also stated that ultimately nothing else really mattered except for how many enrollments the employees were achieving.

131.   Apollo's Enrollment Advisor from May 2013 to October 2013 similarly reported that each enrollment advisor had to have six enrollments a week; this requirement applied to the military side as well.  There was an even bigger push for the military business because the GI Bill would pay for tuition.  If an advisor could not do six enrollments one week, then they needed to get 12 the next week.  Essentially, employees had to enroll students if they wanted to keep their jobs.  University of Phoenix's Senior NDL in North Carolina also confirmed that the recruiters had a certain amount of people they had to enroll, and at the end of six months or a year, employees would be graded on their success in generating enrollments.  He stated that although the University of Phoenix tried to "disguise it," enrollment success could determine whether the employees would keep their jobs.  According to him, the company never stopped grading employees based on enrollments.

132.   The Center for Investigative Reporting report revealed that the University of Phoenix continued to grade its employees based on the number of students they successfully enrolled during the Class Period.  The exposé presented internal University of Phoenix documents show how the university "meticulously track[ed] its success with recruitment at the military events it sponsors."

---

[21] University of Phoenix's Military Enrollment Representative from February 2014 until June 2015 worked on a team dedicated to enrolling military students into University of Phoenix's business school programs.  He left of his own accord due to his dissatisfaction with the University of Phoenix.

133.   Apollo engaged in these practices despite the fact that the Department of Education regulations incorporated into the Executive Order and the 2014 MOU ban the Company from paying bonuses to recruiters "based directly or indirectly" on how many students they enroll.

### c)   Apollo Misused Armed Forces' Insignias

134.   Apollo used the armed forces' insignias without obtaining the proper approval.  In particular, the University of Phoenix produced custom-engraved coins that had the University of Phoenix logo on one side, and on the other side, the insignias of the Department of Defense and the branches of the military.  An example is set forth below:



135.   These "challenge coins" were handed out to military servicemembers and veterans at military events both on-and-off-base.  The CIR explained that "[f]or decades, these 'challenge coins' have held a special place in military culture," and stated that the University of Phoenix recruiters gave their challenge coins "to influential military commanders and other officials to thank them for allowing extensive base access."

136.   The *PBS News Hour* quoted Robert Muth, a former officer in the Marine Corps, who explained that "[t]here's a long tradition within the military of commanders

providing challenge coins to individual troops who've done something great.  If I'm a 19-year-old lance corporal and I see that coin, I assume the Department of Defense has viewed and vetted that organization and approved them in some way to provide me with an education."  Reporter Aaron Glantz explained that they had found that the University of Phoenix was using the military insignias without authorization.  The report showed Dawn Bilodeau, the Chief of Voluntary Education at the Department of Defense, confirming that the allegations regarding the Company's use of military logos on coins "concerned" her.  She stated that "if they're currently handing them out and it was reported, I would be compelled to take action."

137.   University of Phoenix's NDL from 2008 until 2015 explained that Apollo's use of the challenge coins originated with Gary Harrah, the National Director of Military and Veteran Partnerships at the University of Phoenix.  In addition, she stated that another Apollo employee, Jackie Robinson, told the NDL from 2008 until 2015 that Robinson had told Harrah that Robinson believed that the insignias on the coins were copyrighted and that the University needed to get the Department of Defense's permission to use them.  Harrah dismissed these concerns without confirming if permission from the Department of Defense had been obtained, and told University of Phoenix employees to give out the coins.

138.   The use of military insignias on University of Phoenix promotional materials, including "challenge coins," was widely known within Apollo.  When asked about the challenge coins containing University of Phoenix and military logos, Apollo's NDL from March 2012 to June 2014 explained that the coins were presented to commanding offices on behalf of Garland Williams.  He stated that everyone on the military recruiting side understood that this was a big deal, and the coins were still being used when he left the Company.  University of Phoenix's Military Enrollment Advisor and NDL from April 2009 through June 2013, who worked as an NDL in the New England region, received challenge coins from his manager in 2012 and kept them until his employment at University of Phoenix ended in June 2013.  His understanding was

1   that challenge coins should be distributed to leads who ended up enrolling at the

2   University.  University of Phoenix's Military Enrollment Advisor and NDL from April

3   2009 through June 2013 further confirmed that the coins gave the impression that the

4   military had endorsed the University.

5       139.   Apollo's NDL from March 2012 to June 2014 personally observed the use

6   of military insignias alongside the University of Phoenix logo on flyers advertising events

7   that University of Phoenix sponsored on bases.  Such a flyer would display the different

8   military logos as well as the University of Phoenix logo on the bottom of the flyer.  "We

9   paid to have our name on it," he recalled, and this practice did not change during his

10  tenure.  He also recalled that the University of Phoenix would pay to be advertised on

11  military bases' websites, including Fort Leonard Wood's website and Fort Leavenworth's

12  website, or to be showcased on flyers or banners hung at various events.

13              **d)      Additional Violations Of
14                       The Executive Order And The MOUs**

15      140.   Apollo engaged in additional improper military recruiting practices during

16  the Class Period, including by misrepresenting financial aid issues to students and using

17  high-pressure sales tactics.

18      141.   As Aldrich and Nolan described in their lawsuit against Apollo, the

19  University of Phoenix required its NDLs to misrepresent the "nature of the education,

20  financial charges, and employability."  For example, University of Phoenix recruitment

21  and enrollment employees were required to misrepresent that University of Phoenix

22  credits would transfer to other institutions, and promise employment opportunities where

23  none existed.  Aldrich and Nolan further described the University of Phoenix's policy of

24  requiring its employees to substantially misrepresent financial charges to students as a

25  means of achieving recruitment goals.

26      142.   Aldrich and Nolan also explained how the Company instructed its

27  recruitment and enrollment officers to use a technique known as "poking the pain" to

28  encourage students to enroll with the university.  Not only did the University of Phoenix

train its employees to prey upon the vulnerabilities of potential recruits, but also instructed them on how to "overcome objections" and "close the sale" with the potential recruit.

143.    University of Phoenix's Enrollment Manager from October 2009 until June 2015 stated that University of Phoenix was "definitely" targeting people's vulnerabilities; this was always the case.  She described how she was trained on a technique called "bringing the pain" that Apollo employees would use to convince students to enroll.[22] University of Phoenix's Military Enrollment Representative from February 2014 until June 2015 also recalled that "poke the pain" had been covered in his training.  As he explained, the precept of "poke the pain" was essentially for an enrollment representative to ascertain why a prospective student wanted to go to school and "probe the pain points" if students were going to drop out or not enroll.

144.    University of Phoenix's Compliance Officer and Director of Operations, Financial & Student Services from January 2008 to November 2013 described that she was trained on a tactic referred to as "Feel, Felt, Found."  In using the "Feel, Felt, Found" technique, University of Phoenix would tap into what was motivating the student to start classes.  Once the student's motivation was revealed, University of Phoenix would use that and hold it against the student in a way that she felt was preying on people.

145.    In addition to preying upon potential students' vulnerabilities, former Apollo employees have reported that the Company shared false information with prospective students.  Apollo's Finance Counselor and Military Certifying Official from September 2002 until July 2014 said that all the Company cared about was "butts in the seats," so it was common to share false information with students in order to get them enrolled, including regarding financial aid.[23]  University of Phoenix's Compliance Officer

---

[22] She also explained that non-military and military enrollment advisors went to the same training sessions.  She agreed that there was centralized training for everyone.

[23] Apollo's Finance Counselor and Military Certifying Official from September 2002 until July 2014 was also a military certifying official during that period.  She was based out of the Colorado Springs University of Phoenix campus.  Her role was to explain

and Director of Operations, Financial & Student Services from January 2008 to November 2013 stated that University of Phoenix provide false and misleading information regarding the transfer of credits and ability to drop classes once enrolled. Apollo's Enrollment Advisor from May 2013 to October 2013 recounted that enrollment advisors would falsely tell potential recruits that they could get paid to attend the University of Phoenix. Apollo's Finance Counselor and Military Certifying Official from September 2002 until July 2014 explained that a lot of soldiers, especially those who separated from the military 5-6 years ago when jobs were sparse, used financial aid to help survive, a practice that was encouraged at the University of Phoenix. Likewise, Apollo's Finance Advisor from 2008 to 2014 said that it was "absolutely true" that the Company encouraged potential recruits to apply for loans above and beyond what was needed to fund their education in order to obtain extra cash for consumer spending.[24] And, as the Company's Military Enrollment Advisor from April 2010 through August 2013 explained, throughout her tenure at University of Phoenix, the university was a high-pressure environment in which employees were encouraged to call leads, even people who did not really have a need to go to school, and offer them financial aid.[25] She personally contacted people who did not have a computer and who barely made it through high school, yet the University of Phoenix was trying to recruit them.

---

responsibilities for financial aid to students, ensuring the student was certified for financial aid, and assisting with reapplication for financial aid. She handled a variety of funding, including Title IV, GI Bill and Chapter 30, 31, 33, and 1607 funding. She explained that she spent a lot of time correcting incorrect information that enrollment advisors had told military recruits. Apparently, she was told that she needed to "stay in [her] lane."

[24] Apollo's Finance Advisor from 2008 to 2014 was in charge of obtaining students' financial aid forms, both for new students and continuing students who needed to redo their forms.

[25] The Military Enrollment Officer from April 2010 until August 2013 was an enrollment officer who dealt with the military business specifically, and she was assigned to the military division for the Business and Technology school. Although she did not visit military bases, she would interact by telephone or face-to-face with military students who had been recruited and she was responsible for enrolling students into class.

1      146.   Former University of Phoenix employees have also explained that the

2   university would mislead potential students about the time they had to drop classes and

3   obtain refunds.  Apollo's Finance Advisor from 2008 to 2014 stated that the University of

4   Phoenix would tell the recruits that if they do not like the classes, they could drop them

5   and did not have to continue.  However, if the student was in the class for more than two

6   weeks, they were already billed for it.  These practices meant that recruits were saddled

7   with debt to pay for classes they had dropped.

8      147.   The high-pressure sales environment at the University of Phoenix included

9   making numerous unsolicited phone calls to leads.  University of Phoenix's Military

10  Enrollment Representative from February 2014 until June 2015 stated that University of

11  Phoenix called back prospective students who had expressly stated that they did not want

12  to be contacted again by the University of Phoenix.  He stated there had been a "big

13  push" during 2014 to call back such old leads – including military servicemembers –

14  even though some of these individuals had expressly indicated they did not want to ever

15  be called again.  He further stated that the personnel who were assigned to the callback

16  initiative were essentially forced to do so and had no choice but to be part of the

17  initiative.  In order to "pitch" the call to this type of lead, the enrollment advisor would

18  tell the lead something along the lines that the University of Phoenix had new programs

19  that might be of interest to the individuals being called.  He stated that the callback

20  initiative came to his group (the School of Business) from Vice President Wade

21  Anderson, who was Vice President of the School of Business.  He further explained that

22  the University of Phoenix's other schools, such as the school of education (which have

23  different Vice Presidents than the School of Business), were also being tasked to

24  participate in the callback initiative.

25      148.   Apollo's NDL from March 2012 to June 2014 explained how the University

26  of Phoenix's system promoted multiple unsolicited phone calls.  He stated that enrollment

27  advisors were expected to call a certain number of leads every day.  The enrollment

28  advisor would get a batch of up to 100 people to call on a given day, many of whom may

1    have already been called 4-5 times that week.  He also explained that because the

2    enrollment advisors were required to make so many calls, they would make the calls and

3    hang up immediately, just to establish that the call had been made.  Apollo's Enrollment

4    Advisor from May 2013 to October 2013 similarly explained that enrollment advisors in

5    her position would call like telemarketers to get people enrolled, even if the leads did not

6    want to go to school at that point.  She recounted that she was required to complete 45

7    dials an hour; this was also a requirement for the military team.

8           **D.    During The Class Period, Apollo Promotes Its "Online
                    Classroom" And Reiterates Its Purported Compliance
9                   With Governing Regulations, Including The Executive Order**

10          149.   On October 22, 2013, Apollo's Form 10-K discussed the Company's new

11    online learning platform.  In describing the "Teaching/Learning Model" of the University

12    of Phoenix, it stated that "[t]he majority of University of Phoenix students study

13    exclusively online."  The "Teaching/Learning Model" section of the 2013 Form 10-K

14    further described the "[c]omponents of University of Phoenix's teaching/learning models

15    for both online and on-campus classes" as including "actively working to improve its

16    major learning platform in order to deliver highly personalized learning to students, ease

17    the administrative burden on faculty, improve overall student and faculty experiences,

18    and lead to better educational outcomes."  In a section titled, "Key Trends, Developments

19    and Challenges," the Form 10-K stated that "[w]e are upgrading a substantial portion of

20    our key IT systems, including our student learning system, student services platform and

21    corporate applications, and retiring the related legacy systems.  We believe that these new

22    systems will improve the productivity, scalability, reliability and sustainability of our IT

23    infrastructure and improve the student experience."  The 2013 Form 10-K also claimed

24    that there were no disruptions with new classroom, stating that "disruptions and system

25    malfunctions ***may arise***" in the future.

