1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Rameses Te Lomingkit, et al.,              No. CV-16-00689-PHX-JAT

10                    Plaintiffs,              **ORDER**

11  v.

12  Apollo Education Group Incorporated, et
    al.,
13
                     Defendants.
14

15          Pending before the Court are: (1) Defendants' Motion to Dismiss Plaintiffs'

16  Amended Consolidated Class Action Complaint (the "Motion") for failure to state a

17  claim pursuant to Federal Rule of Civil Procedure ("Federal Rule") 12(b)(6), (Doc. 62);

18  (2) Defendants' Request for Judicial Notice in Support of Defendants' Motion to

19  Dismiss, (Doc. 63); (3) Plaintiffs' Request for Judicial Notice, (Doc. 71 at 3–4); and

20  (4) Defendants' Supplemental Request for Judicial Notice in Support of Defendants'

21  Motion to Dismiss, (Doc. 74). The Court now rules on the Motion and Requests.

22  **I.      BACKGROUND[1]**

23

24          [1] While a motion to dismiss is ordinarily limited to the allegations in the
    complaint, other documents may be considered if their "'authenticity . . . is not contested'
25  and 'the plaintiff's complaint necessarily relies' on them." *Lee v. City of L.A.*,
    250 F.3d 668, 688 (9th Cir. 2001) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06
26  (9th Cir. 1998)). Here, Defendants have submitted a request for judicial notice of the
    following: (1) Documents filed with the SEC; (2) Investor communications, including
27  transcripts from investor conference calls and conferences; and (3) Publicly available
    news reports. (Docs. 63; 64-1; 64-2; 64-3). Plaintiffs do not dispute the authenticity of
28  Defendants' aforementioned submitted exhibits. (*See* Docs. 71 at 2–3; 73 at 3–4).
    Additionally, all aforementioned exhibits are referenced in the CAC with the exception of
    Defendants' Exhibits 1, (Doc. 64-1 at 3–194), 2, (*id.* at 195–552), and 25, (Doc. 64-2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

This is a consolidated class action proceeding. Defendant Apollo Education Group, Inc. ("Apollo") is an Arizona-based company that owns and operates proprietary postsecondary education institutions and is one of the largest private education providers in the world. (Docs. 54 ("CAC") at ¶ 1; 62 at 8). In particular, University of Phoenix ("UOP") is Apollo's largest university, accounting for approximately 90% of Apollo's total enrollment and revenues. (CAC at ¶ 1). The remaining Defendants are various individuals who served as Apollo officers and directors between October 22, 2013 and October 21, 2015 (the "Class Period"). In particular, Defendant Peter Sperling served as Chairman of the Apollo Board of Directors throughout the Class Period, (*id.* at ¶ 26); Defendant Gregory Cappelli served as Apollo's CEO and a member of Apollo's Board of Directors throughout the Class Period, (*id.* at ¶ 23); Defendant Brian Swartz served as a Senior Vice President and the CFO of Apollo until May 15, 2015, (*id.* at ¶ 24); and Defendant William Pepicello was a member of Apollo's "executive management" and served as UOP's President until June 20, 2014, (*id.* at ¶ 25). Plaintiffs purchased Apollo stock during the Class Period. (*Id.* at 4).

16
17
18
19
20
21

at 233–308). Thus, the Court will consider, under the incorporation-by-reference doctrine, Defendants' Exhibits 3–24 and 26–33. Pursuant to Federal Rule of Evidence 201(c)(2), the Court will also take judicial notice of Defendants' Exhibits 1, 2, and 25. *See City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1107–08 (E.D. Wash. 2013) (describing the differences between the incorporation-by-reference doctrine and the concept of judicial notice).

22
23
24
25
26
27
28

Plaintiffs request that the Court take judicial notice of Dawn Bilodeau's written testimony before the Senate Armed Services Committee as Chief of the Department of Defense's (the "DOD's") Voluntary Education Programs on November 29, 2016. (Doc. 71 at 3–4). Defendants do not dispute the authenticity of the testimony but request that the Court also take judicial notice of a report authored by U.S. Senator John McCain in his role as the Chairman of the Senate Armed Services Committee entitled "Department of Defense Actions against the University of Phoenix Regarding the Voluntary Education Tuition Assistance Program." (Docs. 74; 74-1; 74-2; 74-3; 74-4). While Plaintiffs' claims against Defendants involve the DOD's decision to place University of Phoenix on probation, Ms. Bilodeau's testimony and Senator McCain's report involve the merits of the internal processes leading to that decision. Only the underlying fact of the probation is relevant at the motion to dismiss stage. Thus, the Court denies Plaintiffs' and Defendants' requests for judicial notice of the testimony and report as irrelevant. *See Shalaby v. Bernzomatic*, 281 F.R.D. 565, 570–71 (S.D. Cal. 2012) (denying requests for judicial notice because the underlying documents were irrelevant).

### A.      Apollo's Online Classroom Upgrades

In 2009, Apollo determined that UOP's software for students was outdated and formulated plans to "rebuild" UOP's "online learning environment from scratch." (*Id.* at ¶ 39). This software—referred to as the "online classroom"—was used by all UOP students, whom relied on the platform to "access their [UOP] accounts, receive . . . educational content for their courses, and turn in their assignments." (*Id.* at ¶ 38). Plaintiffs allege that the successful upgrade of the online classroom platform was "critically important" to Apollo's financial success, and Apollo had plans to sell the technology to other universities. (*Id.* at ¶¶ 38, 40–41).

However, the upgrades experienced multiple disruptions "from mid-2012 to mid-2014." (*Id.* at ¶¶ 51, 52). These disruptions included widespread blackouts, in which users were unable to login to the platform. (*Id.* at ¶ 54). The online classroom disruptions were further "exacerbated" by "rounds of significant layoffs" within Apollo's IT department from 2013 to 2015. (*Id.* at ¶¶ 58–61). Plaintiffs allege that Defendants and Apollo representatives made a number of false and misleading statements during and after the rollout of Apollo's online classroom upgrades.

### 1.      Statements on October 22, 2013

On October 22, 2013, Apollo filed its 2013 Form 10-K with the SEC. (*Id.* at ¶ 204). In relevant part, the Form 10-K stated:

> We are upgrading a substantial portion of our key IT systems, including our student learning system, student services platform and corporate applications, and retiring the related legacy systems. We believe that these new systems will improve the productivity, scalability, reliability and sustainability of our IT infrastructure and improve the student experience.

(*Id.*). During an investor conference call on the same day:

> (1)   Defendant Cappelli claimed that Apollo had made "meaningful progress" in "differentiat[ing] [UOP]" through "the rollout of our new learning platform." (*Id.* at ¶ 205).

> (2)   Defendant Cappelli discussed the importance of "differentiating [UOP] . . . and raising the bar for efficient and effective operations within our industry" and noted that Apollo was "focused on offering a superior classroom

experience." (*Id.*). He further emphasized the importance of "putting these innovations into the marketplace." (*Id.*).

(4) Defendant Swartz stated that the "ability to grow [UOP's] new enrollment [is] about our product and having a competitive product in the marketplace." (*Id.*).

### 2.    Statements on November 13, 2013

On November 13, 2013, Apollo presented at the JPMorgan Ultimate Services Investor Conference. (*Id.* at ¶ 207). During the presentation:

(1) Defendant Swartz discussed Apollo's online classroom upgrades, stating that Apollo had become a "much more leaner [*sic*], nimbler organization, and [is] introducing new products to market faster. In the last few years, we have invested over $1 billion in our learning and service platforms and data platforms at the [UOP]." (*Id.*).

(2) Defendant Swartz elaborated that, as part of offering a "second to none," "superior classroom experience for the student," Apollo made "significant enhancements to the student experience," with "[t]he first [being] our new classroom, or our new learning platform." (*Id.*).

(3) Defendant Swartz informed investors that "[t]he new platform [was] actually rolled out to all of our graduate students today," while a "staggered roll out for all of [the] undergraduates" would take place over the course of fiscal year 2014. (*Id.*).

(4) Defendant Swartz presented a slide claiming the online classroom upgrades had "[c]apabilities and features to keep students on track" and was "simple" and "efficient." (*Id.*).

### 3.    Statements on March 11, 2014

On March 11, 2014, Apollo presented at the Credit Suisse Global Services Conference. (*Id.* at ¶ 209). During the presentation:

(1) Beth Coronelli, Apollo's Vice President of Investor Relations, stated that Apollo's "strategy about differentiations . . . all comes . . . down to the student learning experience." (*Id.*).

(2) Ms. Coronelli discussed Apollo's ability to respond to issues that could arise during UOP's online classroom upgrades, stating that "if there seems to be an issue through the new classroom" that the student is having, "the faculty member or the student advisor can step in and see what's happening." (*Id.*). Ms. Cornelli mentioned that these safeguards helped "to create an ecosystem or a culture around

1  retention." (*Id.*).

2  ### 4.   Statements on April 1, 2014

3  On April 1, 2014, Apollo held an investor conference call. (*Id.* at ¶ 211). During

4  the conference call:

5  (1) Defendant Cappelli stated that Apollo was "first and
6  foremost focused on improving retention" by "improv[ing]
   the student experience" through Apollo's "new, modernized
7  and significantly upgraded online classroom." (*Id.*).

8  (2) Ms. Coronelli stated that Apollo was "in the process of
   building out a significantly easier to use platform for [its]
   students that will be streamlined and much more efficient for
9  [UOP] to administer." (*Id.*).

10  ### 5.   Statements on April 8, 2014

11  On April 8, 2014, Apollo held an investor meeting. (*Id.* at ¶ 213). During the

12  meeting:

13  (1) Defendant Cappelli stated that Apollo was "a different
   [c]ompany today than it was even a few years ago" and was
14  now "really centered around differentiating [UOP]" from its
   competitors. (*Id.*).

15  (2) Defendant Cappelli informed investors that Apollo was
16  "rolling out a new learning platform" that "has tools that
   faculty members and students have never had before and
17  other new retention initiatives to support the success of
   [UOP's] students." (*Id.*).

18  (3) Jerrad Tausz, UOP's Chief Operating Officer, stated that
19  the online classroom upgrades were "the next key element"
   for Apollo's success. (*Id.*).

20

21  ### 6.   Statements on June 25, 2014

22  On June 25, 2014, Apollo published a press release announcing the company's

23  financial results for the third quarter of 2014. (*Id.* at ¶ 215). The press release quoted

24  Defendant Cappelli as stating that "[d]uring the third quarter, we . . . completed the

25  rollout of our new learning platform across the university." (*Id.*). Apollo also held an

26  investor conference call, in which Defendant Cappelli stated that "nearly all [UOP

27  students] are now being served by our new learning platform, which has been greatly

28  enhanced and provides a more efficient and user friendly experience." (*Id.*).

### 7. Statement on September 18, 2014

On September 18, 2014, Apollo presented at the BMO Capital Markets 14th Annual Back to School Education Conference. (*Id.* at ¶ 217). During the conference, Defendant Swartz stated that Apollo was "very, very focused on looking at both the service model as well as the learning model, upgrading our learning management system and making sure that the process to learn for a student is seamless" so that students are not "frustrated on how to move around" the online classroom. (*Id.*).