26          150.   The 2013 Form 10-K also highlighted the Executive Order, including it in

27    the category of "extensive federal and state regulations" that amounted to "recent

28    material activity in the regulatory environment affecting our business and the most

significant regulatory requirements applicable to our domestic postsecondary operations."
The Form 10-K recognized that the Executive Order's "Principles of Excellence"
impacted "marketing standards," among other aspects of Apollo's business.  The annual
report further assured investors that Apollo was complying with the Executive Order,
stating that the "Principles of Excellence" in the Executive Order "could increase the cost
of delivering educational services to our military and veteran students."  Apollo stated
that it was in "compl[iance] with the extensive regulatory requirements."

151.   Apollo's Form 10-K also reported compliance with the 90/10 Rule.  The
Form 10-K stated that Apollo was under the 90% limit that, if reached, would drastically
impact Apollo's business.  Apollo stated that its percentage was 86% in 2011, 84% in
2012, and 83% in 2013, a decrease that the Company stated was "attributable to changes
in student mix and their associated available sources of tuition funding," including an
increase in students that "participate in military benefit programs" such as "tuition
assistance."

152.   Defendants also led an investor conference call on October 22, 2013.
During the call, Defendant Cappelli told investors that Apollo had made "meaningful
progress" in "differentiat[ing] University of Phoenix" through "the rollout of our new
learning platform."   Defendant Cappelli highlighted the importance of thus
"differentiating the University of Phoenix . . . and raising the bar for efficient and
effective operations within our industry."   Defendant Cappelli further emphasized the
new classroom technology, stating that Apollo was "focused on offering a superior
classroom experience."   Defendant Swartz emphasized that University of Phoenix's
"ability to grow our new enrollment [is] about our product and having a competitive
product in the marketplace."   Cappelli also stressed the importance of "putting these
innovations into the marketplace."   Regarding retention, Defendant Swartz stated that
Apollo was expecting "improvement at various levels," as that was Apollo's "number one
priority."

153.   During the October 22, 2013 conference call, Defendant Swartz also

discussed the Company's purported compliance with the 90/10 Rule, emphasizing the decrease in the percentage of Title IV funds.  He stated:

> [F]or the past three years, the University of Phoenix has experienced declines in its 90/10 percentage.  ***In fiscal year 2013, 90/10 decreased by 100 basis points to 83%.***  As a reminder, this is down from 84% in 2012, 86% in 2011, and 88% in 2010.

During the call, Defendant Swartz similarly emphasized the 90/10 percentage, stating that "we're pretty pleased with where the trend has been," "we're watching it carefully," and "we expect it to stay down there" below 90%.

154.    During this time, Defendants profited by selling their shares of Apollo stock at artificially inflated prices.  On October 25, 2013, just three days after the October 22, 2013 misrepresentations, Defendant Pepicello sold 25,924 shares of Apollo common stock for over $730,000.  On January 10, 2014, mere days before Apollo's stock price reached its Class Period high of $35.92 on January 22, 2014, Defendant Swartz sold 50,500 shares of Apollo common stock for over $1.5 million.  Following these sales, the price of Apollo's common stock declined, falling by approximately 80% to close at $7.19 at the end of the Class Period.  In addition, Defendants Swartz and Pepicello reported no other sales of Apollo stock during the Class Period or at any time in the nearly two years prior to the Class Period.

155.    On November 13, 2013 at the JPMorgan Ultimate Services Investor Conference, Defendant Swartz emphasized the Company's new classroom, stating that Apollo had become a "much more leaner [sic], nimbler organization, and we're introducing new products to market faster.  In the last few years, we have invested over $1 billion in our learning and service platforms and data platforms at the University of Phoenix."  He highlighted how, as part of offering a "second to none," "superior classroom experience for the student," the Company had purportedly made "significant enhancements to the student experience," and "[t]he first is our new classroom, or our new learning platform."  As for the implementation of the platform itself, Swartz told investors that "[t]he new platform is actually rolled out to all of our graduate students

today" and that a "staggered roll out for all of [the] undergraduates" would take place over the course of fiscal year 2014. He concluded: "We're very excited about that." During the presentation, Swartz presented a graphic that represented the new online classroom as "Simple. Efficient. Personal" and having "[c]apabilities and features to keep students on track":



156. In early 2014, Defendants continued to emphasize Apollo's purported compliance with the Executive Order. On January 30, 2014, the Company released a press release entitled "University of Phoenix Supports New Federal System for Veterans and Active Duty Servicemember Students." The press release included a direct link to the June 2012 Pepicello letter, available on the Company's website. The January 30, 2014 press release stated that "[i]n July 2012 [sic], University of Phoenix President Dr. Bill Pepicello expressed support of the President's Executive Order 13607."

157. On March 11, 2014, Apollo presented at the Credit Suisse Global Services

Conference, in Scottsdale, Arizona.  During the presentation, Beth Coronelli, Apollo's Vice President of Investor Relations stated that Apollo's "strategy about differentiation . . . all comes to, at the end of the day, down to the student learning experience." Regarding the student learning experience, Coronelli highlighted the "new classroom," stating that "if there seems to be an issue through the new classroom" that the student is having, "the faculty member or the student advisor can step in and see what's happening."  This, Coronelli claimed, helped "to create an ecosystem or a culture around retention."

158.   On April 1, 2014, Apollo held an investor conference call to discuss recent financial results.  During the call, Cappelli stated that Apollo was "first and foremost focused on improving retention" and focused on "improv[ing] the student experience" through the Company's "new, modernized and significantly upgraded online classroom." Cappelli also told investors that Apollo was "in the process of building out a significantly easier to use platform for [its] students that will be streamlined and much more efficient for the University to administer."

159.   On April 8, 2014, Apollo held its "2014 Investor & Analyst Meeting."[26] Defendant Cappelli stressed the importance of the meeting, noting that "Apollo hasn't had an investor day in many years."   Cappelli stated that Apollo was "a different Company today than it was maybe even a few years ago" and was now "really centered around differentiating University of Phoenix" from competitors.   Defendants again reiterated the importance of the online learning platform, stating that the Company was "rolling out a new learning platform" that "has tools that faculty members and students

---

[26] The Investor Day was attended by Defendants Cappelli and Swartz; Beth Coronelli, Apollo Education Group - VP of IR; Jim Berg, Apollo's Chief Ethics and Compliance Officer; Mitch Bowling, Apollo's COO; Ruth Veloria, University of Phoenix's Executive Dean, School of Business; Jerrad Tausz, University of Phoenix's COO; Barry Feierstein, Apollo's Chief Commercial Officer; Tracy Lorenz, President of Western International University; Mark Brenner, Apollo's Chief of Staff, and SVP of Communications and External Affairs; Dan Litteral, Apollo's Deputy General Counsel; Mehul Patel, Apollo's COO; and Jeff Langenbach, Apollo's SVP of Strategy and Business Development.

have never had before and other new retention initiatives to support the success of its students."  During the meeting, University of Phoenix's Chief Operating Officer, Jerrad Tausz, told investors that the new learning platform was "the next key element" for Apollo's success.

160.    On June 25, 2014, Apollo published a press release announcing its financial results for the third quarter of 2014.  The press release quoted Defendant Cappelli as stating that "[*d]uring the third quarter, we . . . completed the rollout of our new learning platform across the university*."  During an investor conference call that day, Defendant Cappelli highlighted the learning platform, stating that "nearly all students in the University are now being served by our new learning platform, which has been greatly enhanced and provides a more efficient and user friendly experience."

161.    On August 9, 2014, shortly after signing the 2014 MOU with the Department of Defense, the Company again reaffirmed its purported compliance with the Executive Order.  Defendants published an editorial written by Apollo's Chief of Staff, Mark Brenner, in the newspaper *The Sacramento Bee*.  The editorial, titled "Another View: University of Phoenix deserves credit for reforms," stated that "President Barack Obama's comprehensive Executive Order 13607 establishes principles of excellence for institutions serving servicemembers, veterans and their families.  University of Phoenix endorsed these important principles early, and was one of the first schools in the country to adopt them."

162.    On September 18, 2014, during the BMO Capital Markets 14th Annual Back To School Education Conference in New York, New York, Apollo again stressed the importance of the new online classroom.  In particular, Defendant Swartz stated that Apollo was "very, very focused on looking at both the service model as well as the learning model, upgrading our learning management system and making sure that the process to learn for a student is seamless" so that students are not "frustrated on how to move around" the online classroom.  Defendant Swartz emphasized that the Company was "working in a structured way" to accomplish that.  Defendant Swartz also addressed

the Company's purported compliance with regulations prohibiting Apollo from incentivizing enrollment personnel financially based on enrollment numbers (*see* ¶¶122-24), asserting that Apollo "adopted changes to our incentive compensation structure before the regulations were even final, let alone before they were ever effective."

163.   On October 21, 2014, Apollo stated during an investor conference call that it had experienced a mere "short-term disruption" in transitioning to the new online classroom and there were only "a few bugs and things in the system that [we]re being worked out," that some students had been "stop[ped] out" only "temporarily," and that "[t]his [was] not a huge part of the student body by any means."  Defendants blamed the "short-term disruption" on students, not the software, equating the online classroom transition to the experience of upgrading from an analog phone to an iPhone, and stating that "there's additional training that needs to be done" for students and that Apollo was "beef[ing] up training" for them.  Defendants assured investors that any problems were "already being improved" and would "get fixed over the near term."

164.   During the October 21, 2014 conference call, analysts inquired whether the new online classroom transition was affecting retention and enrollments.  For instance, analyst Denny Galindo from Morgan Stanley inquired whether the Company's rising bad debt expense was "a sign of people getting frustrated with the new system and dropping out."  Swartz rejected the notion that students were getting frustrated and dropping out, stating that bad debt expense "ticked up just a little bit, very, very slightly, ***simply because our new enrollment trends have improved***."[27]  Defendant Cappelli summarized that "it's a great platform" and emphasized that one benefit of the new platform would be "customer satisfaction" as the platform "enhance[s] the overall learning experience."

165.   During the call, Defendants also continued to highlight their favorable reduction in Title IV funds under the 90/10 Rule, stating that their percentage of revenues

---

[27] Defendant Swartz stated during the October 22, 2013 investor conference call that "bad debts . . . occurs when a student drops [out]" and does not repay his or her debt.  "That oftentimes happens, obviously, when [Apollo is] in a period of growing new enrollments."

attributable to Title IV funds had "decreased 200 basis points to 81%" in fiscal 2014." Apollo's Form 10-K, filed on October 21, 2014, also claimed compliance with the 90/10 Rule.  The Form 10-K stated that Apollo's percentage was 84% in 2012, 83% in 2013, and 81% in 2014, a purported decrease that the Company stated was "attributable to changes in student mix and the associated available sources of tuition funding," including an increase in students that "participate in military benefit programs" such as "tuition assistance."

166.   On November 12, 2014, at the JPMorgan Ultimate Services Investor Conference, the Company continued to emphasize the importance of its online classroom to investors.  Apollo Vice President of Investor Relations Beth Coronelli stated that "retention is [Apollo's] number one priority" and that as part of improving retention, Apollo had "a new classroom that [it had] put in place."  Analyst Jeff Volshteyn from JP Morgan Chase & Co. followed up on these remarks, asking Coronelli about the classroom and noting that Coronelli had mentioned it during her presentation and that "your team mentioned . . . it on the last call" as well.  Volshteyn asked whether the new classroom was "really [a] differentiating kind of proposition for students."  Coronelli responded "Absolutely.  Yes, it is.  From a standpoint of the classroom it is – it's not just an upgrade.   It was a complete new classroom" that was "an overall improved experience."  Coronelli stated that rolling out the new classroom was "a big transition" and assured investors that Apollo was "going through that now, testing class by class."

   **E.   The Truth Begins To Emerge**

       **1.   Apollo Reveals The Truth About Its
          Online Classroom Through Partial Disclosures**

167.   On January 8, 2015, during an investor conference call, Defendant Cappelli admitted that, contrary to his prior statements, problems with the online classroom had, in fact, "resulted in a greater than expected impact on retention."  In a purported effort to provide "additional clarity" regarding his earlier statements on October 21, 2014, Cappelli also explained that the disruption was due in part to the online classroom's

flawed browser compatibility.  In response to a question by Jerry Herman, an analyst at the firm Stifel Nicolaus, about how the new online platform had caused students to "drop out," Defendant Cappelli stated that, instead of students needing "training" on the system as Cappelli had previously stated, students were simply not "able to access the content, the course work, [or] the syllabus."

168.    Defendant Swartz noted that the disruption had "impacted enrollment, and obviously our business outlook for 2015."  Swartz stated that the "disruption . . . ha[d] impacted enrollment" by a large number: "approximately 7,000 incremental students." Swartz also explained that revenue per student was down 8.5%, this figure being "impacted by the increased number of students who withdrew or did not attend class in the quarter due to the disruption related to the new online classroom rollout."