### 8. Statements on October 21, 2014

On October 21, 2014, Apollo held an investor conference call. (*Id.* at ¶ 219). During the call:

> (1) Defendant Cappelli informed investors that Apollo had experienced a "short-term disruption" in transitioning to the upgraded online classroom, and there were "a few bugs and things in the system that [we]re being worked out." (*Id.*).

> (2) Defendant Cappelli informed investors that some students had been "stop[ped] out . . . temporarily," and "[t]his [wa]s not a huge part of the student body by any means." (*Id.*).

> (3) Defendant Cappelli stated that "there's additional training that needs to be done" for students, and Apollo was "beef[ing] up training" for them. (*Id.*).

> (4) Defendant Cappelli assured investors that any problems were "already being improved" and would "get fixed over the near term." (*Id.*).

> (5) In response to a question regarding whether Apollo's rising bad debt expense was "a sign of people getting frustrated with the [upgraded online classroom] and dropping out," Defendant Swartz stated that bad debt expense "ticked up just a little bit, very, very slightly, simply because our new enrollment trends have improved." (*Id.* at ¶ 220).

> (6) Defendant Swartz assured investors that "we'll have the same number of students in the total student count." (*Id.*).

> (7) Defendant Cappelli summarized that the upgraded online classroom was "a great platform" and emphasized that one benefit of the new platform would be "customer satisfaction," because the platform "enhance[s] the overall learning experience." (*Id.*).

On the same day, Apollo filed its Form 10-K for 2014 with the SEC. (*Id.* at ¶ 221).

The Form 10-K warned investors that "disruptions and system malfunctions . . . may arise from [Apollo's IT systems] upgrade initiative." (*Id.*).

### 9. Statements on November 12, 2014

On November 12, 2014, Apollo presented at the JPMorgan Ultimate Services Investor Conference. (*Id.* at ¶ 223). During the presentation:

> (1) Ms. Coronelli stated that "retention is [Apollo's] number one priority," and as part of improving retention, Apollo had "a new classroom . . . put in place." (*Id.*).
>
> (2) In response to a question regarding whether the online classroom upgrades were "really [a] differentiating kind of proposition for students," Ms. Coronelli responded, "Absolutely. Yes, it is. From a standpoint of the classroom it is—it is not just an upgrade. It was a complete new classroom" that was "an overall improved experience." (*Id.*).

### 10. Statements on January 8, 2015

On January 8, 2015, Apollo announced a larger-than-expected drop in enrollment, attributable, in part, to the online classroom disruptions. (*Id.* at ¶¶ 167–70). That same day, the price of Apollo's stock fell by approximately 13.5% to close at $27.55 per share. (*Id.* at ¶ 6). Also on January 8, 2015, Apollo held an investor conference call. (*Id.* at ¶ 225). During the call:

> (1) In response to a question regarding fixes to the online classroom, Defendant Cappelli stated that Apollo had "lots of communications going out to faculty and students about timelines and data so that they feel comfortable that this has been addressed, fixed and it won't be disrupted going forward." (*Id.*).
>
> (2) Defendant Cappelli stated that the online classroom was Apollo's "number one area of focus," and Apollo had "put every necessary asset on it" and possessed "a lot of data" regarding the disruption. (*Id.* at ¶ 226). Defendant Cappelli also noted that Apollo was "not guessing in terms of how [the disruption] emanated . . . [and] where the problems are." (*Id.*).
>
> (3) Defendant Cappelli reassured investors that Apollo had "accelerated [the online classroom's] future enhancements," including "ensuring the classroom [was] compatible with a broader range of browsers and other operating systems at all times, and that course content [was] more readily accessible." (*Id.*).

(4) Defendant Cappelli informed investors that "beginning in January [2015], [Apollo] started to roll out a focused effort to help bring some of those students impacted by the [online] classroom [disruptions] back into [UOP]." (*Id.*). Defendant Cappelli further explained that "the majority of this disruption we feel very confident is from the explanation of the classroom" to users. (*Id.*).

### 11.     Statements on March 25, 2015

On March 25, 2015, Apollo attributed greater amount of fault for UOP's retention difficulties to the "significant" online classroom disruptions. (*Id.* at ¶¶ 173–74). That same day, the price of Apollo's stock again dropped by approximately 28.4% to close at $20.04 per share. (*Id.* at ¶¶ 6, 177). Also on March 25, 2015, Apollo held an investor conference call. (*Id.* at ¶ 228). During the call:

(1) Defendant Cappelli stated that "[t]he majority of fixes related to third-party content access have been completed," and "[t]he classroom is now again compatible with a range of supported browsers and computer operating systems, which is an area [where] we were receiving the highest number of issues." (*Id.*).

(2) In response to a question regarding retention improvements "given [that] the [online classroom is] fixed," Defendant Cappelli stated that "[w]e have worked very hard to make the fixes as quickly as possible and do them the right way." (*Id.*).

Finally, on June 29, 2015, Apollo announced that it was in the process of replacing its online classroom with a new, third-party learning management system called Blackboard. (*Id.* at ¶ 179). Over the next few days, Apollo's stock price dropped "nearly 20% on abnormally high volume." (*Id.* at ¶ 182).

Plaintiffs allege that the aforementioned statements by Defendants and Apollo representatives were false and misleading for the following reasons:

(i) the [upgraded online] classroom was consistently dysfunctional amid widespread outages; (ii) layoffs in Apollo's IT department worsened [the online] classroom's performance and depleted [Apollo] war rooms meant to fix [the online] classroom; (iii) [the online] classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls; (iv) new classroom's consistent technical failures were causing Apollo's students to drop out or not enroll; and[, for the statements made on January 8, 2015 and

- 8 -

1
2

March 25, 2015,] (v) Apollo was taking steps to replace its [upgraded] online classroom with an off-the-shelf product from an outside company.

3

(*Id.* at ¶¶ 206, 208, 210, 212, 214, 216, 218, 222, 224, 227, 229).

4

### B.   Apollo's Military Recruitment and Legal Compliance

5
6
7
8
9
10
11
12
13
14
15
16

Amid UOP's declining enrollments between 2010 and 2013, Apollo increased its marketing to individuals associated with the military.[2] (*Id.* at ¶ 78). On February 10, 2012, UOP entered into an Alliance Memorandum of Understanding (the "2012 MOU") with the DOD, in which UOP agreed to "abide by all applicable federal and state laws" and generally refrain from the use of the DOD's name and logo in writing. (*Id.* at ¶ 100). On April 27, 2012, President Barack Obama signed Executive Order 13607 into law. Exec. Order No. 13607, 77 Fed. Reg. 25,861 (May 2, 2012). Executive Order 13607 ordered the Secretaries of Defense and Veterans Affairs to "strengthen enforcement and compliance mechanisms" for institutions that recruit service members, veterans, spouses, and other family members. *Id.* Plaintiffs allege that Defendants and Apollo representatives made a number of false and misleading statements regarding Apollo's compliance with the various regulations covering military recruitment.

17

### 1.   Statements on October 22, 2013

18
19

On October 22, 2013, Apollo filed its 2013 Form 10-K with the SEC.[3] (*Id.* at ¶ 230). In relevant part, the Form 10-K stated:

20
21

(1) Apollo was in "compl[iance] with the extensive regulatory requirements" governing its business and included Executive Order No. 13607 under the description of "extensive federal

22

23
24
25
26

[2] Plaintiffs explain that this increase in military recruitment efforts is due to a "loophole" in the so-called "90/10 Rule." (Doc. 70 at 16). The 90/10 Rule "requires that [a university depending on federal funds] derive less than 90% of its revenue from Title IV programs in order to receive federal money." (*Id.*). However, "funds from the federal military Tuition Assistance Program" do not count towards the 90% of revenue. (*Id.*; CAC at ¶ 83). During the Class Period, Apollo received over 80% of its total revenues from Title IV programs. (CAC at ¶ 80).

27
28

[3] The same language Plaintiffs allege to be false and misleading from Apollo's 2013 Form 10-K appeared in Apollo's 2014 Form 10-K. (CAC at ¶ 240). Plaintiffs allege that the statements were false and misleading for both appearances. (*Id.*). The 2014 Form 10-K added that the percentage of revenues attributable to Title IV funds had dropped to 81% in 2014. (*Id.*).

and state regulations." (*Id.*)

> (2) The "Principles of Excellence" in the Executive Order impacted Apollo's "marketing standards" and "could increase the cost of delivering educational services to our military and veteran students." (*Id.*).

> (3) Apollo was in compliance with the 90/10 Rule, with the percentage of revenues attributable to Title IV funds being 86% in 2011, 84% in 2012, and 83% in 2013. (*Id.* at ¶ 231). The Form 10-K attributed these figures to "changes in student mix and their associated available sources of tuition funding," including an increase in students that "participate in military benefit programs," such as "tuition assistance." (*Id.*).

On the same day, Apollo held an investor conference call. (*Id.* at ¶ 232). During the call:

> (1) Defendant Swartz stated "for the past three years, [UOP] has experienced declines in its 90/10 percentage. In fiscal year 2013, 90/10 decreased by 100 basis points to 83%. As a reminder, this is down from 84% in 2012, 86% in 2011, and 88% in 2010." (*Id.*).

> (2) Defendant Swartz stated "we're pretty pleased with where the trend has been" with the 90/10 percentage, "we're watching it carefully," and "we expect it to stay" below 90%. (*Id.*).

### 2.    Statements on January 30, 2014

On January 30, 2014, Apollo issued a press release that provided an internet link to a June 2012 letter written by Defendant Pepicello. (*Id.* at ¶ 234). Defendant Pepicello's letter stated that "[UOP] embraces the accountability inherent in the Executive Order [13607]" and that, "on behalf of the entire [UOP] community," he "express[ed] support of, and state[d] our intent to comply with, the President's Executive Order 13607." (*Id.* at ¶ 248).

### 3.    Statements on April 8, 2014

On April 8, 2014, Apollo held an investor conference. (*Id.* at ¶ 236). During the meeting:

> (1) Jim Berg, Apollo's Chief Ethics and Compliance Officer, stated that Apollo had "a variety of systems" and a "safety net" that its recruiting practices complied with government regulations. (*Id.*).

> (2) Mr. Berg, in reference to a 2010 federal government ban

1  on incentive compensation for for-profit recruiters, (*see id.*
2  at ¶ 122), stated that Apollo had "put in place a set of
   performance review criteria for those persons within our
3  ecosystem who work with and who face students." (*Id.*
   at ¶ 236). Mr. Berg further stated that these performance
4  review criteria ensured "that there is nothing in their
   performance review . . . [or] performance criteria that relates
5  to any consideration of the quantity or number of students
   who may enroll." (*Id.*).