169.    Defendants reassured investors that the disruption was fixed during a question and answer session with analysts during the January 8, 2015 investor conference call.  In response to a questions from Peter Appert, an analyst at Piper Jaffray & Co., regarding "fix[ing]" the new online classroom, Cappelli stated that Apollo had had "lots of communications going out to faculty and students about timelines and data so that they feel comfortable that ***this has been addressed, fixed*** and it won't be disrupted going forward."  In response to a question from Sara Gubins, an analyst at BofA Merrill Lynch, Defendant Cappelli stated that based on "pretty specific data to show the timelines" of the online classroom disruption, including "information from our technical assistance center of when things spiked up … [and] why there was frustration," Cappelli and his team was "very confident" about the cause of the disruption

170.    Cappelli assured analysts and investors that he was knowledgeable about the online classroom being "fixed," asserting that the new classroom was "our number one area of focus," Apollo had "put every necessary asset on it," and the Company "ha[d] a lot of data" regarding the disruption, including the communications with faculty and students.  Cappelli stated that Apollo was "not guessing in terms of how this emanated . . . [and] where the problems are."  Beyond purportedly fixing any problem, Cappelli also

reassured investors that the Company had also "accelerated [the] future enhancements" to the new classroom including "ensuring the classroom [was] compatible with a broader range of browsers and other operating systems at all times; and that course content [was] more readily accessible."  In addition, according to Cappelli, the Company had already, "[b]eginng in January [2015], . . . started to roll out a focused effort to help bring some of those students impacted by the classroom back into the University."  Instead of admitting that the issues with the new classroom were serious and widespread technology issues, Cappelli maintained that "the majority of this disruption we feel very confident is from the explanation of the classroom" to users.

171.   Investors and analysts reacted to the news.  In a January 12, 2015 analyst report, analysts at Wells Fargo noted that there was "investor frustration" around the "platform-related dropout issue," but that "management is insistent that it has the information and early evidence to suggest it can turn its platform-related dropout issue around."  The Wells Fargo analysts reported that "[m]anagement is equally insistent that the platform issue seems not to be affecting new student enrollment."  A January 8, 2015 analyst report by Barrington Research noted that Apollo's surprisingly negative results "appear[ed] to be driven by [Apollo's] new classroom conversion rollout, which . . . had a greater-than-expected negative impact on retention."

172.   In response to Defendants' partial disclosures regarding the online classroom, on January 18, 2015, the price of Apollo stock dropped 13.5% to close at $27.55 per share on abnormally high volume, erasing over $465 million in shareholder value.

173.   On March 25, 2015, during an Apollo investor conference call, Defendant Cappelli referred again to the online classroom disruption that he had previously discussed on October 21, 2014, and that was "discussed last quarter" on January 8, 2015.  Cappelli now disclosed that the disruption was "significant" and that "the technology platform issues . . . adversely impacted retention, and reduced the effect of [Apollo's] retention initiatives."  Defendants disclosed that the technology disruption was largely or

wholly responsible for the drop in retentions, with Defendant Cappelli stating: "Are there other things that are driving decreases in retention?  We don't think so . . . ."

174.   During the March 25, 2015 call, Defendant Cappelli also revealed that the technology disruption impacted not just student retention, but also new enrollments.  In response to a question from analyst Denny Galindo from Morgan Stanley as to whether the new online platform "ha[d] any impact on starts," Defendant Cappelli revealed that the platform problems were so severe that Apollo had cut its advertising spending: "What you don't want to do when you have an issue that's impacting students is run out and spend a whole lot of money on advertising to attract more students into a classroom where there's been some problems."  Defendant Cappelli explained that reduced advertising "impacted new enrollments."

175.   Apollo's Form 10-Q for the second quarter of 2015, filed with the SEC on March 25, 2015, reported a decline of approximately 12.9% in new degreed enrollment from the same quarter in 2014.  The Company also disclosed that total degreed enrollment fell by 14.6% and revenue per student to decrease 4.3%, and that the "Average Degreed Enrollment decreased 13.8% in the six months ended February 28, 2015 compared to the prior year period," which the Company attributed in part to the disturbance in the new classroom platform.  The Company explained that "[t]he disruptions experienced by our students using the University's new online classroom contributed to the decline in student retention we experienced during the six months ended February 28, 2015."

176.   Analysts attributed the decrease in total degreed enrollment and new degreed enrollment to the continuing problems with the new classroom conversion rollout.  Analysts from Barrington Research noted that, although "[m]anagement's implied guidance called for an improvement [in enrollment] throughout 2015," the March 25, 2015 financial results showed that new degreed enrollment fell 12.9% and total degreed enrollment fell 14.6%, and concluded that "[t]he miss appears to be driven by [Apollo's] new classroom conversion rollout, which impacted Q1/15 results as well, and

lowered starts versus expectations." Barrington also noted that "[m]anagement lowered FY/15 guidance *as a result of the classroom rollout issues and lower-than-expected enrollment starts*."

177. In response to Defendants' partial disclosures regarding the online classroom, on March 25, 2015, the price of Apollo stock dropped 28.4% to close at $20.04 per share on abnormally high volume, erasing $852 million in shareholder value.

178. While Defendants partially disclosed the impacts of the online classroom on their financial results on March 25, 2015, they continued to misrepresent the status of the platform. During the March 25, 2015 investor conference call, Defendant Cappelli stated that "[t]he classroom is now again compatible with a range of supported browsers and computer operating systems, which is an area we were receiving the highest number of issues," and "[t]he majority of fixes related to third-party content access have been completed." In response to these assurances, analyst Sara Gubins from BofA Merrill Lynch asked whether retention will improve "given [that] the LMS [software system is] fixed." Defendant Cappelli affirmed that the issues were fixed, stating that "[w]e have worked very hard to make the fixes as quickly as possible and do them the right way. Our hope is to begin to see improvement in retention and when we do that, we will certainly report on it."

179. On June 29, 2015, Apollo filed with the SEC its Form 10-Q regarding financial results for the third quarter of 2015. The Form 10-Q revealed for the first time that just one year after the completion of the $1 billion online classroom's implementation, Apollo was junking it for a different, new learning management system designed by a third party. Recognizing that the new online platform had "experienced technical challenges that adversely impacted the user experience for our students and, we believe, student retention," Apollo announced that in June 2015, the Company had entered into an agreement with a third-party provider of learning management systems to implement a new system, which would not "phase in" for new students until calendar year 2016. The Company further reported a decrease in average degreed enrollment at

the University of Phoenix of 13.9% for the nine months ended May 31, 2015, attributing the decrease in part to "[l]ower student retention due in part to the disruptions experienced by our students using the University's new online classroom during fiscal year 2015."

180.   After the market closed on June 29, 2015, Defendants held an investor conference call to discuss recent financial results.  Defendant Cappelli told investors that Apollo was "mov[ing] away from certain proprietary and legacy IT systems," stating that the Company's multi-year, $1 billion online classroom was, contrary to prior representations, simply "not as efficient" as using a third-party provider of "off-the-shelf" products.

181.   Analysts and journalists responded to Apollo's announcement that it was scrapping a project to which it had devoted many years and hundreds of millions of dollars.  A June 30, 2015 article in the *Chronicle of Higher Education* noted the Company's "deep cuts" and summarized that "after spending years and untold millions on developing its own digital course platform that it said would revolutionize online learning, Mr. Cappelli said the university would drop its proprietary learning systems in favor of commercially available products.  Many Apollo watchers had long expected that it would try to license its system to other colleges, but that never came to pass."  A June 30, 2015 article by an online learning analyst entitled "U of Phoenix: Losing hundreds of millions of dollars on adaptive-learning LMS bet" summarized that "even with a budget of hundreds of millions of dollars and adjunct faculty with centralized course design, the University of Phoenix did not succeed in building the next generation learning platform."  Analysts from Morgan Stanley similarly noted in a June 30, 2015 report that the Company's decision to use "off the shelf (vs proprietary) technology" was a "large change" for the Company.  Morgan Stanley expressed skepticism about Apollo's drastic new strategy including the use of "off the shelf" technology, concluding that it was "cautious on the strategy" and "see[ing] a real risk that cost cuts reduce revenue and leave the company in a worse position."  PiperJaffray similarly noted Apollo's "drastic

cuts" in a June 30, 2015 analyst report and stated that "[n]ew scale reductions could shrink the business by up to 25% over the next 12-18 months and demonstrate that we have yet to find the bottom for [Apollo]."

182.   In response to Defendants' disclosures regarding the online classroom, the price of Apollo's stock fell precipitously.  On June 30 and July 1, 2015, Apollo's stock price declined nearly 20% on abnormally high volume as the market absorbed the Company's disclosures as well as revelations by the Center for Investigative Reporting. *See* ¶¶118-19, 135, 183.  In total, over $331 million in shareholder value was eliminated during these three trading days.

### 2.   Apollo's Undisclosed Military Recruiting Practices Are Revealed Through Partial Disclosures

183.   On June 30, 2015, the Center for Investigative Reporting published its exposé entitled "University of Phoenix sidesteps Obama order on recruiting veterans." The exposé detailed how the University of Phoenix, "the proprietary college that is far and away the largest recipient of taxpayer money under the post-9/11 GI Bill," was engaging in aggressive recruiting tactics that violated the Executive Order and the 2014 MOU.  The exposé revealed how the University of Phoenix (i) paid the military to sponsor hundreds of events on military bases across the country, from rock concerts to Super Bowl parties and father-daughter dances, in order to sidestep the ban on recruiting directly on military bases; (ii) engaged in recruitment drives on bases disguised as résumé workshops; (iii) paid what was characterized as incentive pay to recruiters working on military bases; (iv) cultivated veterans' organizations through financial inducements to lobby Congress for for-profit education spending; and (v) used military insignias in school marketing without obtaining the required prior permission.   Specifically, according to the CIR exposé, the University of Phoenix had:

- spent an estimated $250,000 sponsoring an estimated 89 concerts and other large gatherings on military bases over the prior three-year period (commencing in June 2012) that were essentially large recruiting events;

- sponsored job fairs and résumé writing workshops on military bases along with the U.S. Chamber of Commerce under the "Hiring Our Heroes" banner during the prior two-year period (commencing June 2013) that were in reality recruiting events;

- charted, tracked and paid incentive pay to recruiters during at least 2014;

- engaged in lobbying efforts with the American Legion and other military alumni organizations beginning in October 2013 that were designed to financially induce those institutions to support additional federal funding for for-profit education; and

- distributed "challenge coins" that improperly used DoD insignias to make it appear that the DoD endorsed the University of Phoenix's for-profit educational offerings.

184.    On or about June 30, 2015, Defendants published on its website a response entitled "University of Phoenix has unconditionally and unilaterally supported the President's Executive Order 13607 of 2012," with the subheading "The Facts."   The statement asserted that "University of Phoenix has supported, endorsed, and devoted significant resources to ensure compliance with the U.S. Department of Defense MOU, a comprehensive set of rules governing interactions with servicemembers and incorporating the requirements of the President's Principles of Excellence as outlined in Executive Order 13607.   From the outset, the University has unconditionally and unilaterally supported the directives contained in the Executive Order."   The statement further claimed that since February 2012, the University of Phoenix was working to "rein in bad actors across all sectors of higher education" and that "[i]n June 2012, the University embraced the accountability inherent in the executive order," providing a link to the June 26, 2012 Pepicello letter.

185.    The June 30, 2015 statement further asserted that "[t]he work of the University and Hiring our Heroes, including its presentations, stand above reproach and should serve as an example of exactly the type of information and services our nation's war heroes need as they transition into the civilian workforce."   It further highlighted that

employees "attending educational fairs or other events . . . obtain information from interested, prospective students only with the express permission of event hosts" and that "[t]his is also true of any event made possible by the University's support that is covered by the DOD MOU and the President's executive order." According to the statement, "[t]he University takes great care to distinguish between events permitted and prohibited under the DOD MOU and the President's Executive Order."

186. Following the revelations of the exposé, the price of Apollo's Class A common stock fell by $3.09 per share, or 20% on June 30 and July 1, 2015 on unusually high volume. However, due to Defendants' continued misrepresentations in their refutation of the CIR exposé, the market price of Apollo Class A common stock remained artificially inflated.