6  Prompted by Executive Order 13607, UOP and the DOD entered into a June 2014

7  Memorandum of Understanding (the "2014 MOU"), in which UOP agreed to refrain

8  from "[e]ngag[ing] in unfair deceptive, or abusive marketing tactics, such as . . . engaging

9  in open recruiting efforts . . . [and] distributing marketing materials on the [DOD]

10  installation at unapproved locations or events." (*Id.* at ¶¶ 110–11).

11  **4.      Statement on August 9, 2014**

12  On August 9, 2014, Mark Brenner, Apollo's Chief of Staff, penned an editorial

13  that appeared in *The Sacramento Bee* on behalf of Apollo. (*Id.* at ¶ 238). The editorial

14  stated that "Executive Order 13607 establishes principles of excellence for institutions

15  serving servicemembers, veterans and their families. [UOP] endorsed these important

16  principles early, and was one of the first schools in the country to adopt them." (*Id.*).

17  **5.      Statements on October 21, 2014**

18  On October 21, 2014, Apollo held an investor conference call. (*Id.* at ¶ 241).

19  During the call, Defendant Swartz stated that Apollo's percentage of revenues

20  attributable to Title IV funds had "decreased 200 basis points to 81%" in fiscal 2014.

21  (*Id.*).

22  **6.      Statement on June 29, 2015**

23  On June 29, 2015, Apollo held an investor conference call. (*Id.* at ¶ 243). During

24  the call, Defendant Cappelli stated that:

25  in response to the government's requirement to "rein[] in any
   bad actors," "[b]eginning in November 2010, [Apollo was]
26  one of the first organizations to change recruiter comp, well
   before it was mandated[.] . . . [T]here's no doubt that these
27  initiatives also took a toll on our operating and financial
   performance during the period, a period where the reputation
28  at [UOP] was tarred by the broader environment and damaged
   in the public eye . . . . It's clear how important it was to take

1
2

the bold steps we did, which allows us to be a more respected institution today.

3

(*Id.*).

4

One day later, the Center for Investigative Reporting published a story detailing

5

UOP's alleged violations of Executive Order 13607 and the 2014 MOU. (*Id.* at ¶ 183).

6

Such violations included: improper recruitment at events held on military bases; improper

7

tracking and compensation measures; unauthorized use of U.S. Armed Forces insignias

8

on "challenge coins"[4]; and misuse of Hiring Our Heroes[5] events for recruitment. (*Id.*

9

at ¶¶ 118–21, 127, 132, 134–36, 183–89). In the two days following the release of the

10

report, Apollo's stock price experienced the aforementioned decrease of $3.09 per share,

11

or a 20% decline. (*Id.* at ¶ 6).

12

### 7.      Statements on July 24, 2015

13

On July 24, 2015, PBS's television program *News Hour* reported that Apollo

14

violated the 2014 MOU through improper recruiting efforts. (*Id.* at ¶¶ 120–21, 188–89).

15

The program included an interview with Dawn Bilodeau, then-Chief for DOD Voluntary

16

Education and signatory to the 2014 MOU, who stated that Apollo's military recruiting

17

tactics would constitute a "reportable offense." (*Id.* at ¶¶ 110, 189). The program also

18

included UOP Executive Dean James Marks, who stated:

19
20
21
22
23

> In terms of compliance, we do compliance exceptionally well. If we're going to sponsor morale, welfare, and recreational events on military installations, it's to benefit the servicemember and to bring entertainment to them, opportunities with businesses off post—that kind of stuff. If we are looking to find students who want to go through the [UOP] experience as they transition or while they're on active duty, that is a separate and completely distinct action on our part.

24

(*Id.* at ¶ 245).

25
26
27

---

[4] In recognition of the performance of good deeds, superiors award challenge coins to individuals in the military. (*See* CAC at ¶¶ 134–36).

28

[5] Hiring Our Heroes events are job fairs focused on advertising job openings to military servicemembers and veterans. (CAC at ¶ 114).

### 8.     Other Statements

Plaintiffs allege that Defendants published various documents on Apollo's website during the Class Period. (*See id.* at ¶ 250). For example, a document drafted by Garland Williams, UOP's Associate Regional Vice President–Military, appeared on Apollo's website. (*Id.*). Mr. Williams's document stated:

> (1) "[M]any of the reforms included in the Executive Order [13607] were pioneered at [UOP] and are in place today." Mr. Williams elaborated that these compliance measures exemplified that "[UOP] does more than any postsecondary educational institution to demonstrate transparency and a commitment to military students." (*Id.*).

> (2) "[UOP] has . . . led the way when it comes to transparency and student protections for our military students" and that "help[ing] the President and Congress ensure that our nation's military receive a quality education" was "a founding principle at [UOP] and a responsibility we take seriously." (*Id.*).

On or about June 30, 2015, Apollo published another statement on its website. (*Id.* at ¶ 252). This statement asserted:

> (1) "[UOP] has supported, endorsed, and devoted significant resources to ensure compliance with the [2014] MOU, a comprehensive set of rules governing interactions with servicemembers and incorporating the requirements of the President's Principles of Excellence as outlined in Executive Order 13607. From the outset, [UOP] has unconditionally and unilaterally supported the directives contained in the Executive Order." (*Id.*). The statement elaborated that UOP was working to "rein in bad actors across all sectors of higher education, and "[i]n June 2012, [UOP] embraced the accountability inherent in the [E]xecutive [O]rder." (*Id.*).

> (2) "[T]he work of [UOP] and Hiring [O]ur Heroes, including its presentations, stand above reproach and should serve as an example of exactly the type of information and services our nation's war heroes need as they transition into the civilian workforce." (*Id.* at ¶ 253). The statement elaborated that its employees who attend "educational fairs" or "other events . . . obtain information from interested, prospective students only with the express permission of event hosts" and that "[t]his is also true of any event made possible by [UOP's] support that is covered by the [2014] MOU and the President's Executive Order." (*Id.*).

> (3) UOP "takes great care to distinguish between events permitted and prohibited under the [2014] MOU and the President's Executive Order." (*Id.*).

On October 7, 2015, Apollo received a letter from DOD informing Apollo that DOD found it in violation of the 2014 MOU for "use of [DOD's] official seals or other trademark insignia and failure to go through the responsible education advisor for each business related activity requiring access to the [DOD] installations," among other unspecified practices. (*Id.* at ¶ 190). DOD also announced that it had placed UOP on probation, which included: (i) barring UOP from recruiting on military bases; (ii) preventing unenrolled servicemembers from using federal funds for UOP classes; and (iii) threatening to terminate UOP's participation in the Tuition Assistance program. (*Id.* at ¶¶ 190–91). Apollo publicly disclosed the contents of the letter on October 9, 2015. (*Id.* at ¶¶ 12, 192). Within the next few days, Apollo's stock price decreased by $1.84, an approximate 15% decline. (*Id.* at ¶¶ 12, 194).

Plaintiffs allege that the aforementioned statements by Defendants or Apollo's representatives were false and misleading because they omitted at least one of the following: (1) "that Apollo's increase in participants in military benefits programs and its decreases in the 90/10 percentage were due to improper recruitment practices"; (2) "that Apollo violated the Executive Order [13607] and the 2014 MOU"; and/or (3) that Apollo was practicing "undisclosed, improper recruitment practices." (*Id.* at ¶¶ 233, 235, 237, 239, 242, 244, 246).

In this action, Plaintiffs assert claims for violations of: (1) Section 10(b) of the Securities Exchange Act and Rule 10b-5; and (2) Section 20(a) of the Securities Exchange Act. Plaintiffs premise these claims on allegations that Defendants knowingly and recklessly made materially false and misleading statements regarding the rollout of its upgraded online classroom and compliance with federal regulations involving military recruitment. Plaintiffs allege that these false and misleading statements artificially inflated stock prices of Apollo during the Class Period.

## II.    LEGAL STANDARD

To survive a Federal Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Federal Rule 8(a)(2). Federal Rule 8(a)(2) requires a

"short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facial plausibility exists if the pleader sets forth factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Plausibility does not equal "probability," but requires more than a sheer possibility that a defendant acted unlawfully. *Id*. "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (citing *Twombly*, 550 U.S. at 557).

Although a complaint attacked for failure to state a claim does not need detailed factual allegations, the pleader's obligation to provide the grounds for relief requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Federal Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief," as "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id*. at 555 n.3 (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1202, at 94–95 (3d ed. 2004)). Thus, Federal Rule 8's pleading standard demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In ruling on a Federal Rule 12(b)(6) motion to dismiss, a court must construe the facts alleged in the complaint in the light most favorable to the drafter and must accept all well-pleaded factual allegations as true. *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000); *see also Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1053

1  (9th Cir. 2011). However, a court need not accept as true legal conclusions couched as

2  factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

3  **III.   ANALYSIS**

4        Defendants move to dismiss Plaintiffs' Section 10(b) claims because the CAC

5  fails to adequately plead any actionable misstatements, scienter, and loss causation.

6  (Docs. 62; 72). Defendants also move to dismiss Plaintiffs' Section 20(a) claims on the

7  grounds that the CAC fails to adequately allege a primary violation under Section 10(b).

8        **A.     Section 10(b) Claims**

9        Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (2012), and SEC

10  Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2016), prohibit fraudulent

11  activities in connection with securities transactions. Specifically, Section 10(b) makes it

12  unlawful

13              [t]o use or employ, in connection with the purchase or sale of
              any  security . . . , any  manipulative  or  deceptive  device  or
14              contrivance in contravention of such rules and regulations as
              the [SEC] may prescribe as necessary or appropriate in the
15              public interest or for the protection of investors.

16  15 U.S.C. § 78j(b). Rule 10b-5 describes certain types of behavior proscribed by the

17  statute, including:

18              mak[ing] any untrue statement of a material fact or [omitting]
              a  material  fact  necessary  in  order  to  make  the  statements
19              made, in the light of the circumstances under which they were
              made, not misleading.
20

21  17 C.F.R. § 240.10b-5(b).

22        Plaintiffs asserting a claim under Section 10(b) and Rule 10b-5 must adequately

23  allege six elements: (1) a material misrepresentation or omission by the defendants;

24  (2) scienter; (3) a connection between the misrepresentation or omission and the purchase

25  or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

26  loss;  and  (6)  loss  causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206

27  (9th Cir. 2016) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)).

28  Moreover, plaintiffs must satisfy the significantly heightened pleading requirements of

Federal Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u (2012). *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014). Federal Rule 9(b) requires that complaints "state with particularity the circumstances constituting fraud or mistake." In other words, the complaint must specifically "identify[] the statements at issue[,] what is false or misleading about [each] statement[,] and why the statements were false or misleading at the time they were made." *Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). The PSLRA requires plaintiffs to plead both falsity and scienter with particularity. *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1200 (2013); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). In particular, a complaint alleging that defendants made false or misleading statements must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' [*id.*] § 78u-4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).

### 1.    False and Misleading Statements

Plaintiffs' underlying theory is that Defendants allegedly misled investors regarding both the rollout of Apollo's online classroom upgrades and UOP's compliance with applicable law in recruiting servicemembers by withholding information Defendants knew at the time of the various statements. (CAC at ¶¶ 290–98). Because of this misleading and/or omitted information, Plaintiffs allege that they purchased Apollo common stock at artificially inflated prices. (*Id.* at ¶ 297).