187. On July 1, 2015, Senator Richard J. Durbin sent a letter to the Secretary of Defense addressing the matters raised in the CIR exposé and asking that the Defense Department take action. As the letter concluded, the exposé was "deeply troubling" and "document[ed] University of Phoenix's deceptive marketing practices and its infringement on military trademarks." The letter summarized that the University of Phoenix had "evaded th[e] regulations," including "Executive Order 13607 and the Department issued DoDi 1322.25 to protect servicemembers from abuse." Senator Durbin's letter specified some of the troubling revelations in the expose, including how at Hiring Our Heroes job fairs and workshops, "[a] CIR hidden camera documents that all of the resume workshop materials, presentation slides, and sample successful resumes are labeled with University of Phoenix marketing, and trainers urge attendees to go to their website for additional information. Documents obtained by the CIR show these actions are part of a concerted strategy of stealth recruiting by the company to evade Department scrutiny." Senator Durbin also pointed to the Company's use of "a mock military challenge coin" even though Defense Department "had not given permission for the use of its trademark." Senator Durbin "urge[d]" the Secretary of Defense "to investigate these allegations swiftly by taking immediate steps to bar the company from further

1   access to servicemembers until these issues are resolved."

2       188.   On July 24, 2015, the PBS *News Hour* reported on the University of

3   Phoenix's recruiting practices, including its participation at Hiring Our Heroes events,

4   and its use of challenge coins.   In the report, University of Phoenix Executive Dean

5   James Marks rejected reports that the university was violating the Executive Order and

6   military regulations by using welfare and recreational events on military bases, and

7   Hiring Our Heroes events, to recruit students.   Marks stated that "[i]n terms of

8   compliance, we do compliance exceptionally well."   He stated that "find[ing] students" to

9   enroll at University of Phoenix was "a separate and completely distinct action" as

10  compared to the welfare, recreational, and Hiring Our Heroes events.

11      189.   The PBS *News Hour* report also featured an interview with Dawn Bilodeau,

12  the Chief of Voluntary Education at the Department of Defense.   When she was asked by

13  a reporter whether the University of Phoenix's reported use of challenge coins

14  "concerned" her, she stated "Yes. . . .   [I]f they're currently handing them out and it was

15  reported, I would be compelled to take action."   She also stated that "if any one of our

16  educational institutions was providing a workshop where they provided their own

17  marketing materials, used their own references, and had their slides with their names, that

18  would be a reportable offense – a non-compliance action, and we would receive those and

19  adjudicate them."   Bilodeau agreed that "if it turned out to be true" that an education

20  institution such as University of Phoenix was engaging in those practices, "it would be

21  listed and we would take action."   Bilodeau stated that she was "confident" that the

22  Department of Defense could "enforce the requirements" of its new agreement "and take

23  action, plac[ing] schools on probation when needed, which impacts their bottom line if

24  they're not able to recruit new students."   The PBS *News Hour* report concluded by

25  noting that "the Defense Department says it takes the allegations seriously, and is looking

26  into the matter."

27      190.   Two and a half months later, the Department of Defense took action.   On

28  October 9, 2015, Apollo disclosed that in an October 7, 2015 letter from Bilodeau to the

University of Phoenix, the Defense Department had placed the University of Phoenix on probation.  The letter barred the University of Phoenix from recruiting on military bases, prevented troops who were not already enrolled from using federal funds for its classes, and threatened a permanent termination from the Tuition Assistance program.  The letter stated that "[i]n response to allegations published by the Center for Investigative Reporting on June 30, 2015," the Department of Defense had reviewed "the agreements between the University of Phoenix and the DoD, as reflected in the DoD MOU."  The letter stated that the review:

> revealed several violations of the DoD MOU attributed to the University of Phoenix, including, but not limited to, ***transgression of Defense Department policies regarding use of its official seals or other trademark insignia and failure to go through the responsible education advisor for each business related activity requiring access to the DoD installations***."

191.   The October 7, 2015 letter highlighted the "disconcerting" "frequency and scope" of the violations and noted that the allegations against University of Phoenix, "would violate several additional provisions of the University of Phoenix MOU with DoD, specifically, but not limited to: section 3a(2), for failing to comply with governing Federal law and the requirements set forth in the DoD MOU; and section 3j and its subsections, which seek to eliminate unfair, deceptive and abusive marketing."  Sections 3a(2) and 3j are excerpted above at paragraph 110.  The letter further stated that the allegations raised a concern that University of Phoenix's was violating section 3m(l) of the 2014 MOU, which regards the Servicemembers Opportunity Colleges Principles and Criteria and the Military Student Bill of Rights.  The letter further informed the University of Phoenix that it would not be authorized access to Defense Department installations "for the purposes of participating in any recruitment-type activities, including but not limited to job training, and career events and fairs."

192.   Analysts reacted to Apollo's disclosure of the Defense Department's probation letter.  In an October 2015 report, S&P Capital IQ stated "We see challenges from University of Phoenix . . . being put on probationary status regarding the Dept. of

Defense tuition assistance program." Analysts at Deutsche Bank similarly commented on the probation letter, stating that "University of Phoenix has been notified by DoD that they have been placed on probationary status and cannot participate in the DoD tuition assistance program for active military personnel."

193. After the market closed on October 9, 2015, *The Wall Street Journal* disclosed that the Department of Justice and the Department of Education were coordinating ongoing investigations into the University of Phoenix. The Department of Education was overseeing an interagency task force "to help ensure proper accountability for and oversight of career colleges and for-profit institutions."

194. As the market learned of and incorporated the disclosures made on October 9, 2015 into the stock price, the price of Apollo Class A common stock declined further, falling from a close of $12.36 per share on October 8, 2015 to a close of $10.52 per share on Monday, October 12, 2015, and erasing over $197 million in shareholder value.

195. On October 22, 2015, before the open of trading, Apollo filed its Form 10-K for 4Q 2015 and fiscal year 2015 ending August 31, 2015. Contrary to prior representations, new enrollment at the University of Phoenix had fallen by nearly one-third in the quarter and total enrollment was almost 20% lower than in the same period in 2014. These declines were worse than analyst expectations and in part due to the previously undisclosed dysfunction of the online classroom as well as Apollo's inability to recruit as before. With this background, Apollo disclosed in its 2015 Form 10-K that it was now undergoing a "[t]ransformation," "working to stabilize enrollment and eventually return to growth by," among other things, "[t]ransitioning technology systems from proprietary and legacy systems, including the University's online classroom, to commercial software . . . ." The Company also disclosed that the "transition" away from the new classroom to commercial software was expected to "accelerate the current rate of decline in enrollment at University of Phoenix, perhaps significantly, during the near term."

196. Also on October 22, 2015, the Company held a conference call with

investors and analysts.  During the conference call, Defendant Cappelli disclosed that the ban on participating in the military TA programs would impact revenues and profits. Defendant Cappelli stated that the Company's financial "outlook range does include some impact from the recent Department of Defense action" and that Apollo could not "be certain as to the timing of reinstatement."

197.   During the October 22, 2015 earnings conference call, Defendant Cappelli also provided additional detail about the Company's plans to abandon its $1 billion investment in its built-from-scratch new online classroom in favor of a platform produced by a different company:

> "Finally, as we discussed last quarter, we continue to build self-service capabilities for many of our student service applications.  And we're making progress in moving away from more costly, proprietary, and legacy IT systems.  That will greatly improve costs and efficiency.  We're still on track to begin to roll out the new Learning Management System for incoming students in partnership with a leading provider using their newly designed state-of-the-art LMS by the end of [fiscal] 2016."

198.   On October 22, 2015, Apollo filed with the SEC its Form 10-K Annual Report.  Under a section titled "*University of Phoenix Transformation*," the Form 10-K reported the decline in enrollment suffered by the University of Phoenix during the fiscal year: namely, an 18% decline.  Under a section titled "Analysis of Operating Results by Reportable Segment," the Form 10-K detailed the operating results for University of Phoenix, revealing that the segment had experienced decreases in enrollment and revenue during fiscal years 2014 and 2015:

> "University of Phoenix's net revenue decreased $484.6 million and $671.5 million, or 18.4% and 20.3%, in fiscal years 2015 and 2014, respectively, compared to the prior years. The decreases were principally attributable to lower enrollment from the continued decline in New Degreed Enrollment, *as detailed and defined below*, and a decline in student retention in fiscal year 2015."

199.   The decline in New Degreed Enrollment referenced in the above statement was described in the 2015 Form 10-K as being based on 1) "The University's reduced advertising in fiscal year 2015, [which] contributed to the 15.6% decline in Aggregate

1    New Degreed Enrollment"; and 2) "*Lower student retention* due in part to the

2    *disruptions in the University's online classroom* during fiscal year 2015."

3         200.   Following these disclosures, the price of Apollo Class A common stock fell

4    further, closing down $3.42 per share – or more than 32% – from a close of $10.60 per

5    share on October 21, 2015, to a close of $7.19 per share on October 22, 2015, on

6    unusually high volume of more than 14.2 million shares traded.  In total, the Company's

7    share price declined approximately 80% from its Class Period high of nearly $36 per

8    share, erasing nearly $3 billion in market capitalization.

9         201.   Following the Class Period, on January 15, 2016, the Company filed a

10   Current Report on Form 8-K with the SEC disclosing that the "University of Phoenix,

11   Inc., was notified by the U.S. Department of Defense ('DoD') that the University's

12   probationary status in respect of its participation in the DoD Tuition Assistance Program

13   for active duty military personnel ha[d] been lifted, effective immediately."  However, the

14   Company disclosed that the University of Phoenix would remain "*subject to a*

15   *heightened compliance review for a period of one-year following the removal of*

16   *probationary status*" and that *"[d]uring this period, the University [would] continue to*

17   *engage with the Department and complete the production of information and*

18   *documents previously requested by the Department*" and would "*be subject to an*

19   *enhanced compliance review in fiscal year 2017.*"

20        202.   On February 8, 2016, Apollo announced that it had agreed to be taken

21   private.   If approved, the Company would be acquired by a consortium of private

22   investors, led by The Vistria Group, who would pay $9.50 per share for all outstanding

23   Class A and B shares.  During the Class Period, however, Apollo's management had kept

24   secret the fact that the Board of Directors had lost confidence in them and commenced

25   shopping the Company.  At least as early as December 2014, the Company had begun

26   plans to sell the Company.  Management held discussions with bidders for the Company

27   throughout 2015.  Only in 2016, after the Class Period, did Apollo disclose that bidders

28   reduced their bids for Apollo shortly after the October 9, 2015 disclosure, "likely

reflect[ing] . . . bidders' perception of increased downside risk due to the heightened regulatory pressure faced by the Company, including the announcement that the U.S. Department of Defense was placing the University of Phoenix on probationary status."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

203.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Among other things, Defendants made false and misleading statements to investors, and omitted material facts, regarding (i) the status of the Company's $1 billion online classroom; and (ii) the Company's undisclosed violations of regulations, the Executive Order, and the Company's contract with the Department of Defense.  At the same time, Defendants omitted material facts regarding the disruption-plagued online classroom.  Defendants also omitted that the University of Phoenix was not in compliance with the MOUs or the President's Executive Order, and that its statements regarding the 90/10 Rule were misleading because they were based on improper military recruiting.

### A.    False And Misleading Statements And Omissions Regarding Apollo's Online Classroom

204.    On October 22, 2013, the first day of the Class Period, Apollo filed with the SEC its 2013 Form 10-K.  In a section titled, "Key Trends, Developments and Challenges," the Form 10-K stated that "[w]e are upgrading a substantial portion of our key IT systems, including our student learning system, student services platform and corporate applications, and retiring the related legacy systems.  We believe that these new systems will improve the productivity, scalability, reliability and sustainability of our IT infrastructure and improve the student experience."  The Form 10-K also stated that "disruptions and system malfunctions . . . may arise from [Apollo's IT systems] upgrade initiative."

205.    Also on October 22, 2013, Apollo held an investor conference call, in

which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated.  During the call, Defendant Cappelli told investors that Apollo had made "meaningful progress" in "differentiat[ing] University of Phoenix" through "the rollout of our new learning platform."  Cappelli discussed the importance of thus "differentiating the University of Phoenix . . . and raising the bar for efficient and effective operations within our industry."  He further discussed the new classroom technology, stating that Apollo was "focused on offering a superior classroom experience."  Defendant Swartz stated that University of Phoenix's "ability to grow our new enrollment [is] about our product and having a competitive product in the marketplace."  Cappelli discussed the importance of "putting these innovations into the marketplace."

206.  Defendants' statements in the 2013 Form 10-K and conference call, identified above in ¶¶204-05, were false and misleading when made.  Defendants' statements omitted that (i) the new classroom was already consistently dysfunctional and experiencing "disruptions and system malfunctions" amid widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; and (iv) new classroom's consistent technical failures were causing Apollo's students to drop out or not enroll.  *See* ¶¶50-69, above.

207.  On November 13, 2013, Apollo presented at the JPMorgan Ultimate Services Investor Conference.  During the presentation, Defendant Swartz discussed the Company's new classroom, stating that Apollo had become a "much more leaner [sic], nimbler organization, and we're introducing new products to market faster.  In the last few years, we have invested over $1 billion in our learning and service platforms and data platforms at the University of Phoenix."  He stated that, as part of offering a "second to none," "superior classroom experience for the student," the Company had purportedly made "significant enhancements to the student experience," and "[t]he first is our new

classroom, or our new learning platform." Swartz told investors that "[t]he new platform is actually rolled out to all of our graduate students today" and that a "staggered roll out for all of [the] undergraduates" would take place over the course of fiscal year 2014. During the presentation, Swartz presented a slide about the new online classroom, stating that it had "[c]apabilities and features to keep students on track," and was "simple" and "efficient":



208.   Defendants' statements at the November 13, 2013 JPMorgan Ultimate Services Investor Conference, identified above in ¶207, were false and misleading when made.   Defendants' statements omitted that (i) the new classroom was consistently dysfunctional amid widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; and (iv) new

classroom's consistent technical failures were causing Apollo's students to drop out or not enroll. *See* ¶¶50-69, above.