Plaintiffs must allege falsity in light of "specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994)). "A court evaluates defendants' alleged false statements in the context in which they were made, especially in regard to contemporaneous qualifying or clarifying

language." *Xu v. Chinacache Int'l Holdings Ltd.*, No. 2:15-cv-7952-CAS (RAOx), 2016 WL 4370030, at *5 (C.D. Cal. Aug. 15, 2016) (citing *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996)). In other words, plaintiffs must "demonstrate that a particular statement, when read in light of all the information then available to the market . . . conveyed a false or misleading impression." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any or all material information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011). Rather, disclosure is required under these provisions only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). In other words, plaintiffs cannot simply allege that an omission was material to properly allege falsity; rather, plaintiffs must show that the omission actually renders *other* statements misleading. *In re Rigel Pharms.*, 697 F.3d at 880 n.8. "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45. Alternatively, various statutes or regulations may create an affirmative duty to disclose information even when no statements made by a defendant are false and misleading. *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1480 (N.D. Cal. 1992).

The CAC alleges two general categories of false and misleading statements: (1) statements regarding Apollo's implementation of the online classroom; and (2) statements regarding Apollo's compliance with various regulations involving military recruitment. The Court analyzes these alleged misrepresentations to determine whether the CAC includes detailed allegations compelling the inference that each statement was false. *See Lloyd*, 811 F.3d at 1206.

Before analyzing each section, however, there is one global deficiency in the

- 18 -

CAC. Rule 10b-5 has no "freestanding completeness requirement." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, a "complaint must *specify* the reason or reasons why the statements made by [the defendants] were *misleading* or *untrue*, not simply why the statements were *incomplete*." *Id.* (emphasis added). Here, while Plaintiffs label each identified statement made by Defendants or Apollo representatives as "false and misleading when made," Plaintiffs only specify why each statement was *incomplete*. (*See, e.g.*, CAC at ¶¶ 206, 228, 233). Barring an affirmative statutory or regulatory requirement, a duty to disclose will only attach to statements that are false or misleading. Thus, Plaintiffs' pleading strategy, which merges a variety of statements by Defendants or Apollo representatives into one paragraph and then formulaically lists the information omitted from such statements, fails to meet the heightened pleading standards of the PSLRA. *See Brody*, 280 F.3d at 1006; *see also Ronconi*, 253 F.3d at 429. It is not the Court's responsibility to determine why each statement was false and misleading, potentially giving rise to Defendants' duty to disclose additional information.[6] In addition to this broad deficiency in pleading, the CAC has numerous specific deficiencies as to various statements that the Court discusses in turn.

### a.    New Classroom Statements

Defendants argue that the Court should dismiss Plaintiffs' CAC because the allegedly misleading statements and omissions regarding Apollo's online classroom upgrades are either not misleading or not actionable. (Docs. 62 at 7–22; 72 at 1–12). Plaintiffs allege that the statements regarding Apollo's online classroom upgrades were false and misleading because the statements omit one or more of the following pieces of

---

[6] One particularly strong example of Plaintiffs' improper pleading is exhibited where Plaintiffs argue that Defendants made false and misleading statements by omitting their involvement in "improper recruitment practices." (*See* CAC at ¶¶ 233, 235, 237, 239, 242, 244, 246, 249, 251, 254). Plaintiffs not only fail to tie "improper recruitment practices" to any objectively identifiable standard but also utilize a pleading strategy that would require Apollo to disclose every single recruitment practice for fear of one being deemed "improper." Plaintiffs must *specifically* state what makes each statement false and misleading rather than what information is missing from each statement.

information:

> (i) the [upgraded online] classroom was consistently dysfunctional amid widespread outages;
>
> (ii) layoffs in Apollo's IT department worsened [the online] classroom's performance and depleted [Apollo] war rooms meant to fix [the online] classroom;
>
> (iii) [the online] classroom's dysfunction caused numerous student complaints and was reported to senior management in internal reports and conference calls;
>
> (iv) [the online] classroom's consistent technical failures were causing Apollo's students to drop out or not enroll; and/or
>
> (v) Apollo was taking steps to replace its [upgraded] online classroom with an off-the-shelf product from an outside company.

(CAC at ¶¶ 206, 208, 210, 212, 214, 216, 218, 222, 224, 227, 229). Defendants argue that Plaintiffs have failed to allege that any of Defendants' statements are false or misleading because the statements do not contradict Plaintiffs' allegations, are inactionable puffery, and fall under the PSLRA's safe harbor as forward-looking. (*See* Docs. 62 at 13–19; 72 at 6–12).

### i.    Deficiencies in Underlying Factual Allegations

Defendants first argue that Plaintiffs' identified statements are not false and misleading because of deficiencies in Plaintiffs' underlying factual allegations, which purport to contradict the statements. In particular, Defendants argue that Plaintiffs rely on a number of witness statements[7] that lack factual particularity or foundation to plead

---

[7] Plaintiffs argue that Defendants are wrong to label Plaintiffs' witnesses as "confidential witnesses" because the CAC identifies these witnesses by their "title, tenure and responsibility to support the basis for the imparted information." (Doc. 70 at 33 & 33 n.16 (citing *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2016 WL 215476, at *3–4 (S.D. Tex. Jan. 19, 2016) (declining to "discount allegations from confidential sources" for witnesses "not identified by name [but] adequately identified in other ways and [whose] basis for . . . knowledge is set forth in the Complaint")). While the Court agrees with Plaintiffs that these witnesses are not exactly "confidential," the test for determining the plausibility for any witness's account at the motion to dismiss stage is the same no matter what label Plaintiffs give to their witnesses. *See Zucco Partners*, 552 F.3d at 995 (requiring all witnesses to be "described with sufficient particularity to establish their reliability and personal knowledge"). Thus, while the Court will not blindly discount allegations from Plaintiffs' witnesses, the Court will use all background information provided in the CAC to evaluate the plausibility of each witness's account.

falsity for Defendants' statements.

Plaintiffs point to statements by eight witnesses[8] to support their allegations that Defendants falsely misled investors regarding problems with the online classroom. However, a number of these statements lack objective indicators, particularity, and personal knowledge required at the pleading stage. *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113–15 (N.D. Cal. 2009). For example, CW 2 estimated "at least 30–50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014," (CAC at ¶ 52) and both CW 2 and CW 4 specified that these outages sometimes lasted multiple days and locked all students out from the platform, (*id.* at ¶ 54). Plaintiffs appear to rely on these statements to allege that Defendant Cappelli's statements, discussing a "short-term" disruption that only "stop[ped] out [some students] temporarily," were false and misleading. (*Id.* at ¶ 219). However, it is impossible for the Court to determine whether Defendant Cappelli's characterization of the disruption was false and misleading without additional information regarding the temporal proximity between CW 2 and CW 4's observed outages and Defendant Cappelli's statements.[9] This is just one example of a temporal mismatch between witnesses' statements and Defendants' statements. (*See, e.g.*, *id.* at ¶ 66) (providing no timeline for when CW 3, CW 7, or CW 8 received or observed student complaints regarding the online classroom)). Without more supporting information as to how Defendants' statements were actually false, the Court cannot allow

---

[8] Confidential Witness ("CW") 1 was Apollo's Release Engineer from January 2012 to mid-October 2015, (CAC at ¶ 51 n.4); CW 2 was Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014, (*id.* at ¶ 51 n.5); CW 3 was UOP's Enrollment Manager from October 2009 to June 2015, (*id.* at ¶ 51 n.6); CW 4 was Apollo's Principal Systems Engineer from January 2012 to October 2015, (*id.* at ¶ 54 n.7); CW 5 was Apollo's National Defense Liaison ("NDL") from March 2012 to June 2014, (*id.* at ¶ 56 n.9); CW 6 was UOP's Military Enrollment Advisor and NDL from April 2009 to June 2013, (*id.* at ¶ 56 n.10); CW 7 was UOP's Compliance Officer and Director of Operations, Financial & Student Services from January 2008 to November 2013, (*id.* at ¶ 66 n.11); and CW 8 was UOP's Executive Enrollment Sales Representative from September 2006 to November 2015, (*id.* at ¶ 66 n.12).

[9] The Court also notes that CW 2 stopped working at Apollo in July 2014, yet Plaintiffs indiscriminately rely on CW 2's observations to show the falsity of Defendants' statements about the online classroom throughout the Class Period, which extends to October 21, 2015.

Plaintiffs' claims to go forward. *See, e.g.*, *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (requiring a plaintiff to explain "why the disputed statement was untrue or misleading *when made*" (emphasis added)); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (requiring a plaintiff to allege "specific contemporaneous statements" to show falsity); *Sterling Fin. Corp.*, 963 F. Supp. 2d at 1109 ("Without evidence of contemporaneous falsity, an allegation of a misleading representation, which entirely rests on later contradictory statements [or state of affairs], constitutes an impermissible attempt to plead fraud by hindsight." (citation omitted)).

Plaintiffs also inappropriately rely on confidential witnesses lacking firsthand knowledge. Plaintiffs must state with particularity the basis for a witness's personal knowledge and the plausibility of the witness's account. *See Zucco Partners*, 552 F.3d at 986–98; *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Here, a number of the confidential witnesses' statements lack any indication that the witness had firsthand knowledge of the subject. For example, Plaintiffs rely on CW 2's observations regarding layoffs that occurred nearly one year after CW 2 was no longer employed by Apollo. (CAC at ¶¶ 58–60). While Plaintiffs preface CW 2's observations by noting that "he kept in touch with engineers on his team," (*id.* at ¶ 58), such "vague hearsay" is not enough to satisfy the Ninth Circuit Court of Appeals' (the "Ninth Circuit's") pleading standard.[10] *Zucco Partners*, 552 F.3d at 997.

Finally, a few confidential witness statements lack clarity and objective indicators by which the Court can determine compliance with the PSLRA's pleading requirements. *See Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) (requiring a plaintiff to allege "objective indicators" to bolster the plausibility of confidential

---

[10] Plaintiffs rely on a number of other confidential witness statements that appear to lack firsthand knowledge. (*See, e.g.*, CAC at ¶¶ 55 (relying on CW 2's statements derived from "stay[ing] in contact with several of the engineers on his release team after he left Apollo"), 58 (same), 59 (same), 60 (same), 61 (same), 73 (relying on CW 1's speculation as to when Apollo signed an agreement with Blackboard based on statements made by unspecified Apollo employees).

witness's observations when those observations are conclusory); *In re Nimble Storage, Inc. Sec. Litig.*, No. 15-cv-05803-YGR, 2016 WL 7209826, at *10 (N.D. Cal. Dec. 9, 2016) (finding that a plaintiff "failed to plead adequately any fraudulently misleading statements" partially because, "[a]lthough [two confidential witnesses] allege that such reclassifications were done to make [the defendant's] enterprise segment appear stronger than it was, neither provides any facts or details upon which such conclusory allegations are based"). For example, Plaintiffs rely on an "industry expert" to estimate when Apollo made the decision to transition from its online classroom to Blackboard, the third-party platform. (CAC at ¶ 74). However, besides the label of "industry expert," Plaintiffs provide no other information from which the Court can determine the plausibility of the expert's opinion. Plaintiffs instead rely on conclusory phrases like "based on his experience," "Apollo's senior management had to be aware," and "there could be no way," rather than specifying any objectively based reasoning for these conclusions. (*Id.*; *see also, e.g.*, *id.* at ¶¶ 71–72 (referencing CW 2's opinion that the decision to transition to Blackboard was "clearly made long before it was announced," estimating "several months to six months at a minimum" but providing few specifics as to what led to this conclusion)).