209.   On March 11, 2014, Apollo presented at the Credit Suisse Global Services Conference, in Scottsdale, Arizona.   During the presentation, Coronelli stated that Apollo's "strategy about differentiation . . . all comes to, at the end of the day, down to the student learning experience."   Coronelli discussed Apollo's ability to respond to issues that could arise as Apollo transitions to the new classroom, stating that "if there seems to be an issue through the new classroom" that the student is having, "the faculty member or the student advisor can step in and see what's happening."   This, Coronelli stated, helped "to create an ecosystem or a culture around retention."

210.   Apollo's statements at the March 11, 2014 Credit Suisse Global Services Conference, identified above in ¶209, were false and misleading when made. Defendants' statements omitted that (i) the new classroom was consistently dysfunctional amid widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; and (iv) new classroom's consistent technical failures were causing Apollo's students to drop out or not enroll. *See* ¶¶50-69, above.

211.   On April 1, 2014, Apollo held an investor conference call, in which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated.   During the call, Defendant Cappelli stated that Apollo was "first and foremost focused on improving retention" by "improv[ing] the student experience" through the Company's "new, modernized and significantly upgraded online classroom." Cappelli also stated that Apollo was "in the process of building out a significantly easier to use platform for [its] students that will be streamlined and much more efficient for the University to administer."

212.   Defendants' statements during the April 1, 2014 conference call, identified

1   above in ¶211, were false and misleading when made.  Defendants' statements omitted

2   that (i) the new classroom was consistently dysfunctional amid widespread outages; (ii)

3   layoffs in Apollo's IT department worsened new classroom's performance and depleted

4   Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction

5   caused numerous student complaints and was reported to senior management in internal

6   reports and conference calls; and (iv) new classroom's consistent technical failures were

7   causing Apollo's students to drop out or not enroll.  *See* ¶¶50-69, above.

8        213.   On April 8, 2014, Apollo held its "2014 Investor & Analyst Meeting,"

9   during which Apollo's top executives (*see* ¶159 and footnote 26) attended and

10  participated.  During the meeting, Defendant Cappelli stated that Apollo was "a different

11  Company today than it was even a few years ago" and was now "really centered around

12  differentiating University of Phoenix" from competitors.  He stated that the Company

13  was "rolling out a new learning platform" that "has tools that faculty members and

14  students have never had before and other new retention initiatives to support the success

15  of [its] students."  University of Phoenix's Chief Operating Officer, Jerrad Tausz, stated

16  that the new learning platform was "the next key element" for Apollo's success.

17       214.   Defendants' statements during the April 8, 2014 investor and analyst

18  meeting, identified above in ¶213, were false and misleading when made.  Defendants'

19  statements omitted that (i) the new classroom was consistently dysfunctional amid

20  widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's

21  performance and depleted Company war rooms meant to fix new classroom; (iii) new

22  classroom's dysfunction caused numerous student complaints and was reported to senior

23  management in internal reports and conference calls; and (iv) new classroom's consistent

24  technical failures were causing Apollo's students to drop out or not enroll.  *See* ¶¶50-69,

25  above.

26       215.   On June 25, 2014, Apollo published a press release announcing its financial

27  results for the third quarter of 2014.  The press release quoted Defendant Cappelli as

28  stating that "[d]uring the third quarter, we . . . completed the rollout of our new learning

platform across the university." Also on June 25, 2014, Apollo held an investor conference call, in which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated. During the call, Defendant Cappelli stated that "nearly all students in the University are now being served by our new learning platform, which has been greatly enhanced and provides a more efficient and user friendly experience."

216. Defendants' statements in the June 25, 2014 press release and during the June 25, 2014 conference call, identified above in ¶215, were false and misleading when made. Defendants' statements omitted that (i) the new classroom was consistently dysfunctional amid widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; and (iv) new classroom's consistent technical failures were causing Apollo's students to drop out or not enroll. *See* ¶¶50-69, above.

217. On September 18, 2014, during the BMO Capital Markets 14th Annual Back To School Education Conference in New York, New York, Defendant Swartz stated that Apollo was "very, very focused on looking at both the service model as well as the learning model, upgrading our learning management system and making sure that the process to learn for a student is seamless" so that students are not "frustrated on how to move around" the online classroom.

218. Defendants' statements at the September 18, 2014 BMO Capital Markets 14th Annual Back To School Education Conference, identified above in ¶217, were false and misleading when made. Defendants' statements omitted that (i) the new classroom was consistently dysfunctional amid widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference

1    calls; and (iv) new classroom's consistent technical failures were causing Apollo's

2    students to drop out or not enroll.  *See* ¶¶50-69, above.

3        219.   On October 21, 2014, Apollo held an investor conference call, in which

4    Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli,

5    participated.   During the call, Defendant Cappelli stated that the Company had

6    experienced a mere "short-term disruption" in transitioning to the new online classroom,

7    there were only "a few bugs and things in the system that [we]re being worked out," that

8    some students had been "stop[ped] out" only "temporarily," and that "[t]his [wa]s not a

9    huge part of the student body by any means."  Cappelli stated that the issue was training

10   for students, as "there's additional training that needs to be done" for students and Apollo

11   was "beef[ing] up training" for them.  Defendants assured investors that any problems

12   were "already being improved" and would "get fixed over the near term."

13       220.   During the October 21, 2014 conference call, Denny Galindo from Morgan

14   Stanley inquired whether the Company's rising bad debt expense was "a sign of people

15   getting frustrated with the new system and dropping out."  Swartz responded by stating

16   that bad debt expense "ticked up just a little bit, very, very slightly, simply because our

17   new enrollment trends have improved."   Defendant Swartz stated that "we'll have the

18   same number of students in the total student count" regardless of the new classroom

19   transition issue.  Defendant Cappelli summarized that new classroom was "a great

20   platform" and emphasized that one benefit of the new platform would be "customer

21   satisfaction" as the platform "enhance[s] the overall learning experience."

22       221.   On October 21, 2014, Apollo also filed with the SEC an annual report on

23   Form 10-K.  The Form 10-K stated that "disruptions and system malfunctions . . . may

24   arise from [Apollo's IT systems] upgrade initiative."

25       222.   Defendants' statements during the October 21, 2014 conference call and in

26   the 2014 Form 10-K, identified above in ¶¶219-21, were false and misleading when

27   made.   Defendants' statements omitted that (i) the new classroom was already

28   consistently dysfunctional and experiencing "disruptions and system malfunctions" amid

widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; and (iv) new classroom's consistent technical failures were causing Apollo's students to drop out or not enroll, which, among other things, increased Apollo's bad debt expense.  *See* ¶¶50-69, 164, above.

223.   On November 12, 2014, at the JPMorgan Ultimate Services Investor Conference in New York, New York, Apollo's Coronelli stated that "retention is [Apollo's] number one priority" and that as part of improving retention, Apollo had "a new classroom that [it had] put in place."  In response to a question from analyst Jeff Volshteyn from JP Morgan Chase & Co. regarding whether the new classroom was "really [a] differentiating kind of proposition for students," Coronelli responded "Absolutely.  Yes, it is.  From a standpoint of the classroom it is – it's not just an upgrade. It was a complete new classroom" that was "an overall improved experience."

224.   Apollo's statements during the November 12, 2014 JPMorgan Ultimate Services Investor Conference, identified above in ¶223, were false and misleading when made.  Defendants' statements omitted that (i) the new classroom was consistently dysfunctional amid widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; and (iv) new classroom's consistent technical failures were causing Apollo's students to drop out or not enroll.  *See* ¶¶50-69, above.

225.   On January 8, 2015, Apollo held an investor conference call, in which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated.  During the call, and in response to a questions from Peter Appert, an analyst at Piper Jaffray & Co., regarding "fix[ing]" the new online classroom, Cappelli stated that Apollo had had "lots of communications going out to faculty and students about timelines

and data so that they feel comfortable that ***this has been addressed, fixed*** and it won't be disrupted going forward."

226.   During the January 8, 2015 call, Cappelli also stated that the new classroom was Apollo's "number one area of focus," Apollo had "put every necessary asset on it," and the Company "ha[d] a lot of data" regarding the disruption.  Cappelli stated that Apollo was "not guessing in terms of how this emanated . . . [and] where the problems are."  Cappelli also reassured investors that the Company had also "accelerated [the] future enhancements" to the new classroom including "ensuring the classroom [was] compatible with a broader range of browsers and other operating systems at all times, and that course content [was] more readily accessible."  In addition, according to Cappelli, the Company had already, "[b]eginng in January [2015], . . . started to roll out a focused effort to help bring some of those students impacted by the classroom back into the University."  Cappelli stated that "the majority of this disruption we feel very confident is from the explanation of the classroom" to users.

227.   While Defendants made a partial disclosure on January 8, 2015 (*see* ¶¶167-68), Defendants' statements during the January 8, 2015 conference call, identified above in ¶¶225-26, were false and misleading when made.  Defendants' statements omitted that (i) the new classroom was consistently dysfunctional amid widespread outages; (ii) layoffs in Apollo's IT department worsened new classroom's performance and depleted Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; (iv) new classroom's consistent technical failures were causing Apollo's students to drop out or not enroll; and (v) Apollo was taking steps to replace its new online classroom with an off-the-shelf product from an outside company. *See* ¶¶50-75, above.

228.   On March 25, 2015 call, Apollo held an investor conference call, in which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated.   During the call, Defendant Cappelli stated that "[t]he majority of fixes

1  related to third-party content access have been completed" and "[t]he classroom is now

2  again compatible with a range of supported browsers and computer operating systems,

3  which is an area we were receiving the highest number of issues."  In response to a

4  question from analyst Sara Gubins from BofA Merrill Lynch about how much retention

5  would improve "given [that] the LMS [software system is] fixed," Defendant Cappelli

6  stated that "[w]e have worked very hard to make the fixes as quickly as possible and do

7  them the right way."

8       229.   While Defendants made a partial disclosure on March 25, 2015 (*see* ¶¶173-

9  76), Defendants' statements during the March 25, 2015 conference call, identified above

10  in ¶228, were false and misleading when made.  Defendants' statements omitted that (i)

11  the new classroom was consistently dysfunctional amid widespread outages; (ii) layoffs

12  in Apollo's IT department worsened new classroom's performance and depleted

13  Company war rooms meant to fix new classroom; (iii) new classroom's dysfunction

14  caused numerous student complaints and was reported to senior management in internal

15  reports and conference calls; (iv) new classroom's consistent technical failures were

16  causing Apollo's students to drop out or not enroll; and (v) Apollo was taking steps to

17  replace its new online classroom with an off-the-shelf product from an outside company.

18  *See* ¶¶50-75, above.

19       **B.    False And Misleading Statements And**
        **Omissions Regarding Apollo's Military Recruiting**

20

21            **1.    Statements In SEC Filings,**
                **Conference Calls, And Other Media**

22       230.   On October 22, 2013, Defendants stated in Apollo's 2013 Form 10-K that

23  Apollo was in "compl[iance] with the extensive regulatory requirements" governing its

24  business.  The Form 10-K listed the Executive Order under "extensive federal and state

25  regulations."  The annual report further assured investors that Apollo was complying with

26  the Executive Order, stating that the "Principles of Excellence" in the Executive Order

27  impacted "marketing standards" and "could increase the cost of delivering educational

28  services to our military and veteran students."

231.   The Form 10-K also reported compliance with the 90/10 Rule, reporting that its percentage of revenues attributed to Title IV funds was "86%" in 2011, "84%" in 2012, and "83%" in 2013.   The Form 10-K stated that the figures were "attributable to changes in student mix and their associated available sources of tuition funding," including an increase in students that "participate in military benefit programs" such as "tuition assistance."

232.   Apollo also held an investor conference call on October 22, 2013.   During the call, Defendant Swartz discussed the 90/10 Rule:

> [F]or the past three years, the University of Phoenix has experienced declines in its 90/10 percentage.   In fiscal year 2013, 90/10 decreased by 100 basis points to 83%.   As a reminder, this is down from 84% in 2012, 86% in 2011, and 88% in 2010.

Defendant Swartz stated that "we're pretty pleased with where the trend has been" with the 90/10 percentage, "we're watching it carefully," and "we expect it to stay down there" below 90%.