The above-referenced deficiencies in Plaintiffs' pleading of factual allegations may indicate that each confidential witness's report is "not sufficiently, reliable, plausible, or coherent to warrant further consideration." *See, e.g.*, *Zucco Partners*, 552 F.3d at 997 n.4. Furthermore, when combined with Plaintiffs' failure to specify how the confidential witness reports contradict the identified Defendants' statements, the Court has little ability to determine whether Plaintiffs have met the PSLRA's rigorous pleading standard.

### ii. Falsity of Defendants' Statements

Defendants next argue that Plaintiffs have failed to allege that any of the statements, viewed in context, were false and misleading. (Doc. 72 at 6–12). Because Plaintiffs have not alleged that Defendants had a statutory or regulatory duty to disclose,

Plaintiffs must specifically allege statements that misled investors into believing either: (1) Apollo's online classroom was not experiencing "consistent[] dysfunction[]" and "widespread outages"; (2) layoffs in Apollo's IT department were not worsening the online classroom's performance; (3) Apollo management did not receive "numerous" student complaints about the online classroom; (4) Apollo's online classroom did not cause a drop in student retention or enrollment; or (5) Apollo was not taking steps to replace the online classroom with a different product. Many of the statements specified in the CAC fail to address or insinuate these representations and, thus, are not false and misleading. Further, as noted previously, Plaintiffs provide no allegation specifying why any particular statement is false.

First, a number of Plaintiffs' specified statements are not inconsistent with the alleged facts that purport to make them false. For example, the statement that Apollo was "upgrading a substantial portion of our key IT systems, including our student learning system, student services platform and corporate applications, and retiring the related legacy systems," (CAC at ¶ 204), implies nothing about the online classroom's functionality or effects on student retention, layoffs in the IT department, or numbers of student complaints.[11] Additionally, even the statement that Apollo was "very, very focused" on preventing students from being "frustrated on how to move around [the online classroom]," (*id.* at ¶ 217), does not imply that students had little difficulty

---

[11] Many of Plaintiffs' other identified statements fail to mention or imply the same representations regarding the online classroom. (*See, e.g.*, CAC at ¶¶ 205 (discussing "meaningful progress" in "differentiating" UOP), 207 (mentioning a $1 billion investment in "learning and service platforms and data platforms," which were being rolled out to graduate students), 209 (describing Apollo's focus on "the student learning experience" and explaining the protocol students can follow if they have difficulty with the online classroom), 211 (discussing Apollo's focus on "improved retention"), 213 (stating that Apollo was a "different Company today than it was even a few years ago," and is now "really centered around differentiating [UOP]" by "rolling out a new learning platform" with new tools and classifying the online classroom has "the next key element" of Apollo's success), 215 (noting that Apollo had completed the rollout of the online classroom and that "nearly all students are being served" by the platform), 226 (stating that the online classroom was Apollo's "number one area of focus," and Apollo had "every necessary asset on it")).

navigating the platform.[12] Plaintiffs fail to outline why any of these statements are inconsistent with the Plaintiffs' alleged facts about the online classroom. Simply juxtaposing aspirational public statements with paragraphs referring to Apollo's internal issues does not properly allege the falsity of the statements. As the Ninth Circuit has recognized, "[p]roblems and difficulties are the daily work of business people." *Ronconi*, 253 F.3d at 434. The presence of such difficulties with Apollo's online classroom does not provide an automatic basis for Plaintiffs' securities lawsuit. *See id.* Further, in contrast to being false and misleading, some of the statements identified by Plaintiffs actually broach the subject of the online classroom's potential dysfunction. (*See, e.g.*, *id.* at ¶¶ 204 ("[D]isruptions and system malfunctions . . . may arise from [the online classroom] upgrade initiative."), 221 (same)).

Second, Plaintiffs present a number of Defendants' statements out of context. Courts must examine allegedly false and misleading statements within their broader context. *See Basic*, 485 U.S. at 231–32 (holding that actionable statements must have a "substantial likelihood" of altering the "'*total mix*' of information made available" (emphasis added) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))). For example, Plaintiffs state that during an investor conference call, "and in response to questions from [an analyst], regarding 'fix[ing]' the new online classroom, [Defendant] Cappelli stated that Apollo had had 'lots of communications going out to faculty and students about timelines and data so that they feel comfortable that *this has been addressed, fixed* and it won't be disrupted going forward." (CAC at ¶ 225) (emphasis in original). It appears from Plaintiffs' emphasis that Plaintiffs allege this

---

[12] Many other statements, while discussing Defendants' aspirations regarding the online classroom, also are not inconsistent with the alleged facts about the online classroom. (*See, e.g.*, CAC at ¶¶ 207 (classifying the online classroom's "[c]apabilities and features" as "simple" and "efficient"), 219 (stating that any problems with the online classroom were "already being improved" and would "get fixed over the near term"), 223 (stating that the online classroom upgrades created "an overall improved experience"), 226 (discussing various proposed fixes and explanations for the online classroom issues), 228 (noting that the "majority of fixes related to third-party content access have been completed" and that the online classroom "is now again compatible with a range of supported browsers and computer operating systems, which is an area [Apollo was] receiving the highest number of issues")).

statement was false and misleading when made because Apollo had not "fixed" the issues with the online classroom. (*See* Doc. 70 at 26). However, just a few sentences before this statement, Defendant Cappelli stated that "[w]e're going to get it fixed." (Doc. 64-2 at 165). Also within the broader statement, Defendant Cappelli focused on what Apollo was *doing* to fix the platform issues. (*Id.*). Thus, when viewed in context, Defendant Cappelli does not appear to imply that problems with the online classroom were already fixed.[13] The use of selective quotes to deprive statements of their context does not make such statements actionable under Section 10(b) and Rule 10b-5.

### iii.    Inactionable Puffery

Defendants argue that a number of Plaintiffs' identified statements are not actionable because they are "vague, optimistic claims of upgrading, differentiating enhancements, and superior experience," which constitute puffery. (Doc. 72 at 7). Plaintiffs respond that these statements are not "vague, generalized and unspecific assertions of corporate optimism" but, rather, are actionable because Defendants used them "to emphasize or induce reliance upon [their] representation[s]." (Doc. 70 at 24–25).

Statements are not actionable if they are "generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242 (9th Cir. 1990)). The Ninth Circuit has explained that 'puffing' "concerns expressions of opinion, as opposed to knowingly false statements of fact: 'When valuing corporation,[]

---

[13] Plaintiffs appear to have taken a number of other statements out of context. (*Compare, e.g.*, CAC at ¶ 207 ("[Defendant Swartz] stated that, as part of offering a 'second to none,' 'superior classroom experience for the student' . . . ."), *with* Doc. 64-2 at 6 (prefacing "a superior classroom experience" with "we want to offer" and prefacing "second to none" with "[w]e want it to be"); *compare, e.g.*, CAC at ¶¶ 178, 228; Doc. 70 at 17 (characterizing Defendant Cappelli's statement that "[t]he majority of fixes related to third-party content access have been completed" as representing online classroom problems as being "fixed"), *with* Doc. 64-2 at 183 (including Defendant Cappelli's statement that "we're *on track* to fix the technology platform issues" one sentence before Plaintiffs' identified statement (emphasis added))).

investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers.'" *Or. Pub. Emples. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)). The Ninth Circuit has further recognized that the phrases "significant events," "advantages," "high priority," and those beginning with "we believe" are puffery because they are vague and subjective. *Id.* at 606–07. However, statements disguised as opinions but containing objectively determinable representations are still actionable as material misrepresentations. *See, e.g.*, *Brickman v. Fitbit, Inc.*, No. 15-cv-02077-JD, 2016 WL 3844327, at *3 (N.D. Cal. July 15, 2016) (holding that representations on a package that a device will "'TRACK YOUR NIGHT,' including 'Hours slept,' 'Times woken up,' and 'Sleep quality,'" are not the kind of "vague and empty taglines like 'KNOW YOURSELF, LIVE BETTER' that courts have treated as non-actionable" (citing *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1011–12 (N.D. Cal. 2014))).

Several of Plaintiffs' identified statements are inactionable puffery. For example, Plaintiffs cite to a statement by Defendant Cappelli that Apollo was "focused on offering a superior classroom experience" and that Apollo had made "meaningful progress" in "differentiat[ing]" UOP. (CAC at ¶ 205). Plaintiffs also cite to Defendant Swartz's online classroom presentation, in which he stated "[we want it to be] second to none" and "[we want to offer a] superior classroom experience for the student." (*Id.* at ¶ 207). Defendant Swartz also touted the upgrades to the online classroom as one of the first of the "significant enhancements" Apollo was making to the student experience. (*Id.*).

Phrases like "a superior" experience, "meaningful progress," "differentiate," and "significant enhancements" are classic examples of corporate puffery because they do not provide any objective understanding into what they describe. *See Apollo*, 774 F.3d at 606. Further, the statements prefaced with the phrase "we want" simply communicate a desire—nothing more than a vague, subjective opinion. *See, e.g.*, *Glen Holly*, 352 F.3d at 379 (holding that statements "generally describing the 'high priority' [the defendant] placed on product development and alluding to marketing efforts" fail to state an

actionable fraud claim); *Sterling Fin. Corp.*, 963 F. Supp. 2d at 1126–29 (holding that the defendant's statement that "[c]redit quality issues are a top priority" was not actionable despite the defendant ignoring red flags and warning signs, understating reserves, and deferring construction loans). Thus, no reasonable investor would base an investment decision on statements such as these.[14] *See Apollo*, 774 F.3d at 606.

Plaintiffs argue that many of the above-referenced statements, including the phrase "superior classroom experience," provide material information and, thus, are not vague corporate puffery. (Doc. 70 at 24–25). However, the cases Plaintiffs cite fail to bolster their argument in this case. For example, in *Robb v. Fitbit, Inc.*, the district court ruled that statements about "superior . . . tracking technology" and an "advanced tracker" were not puffery. No. 16-cv-00151-SI, 2016 WL 6248896, at *6–8 (N.D. Cal. Oct. 26, 2016). The court emphasized that the plaintiffs had alleged enough factual representations by defendants that it was not "left to speculate whether [defendant's] product was 'highly accurate compared to what?'" *Id.* at *7. The court elaborated that "plaintiffs ha[d] alleged not that users have difficulty using the product but that the product itself does not do the thing that it claims to do, i.e., 'automatically and continuously track their heart rate during everyday activity and exercise.'" *Id.* Here, on the other hand, the Court must speculate as to which feature Defendants were referencing when they stated that the online classroom was "an overall improved experience" or which competing product made the upgraded online classroom a "differentiating kind of proposition for students."