233.   Defendants' statements in the 2013 Form 10-K and conference call, identified above in ¶¶230-32, were false and misleading when made.   Defendants' statements omitted that Apollo's increase in participants in military benefits programs and its decreases in the 90/10 percentage were due to improper recruitment practices and that Apollo violated the Executive Order and the 2014 MOU.   *See* ¶¶80-85, 100-48, above.

234.   On January 30, 2014, Apollo issued a press release entitled "University of Phoenix Supports New Federal System for Veterans and Active Duty Servicemember Students."   The press release included a direct link to the June 2012 Pepicello letter, available on the Company's website.   The January 30, 2014 press release stated that "[i]n July 2012 [sic], University of Phoenix President Dr. Bill Pepicello expressed support of the President's Executive Order 13607."

235.   Defendants' statements in the January 30, 2014 press release, identified above in ¶234, were false and misleading when made.   Defendants' statements omitted Apollo's undisclosed, improper recruitment practices and that Apollo violated the

1    Executive Order and the 2014 MOU.  *See* ¶¶100-48, above.

2        236.   On April 8, 2014, Apollo held its "2014 Investor & Analyst Meeting."

3    During the meeting, Jim Berg ("Berg"), Apollo's Chief Ethics and Compliance Officer,

4    stated that the Company had "a variety of systems" and a "safety net" that its recruiting

5    practices complied with government regulations.   Regarding the prohibition on

6    incentivizing admissions personnel based on the number of enrollments, Berg stated that

7    the Company had "put in place a set of performance review criteria for those persons

8    within our ecosystem who work with and who face students so that there is nothing in

9    their performance review . . . [or] performance criteria that relates to any consideration of

10   the quantity or number of students who may enroll."

11       237.   Defendants' statements during the 2014 Investor & Analyst Meeting,

12   identified above in ¶236, were false and misleading when made.  Defendants' statements

13   omitted Apollo's undisclosed, improper recruitment practices, that Apollo violated the

14   Executive Order and the 2014 MOU, and that Apollo based employment decisions on the

15   number of enrollments.  *See* ¶¶100-48, above.

16       238.   On August 9, 2014, Defendants published an editorial written by Apollo's

17   Chief of Staff, Mark Brenner, in the newspaper *The Sacramento Bee*.  The editorial, titled

18   "Another View: University of Phoenix deserves credit for reforms," stated that "President

19   Barack Obama's comprehensive Executive Order 13607 establishes principles of

20   excellence for institutions serving servicemembers, veterans and their families.

21   University of Phoenix endorsed these important principles early, and was one of the first

22   schools in the country to adopt them."

23       239.   Defendants' statements in the August 9, 2014 newspaper editorial,

24   identified above in ¶238, were false and misleading when made.  Defendants' statements

25   omitted Apollo's undisclosed, improper recruitment practices and that Apollo violated the

26   Executive Order and the 2014 MOU.  *See* ¶¶100-48, above.

27       240.   On October 21, 2014, Defendant's stated in Apollo's 2014 Form 10-K that

28   it was in "compl[iance] with the extensive regulatory requirements" governing its

business.  The annual report further assured investors that Apollo was complying with the Executive Order, stating that the "Principles of Excellence" in the Executive Order "could increase the cost of delivering educational services to our military and veteran students."  The Form 10-K also reported compliance with the 90/10 Rule, reporting that its percentage of revenues attributed to Title IV funds was "84%" in 2012, "83%" in 2013, and "81%" in 2014.  The Form 10-K stated that the figures were "attributable to changes in student mix and their associated available sources of tuition funding," including an increase in students that "participate in military benefit programs" such as "tuition assistance."

241.  Apollo also held an investor conference call on October 21, 2014.  During the conference call, Defendant Swartz stated that Apollo's percentage of revenues attributable to Title IV funds had "decreased 200 basis points to 81%" in fiscal 2014.

242.  Defendants' statements in the 2014 Form 10-K and conference call, identified above in ¶¶240-41, were false and misleading when made.  Defendants' statements omitted that Apollo's increase in participants in military benefits programs and its decreases in the 90/10 percentage were due to improper recruitment practices and that Apollo violated the Executive Order and the 2014 MOU.  *See* ¶¶80-85, 100-48, above.

243.  On June 29, 2015, Apollo held an investor conference call, in which Defendants Cappelli, Vice President of Investor Relations Beth Coronelli, and interim CFO Joe D'Amico participated.  During the call, Defendant Cappelli stated that, in response to the government's requirement to "rein[] in any bad actors," "[b]eginning in November 2010, we were one of the first organizations to change recruiter comp, well before it was mandated . . . there's no doubt that these initiatives also took a toll on our operating and financial performance during the period, a period where the reputation at the University of Phoenix was tarred by the broader environment and damaged in the public eye. . . .  It's clear how important it was to take the bold steps we did, which allows us to be a more respected institution today."

244.  Defendants' statements during the June 29, 2015 conference call, identified

above in ¶243, were false and misleading when made.  Defendants' statements omitted Apollo's undisclosed, improper recruitment practices and that Apollo violated the Executive Order and the 2014 MOU.  *See* ¶¶100-48, above.

245.   On July 24, 2015, the PBS *News Hour* reported on the University of Phoenix's recruiting practices.  The report showed video footage of University of Phoenix Executive Dean James Marks stating:

> In terms of compliance, we do compliance exceptionally well.  If we're going to sponsor morale, welfare, and recreational events on military installations, it's to benefit the servicemember and to bring entertainment to them, opportunities with businesses off post – that kind of stuff.  If we are looking to find students who want to go through the University of Phoenix experience as they transition or while they're on active duty, that is a separate and completely distinct action on our part.

246.   Apollo's statements above in ¶245 were false and misleading when made. Defendants' statements omitted Apollo's undisclosed, improper recruitment practices and that Apollo violated the Executive Order and the 2014 MOU.  *See* ¶¶100-48, above.

## 2.   Statements Published On Apollo's Website During The Class Period

247.   Apollo   maintained   two   Company   websites   (www.apollo.edu   and www.phoenix.edu) (the "Company website") throughout the Class Period, to which it directed investors for information about the Company and its recruiting practices. Defendants approved of, and referred investors to, the Company website during each quarterly investor conference call during the Class Period.  The Individual Defendants controlled and approved the content of the Company website.

248.   Throughout the Class Period, Defendants published on the Company website a June 26, 2012 letter from the President of the University of Phoenix, William Pepicello to the U.S. Departments of Veterans Affairs, Defense, Education, and Justice, as well as the Bureau of Consumer Financial Protection.   The letter stated that the "University of Phoenix embraces the accountability inherent in the Executive Order 1307 [sic]" and that he was writing "on behalf of the entire University of Phoenix community,

to express support of, and state our intent to comply with, the President's Executive Order 13607."

249.    Defendants' statements in the June 26, 2012 Pepicello letter, identified above in ¶248, were false and misleading when made.  Defendants' statements omitted Apollo's undisclosed, improper recruitment practices and that Apollo violated the Executive Order and the 2014 MOU.  *See* ¶¶100-48, above.

250.    Throughout the Class Period, Defendants also published on the Company website "A Message to University of Phoenix Military Students" by the University of Phoenix's Associate Regional Vice President – Military, Garland Williams.  The message stated that "many of the reforms included in the Executive Order were pioneered at University of Phoenix and are in place today."  According to Williams, these compliance measures exemplified the purported fact that the "University of Phoenix does more than any postsecondary educational institution to demonstrate transparency and a commitment to military students."  The July 2012 letter provided a direct weblink to view "President Bill Pepicello's letter of support" of the Executive Order dated June 26, 2012.  The July 2012 document also asserted that "University of Phoenix has . . . led the way when it comes to transparency and student protections for our military students" and that "help[ing] the President and Congress ensure that our nation's military receive a quality education" was "a founding principle at University of Phoenix and a responsibility we take seriously."

251.    Defendants' statements in the document titled "A Message to University of Phoenix Military Students," identified above in ¶250, were false and misleading when made.   Defendants' statements omitted Apollo's undisclosed, improper recruitment practices and that Apollo violated the Executive Order and the 2014 MOU.  *See* ¶¶100-48, above.

252.    On or about June 30, 2015, Defendants published on Apollo's website a statement responding to the disclosures of University of Phoenix recruiting practices entitled "University of Phoenix has unconditionally and unilaterally supported the

President's Executive Order 13607 of 2012," with the subheading "The Facts."   The statement asserted that "University of Phoenix has supported, endorsed, and devoted significant resources to ensure compliance with the U.S. Department of Defense MOU, a comprehensive set of rules governing interactions with servicemembers and incorporating the requirements of the President's Principles of Excellence as outlined in Executive Order 13607.   From the outset, the University has unconditionally and unilaterally supported the directives contained in the Executive Order."   The statement further stated that since February 2012, the University of Phoenix was working to "rein in bad actors across all sectors of higher education" and that "[i]n June 2012, the University embraced the accountability inherent in the executive order," providing a link to the June 26, 2012 Pepicello letter.

253.   The June 30, 2015 statement further asserted that "[t]he work of the University and Hiring our Heroes, including its presentations, stand above reproach and should serve as an example of exactly the type of information and services our nation's war heroes need as they transition into the civilian workforce."   It further stated that employees "attending educational fairs or other events . . . obtain information from interested, prospective students only with the express permission of event hosts" and that "[t]his is also true of any event made possible by the University's support that is covered by the DOD MOU and the President's Executive Order."   The statement further asserted that, "[t]he University takes great care to distinguish between events permitted and prohibited under the DOD MOU and the President's Executive Order."

254.   Defendants' statements in the June 30, 2015 document, identified above in ¶¶252-53, were false and misleading when made.   Defendants' statements omitted Apollo's undisclosed, improper recruitment practices and that Apollo violated the Executive Order and the 2014 MOU.  *See* ¶¶100-48, above.

## VI.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

255.   Numerous additional facts raise a strong inference that Defendants knew or were reckless in disregarding the true facts when making the false and misleading

1   statements identified above.

2       256.   *The Individual Defendants spoke repeatedly about the Company's new*

3   *online classroom platform, assuring investors that they knew what they were talking*

4   *about.*   On numerous occasions both before and during the Class Period, Defendants

5   Cappelli and Swartz publicly spoke to investors and analysts about the Company's new

6   online classroom platform.   Defendants Cappelli and Swartz addressed investors on this

7   topic through a variety of media, including during investor conference calls, in SEC

8   filings, at industry events, and in press releases.   They repeatedly stated that the Company

9   had invested hundreds of millions of dollars in the new online classroom, and that they

10  were monitoring it with a wealth of available data.   Defendants' repeated emphasis on the

11  new classroom and assurances regarding its status show that they knew, or were severely

12  reckless in not knowing, that the problems with the new online classroom were far worse

13  than they represented, that the new classroom was riddled with technical issues that

14  negatively impacted student recruitment and retention, and that the Company took steps

15  to scrap the new classroom long before Apollo's choice of a third-party provider was

16  announced on June 29, 2015.

17      257.   *Defendants stated that they were personally focused on the new online*

18  *classroom, including the status and effects of its dysfunction.*   Before and during the Class

19  Period, Defendants stated that they closely monitored the Company's purported progress

20  in implementing the new online classroom, emphasizing how important the project was

21  to University of Phoenix.   For instance, Defendant Cappelli stated that the online

22  classroom was "our number one area of focus," and Defendant Swartz stated that senior

23  management was "very, very focused on . . . upgrading our learning management system

24  and making sure that the process to learn for a student is seamless."   Between October

25  2014 and March 2015, in particular, Defendants purported to provide up-to-date

26  information on the current status of the new classroom and its impact on retention and

27  new enrollments.   On January 8, 2015, after over a year and a half of deep layoffs in the

28  IT department, and after Apollo had taken substantial steps to scrap the new classroom

entirely in favor of Blackboard, Cappelli told investors that Defendants were deploying "every necessary asset" for the benefit of new classroom.  The Individual Defendants' personal "focus" on the new classroom further shows their knowledge of the true, undisclosed status of the dysfunctional new classroom during the Class Period.

258.  *Defendants received reports, data and extensive complaints regarding the new online classroom's pervasive dysfunction and impacts on student retention and enrollments.*  As described above in paragraphs 50-69, the online classroom's dysfunction was not limited to a minor portion of the online classroom, but severely impacted the ability of thousands of students to participate in the University of Phoenix educational programs on a daily basis, leading to student dropouts.  These widespread issues, including system blackouts, prompted students to submit numerous complaints, and prompted Apollo's technical teams to issue reports, including escalation reports, that were sent to Apollo's senior management, including Cappelli and Swartz.  *See* ¶¶62-69, above.  The Individual Defendants also admitted publicly that they received related "information from our technical assistance center," "pretty specific data to show the timelines" of the system dysfunction, and "a lot of data" about the issue.  The Individual Defendants further stated that they used frequent, detailed data and "metrics" to monitor the "number one priority" of retention that was being impacted by the new classroom dysfunction, including updated "KPIs [*i.e.*, key performance indicators] that we are on every single week with our team" and "cohort completion rates."  In addition, Defendants claimed in April 2014 that they had "recently put tools in place" to monitor dropouts and retention, including "a warning system" to detect and work to mitigate potential dropouts.