---

[14] The Court recognizes that many other statements identified by Plaintiffs are classic inactionable puffery. (*See, e.g.*, CAC at ¶¶ 211 (stating that Apollo was "first and foremost focused on improving retention" by "improv[ing] the student experience" through the "new, modernized and significantly upgraded online classroom"), 211 (stating that Apollo was building a "significantly easier to use platform" that is "much more efficient for [UOP] to administer"), 213 (stating that Apollo was "a different Company today than it was even a few years ago" and was now "really centered around differentiating [UOP]" from its competitors), 217 (stating that Apollo was "very, very focused on looking at both the service model as well as the learning model"), 220 (characterizing the online classroom as "a great platform" partially because it would "enhance[] the overall learning experience"), 223 (stating that "retention is [Apollo's] number one priority"), 223 (agreeing that the online classroom upgrades were "really [a] differentiating kind of proposition for students" and provided "an overall improved experience")).

1    Unlike the plaintiffs in *Robb*, Plaintiffs fail to identify statements that lead to the type of
2    objective inquiry necessary to make vague and generalized statements actionable.[15]
3    Accordingly, the Court concludes that the above-referenced vague and optimistic
4    statements are not actionable.

5                              **iv.    Forward-Looking Statements**

6            Defendants argue that a few of Plaintiffs' identified statements are not actionable
7    because they fall within the PSLRA's safe harbor for forward-looking statements.
8    (Doc. 62 at 13–14). In particular, Defendants argue that the following statements are
9    forward-looking:

10           (1) "We believe that these new systems will improve the
11           productivity, scalability, reliability and sustainability of our
             IT infrastructure and improve the student experience." (CAC
12           at ¶ 204 (discussing IT system upgrades in a statement from
             Apollo's 2013 Form 10-K)).

13           (2) "The new platform is actually rolled out to all of our
14           graduate students today" and a "staggered roll out for all of
             [the] undergraduates" would occur over the course of fiscal
15           year 2014. (*Id.* at ¶ 207 (statement by Defendant Swartz)).

16           (3) Apollo was "in the process of building out a significantly
             easier to use platform for [its] students that will be
17           streamlined and much more efficient for [UOP] to
             administer." (*Id.* at ¶ 211 (statement by Defendant Cappelli)).

18   (*See* Doc. 62 at 13–14). For the first and third statements, Apollo directed investors to the
19   risk disclosures present in Apollo's 2013 10-K. (*See* Docs. 64-1 at 1191; 64-2 at 24). The
20   second statement directed investors to Apollo's "ICC filings" for additional information.
21   (Doc. 64-2 at 2). The risk disclosures in Apollo's 2013 10-K warned investors of
22   potential "disruption" to Apollo's IT systems, potential for failed upgrades, delay in roll

23
24           [15] Plaintiffs also argue that *South Ferry LP # 2 v. Killinger* supports their
     argument. (*See* Doc. 70 at 24–25 (citing 399 F. Supp. 2d 1121, 1130 (W.D. Wash. 2005),
25   *vacated on other grounds*, 542 F.3d 776 (9th Cir. 2008)). However, the *Killinger* court
     specifically noted that each optimistic statement was "either immediately preceded or
26   followed by very specific statements of fact that supposedly justify or supply a
     foundation for the optimism," such that the statements were not vague and subjective
27   puffery. *Killinger*, 399 F. Supp. 3d at 1130. While Plaintiffs argue that "Defendants'
     challenged statements are tied to additional, similar statements that misrepresent the
     platform's capabilities and rollout," (Doc. 70 at 25), Plaintiffs fail to cite—and the Court
28   cannot find—any such statement immediately preceding or following the identified
     statements.

1   out, and cost overruns. (Doc. 62 at 14–15).

2          The PSLRA carves out a safe harbor for forward-looking statements. *In re Cutera*

3   *Sec. Litig.*, 610 F.3d at 1111. A statement falls within the PSLRA's safe harbor provision

4   if: (1) it is "identified as a forward-looking statement, and is accompanied by meaningful

5   cautionary statements identifying important factors that could cause actual results to

6   differ materially from those in the forward-looking statement"; or (2) "the plaintiff fails

7   to prove that the forward-looking statement" was made with "actual knowledge by that

8   person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). For oral

9   forward-looking statements, cautionary language may be supplied separately in a readily

10  available written document, as long as the statement "identifies the document, or portion

11  thereof, that contains the additional information about those factors relating to the

12  forward-looking statement." *Id.* § 78u-5(c)(2)(B)(i)–(ii).

13         Here, each of the three statements expresses Defendants' beliefs about a future

14  outcome related to upgrading UOP's IT platform. The Court finds that each statement is a

15  classic forward-looking statement. Plaintiffs argue that none of the identified statements

16  is forward-looking because "[s]tatements that omit material facts are not protected."

17  (Doc. 70 at 23 (emphasis omitted)). However, as the Court has discussed above, Plaintiffs

18  have failed to allege that any of Defendants' statements were false and misleading *by*

19  *themselves*. Plaintiffs' argument requires the Court to adopt a freestanding duty to

20  complete requirement, which the Ninth Circuit has directly rejected. *Brody*,

21  280 F.3d at 1006. Just because Plaintiffs attempt to allege that Defendants omitted

22  material information from their statements does not take the underlying statements out of

23  the purview of the PSLRA safe harbor—Plaintiffs must also properly allege that the

24  statements were false and misleading when made. Thus, the Court finds that each of the

25  three statements is forward-looking.

26         Notwithstanding the statements being forward-looking, Plaintiffs argue that the

27  cautionary language was not meaningful because the language did not "precisely address

28  the substance of the challenged statement or omission" and discredit the misleading

nature of the statement or omission. (Doc. 70 at 23 (citing *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005))). However, the "PSLRA does not require a listing of *all* factors that might make the results different from those forecasted. Instead, the warning must only mention important factors of similar significance to those actually realized." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004) (citation omitted). Here, the risk disclosures present in Apollo's 2013 10-K are directly relevant to the disruptions that occurred during the online classroom rollout, *see, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) (holding that cautionary language stating "risks and uncertainties described in detail in the company's [SEC] filing" was adequate under the PSLRA).

However, not all of the statements provide reference to meaningful cautionary language required by the PSLRA safe harbor. While statements one and three directly reference Apollo's 2013 10-K, (*see* Docs. 64-1 at 1191; 64-2 at 24), the second statement only vaguely referred investors to "ICC filings,"[16] (*see* Doc. 64-2 at 2). The Court finds that such vague reference fails to comply with the PSLRA's requirement that forward-looking statements identify "the document," or the "portion thereof," providing the appropriate risk disclosure. 15 U.S.C. § 78u-5(c)(2)(B)(i)–(ii). *But see In re Fusion-io, Inc. Sec. Litig.*, No. 13-cv-05368-LHK, 2015 WL 661869, at *13 (N.D. Cal. Feb. 12, 2015) (holding that the PSLRA safe harbor applied even though "cautionary language did not identify the specific document, or portion thereof, where additional cautionary language could be found" because the plaintiffs "cite[d] no authority . . . that documents containing additional cautionary language must be cited with specificity"). Accordingly, while the PSLRA safe harbor applies to statements one and three, statement two fails to identify any *particular* document containing cautionary

---

[16] Defendant Swartz appeared to provide "reference" to a safe harbor statement on a slide in a slideshow. (Doc. 64-2 at 2). However, Defendants have failed to provide the Court with the substance of this statement or information as to whether the slide explicitly referenced a specific "ICC filing."

language and, thus, is not covered by the safe harbor.[17] Nonetheless, statement two is inactionable for the reasons stated above. (*See supra* Sections III.A.1, III.A.1.a.ii).

### b.   Legal Compliance in Military Recruitment Practices

Defendants next argue that the Court should dismiss Plaintiffs' CAC because the allegedly misleading statements and omissions regarding Apollo's compliance with various regulations involving military recruitment are either not misleading or not actionable. (Docs. 62 at 20–29; 72 at 13–16). Plaintiffs allege that the statements regarding Apollo's legal compliance were false and misleading, and that the statements omit one or more of the following pieces of information:

> (i) Apollo utilized "improper recruitment practices." (CAC at ¶¶ 233, 235, 237, 239, 242, 244, 246, 249, 251, 254).
>
> (ii) Apollo "violated . . . Executive Order [13607] and the 2014 MOU." (*Id.* at ¶¶ 233, 235, 237, 239, 242, 244, 246, 249, 251, 254).
>
> (iii) Apollo "based employment decisions on the number of enrollments." (*Id.* at ¶ 237).

Defendants argue that Plaintiffs have failed to allege that any of Defendants' statements are false or misleading because the statements do not contradict Plaintiffs' allegations and are inactionable puffery. (*See* Doc. 62 at 20–21).

### i.   Deficiencies in Underlying Factual Allegations

Defendants first argue that Plaintiffs' identified statements are not false and misleading because of deficiencies in Plaintiffs' underlying factual allegations, which purport to contradict the statements. In particular, Defendants argue, "Plaintiffs do not allege that there has been any adjudication by any court or government agency that Apollo violated any governing regulation or agreement during the Class Period." (*Id.*

---

[17] Plaintiffs also argue that Defendants' forward-looking statements are not protected by the safe harbor provision because "Defendants knew the statements were false and omitted material information." (Doc. 70 at 24). Because the Court finds the cautionary language accompanying statements one and three was sufficient, Plaintiffs' "state of mind" argument is irrelevant. *See In re Cutera*, 610 F.3d at 1112 ("[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant.").

at 21–22). In the alternative, Defendants argue that Plaintiffs have failed to allege either improper recruitment practices or violations of Executive Order 13607 and the 2014 MOU. (*Id.* at 22–28).

### (1)    Adjudication by Court or Agency

Defendants argue that Plaintiffs must allege an "adjudication by any court or government agency that Apollo violated [a] government regulation or agreement during the Class Period" in order to properly allege Defendants' noncompliance with various regulations. (*Id.* at 21–22) (citing *Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1081–82 (D. Minn. 2012); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 581 (S.D.N.Y. 2012)). However, although the cases cited by Defendants also involved for-profit education institutions, the underlying allegations of noncompliance differ from those alleged in this case. For example, both *Capella* and *ITT* involved a complicated determination regarding whether the defendant's past business practices would violate newly enacted regulations. *See Capella*, 873 F. Supp. 2d at 1082; *In re ITT*, 859 F. Supp. 2d at 581. Further, both cases involved regulations that did not actually "prohibit or penalize incidents" of each defendant's unethical practices. *See In re ITT*, 859 F. Supp. 2d at 581. Thus, the courts in both cases appeared to use the lack of an official adjudication of noncompliance as one factor of many in finding that the plaintiffs failed to allege an actionable misstatement regarding each defendant's legal compliance.