259.  *The new online classroom was critical to Apollo's core business.*  In its public filings with the SEC during the Class Period, Apollo consistently maintained that "[t]he majority of University of Phoenix students study exclusively online," and stated that "the proportion of the University's online students has increased over recent years."  Moreover, Defendants recognized that the online classroom was crucial for each student, as "[a]ll of our students today, regardless if they are ground students or online students,

get all of their content and all of their textbooks through our online learning management system."  Given the core importance of online students to Apollo's financial condition the Company needed to "have new innovations that are available in the marketplace to differentiate [itself]" and the new online platform was a key initiative that Apollo planned to use to differentiate itself amid increased competition.  *See* ¶¶36-49, 149, 152, 155, 157-60, 162, 164, 166, above.  The amount of resources that Apollo devoted to the new online classroom further emphasizes how the online classroom was a "core" aspect of Apollo's business that Defendants monitored.  On December 7, 2011, Defendant Cappelli emphasized to investors that "I told you we're spending $1 billion on the classroom of the future.  That's in our financials.  We've been pouring that money in there."  Apollo's huge monetary investment in the critical online classroom further shows that Defendants knew, or were reckless in not knowing, that their representations about the new online platform were false and omitted material facts.

260.  *Investors and analyst attention was focused on the Company's rollout of its new online classroom during the Class Period.*  During the Class Period, the Individual Defendants provided updates to analysts about the new online classroom because they knew that investors and analyst were acutely interested in the topic and frequently reported on it.  For example, on March 5, 2013, analysts from Deutsche Bank opined that Apollo had a "hidden tech asset . . . worth $2 to $6 per share," or as much as 37% of the Company's valuation.  After Defendants' disclosures on January 8, 2015, analysts reacted to the news, noting "investor frustration" around the "platform-related dropout issue."  Analysts also reacted to Apollo's abandonment of the online classroom in favor of a third-party solution, noting that the Company's decision to use "off the shelf (vs proprietary) technology" was a "large change" for the Company and posed a "real risk that cost cuts reduce revenue and leave the company in a worse position."  With investor and analyst attention focused on the online classroom issues, Defendants had a heightened awareness of the issues and knew or were reckless in not knowing that their Class Period statements were false and misleading and omitted materials facts.

261.   *Apollo's military recruiting violations were easily observed by outsiders.* As described above, Apollo's improper military recruiting tactics were easily uncovered by outside investigators.  For example, on June 30, 2015, the Center for Investigative Reporting published a report entitled "University of Phoenix sidesteps Obama order on recruiting veterans," which exposed University of Phoenix's use of aggressive recruiting tactics in violation of the Executive Order and the 2014 MOU.  The reporter attended events and easily observed Apollo's recruiting violations.  Likewise, the PBS *News Hour* easily obtained camera footage that showed Apollo's recruiting practices at Hiring Our Heroes events, and through Apollo's own internal documents by Freedom Of Information Act requests.  The ease with which outsiders discovered Apollo's true recruiting practices further shows the Individual Defendants' scienter because of their superior access to information, time with the Company, and obligations as executives.

262.   *Apollo's marketing was centralized, and Apollo generated numerous internal reports related to its military recruiting practices.*  Defendants emphasized Apollo's "centralized" marketing and the Company's extensive monitoring of its recruiting practices.  As Cappelli stated during an April 1, 2014 conference call with investors, "Apollo marketing is centralized."  Days later, during the Company's April 8, 2014 Investor Day, Defendants claimed the Company had "a variety of systems" to monitor its recruiting practices.  During the Investor Day, Apollo's Chief Ethics and Compliance Officer, Jim Berg, stated that of the numerous phone calls its enrollment personnel have with prospective students each year, each call over 60 seconds long was recorded and subjected to "software analytics" to detect "compliance issue[s]."  Berg assured investors that while there were about 3,000 calls per year involving a potential compliance issue, for those the Company writes "memoranda."  Berg stated that some calls involve "more serious compliance issue[s] that we investigate and we take immediate . . . remedial actions."  Apollo's former employees also confirmed that Apollo used a number of different internal reports showing that Apollo's employees were unlawfully being compensated based on how many enrollments they achieved.  *See*

1   ¶¶122-33, above.

2       263.   *The 90/10 Rule gave Defendants a powerful motive to engage in improper*

3   *military recruiting practices and keep those practices hidden from investors.*   As

4   discussed above, Apollo's financial condition hinged on its ability to comply with the

5   90/10 Rule by enrolling military servicemembers and veterans.  Apollo emphasized the

6   importance of the 90/10 Rule in numerous ways, including in its filings with the SEC,

7   investor conference calls, and other presentations to investors.  Because over 80% of

8   Apollo's revenues depended on its compliance with the 90/10 Rule, Defendants were

9   highly motivated to report favorable numbers through improper military recruiting

10  practices.  Defendants failed to disclose these practices to the public because they would

11  result – and during the Class Period, did result – in the Department of Defense putting

12  University of Phoenix on probation.

13      264.   *Public reports and governmental investigations repeatedly alerted*

14  *Defendants to allegations of Apollo's improper recruiting practices.*  Both leading up to

15  and during the Class Period, Apollo management was repeatedly alerted to allegations of

16  its improper recruiting practices from multiple sources, including the Department of

17  Education, the United States Senate, and veterans groups.  *See, e.g.*, ¶¶84-99, 117-21.

18  For example, the 2010 Senate Report addressed how University of Phoenix "aggressively

19  recruit[s] and market[s] to veterans and servicemembers" and discussed the industry's

20  increasing focus on military recruiting.  Similarly, the 2012 Senate Report focused

21  specifically on Apollo's deceptive recruiting practices, including the Company's use of

22  high-pressure sales tactics and deception to coerce students into enrolling.  The 2012

23  Senate Report also specifically highlighted the improper use of military logos and

24  aggressive recruiting of enrollees at certain locations, including wounded warrior centers

25  and veterans hospitals.  *See* ¶¶87-93.  In addition, a U.S. Senate Report titled "Is the New

26  G.I. Bill Working?: For-Profit Colleges Increasing Veteran Enrollment and Federal

27  Funds," issued in July 2014, further noted findings that an Apollo competitor, Corinthian

28  Colleges, had been "unlawfully displaying the official seals of military departments

without the proper disclaimer on recruitment materials, implying a connection or even endorsement of Corinthian's outreach efforts to veterans."

265. *Apollo's recruiting at Hiring Our Heroes events while the Company had a hiring freeze further shows Defendants' scienter.* The Company participated in Hiring Our Heroes events when it was not hiring and was involved in deep layoffs. *See* ¶¶114-21. As Apollo's Enrollment Advisor from May 2013 to October 2013 stated, the University of Phoenix told veterans and servicemembers that they were going to hire veterans and that they wanted to have 30% of their positions staffed by the military, but in reality University of Phoenix was laying people off and had a hiring freeze, and was entering the job applicants' information into University of Phoenix's leads database. Likewise, during an October 21, 2014 investor conference call, Apollo's CFO, Defendant Swartz, referred to Apollo's "cost cuts" in 2014. A few weeks later, on November 10, 2014, the Company issued a press release stating that "[e]ach year, there are hundreds of Hiring Our Heroes veteran events that help transitioning service members, veterans and their families find viable career options." The Company's participation at Hiring Our Heroes amid deep Company cost-cuts and a hiring freeze further shows knowledge that Defendants used the events for improper student recruitment.

## VII.   LOSS CAUSATION

266. Defendants' materially false and misleading statements and omissions artificially inflated the price of Apollo common stock and maintained inflation in the stock price. Certain disclosures revealed to the market, on a piecemeal basis, the false and misleading nature of Defendants' statements and omissions.

267. First, On January 8, 2015, new facts were revealed to the market that partially corrected Defendants' prior misrepresentations. During an investor conference call that day, Defendant Cappelli referred to his statements during the October 21, 2014 investor conference call, during which he had characterized a disruption in the online classroom as only "temporarily" "stopping out" some students due to a "few bugs" that did not affect a large part of the student body. On January 8, however, Cappelli admitted

that the disruption had, in fact, "resulted in a greater than expected impact on retention." Cappelli also explained that the disruption was due in part to the online classroom's flawed browser compatibility.  In response to a question by Jerry Herman, an analyst at the firm Stifel Nicolaus, about how the new online platform had caused students to "drop out," Defendant Cappelli stated that, instead of students needing "training" on the system as Cappelli had previously stated, students were simply not "able to access the content, the course work, [or] the syllabus."  Defendant Swartz stated that the "disruption . . . ha[d] impacted enrollment" by a large number: "approximately 7,000 incremental students."

268.    The price of the Company's securities declined in response to this news. On January 8, 2015, the price of Apollo stock dropped 13.5% to close at $27.55 per share on abnormally high volume, erasing over $465 million in shareholder value.

269.    Second, on March 25, 2015, new facts were revealed to the market that further corrected Defendants' prior misrepresentations.  During a March 25, 2015 investor conference call, Defendants provided additional information to investors about the disruption caused by the Company's new online platform that the Defendants had previously discussed on October 21, 2014 and January 8, 2015.  Defendants admitted that the disruption caused by the new online classroom was "significant."  Defendant Cappelli also told investors that "the technology platform issues . . . adversely impacted retention, and reduced the effect of [Apollo's] retention initiatives."  Defendants represented that the technology disruption was largely or wholly responsible for the drop in retentions, with Defendant Cappelli stating: "Are there other things that are driving decreases in retention?  We don't think so . . . ."  Defendant Cappelli further revealed that the technology disruption was impacting not just student retention, but also new enrollments. Apollo's Form 10-Q for the second quarter of 2015, filed with the SEC on March 25, 2015, reported the impact of the online platform disruption on Apollo's financial results. See ¶¶173-76.

270.    The additional revelations during the March 25, 2015 investor conference

call and in the Company's Form 10-Q caused Apollo's stock price to decline further.  On March 25, 2015, Apollo's stock price dropped 28.4% to close at $20.04 per share, and the Company lost another $852 of market capitalization.

271.   <u>Third</u>, after the market closed on June 29, 2015, and also on June 30, 2015, new facts were revealed to the market that further corrected Defendants' prior misrepresentations.  On June 29, 2015, after the close of trading, Apollo filed with the SEC its Form 10-Q regarding financial results for the third quarter of 2015 and held an investor conference call to discuss those results.  Apollo disclosed for the first time that it planned to transition away from the new online classroom, and had instead contracted with a third party for an "off-the-shelf" platform.  The Company further reported a decrease in average degreed enrollment at the University of Phoenix of 13.9% for the nine months ended May 31, 2015, attributing the decrease in part to "[l]ower student retention due in part to the disruptions experienced by our students using the University's new online classroom during fiscal year 2015."

272.   <u>Fourth</u>, On June 30, 2015, the truth regarding Apollo's military recruiting practices was partially revealed when the Center for Investigative Reporting published a report titled "University of Phoenix sidesteps Obama order on recruiting veterans."

273.   In response to the disclosures regarding the online classroom and Apollo's recruiting practices, the price of Apollo's stock fell precipitously.  On June 30 and July 1, 2015, Apollo's stock price declined nearly 20% on abnormally high volume as the market absorbed the Company's disclosures as well as the disclosures by the Center for Investigative Reporting.  In total, over $330 million in shareholder value was eliminated during these two trading days.

274.   <u>Fifth</u>, on October 9, 2015, Apollo filed a Form 8-K with the SEC disclosing that in a letter dated October 7, 2015, the Department of Defense had placed the University of Phoenix on probation.  After the market closed on October 9, 2015, *The Wall Street Journal* disclosed that the Department of Justice and the Department of Education were coordinating ongoing investigations into the University of Phoenix for its

1   recruiting tactics.

2       275.   As the market learned of and incorporated the disclosures made on October

3   9, 2015 into the stock price, the price of Apollo Class A common stock declined further,

4   falling nearly 15% from a close of $12.36 per share on Thursday, October 8, 2015, to a

5   close of $10.52 per share on Monday, October 12, 2015, erasing over $197 million in

6   shareholder value.

7       276.   <u>Sixth</u>, during an October 22, 2015 investor conference call, Defendants

8   revealed the enrollment declines at the University of Phoenix, due in part to the

9   dysfunction of the Company's online classroom and the University of Phoenix's

10  probationary status.  Defendant Cappelli stated that the Company's financial "outlook

11  range does include some impact from the recent Department of Defense action" that

12  Apollo could not "be certain as to the time of reinstatement," and that "external factors"

13  would continue to "put pressure on new student enrollment, revenue and operating

14  margin in fiscal year 2016."  Defendant Cappelli also provided additional detail about the

15  Company's plans to abandon its $1 billion investment in its new online classroom in

16  favor of a platform produced by a different company.  Apollo further disclosed in its 2015

17  Form 10-K Annual Report, filed October 22, 2015, the impact that the disruption in the

18  new online classroom had on New Degreed Enrollment, which dropped 15.6% in the

19  quarter "due in part to the disruptions in the University's online classroom during fiscal

20  year 2015."