On the other hand, some courts have not required a prior adjudication at the initial pleading stage. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 363 (E.D.N.Y. 2013) (finding actionable alleged misstatements regarding legal compliance despite an inconclusive regulatory investigation because "[w]hether or not [the defendants] . . . actually violated [the law]—and thus whether the representation that the [defendant's practices] complied with [the specific law] was actually an 'untrue' statement—are not issues for resolution at this stage" (quoting *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010))). Further, given that many companies

settle government investigations through fines to avoid adverse determinations, to require a formal adjudication would allow many companies to 'buy out' of securities lawsuits. *Cf., e.g.*, *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) (noting with respect to loss causation that "[t]o require, in all circumstances, a conclusive government finding of fraud merely to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit"). The Court agrees with the reasoning used in these cases. Thus, Plaintiffs are not required to allege a final adjudication of Defendants' legal noncompliance in order to render Defendants' statements about compliance actionable.

### (2)   Witness Statements

Defendants also argue that Plaintiffs base many of their allegations on implausible observations by confidential witnesses.[18] (Doc. 62 at 22–28). In particular, Defendants assert that many of Plaintiffs' witnesses had left Apollo before the 2014 MOU went into effect. Additionally, many of the witnesses' statements lack particularity necessary to establish their plausibility. The Court agrees.

The allegations concerning CW 5, CW 7, CW 10, CW 13, CW 15, (*see* CAC at ¶¶ 115, 116, 128, 129, 131, 139, 144, 145, 148), fail to meet the PSLRA's pleading requirements to allege that Apollo was noncompliant with the 2014 MOU. Each of these witnesses had left Apollo before the 2014 MOU became effective. Thus, any knowledge these witnesses possessed regarding Apollo's compliance with the 2014 MOU was

---

[18] In addition to the confidential witnesses already described in this Order, Plaintiffs rely on the following additional confidential witnesses for allegations involving military recruitment: CW 9 was UOP's NDL from 2008 to 2015, (CAC at ¶ 77 n.15); CW 10 was Apollo's Enrollment Advisor from May 2013 to October 2013, (*id.* at ¶ 115 n.17); CW 11 was UOP's Senior NDL in North Carolina for the final two years of his tenure with UOP, which lasted from February 2007 to March 2013, (*id.* at ¶ 116 n.18); CW 12 was UOP's Military Enrollment Representative from February 2014 to June 2015, (*id.* at ¶ 130 n.21); CW 13 was Apollo's Finance Counselor and Military Certifying Official from September 2002 to July 2014, (*id.* at ¶ 145 n.23); CW 14 was Apollo's Finance Advisor from 2008 to 2014, (*id.* at ¶ 145 n.24); CW 15 was Apollo's Military Enrollment Officer from April 2010 to August 2013, (*id.* at ¶ 145 n.25).

necessarily secondhand. *See, e.g.*, *Zucco Partners*, 552 F.3d at 996 (concluding that two confidential witnesses who were not employed during a class period "have only second-hand information about accounting practices at the corporation during that year"); *Shurkin v. Golden State Warriors*, 471 F. Supp. 2d 998, 1015 (N.D. Cal. 2006) ("CW3's employment ended before the Class Period and thus, CW3 lacks any personal knowledge as to the [defendant's] production activity during the [time period] that is at issue here."). Thus, these allegations lack sufficient particularity to establish CW 5, CW 7, CW 10, CW 13, and CW 15's personal knowledge and the plausibility of their statements regarding Apollo's noncompliance with the 2014 MOU.

Many of Plaintiffs' other allegations that rely on witnesses also lack sufficient particularity. For example, Plaintiffs allege that the 2014 MOU prohibited "high pressure sales tactics." (CAC at ¶ 140). However, in alleging Apollo's use of "high pressure sales tactics," Plaintiffs fail to plead with enough particularity. Plaintiffs allege that Apollo used various telephone solicitation practices, (*id.* at ¶¶ 143, 147), and Apollo "targeted people's vulnerabilities" by training employees to ask why students were dropping out or why potential recruits wanted to go to school, (*id.* at ¶ 143). Neither of these practices appears to be a "high pressure sales tactic." It seems unlikely—and Plaintiffs cite no authority suggesting—that making a phone call to a person who asked not to be called or inquiring into the reasons a person is enrolling or dropping out of school could be classified as a "high pressure sales tactic" without more.

Plaintiffs also fail to plead with enough particularity in alleging that Apollo "misrepresented financial aid issues" to students. (*Id.* at ¶ 140). Plaintiffs allege that Apollo encouraged students to accept loans "for consumer spending," (*id.* at ¶ 145), and Apollo told students "they could drop" classes they disliked despite already charging students for those classes, (*id.* at ¶ 146). Without more information, such as whether Apollo denied refunds to students who dropped out of classes based on advice from an employee, the Court cannot determine whether Plaintiffs have plausibly alleged that Defendants misrepresented financial aid issues. Additionally, Plaintiffs fail to explain

why using financial aid for non-educational means—such as room, board, and food—is a misrepresentation.

Plaintiffs argue that the Ninth Circuit does not require additional particularity beyond allegations that allow defendants to "prepare an adequate answer." (Doc. 70 at 3 (citing *In re CBT Grp. PLC Sec. Grp. Litig.*, No. C-98-21014-RMW, 2001 WL 1822729, at *6 (N.D. Cal. Dec. 28, 2001)). However, determining the level of particularity required to allow defendants to prepare an adequate answer is dependent on the type of fraud alleged, among other case-specific factors. *See, e.g.*, *CBT*, 2001 WL 1822729, at *6 (finding that because the complaint identified "numerous instances of improper revenue recognition," "the court [was] not persuaded" that the plaintiffs needed to allege the "names of the customers, the dates of the sales and the amounts"). Here, Plaintiffs alleged few instances of noncompliance. Additionally, Plaintiffs are alleging that Defendants misrepresented "financial aid issues" and utilized "high pressure sale tactics," both of which are amorphously defined. Without more specificity, the Court cannot determine whether Plaintiffs have plausibly alleged that Apollo "misrepresented financial aid issues" and promoted "high pressure sales tactics." *See Mauss v. NuVasive, Inc.*, No. 13-cv-2005 JM (JLB), 2014 WL 6980441, at *8 (S.D. Cal. Dec. 9, 2014) ("Without the 'who, what, when, where, and how' of at least some of the purportedly illegal conduct, and without some indication of how those facts constitute a violation of [specific] laws and regulations, the court cannot meaningfully evaluate the plausibility of [the plaintiff's] claims that [the defendants] misrepresented [their] compliance with the laws.").

### (3)   DOD's Letter

Plaintiffs allege that a letter, sent by the DOD to UOP and disclosed by Apollo on October 9, 2015, supports their allegations that Defendants violated the 2014 MOU by using challenge coins and failing to obtain proper permissions to access DOD installations. (CAC at ¶¶ 190–91; Doc. 70 at 31). Plaintiffs also allege that DOD placed UOP on probation pending a further investigation. (CAC at ¶ 190–91; Doc. 70 at 31).

Defendants argue that Plaintiffs' allegations are insufficient. (Doc. 72 at 14–15 & 15 n.11). To support this argument, Defendants attack the process used by the DOD in placing UOP on probation. (*Id.* at 15 n.11).

In ruling on Defendants' Motion, the Court must take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1340 (9th Cir. 1995). Defendants appear to argue that when a complaint alleges findings from a regulatory or legislative body, a court is not obligated to take the result of those findings as true. (*See* Doc. 72 at 15 n.11 (citing *Berry v. Webloyalty, Inc.*, No. 10-cv-1358, 2010 WL 8416525, at *8 (S.D. Cal. Nov. 16, 2010); *In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1171 (S.D. Cal. 2010))). In *Berry*, the district court declined to take judicial notice of statements made in a U.S. Senate Committee report regarding aggressive sales tactics because "there is sufficient dispute about the content of the information." 2010 WL 8416525, at *3. Similarly, the district court in *Easysaver* declined to consider the findings within the same report because "the facts can be disputed, the findings pertained to other companies, and the conclusions involve interpretation, opinion, and judgment." 737 F. Supp. 2d at 1170–71 (citations omitted). Here, however, the DOD did not make findings on some abstract practice but, rather, UOP's exact practices underlying this litigation. Further, while those cases involved judicial notice, DOD's findings and decision to put UOP on probation are part of Plaintiffs' allegations in the CAC. Even if this Court was using the judicial notice standard, Defendants do not dispute *whether* DOD found UOP in violation and placed UOP on probation. Rather, Defendants are arguing the merits of the process DOD applied in reviewing UOP's actions. This inquiry is more appropriate for the summary judgment stage rather than the motion to dismiss stage of litigation. Thus, the Court finds that Plaintiffs have sufficiently alleged that Defendants violated the 2014 MOU in using challenge coins and failing to obtain proper permissions to access DOD installations.

1

**ii.     Falsity of Defendants' Statements**

2     Defendants argue that Plaintiffs have failed to allege that any of the identified

3 statements, viewed in context, were false and misleading. (Doc. 62 at 22–29). Because

4 Plaintiffs have not alleged that Defendants had a statutory or regulatory duty to disclose,

5 Plaintiffs must specifically identify statements that misled investors into believing either:

6 (1) Apollo utilized proper recruitment practices; (2) Apollo was in full compliance with

7 Executive Order 13607 and the 2014 MOU; or (3) Apollo based its employment

8 decisions on each employee's enrollment numbers. Many of the statements specified in

9 the CAC fail to address or insinuate these representations and, thus, are not false and

10 misleading. Further, as noted previously, Plaintiffs provide no allegation specifying why

11 any particular statement is false.

12     A number of Plaintiffs' identified statements, when evaluated in context, fail to

13 convey the representation that Plaintiffs allege. For example, Plaintiffs state that Apollo's

14 2013 and 2014 Form 10-Ks state that Apollo "was in 'compl[iance] with the extensive

15 regulatory requirements' governing its business." (CAC at ¶¶ 230, 240). However, the

16 actual statement, located in each Form 10-K's "Risks Related to the Highly Regulated

17 Industry in Which We Operate" section states, "If we fail to *comply with the extensive*

18 *regulatory requirements* for our business, we could face significant monetary liabilities,

19 fines and penalties, including loss of access to U.S. federal student loans and grants for

20 our students." (Doc. 64-1 at 38, 225 (emphasis added)). Plaintiffs argue that this

21 statement conveys that Defendants were in full compliance with all regulatory

22 requirements because it is prefaced with "if." (Doc. 70 at 29). The Court finds that these

23 "if . . . then" statements fail to guarantee anything; in fact, the statements warn investors

24 of the risks accompanying potential noncompliance. *See In re Rocket Fuel, Inc. Sec.*

25 *Litig.*, No. 14-cv-3998-PJH, 2015 WL 9311921, at *6 (N.D. Cal. Dec. 23, 2015) ("With

26 respect to the statement that 'if we fail to detect fraud . . . our reputation will suffer' . . . ,

27 the court finds that this statement . . . makes no implication of any specific level of

28 success, and in fact does the opposite, warning readers that the technology may

1    sometimes fail to detect fraud.").