21      277.   Following these disclosures, the price of Apollo Class A common stock fell

22  further, closing down $3.42 per share – or more than 32% – from a close of $10.60 per

23  share on October 21, 2015 to a close of $7.19 per share on October 22, 2015, on

24  unusually high volume of more than 14.2 million shares traded.

25  **VIII.   PRESUMPTION OF RELIANCE**

26      278.   At all relevant times, the market for Apollo's common stock was efficient

27  for the following reasons, among others:

28

(a) Apollo's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Exchange, a highly efficient and automated market;

(b) As a regulated issuer, Apollo filed periodic reports with the SEC and the NADAQ Stock Exchange;

(c) Apollo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Apollo was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

279.   As a result of the foregoing, the market for Apollo's common stock reasonably promptly digested current information regarding Apollo from all publicly available sources and reflected such information in the price of Apollo's common stock. All purchasers of Apollo common stock during the Class Period suffered similar injury through their purchase of Apollo common stock at artificially inflated prices, and a presumption of reliance applies.

280.   A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

IX. **INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE**

281.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained

of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Apollo's online classroom platform, its compliance with regulations and the Executive Order, and its current and historical recruiting practices, among others.

282.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Apollo's recruiting practices and online education software platform, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Apollo were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

283.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Apollo who knew that the statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

284.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Apollo between October 22, 2013 and October 21, 2015, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Apollo at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof,

including but not limited to Apollo's employee retirement and benefit plans, and any entity in which Defendants or their immediate families have or had a controlling interest.

285.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Apollo shares were actively traded on the NASDAQ Stock Exchange.  As of October 22, 2015, there were over 107 million shares of Apollo common stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of thousands of members of the proposed Class. Class members who purchased Apollo common stock may be identified from records maintained by Apollo or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

286.   Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

287.   Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

288.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c)   whether Defendants acted with scienter; and

(d)   the proper way to measure damages.

289.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.

Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

**XI.    CLAIMS FOR RELIEF**

**COUNT I**

**For Violations Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against Defendants Apollo, Cappelli, Swartz, And Pepicello)**

290.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

291.    This Count is asserted on behalf of all members of the Class against Defendants Apollo, Cappelli, Swartz, and Pepicello for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

292.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

293.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Apollo common stock during the Class Period.

294.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and

1    participated in a continuous course of conduct that operated as a fraud and deceit upon

2    Plaintiffs and the Class; made various untrue and/or misleading statements of material

3    facts and omitted to state material facts necessary in order to make the statements made,

4    in light of the circumstances under which they were made, not misleading; made the

5    above statements intentionally or with a severely reckless disregard for the truth; and

6    employed devices and artifices to defraud in connection with the purchase and sale of

7    Apollo common stock, which were intended to, and did: (a) deceive the investing public,

8    including Plaintiffs and the Class, regarding, among other things, Apollo's military

9    recruiting practices and its online educational platform; (b) artificially inflate and

10   maintain the market price of Apollo common stock; and (c) cause Plaintiffs and other

11   members of the Class to purchase Apollo common stock at artificially inflated prices and

12   suffer losses when the true facts became known.

13        295.   Defendants Apollo, Cappelli, Swartz, and Pepicello are liable for all

14   materially false and misleading statements made during the Class Period, as alleged

15   above.

16        296.   As described above, Defendants acted with scienter throughout the Class

17   Period, in that they acted either with intent to deceive, manipulate, or defraud, or with

18   severe recklessness.  The misrepresentations and omissions of material facts set forth

19   herein, which presented a danger of misleading buyers or sellers of Apollo stock, were

20   either known to the Defendants or were so obvious that the Defendants should have been

21   aware of them.

22        297.   Plaintiffs and the Class have suffered damages in that, in reliance on the

23   integrity of the market, they paid artificially inflated prices for Apollo common stock,

24   which inflation was removed from its price when the true facts became known.  Plaintiffs

25   and the Class would not have purchased Apollo common stock at the prices they paid, or

26   at all, if they had been aware that the market price had been artificially and falsely

27   inflated by these Defendants' misleading statements.

28        298.   As a direct and proximate result of these Defendants' wrongful conduct,

Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Apollo common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Cappelli, Swartz, And Sperling)

299.    This Count is asserted on behalf of all members of the Class against Defendants Cappelli, Swartz, and Sperling for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

300.    During their tenures as officers and/or directors of Apollo, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶23-24, 26.  By reason of their positions of control and authority as officers and/or directors of Apollo, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Apollo during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

301.    In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶23-24, Defendants Cappelli and Swartz had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its reporting functions.  Defendants Cappelli and Swartz signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by Apollo during the Class Period.  Likewise, Defendant Sperling was Chairman of the Apollo Board of Directors and signed the Company's annual reports filed with the SEC on Form 10-K during the Class Period.  Mr. Sperling also held a

majority of the Company's voting stock during the Class Period.  As a result of the foregoing, Defendants Cappelli, Swartz, and Sperling, as a group and individually, were controlling persons of Apollo within the meaning of Section 20(a) of the Exchange Act.

302.   As set forth above, Apollo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

303.   By virtue of their positions as controlling persons of Apollo and as a result of their own aforementioned conduct, Defendants Cappelli, Swartz, and Sperling are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Apollo securities.  As detailed above in ¶¶23-24, 26, during the respective times these Defendants served as officers and/or directors of Apollo, each of these Defendants was culpable for the material misstatements and omissions made by Apollo.

304.   As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Apollo common stock.

## XII.   <u>PRAYER FOR RELIEF</u>

305.   WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)   Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## XIII.  **JURY DEMAND**

306.    Plaintiffs hereby demand a trial by jury.

Dated: August 15, 2016

Respectfully submitted,

By: */s/ David R. Stickney*
　　　David R. Stickney

Blair A. Nicholas (*pro hac vice*)
David R. Stickney (*pro hac vice*)
Brandon Marsh (*pro hac vice*)
Rachel Felong (*pro hac vice*)
BERNSTEIN LITOWITZ BERGER
　　& GROSSMANN LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:　(858) 793-0070
blairn@blbglaw.com
davids@blbglaw.com
brandon.marsh@blbglaw.com
rachel.felong@blbglaw.com

*Counsel for Lead Plaintiff Government of Guam*
*Retirement Fund, and Lead Counsel for the Class*

Richard G. Himelrick
TIFFANY & BOSCO P.A.
2525 East Camelback Road, Seventh Floor
Phoenix, AZ 85016
Tel:　(602) 255-6000
rgh@tblaw.com

*Local Counsel for Lead Plaintiff Government*
*of Guam Retirement Fund and the Class*

Jonah H. Goldstein
Robert R. Henssler Jr.
Matthew Balotta
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel:　(619) 231-1058
jonahg@rgrdlaw.com
bhenssler@rgrdlaw.com

1

mbalotta@rgrdlaw.com

2

*Counsel for Additional Plaintiffs Rameses Te
Lomingkit and National Shopmen Pension Fund*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

     I hereby certify that on August 15, 2016, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the email addresses denoted in the Electronic Mail Notice List.


                               */s/ Ashley Lee*
                               ASHLEY LEE

## CERTIFICATION PURSUANT TO
## <u>THE FEDERAL SECURITIES LAWS</u>

I, Joe T. San Agustin, on behalf of the Government of Guam Retirement Fund ("GGRF"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Chairman of GGRF.  I have reviewed a complaint filed in this matter.

2.  GGRF did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  GGRF is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. GGRF fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  GGRF's transactions in the Apollo Education Group, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.  GGRF has sought to serve and was appointed as a lead plaintiff on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of GGRF's prior Certification in this case, dated May 3, 2016 (see ECF No. 36-1):

*Government of Guam Retirement Fund v. Invacare Corp.*, No. 13-cv-1165 (N.D. Ohio)

6.  GGRF will not accept any payment for serving as a representative party on behalf of the Class beyond GGRF's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __11th__ day of August, 2016.

Joe T. San Agustin
Chairman
*Government of Guam Retirement Fund*

**Government of Guam Retirement Fund**
**Transactions in Apollo Education Group, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 1/14/2014 | 416 | $31.2285 |
| Purchase | 1/15/2014 | 2,769 | $31.8421 |
| Purchase | 1/15/2014 | 484 | $31.9750 |
| Purchase | 1/16/2014 | 2,741 | $32.9989 |
| Purchase | 1/17/2014 | 1,864 | $33.6953 |
| Purchase | 1/21/2014 | 1,782 | $34.8697 |
| Purchase | 1/21/2014 | 1,367 | $35.0755 |
| Purchase | 1/22/2014 | 842 | $35.2862 |
| Purchase | 1/22/2014 | 1,919 | $35.2959 |
| Purchase | 1/23/2014 | 1,975 | $34.9103 |
| Purchase | 1/24/2014 | 2,313 | $33.7759 |
| Purchase | 1/24/2014 | 351 | $34.1587 |
| Purchase | 1/27/2014 | 2,737 | $32.9615 |
| Purchase | 1/27/2014 | 1,801 | $33.0515 |
| Purchase | 1/28/2014 | 1,464 | $33.1306 |
| Purchase | 1/29/2014 | 2,179 | $32.6446 |
| Purchase | 4/24/2014 | 700 | $28.0405 |
| Purchase | 8/26/2014 | 1,126 | $27.7260 |
| Purchase | 8/26/2014 | 785 | $27.7302 |
| Purchase | 8/27/2014 | 397 | $27.5317 |
| Purchase | 8/27/2014 | 408 | $27.5244 |
| Purchase | 8/28/2014 | 754 | $27.5504 |
| Purchase | 8/29/2014 | 1,424 | $27.7741 |
| Purchase | 9/2/2014 | 1,551 | $28.1481 |
| Purchase | 11/13/2014 | 803 | $29.3715 |
| Purchase | 11/14/2014 | 28 | $29.5400 |
| Purchase | 11/14/2014 | 42 | $29.5632 |
| Purchase | 11/17/2014 | 65 | $29.4998 |
| Purchase | 11/17/2014 | 299 | $29.4750 |
| Purchase | 11/18/2014 | 1,202 | $29.4900 |
| Sale | 8/5/2013 | (476) | $19.9400 |
| Sale | 8/5/2013 | (1,600) | $19.6675 |
| Sale | 8/7/2013 | (1,600) | $20.2643 |
| Sale | 8/8/2013 | (2,700) | $20.6839 |
| Sale | 4/8/2015 | (81) | $17.7250 |
| Sale | 4/8/2015 | (615) | $17.7620 |
| Sale | 4/8/2015 | (319) | $17.7585 |
| Sale | 4/9/2015 | (2,029) | $17.4997 |
| Sale | 4/10/2015 | (3,607) | $17.1145 |
| Sale | 4/13/2015 | (3,817) | $16.7639 |
| Sale | 5/8/2015 | (195) | $17.3214 |
| Sale | 5/8/2015 | (194) | $17.2673 |
| Sale | 5/8/2015 | (988) | $17.2750 |
| Sale | 5/8/2015 | (618) | $17.1445 |

**Government of Guam Retirement Fund**
**Transactions in Apollo Education Group, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 5/11/2015 | (2,136) | $17.2884 |
| Sale | 5/11/2015 | (1,237) | $17.3250 |
| Sale | 5/11/2015 | (1,088) | $17.2707 |
| Sale | 5/12/2015 | (1,878) | $16.9173 |
| Sale | 5/13/2015 | (1,236) | $16.9165 |
| Sale | 5/13/2015 | (208) | $17.0009 |
| Sale | 5/14/2015 | (1,029) | $16.7557 |
| Sale | 5/18/2015 | (109) | $16.5739 |
| Sale | 5/19/2015 | (99) | $16.5550 |
| Sale | 5/19/2015 | (85) | $16.5000 |
| Sale | 5/20/2015 | (575) | $16.3134 |
| Sale | 5/21/2015 | (1,052) | $16.4718 |
| Sale | 5/22/2015 | (458) | $16.5088 |
| Sale | 5/26/2015 | (546) | $16.1862 |
| Sale | 5/26/2015 | (115) | $16.1750 |
| Sale | 5/27/2015 | (698) | $16.4617 |
| Sale | 5/28/2015 | (711) | $16.5679 |
| Sale | 5/29/2015 | (1,090) | $16.6049 |
| Sale | 6/1/2015 | (197) | $16.8522 |
| Sale | 6/3/2015 | (288) | $17.1709 |
| Sale | 6/4/2015 | (1,530) | $16.7112 |
| Sale | 6/4/2015 | (960) | $16.7754 |
| Sale | 6/5/2015 | (2,038) | $16.6475 |
| Sale | 6/8/2015 | (1,279) | $16.6140 |
| Sale | 6/9/2015 | (1,804) | $16.6174 |
| Sale | 6/10/2015 | (1,679) | $16.6142 |