2         Many of Plaintiffs' other identified statements appear to rely on a nonexistent

3    freestanding completeness duty. For example, Plaintiffs allege various statements in

4    which Defendants reported "compliance with the 90/10 rule" and cited yearly 90/10

5    percentages are false and misleading. (*See* CAC at ¶¶ 231, 232, 240, 241). In Plaintiffs'

6    Response, they explain that their basis for alleging these statements is that Apollo

7    achieved these percentages through illegal practices—not that the percentages were

8    actually false. (Doc. 70 at 29). Thus, Plaintiffs appear to be arguing that Defendants'

9    statements failed to provide a *complete* picture of the 90/10 percentages rather than that

10   those percentages were actually false.[19] *See Capella*, 873 F. Supp. 2d at 1080 (finding

11   that the defendant's failure to mention its "predatory recruitment practices or quota

12   system" in discussing revenue and enrollment growth was "too tenuous" to render its

13   "statements regarding its financial success misleading" (quotations omitted)).

14        Finally, some of Plaintiffs' allegations lack sufficient specificity. For example,

15   Plaintiffs allege that Apollo fired various recruiters based on the number of enrollees

16   recruited by each employee. (*See* CAC at ¶¶ 126, 130, 131, 133). Plaintiffs also allege

17   that Apollo's Chief Ethics and Compliance Officer stated that "there is nothing in [the

18   Apollo employee] performance review . . . [or] performance criteria that relates to any

19   consideration of the quantity or number of students who may enroll." (*Id.* at ¶ 236). Thus,

20   Plaintiffs appear to argue that this statement was false and misleading because it omits

21   _____

22   [19] The Court also finds that some of Plaintiffs' other identified statements fail to
     contradict underlying facts unless the Court recognizes a freestanding completeness

23   requirement. (*See, e.g.*, CAC at ¶¶ 234 (alleging that Defendant Pepicello "expressed
     support" of Executive Order 13607 but failing to allege a conveyance of compliance),

24   236 (alleging that Apollo's Chief Ethics and Compliance Officer described methods
     utilized to be in compliance with various regulations but failing to allege a conveyance of

25   compliance), 243 (alleging that Apollo was "one of the first organizations to change
     recruiter comp" but failing to allege that Apollo did not actually change recruiter comp),

26   248 (alleging that UOP "embraces the accountability inherent in Executive Order" 13607
     and expresses "support of, and state [UOP's] intent to comply" with the Order but failing

27   to allege that Apollo never actually possessed such intent), 250 (alleging that "many" of
     the Executive Order 13607 "reforms" "are in place today" but failing to allege that

28   "many" of the reforms were not in place), 252 (alleging UOP's "unconditional" and
     "unilateral" support for Executive Order 13607 but failing to allege that UOP did not
     actually support the Order)).

that Apollo based *some* employment decisions—namely, the firing of employees—on enrollments. (*Id.* at ¶ 237). However, the Ninth Circuit has held that the Higher Education Act "does not prohibit *any and all* employment-related decisions on the basis of recruitment numbers; it prohibits only a particular type of incentive compensation." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011). Thus, it is unclear whether Plaintiffs are alleging that the Compliance Officer's statement is false and misleading because it is inconsistent with Apollo's legal termination of employees[20] or some other reason.[21] Alternatively, if Plaintiffs allege that the Compliance Officer's statement is false and misleading for representing compliance with applicable laws, then Plaintiffs would need to allege that Apollo used an incentive compensation system based on enrollments. Thus, in simply alleging that Apollo misleadingly omitted that it made some employment decisions based on enrollments, Plaintiffs have failed to allege that that Defendants plausibly made a false and misleading statement.

### iii.    Inactionable Puffery

Defendants argue that some of Plaintiffs' other identified statements are "substantially identical to statements of compliance with Title IV that courts have found too vague to be actionable." (Doc. 62 at 21). Plaintiffs counter that their "allegations of misstatements and omissions are more than adequate," but Plaintiffs fail to provide any specific analysis. (Doc. 70 at 28).

Courts often hold that statements regarding general legal compliance are too vague to be actionable misrepresentations or omissions. *See, e.g.*, *Karam v. Corinthian Colls., Inc.*, No. CV 10-6523-GHK (PJWx), 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) (finding statements like "[c]ompliance for the organization has really

---

[20] Further, even if this is the reason Plaintiffs allege the Compliance Officer's statement to be false and misleading—and despite the terminations appearing to be legal—Plaintiffs have failed to also allege that Apollo utilized the "performance review" or "performance criteria" in deciding which employees to terminate.

[21] Similarly, although Plaintiffs allege that Apollo tracked conversion rates for enrolled students, (CAC at ¶¶ 127–29), Plaintiffs fail to state what specific regulation or law banned this practice during the Class Period.

been job one for us" to be inactionable puffery); *In re Gentiva*, 932 F. Supp. 2d at 370 (finding statements "that the compliance program was 'robust' or 'best-of-class' and that the company's financial reporting was 'very conservative'" to be inactionable puffery). For example, in *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, the plaintiffs alleged that the defendant made "numerous misrepresentations regarding its 'highly disciplined' risk management and its standard-setting reputation for integrity." 553 F.3d 187, 205 (2d Cir. 2009). The plaintiffs alleged such statements were misleading "because [the defendant's] poor financial discipline led to liability in the WorldCom litigation and involvement in the Enron scandal." *Id.* at 206. The Second Circuit Court of Appeals rejected that argument, noting that the defendant's statements "did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices." *Id.*

Here, many of Plaintiffs' identified statements are too vague to warrant them actionable. For example, Plaintiffs allege that statements from Apollo's Chief Ethics and Compliance Officer describing the "variety of systems" and "safety net" Apollo has put in place to identify and fix areas or incidences of noncompliance is too vague to be actionable. (*See* CAC at ¶ 236; Doc. 64-2 at 79–80). These statements mirror the identified statements in *ECA* in that Plaintiffs are not alleging those compliance systems did not exist; rather, Plaintiffs appear to argue that because Apollo was allegedly not compliant with various laws and regulations, the safety net failed. Similarly, Plaintiffs identify a statement made by Apollo's Chief of Staff in which he states that UOP "endorsed" and "was one of the first schools in the country to adopt" the principles set forth in Executive Order 13607. (CAC at ¶ 93). Again, like the statements in *ECA*, the expressions of support and even adoption of Executive Order 13607's principles "did not, and could not, amount to a guarantee" that UOP would not be found noncompliant with those principles.[22] *ECA*, 553 F.3d at 206.

---

[22] The Court finds many other statements identified by Plaintiffs as false and misleading to be inactionable puffery. (*See, e.g.*, CAC at ¶¶ 234 ("[Defendant] Pepicello "expressed support of the President's Executive Order 13607."), 245 ("In terms of

### 2. Scienter

The Ninth Circuit treats falsity and scienter as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), *abrogated on other grounds*, *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d at 784. However, because the Court concludes that Plaintiffs have failed to allege that Defendants made a false and misleading statement, the Court does not address scienter.

### 3. Loss Causation

Similarly, having agreed with Defendants that Plaintiffs have failed to allege any false and misleading statements, the Court will not reach Defendants' loss causation argument at this time.

### B. Section 20(a) Claims

To state a claim under Section 20(a), a plaintiff must establish (1) a primary violation of federal securities law, and (2) that the defendant exercised actual power or control over the primary violator. *See No. 84 Emp'r–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003); *see also* 15 U.S.C. § 78t. Because the Court finds that Plaintiffs have failed to state a Section 10(b) and Rule 10b-5 claim, Plaintiffs' Section 20(a) claims necessarily fails. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993).

///

---

compliance, we do compliance exceptionally well."), 248 ("[UOP] embraces the accountability inherent in the Executive Order [13607]" and "express[es] support of, and state[s] our intent to comply with, the [Order]."), 250 ("[UOP] does more than any postsecondary educational institution to demonstrate transparency and a commitment to military students."), 250 ("[UOP] has . . . led the way when it comes to transparency and student protections for our military students"), 250 ("[H]elp[ing] the President and Congress ensure that our nation's military receive a quality education" was "a founding principle at [UOP] and a responsibility we take seriously."), 252 ("[UOP] has unconditionally and unilaterally supported the President's Executive Order 13607 of 2012."), 252 ("[UOP] has supported, endorsed, and devoted significant resources to ensure compliance with the [2014 MOU] . . . ."), 252 ("[UOP] embraced the accountability inherent in the executive order."), 253 ("[UOP] takes great care to distinguish between events permitted and prohibited under the [2014 MOU and the President's Executive Order.]")).

1

**IV.    LEAVE TO AMEND**

2          As Plaintiffs have only amended the CAC once and because of the liberal policy in

3 favor of amendment embodied in Federal Rule 15(a), the Court will grant Defendants'

4 Motion to Dismiss but grant Plaintiffs' request to amend. (*See* Doc. 70 at 44); *see also,*

5 *e.g.*, *Mark H. v. Lemahieu*, 513 F.3d 922, 939–40 (9th Cir. 2008) (citing *Verizon Del.,*

6 *Inc. v. Covad Comm'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004)).

7          The Court notes that the CAC in this case alleges over 115 assertions that

8 Plaintiffs seemingly purport to put in the false and misleading category. If Plaintiffs

9 choose to amend, Plaintiffs must distinguish on a factual-assertion-by-factual-assertion

10 basis why each expressly alleged assertion is false and misleading. In other words,

11 Plaintiffs must distinguish between statements they have included as background or

12 context and actionable assertions. For each statement Plaintiffs claim (on an assertion-by-

13 assertion basis) to be false and misleading, Plaintiffs must allege with particularity how

14 that specific statement is false and misleading. The Court has, by this Order, advised

15 Plaintiffs as to the standard under the PSLRA and Federal Rule 9(b) and expects

16 Plaintiffs to comply in the next amended complaint, without seeking further amendment.

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.  CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendants' Request for Judicial Notice in Support of Moving Defendants' Motion to Dismiss the Consolidated Class Action Complaint, (Doc. 63), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Supplemental Request for Judicial Notice in Support of Motion to Dismiss Consolidated Class Action Complaint, (Doc. 74), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Request for Judicial Notice, (Doc. 71 at 3–4), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Consolidated Class Action Complaint, (Doc. 62), is **GRANTED**. Plaintiffs may file an amended complaint against Defendants within twenty-one (21) days from the date of this Order; if Plaintiffs fail to file an amended complaint within this deadline, the Clerk of the Court shall enter judgment, dismissing this case with prejudice.[23]

Dated this 16th day of February, 2017.

James A. Teilborg
Senior United States District Judge

---

[23] If Plaintiffs file an amended complaint, Defendants shall answer, or otherwise respond, to the amended complaint within twenty (20) days.