1  TIFFANY & BOSCO P.A.
   RICHARD G. HIMELRICK (State Bar No. 004738)
2  2525 East Camelback Road, Seventh Floor
   Phoenix, AZ 85016
3  Tel:    (602) 255-6000
   rgh@tblaw.com
4

5  *Local Counsel for Lead Plaintiff*
   *Government of Guam Retirement Fund*
6

7  BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
8  BLAIR A. NICHOLAS (*pro hac vice*)
   DAVID R. STICKNEY (*pro hac vice*)
   BRANDON MARSH (*pro hac vice*)
9  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
10 Tel:    (858) 793-0070
   blairn@blbglaw.com
11 davids@blbglaw.com
   brandon.marsh@blbglaw.com
12

13 *Counsel for Lead Plaintiff*
   *Government of Guam Retirement Fund*
   *and Lead Counsel for the Class*
14

15             UNITED STATES DISTRICT COURT

16                  DISTRICT OF ARIZONA

17 Rameses Te Lomingkit, Individually And     No. 2:16-cv-00689-PHX-JAT
   On Behalf Of All Others Similarly
18 Situated,                                  **AMENDED CLASS ACTION
                                              COMPLAINT FOR
19                                            VIOLATIONS OF THE
                        Plaintiff,            <u>FEDERAL SECURITIES LAWS</u>**
20

21         v.

22 Apollo Education Group, Inc. (F/K/A         **CLASS ACTION**
   Apollo Group, Inc.); Peter V. Sperling;
23 Gregory W. Cappelli; and Brian L. Swartz,   **JURY TRIAL DEMANDED**

24                      Defendants.

25

26

27

28

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ............................................................. 2

II.   JURISDICTION AND VENUE ........................................................ 6

III.  THE PARTIES ................................................................................ 6

      A.    Plaintiffs ................................................................................ 6

      B.    Defendants ............................................................................. 7

IV.   SUMMARY OF THE ACTION ...................................................... 8

      A.    Background To Apollo ........................................................... 8

      B.    As Apollo's Enrollment Declined, The New "Online
            Classroom" Was Critical For The Company ............................... 10

      C.    During The Class Period, Apollo Promoted Its Online
            Classroom ............................................................................ 16

      D.    Unknown to Investors At The Time, Apollo's New Online
            Classroom Was Dysfunctional And Suffered From Pervasive
            Disruptions .......................................................................... 20

            1.    The Online Classroom Was Consistently
                  Dysfunctional Amid Widespread Outages ..................... 20

            2.    Ongoing Layoffs In Apollo's IT Department
                  Exacerbated The New Classroom's Failures ................... 26

            3.    The Online Classroom Was Not Competitive, Rampant
                  Disruptions Hurt Enrollment, And Employees Were
                  Calling For A Return To The Legacy Platform ............... 29

            4.    Apollo's Senior Management Also Knew Of The New
                  Classroom's Deficiencies And Serial Disruptions
                  Through Reports, Complaints, And Conference Calls ...... 34

            5.    Apollo's Senior Management Decided To Scrap The
                  New Classroom Long Before Informing Investors ........... 39

      E.    Apollo Revealed The Truth About Its Online Classroom
            Through Partial Disclosures ..................................................... 43

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS ....................................................................... 50

VI.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ................... 78

VII.  LOSS CAUSATION ..................................................................... 82

VIII. PRESUMPTION OF RELIANCE ................................................... 84

IX.      DEFENDANTS' DUTY TO DISCLOSE ................................................. 85

X.       INAPPLICABILITY OF THE STATUTORY SAFE HARBOR
         AND BESPEAKS CAUTION DOCTRINE ......................................... 86

XI.      CLASS ACTION ALLEGATIONS .................................................... 87

XII.     CLAIMS FOR RELIEF ...................................................................... 88

COUNT I  For Violations Of Section 10(b) Of The Exchange Act And SEC
         Rule 10b-5 Promulgated Thereunder (Against Defendants Apollo,
         Cappelli, And Swartz) .................................................................... 88

COUNT II  For Violations Of Section 20(a) Of The Exchange Act (Against
         Defendants Cappelli, Swartz, And Sperling) .................................. 90

XIII.    PRAYER FOR RELIEF ...................................................................... 91

XIV.    JURY DEMAND ................................................................................ 92

1    Lead Plaintiff, the Government of Guam Retirement Fund, and additional
2    plaintiffs Rameses Te Lomingkit and National Shopmen Pension Fund (collectively with
3    the Lead Plaintiff, "Plaintiffs"), bring this action pursuant to Sections 10(b) and 20(a) of
4    the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and
5    all other persons or entities who purchased or otherwise acquired Class A common stock
6    of Apollo Education Group, Inc. ("Apollo" or the "Company") during the period from
7    November 13, 2013 through October 21, 2015, inclusive (the "Class Period") and were
8    damaged thereby (the "Class").
9    Plaintiffs allege the following based upon personal knowledge as to themselves
10    and their own acts and upon information and belief as to all other matters. Plaintiffs'
11    information and belief are based on the ongoing independent investigation of their
12    undersigned counsel.  This investigation includes review and analysis of: (i) Apollo's
13    public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research
14    reports by securities and financial analysts; (iii) transcripts of Apollo's conference calls
15    with analysts and investors and accompanying slide presentations; (iv) Company
16    presentations, press releases, and reports; (v) news and media reports concerning the
17    Company and other facts related to this action; (vi) data reflecting the pricing of Apollo
18    securities; (vii) information from consultations with relevant experts; (viii) information
19    provided by former Apollo employees; and (ix) other material and data concerning the
20    Company, as identified herein.  Plaintiffs believe that substantial additional evidentiary
21    support is likely to exist for the allegations set forth herein after a reasonable opportunity
22    for further investigation or discovery.
23
24
25
26
27
28

## I.     NATURE OF THE ACTION

1.     Apollo is a for-profit education company that sells online and on-campus degree and certification programs.  The largest of Apollo's universities is the University of Phoenix, accounting for about 90% of enrollment and revenues.  After many years of impressive growth before the Class Period, the number of students enrolled at the University of Phoenix started a steep decline in 2010.  Defendants publicly attributed the decline primarily to increased competition and regulation.  In an effort to differentiate Apollo from its competitors, the Company invested heavily in a $1 billion development project: a new online classroom.

2.     During the Class Period, Apollo and its top officers – Chief Executive Officer Gregory W. Cappelli and Chief Financial Officer Brian L. Swartz – made false and misleading statements to investors, and omitted material facts, regarding the status and performance of the Company's critical online classroom project.  In response to Defendants' statements, the price of Apollo's shares traded at artificially-inflated levels, reaching a high of almost $36 per share during the Class Period.  When the truth emerged, the price plunged to less than $7.50 per share and remained at such prices.

3.     Before and during the Class Period, Defendants repeatedly emphasized to investors the importance of Apollo's new online classroom, its successful rollout, and its benefits to Apollo.  Every University of Phoenix student used the online classroom, and for years the Company invested heavily into "the classroom of the future."  The platform would, for instance, "get to know" each of Apollo's students personally and adapt to accommodate their individual "learning DNA."  On November 13, 2013, the first day of the Class Period, Defendants represented that the online classroom was rolled out to a significant number of Apollo's students, and it offered an improved education experience that differentiated Apollo from its competition.  Defendant Swartz told investors that the new platform had been "***rolled out to all of our graduate students***" and provided a "***significant enhancement[] to the student experience***."   In June 2014, Defendant Cappelli stated that by May 2014 Apollo had "***completed the rollout of our new learning***

*platform across the university*" and that the new classroom had been "*greatly enhanced and provides a more efficient and user friendly experience*."[1]  Throughout the Class Period, Defendants repeatedly promoted the online classroom and its benefits to the Company.

4.      In truth, however, the new platform was a catastrophe from the outset, leading to rampant complaints and causing students to quit the university altogether.  The new classroom experienced constant and pervasive software problems – including frequent "disruptions" and "widespread blackouts."   The software lacked basic functionality, as students reported widespread problems logging in, obtaining their course materials, turning in assignments, and receiving passing grades.  As a result, Apollo's students dropped out in frustration.   The new online classroom was problematic beginning in 2012 and remained that way until it was scrapped altogether.  According to former employees, for example, the classroom was "constantly kept in turmoil" and "never got better" from "the day we rolled it out."  The number of major outages and student complaints soared even higher at the beginning of the Class Period, in late 2013 and early 2014.  By mid-2014, the online classroom was such a disaster that Apollo's employees called on management to revert to the legacy classroom.

5.      Defendants omitted these facts in their statements to investors.  They also misrepresented the timing of the online classroom's rollout and the Company's resources for addressing the problematic technology.   Contrary to Defendants' representations, students continued to use the old platform long after Defendants announced publicly that the rollout had been "completed," while the software dysfunction continued to plague the new classroom.  And while Apollo claimed to be devoting "every necessary asset" to the online classroom, in fact the Company had depleted its ability to respond to disruptions in

---

[1] Unless otherwise noted, all emphasis is added.  In public statements, Apollo used the terms "online classroom," "Learning Management System," and "online learning platform" interchangeably.   Apollo's Release Engineer from January 2012 to mid-October 2015 also confirmed that the terms "Learning Management System" and "new classroom" referred to the same technology.

the online classroom through rounds of deep layoffs.  In addition, instead of devoting needed resources to the online classroom, the Company secretly worked to replace the online classroom with "off-the-shelf" technology.

6.     Defendants, meanwhile, were not kept in the dark about the pervasive problems.  They received, for example, real-time reports and complaints of the rampant problems and failures.  Major deficiencies in the new classroom and its inability to compete against other products were documented in a December 2012 report for Apollo's executives, and in response, the executives abandoned the Company's effort to sell the online classroom platform to other educational institutions.  At internal town hall meetings, employees asked Defendant Cappelli to put the online classroom on hold and return to the legacy platform due to widespread dysfunction in the new platform. Apollo's management sent quarterly emails in 2014 acknowledging problems with the new classroom and discussed the drops in enrollments.  Defendants were also well aware of the Company's undisclosed effort to replace the classroom with third-party, off-the-shelf technology even while promoting the new classroom as a development that differentiated Apollo from its competition.   When Defendants ultimately mentioned disruption during the Class Period, they characterized them as "a small hiccup" that was "short-term" and "not [affecting] a huge part of the student body by any means."

7.     The truth about the online classroom was revealed to investors through partial disclosures between January 8, 2015 and October 22, 2015, causing the share price to drop repeatedly:

- On January 8, 2015, Apollo disclosed that the online classroom "has experienced technical challenges that in many cases have adversely impacted the user experience for our students."  Defendant Cappelli disclosed that, contrary to prior statements, the online classroom lacked basic functionality, as students were not "able to access the content, the course work, [or] the syllabus."  In response to these and additional disclosures, the price of Apollo stock dropped over 13%, erasing over $465 million in shareholder value.

- On March 25, 2015, Defendants revealed that the "significant" platform problems were so severe that they harmed not only student

retention and total enrollment figures, but also new enrollments, and caused Apollo to reduce its advertising spending.  The price of Apollo stock dropped over 30%, erasing over $940 million in shareholder value.

- On June 29, 2015, Apollo revealed for the first time that Apollo had already signed a contract to junk the new online classroom for a third-party, off-the-shelf system.  Apollo's stock price declined nearly 20%.

- On October 22, 2015, Apollo revealed further enrollment declines due to the "disruptions in the University's online classroom" and the price of Apollo stock dropped more than 32%.

8.    In total, the Company's share price declined approximately 80% from its Class Period high of nearly $36 per share, erasing more than $2.9 billion in market capitalization.  The chart below shows the movement of the Company's stock during the Class Period:



9.      In the aftermath, Apollo's share price remained at these levels.  Following the Class Period, the Company revealed that its Board of Directors had sought since December 2014 to sell Apollo to private investors.

10.     By this action, Plaintiff investors seek redress for Defendants' violations of the federal securities laws.

## II.    JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

13.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   THE PARTIES

### A.     Plaintiffs

14.     On June 16, 2016, the Court appointed Government of Guam Retirement Fund as Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  The Guam Retirement Fund is a defined-benefit pension plan, providing lifetime retirement benefits and disability benefits to employees of the Government of Guam and employees of certain public corporations, and in certain cases, benefits to qualified survivors if the plan member dies.  As set forth in the attached certification, the Guam Retirement Fund purchased Apollo common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.     Additional Plaintiff Rameses Te Lomingkit purchased Apollo common stock during the Class Period, as detailed in his previously submitted certification, and suffered damages.

16.     Additional Plaintiff National Shopmen Pension Fund ("NSPF") is a multi-employer defined benefit plan with headquarters in Washington, D.C.  NSPF purchased Apollo common stock during the Class Period, as detailed in its previously submitted certification, and suffered damages.

B.     **Defendants**

17.     Defendant Apollo Education Group, Inc., is an Arizona corporation with its principal place of business located at 4025 South Riverpoint Parkway, Phoenix, Arizona. Effective November 15, 2013, the Company formally changed its name from Apollo Group, Inc. to Apollo Education Group, Inc.   During the Class Period, Apollo had approximately 108 million shares of its Class A common stock outstanding.  The shares traded in an efficient market on the NASDAQ under the ticker symbol "APOL."  The Company also had approximately 475,000 shares of its Class B common stock, its only voting stock.  All of the voting stock was owned by Apollo executives and insiders, primarily by defendant Peter V. Sperling.   At least as early as December 2014, management and the Board of Directors took steps to sell the Company.  On February 8, 2016, Apollo announced that it had agreed to be taken private.  On February 1, 2017, Apollo announced the completion of its acquisition by a consortium of private investors led by The Vistria Group, who paid $10.00 per share for all outstanding Class A and B shares.

18.     Defendant Gregory W. Cappelli ("Cappelli") was Apollo's CEO and a member of its Board of Directors throughout the Class Period.  Cappelli also serves as a member of the University of Phoenix Board of Trustees.  Before joining Apollo, Cappelli was a stock analyst at investment bank Credit Suisse.  Cappelli joined Apollo on April 2, 2007 as an Executive Vice President of Global Strategy and Assistant to Executive Chairman of Apollo Group.  He served as Co-Chief Executive Officer of Apollo from

April 2009 until August 2012.  Cappelli became CEO of Apollo on August 26, 2012.  Defendant Cappelli signed Apollo's annual reports on Form 10-K for fiscal years 2013, 2014, and 2015, and also signed the Company's interim quarterly financial reports on Form 10-Q throughout the Class Period.

19.    Defendant Brian L. Swartz ("Swartz") was a Senior Vice President and the CFO of Apollo from 2007 until May 15, 2015.  The Company announced in a press release on April 28, 2015 that Swartz was leaving the Company "to pursue a new direction."  Defendant Swartz signed Apollo's annual reports on Form 10-K for the fiscal years 2013 and 2014, and also signed the Company's interim quarterly financial reports on Form 10-Q throughout the Class Period until his departure.

20.    Defendant Peter V. Sperling ("Sperling") was, throughout the Class Period, Chairman of the Apollo Board of Directors.  Peter Sperling is the son of John Sperling, who founded Apollo in 1976 and served as a member of its Board of Directors and its Chairman Emeritus until his death in August 2014.  Defendant Sperling owns 49% of outstanding Class B voting stock through a revocable grantor trust.  The remaining 51% of the voting stock is held in an irrevocable trust, of which Defendant Sperling is one of three trustees.  Accordingly, "the Class B Trust and Mr. Peter Sperling together control the election of all members of [the] Board of Directors and substantially all other actions requiring a vote of [the] shareholders."  Defendant Sperling signed Apollo's annual reports on Form 10-K for the fiscal years 2013, 2014, and 2015.

21.    Defendants Cappelli, Swartz, and Sperling are referred to herein as the "Individual Defendants."

IV.    **SUMMARY OF THE ACTION**

A.    **Background To Apollo**

22.    Apollo operates the University of Phoenix, the nation's largest for-profit university.  During the Class Period, the Company derived all or nearly all of its operating income from its University of Phoenix business.  In its October 22, 2013 Form 10-K, for instance, Apollo disclosed that it generated 90% of its net revenue and more

than 100% of its operating income in fiscal 2013 from the University of Phoenix.

23.    The University of Phoenix was founded in 1976 as a small for-profit university.  In 1989, the University launched its online program – long before most other universities offered any online courses.   In 1994, Apollo became a publicly-traded company.  The Company experienced impressive growth for more than a decade, with the number of students enrolled in its courses growing by more than 25% per year.  The Company not only expanded the University's online presence as the Internet became more widely available and easier to use, but also built numerous physical campuses.

24.    As a for-profit university, University of Phoenix's revenues and profits depend heavily on the number of students enrolled in its classes.  As U.S. Senator Tom Harkin, former Chairman of the Senate committee overseeing federal education policy, has explained, "[w]hat drives the profits is how many students they enroll."  Defendant Cappelli agreed that "[e]nrolling new students is important for the health of our overall organization."    Accordingly, the Company closely tracks the numbers of new enrollments, *i.e.*, the number of students enrolling for the first time in the most recent financial period, as well as the number of total enrollments.   New enrollments are important to Apollo because they generate immediate revenue regardless of whether the student remains enrolled over the longer term and obtains a degree.

25.    Apollo obtains new students by spending heavily on marketing.  In fiscal year 2014, for instance, Apollo spent over $760 million on "marketing" and "admissions advisory" costs – over 25% of Apollo's net revenues.  Apollo recognized in its SEC filings that it "expend[ed] significant resources on marketing" and that "the substantial majority of [marketing expense] represented advertising."  At the same time, Apollo spent less than half of its net revenues (42.8%) on "instruction and student advisory" costs.

26.    "Retentions," *i.e.*, the number of students who remain enrolled without dropping out, are also important for Company profits.  The Company closely tracked its retention figures.  Defendant Cappelli told securities analysts that retention was the Company's "top priority" during the Class Period.  Defendant Swartz emphasized the

importance of retention: "Retention, from a financial point view, is even more important, or is a bigger lever. . . .  [I]f we could keep all of our students at the University of Phoenix for one course longer, which is about five weeks, it would add hundreds of millions of dollars to our bottom line."   Securities analysts focused on both new enrollment and retention.  When asked, however, Apollo refused to disclose its actual retention figures during the Class Period and instead offered "color" on retention and its initiatives to improve retention.

**B.    As Apollo's Enrollment Declined,
The New "Online Classroom"
Was Critical For The Company**

27.    After rising steadily for years, the number of students enrolled at the University of Phoenix started to decline in 2010.  Apollo's filings with the SEC reported that enrollments peaked in the third quarter of 2010, then declined precipitously thereafter.  While Apollo reported having 460,900 "degreed enrollment" students in fiscal 2010,[2] that number fell to 418,700 students in 2011; 356,900 students in 2012; and 301,100 students in 2013.   During the same period, Apollo's revenues and profits declined.  Net revenues fell from $4.9 billion in 2010 to $3.7 billion in 2013, while net income fell even more dramatically, from $522 million to $249 million over the same period.

28.    Apollo attributed its decline in part to competition from other for-profit universities, as well as traditional public and private universities, who increasingly offered online education options.   During a March 26, 2012 conference call with investors, for instance, Defendant Cappelli stated that "[t]here's more competition today than there was a year ago," and, in particular, "there's more online competition now."  Defendant Cappelli further noted that "if you look at the not-for-profits, more of them are online doing what we used to do."

---

[2] Apollo's fiscal year runs from September 1 to August 31 each year.  Fiscal 2010 is thus September 1, 2009 through August 31, 2010.

29.   In this competitive landscape, University of Phoenix's new "online classroom" was critically important to Apollo's success.  The online classroom was the University of Phoenix's central platform for providing educational services to students. Instructors used the online classroom to teach classes and distribute learning materials, and students used it to access their accounts, receive the educational content for their courses, and turn in their assignments.  As Defendant Swartz explained during a November 13, 2013 JPMorgan Ultimate Services Investor Conference, every University of Phoenix student used the online classroom, regardless of whether they attended classes in physical campuses or solely online:  "All of our students today, regardless if they are ground student or online students, get all of their content and all of their textbooks through our online learning management system."

30.   Leading up to the Class Period, Apollo announced a major reworking of its online classroom, promising thorough technology enhancements that would differentiate the University of Phoenix's online classroom from the competition's offerings, attracting more students to mitigate the Company's enrollment declines.  As the *Chronicle of Higher Education* reported, Apollo determined in 2009 "that its software for students was outdated," so it "installed a team of more than 100 people . . . to rebuild the college's online learning environment from scratch."

31.   Defendants repeatedly emphasized the importance of the new online classroom to investors.  For example, Defendant Cappelli stated during an October 13, 2010 conference call that Apollo has "been investing heavily in both technology and talent as part of [the] new learning platform."  At the William Blair & Company, LLC Global Services Growth Stock Conference on December 7, 2010, Cappelli stated that "[w]e have to continue to innovate at Apollo Group and the University of Phoenix . . . That's why we're investing in technologies, why we're investing into the classroom in record numbers."  At the same conference a year later, on December 7, 2011, Cappelli stated "I told you we're spending $1 billion on the classroom of the future.  That's in our financials.  We've been pouring that money in there."  The Company further stated that it

was building a new online classroom that would "get to know" each of Apollo's 400,000 students personally and adapt to accommodate the idiosyncrasies of their "learning DNA."

32.    Apollo also announced it intended to sell the new online classroom technology to other universities.  At the May 12, 2011 Barclays Capital Inc. Global Services Conference, Defendant Cappelli discussed the Company's creation of a "new division, a services business" to sell its technology.  He explained that "because we are investing hundreds of millions of dollars . . . into the classroom of the future . . . we want to be able to take those capabilities to traditional schools both here and abroad." Similarly, during the September 15, 2011 BMO Capital Markets Back to School Education Conference, Defendant Cappelli said that selling the technology would "allow community colleges, state schools and other proprietary schools to leverage off of our platform going forward."

33.    Defendants' positive representations regarding the online classroom continued in 2012.  During an investor conference call on January 5, 2012, Defendant Cappelli described the Company's progress with the new online platform, saying that Apollo "continue[d] to expand course offerings on our new learning platform and pilot our new classroom concept."

34.    On February 29, 2012, Defendants Cappelli and Swartz represented Apollo at the Robert W. Baird and Co., Inc. Business Solutions Conference.   During his presentation, Swartz told investors that Apollo was "in the process of building and rolling out a new classroom platform" as part of its efforts to "invest[] heavily in technology." During Apollo's investor conference call held on March 26, 2012, Defendant Cappelli described the "new education platform" as an "initiative[] that [would] enhance our student's experience and support our value proposition" and told investors that it would begin to be rolled out "later in the year, starting in [the] business program."  Cappelli further explained during a March 26, 2012 conference call with investors that the new classroom was at the core of Apollo's plans to differentiate University of Phoenix amid

1   increased competition, reiterating that Apollo needed to "have new innovations that are

2   available in the marketplace to differentiate [itself]."

3       35.   On September 13, 2012, at the BMO Capital Markets Back to School

4   Education Conference, Cappelli informed analysts and investors that the new online

5   platform "is being rolled out this fall."  Cappelli reiterated to investors that the Company

6   was "invest[ing] upwards of $1 billion into what we call the classroom of the future,"

7   explaining that "a lot of that investment's already been made."  At the JPMorgan Ultimate

8   Services Investor Conference on November 14, 2012, Cappelli stated that the Company

9   had "been spending and investing hundreds of millions of dollars to innovate in the

10   classroom from adaptive learning to many areas of education to careers."  Cappelli

11   assured investors that "this is the year for us to execute, get those investments into the

12   marketplace whether it's our new Learner Management System platform that has all

13   kinds of capabilities we didn't have before, adaptive learning and other recent innovation

14   that we've been working on."

15       36.   Journalists reported that Apollo's online classroom was taking on added

16   significance amid Apollo's increased focus on online education and decision to close 155

17   of its 240 brick-and-mortar University of Phoenix campuses.  An October 16, 2012 article

18   cited the Company's statements that the closures would generate $300 million in cost

19   savings, and noted that the $300 million would be used to "invest more heavily in the

20   company's online learning platform," among other things.

21       37.   In 2013, Defendants continued to emphasize that the online classroom

22   differentiated the University of Phoenix from other universities.  During the February 26,

23   2013 Robert W. Baird and Co., Inc. Business Solutions Conference, Defendant Swartz

24   explained that Apollo's "new learning platform that [the Company] ha[s] been investing

25   in for several years is just now rolling out to many of the courses and the plan is to roll

26   that out through the end of this fiscal year through the end of August."  In response to a

27   question from Jeff Mueller, a Robert W. Baird analyst, about the advantages of the new

28   online platform, Defendant Swartz called it a "significant kind of leapfrog better than

where we have been in the past" and explained that "it is a whole new interface for students.  It is much more user friendly. . . .  It is just obviously a more user-friendly experience, which is important."

38.     Given the Company's constant and positive representations, analysts and investors perceived the Company's new online platform as valuable watershed technology.  For example, on March 5, 2013, analysts from Deutsche Bank labeled the new "LMS," *i.e.*, the online classroom, a "tech asset . . . worth $2 to $6 per share."  The analysts thus valued the online classroom to be worth as much as 37% of the market's then valuation of the entire Company at $16.20 per share.

39.     On March 11, 2013, at a presentation at the Credit Suisse Global Services Conference, Defendant Swartz discussed how the Company had "put a lot of money into our new platforms and technology.  The first, just to start off with, is our new . . . learning platform which is just now rolling out to students."  In response to a question from analyst Kelly Flynn regarding to what extent "innovations and market differentiation" "will drive growth again" for the Company, Defendant Swartz emphasized how the new online classroom would attract students and increase enrollments because it was a key "value proposition for students."  Swartz told Flynn that "what we are really focused on is providing a product and a service, an educational experience that is valued by students. So we've been investing for several years here."  Swartz echoed Cappelli's statements that 2013 is "the year of execution."

40.     On June 25, 2013, Apollo held an investor conference call to address its third quarter results.  Defendant Cappelli told investors that "a 25% decline in new enrollments at University of Phoenix is difficult to accept," reiterating that the Company had devised a plan to differentiate University of Phoenix for students through "simplicity of use, functionality, flexibility to adapt to the changing educational landscape, speed to market with new offerings, and an enhanced overall experience."  He told investors that Apollo "clearly understand[s] the need to . . . have competitive products in the market to attract new students."  As an example of the retention efforts Apollo was using to keep

students, Defendant Cappelli listed "of course adaptive learning," which was a component of the new classroom.   Cappelli emphasized the Company's efforts to "creat[e] a more nimble organization focused on operational excellence" by "reengineering the educational experience at our institutions."   Defendant Swartz highlighted how, "[o]n the Learning Management System, by the end of this fiscal year – so, the next few months – we expect it to be rolled out to most of the graduate level programs and colleges.  With respect to the undergraduate level, there will be a staggered rollout through fiscal 2014 – mostly in the first half of '14."

41.   On October 22, 2013, Apollo held an investor conference call to address its annual results.  During the call, Defendant Cappelli told investors that Apollo had made "meaningful progress" in the "major initiative[]" of rolling out the new learning platform. Defendant Cappelli emphasized the new classroom technology, stating that Apollo was "focused on offering a superior classroom experience."   Defendant Swartz stated that University of Phoenix's "ability to grow our new enrollment [is] about our product and having a competitive product in the marketplace."   Regarding retention, Defendant Swartz stated that Apollo was expecting "improvement at various levels," as that was Apollo's "number one priority."

42.   Also on October 22, 2013, Apollo filed a Form 10-K with the SEC that discussed the Company's new online classroom.   The Form 10-K described the "[c]omponents of University of Phoenix's teaching/learning models for both online and on-campus classes" as including "actively working to improve its major learning platform in order to deliver highly personalized learning to students, ease the administrative burden on faculty, improve overall student and faculty experiences, and lead to better educational outcomes."  In a section titled, "Key Trends, Developments and Challenges," the Form 10-K highlighted the online classroom's "reliability and sustainability," stating that "[w]e are upgrading a substantial portion of our key IT systems, including our student learning system, student services platform and corporate applications, and retiring the related legacy systems.  We believe that these new systems

1   will improve the productivity, scalability, reliability and sustainability of our IT
2   infrastructure and improve the student experience."

3         **C.**      **During The Class Period, Apollo Promoted Its Online Classroom**

4        43.    On the first day of the Class Period, November 13, 2013, Apollo presented
5   at the JPMorgan Ultimate Services Investor Conference.   During the presentation,
6   Defendant Swartz told investors that "***[t]he new platform is actually rolled out to all of***
7   ***our graduate students today***" and that a "staggered roll out for all of [the]
8   undergraduates" would take place over the course of fiscal year 2014 (ending August 31,
9   2014).   Swartz emphasized that after investing "over $1 billion in our learning and
10  service platforms and data platforms at the University of Phoenix," Apollo had made
11  "significant enhancements to the student experience[, including] a new classroom."

12       44.    During the presentation, Swartz presented a slide about the new online
13  classroom.   The slide highlighted the online classroom's "management and delivery of
14  course materials" to students.   In addition to statements emphasizing the online
15  classroom's ability to deliver course materials, the slide presentation also discussed the
16  students' purported experience on the platform, stating that students benefited from a
17  "simple," "efficient," and "personal" new classroom.   According to Defendants'
18  presentation, the new classroom not only provided "[i]ndividualized learning pathways,
19  reports, notifications, and recommendations," but also had additional "[c]apabilities and
20  features to keep students on track and motivated":

21
22
23
24
25
26
27
28



45.   On March 11, 2014, Apollo presented at the Credit Suisse Global Services Conference, in Scottsdale, Arizona.   During the presentation, Beth Coronelli, Apollo's Vice President of Investor Relations, stated that Apollo's "strategy about differentiation . . . all comes to, at the end of the day, down to the student learning experience." Regarding the student learning experience, Coronelli highlighted the "new classroom," stating that "if there seems to be an issue through the new classroom" that the student is having, "the faculty member or the student advisor can step in and see what's happening."   This, Coronelli claimed, helped "to create an ecosystem or a culture around retention."

46.   On April 1, 2014, Apollo held an investor conference call to discuss recent financial results.   During the call, Cappelli stated that Apollo was "first and foremost focused on improving retention" and focused on "improv[ing] the student experience" through the Company's "new, modernized and significantly upgraded online classroom."

47.     On April 8, 2014, Apollo held its "2014 Investor & Analyst Meeting."[3] Defendant Cappelli stressed the importance of the meeting, noting that "Apollo hasn't had an investor day in many years."   Cappelli stated that Apollo was "a different Company today than it was maybe even a few years ago" and was now "really centered around differentiating University of Phoenix" from competitors.   Defendants again reiterated the importance of the online learning platform, stating that the Company was "rolling out a new learning platform" that "has tools that faculty members and students have never had before and other new retention initiatives to support the success of [its] students."   During the meeting, University of Phoenix's Chief Operating Officer, Jerrad Tausz, told investors that the new online classroom "really . . . make[s] things simple for the students."

48.     Analysts focused on Defendants' positive representations regarding the online classroom.   For instance, an April 9, 2014 analyst report by Barclays noted that, according to Apollo's executives, the Company's "improved online tracking for staff to identify students who are falling behind" was a positive retention initiative.

49.     On June 25, 2014, Apollo issued a press release that quoted Defendant Cappelli,  "[d]*uring the third quarter, we . . . completed the rollout of our new learning platform across the university*."   During an investor conference call that day, Defendant Cappelli highlighted the learning platform, stating that "nearly all students in the University are now being served by our new learning platform, which has been greatly enhanced and provides a more efficient and user friendly experience."

50.     On September 18, 2014, during the BMO Capital Markets 14th Annual

---

[3] The Investor Day was attended by Defendants Cappelli and Swartz; Beth Coronelli, Apollo Education Group - VP of IR; Jim Berg, Apollo's Chief Ethics and Compliance Officer; Mitch Bowling, Apollo's COO; Ruth Veloria, University of Phoenix's Executive Dean, School of Business; Jerrad Tausz, University of Phoenix's COO; Barry Feierstein, Apollo's Chief Commercial Officer; Tracy Lorenz, President of Western International University; Mark Brenner, Apollo's Chief of Staff, and SVP of Communications and External Affairs; Dan Litteral, Apollo's Deputy General Counsel; Mehul Patel, Apollo's COO; and Jeff Langenbach, Apollo's SVP of Strategy and Business Development.

Back To School Education Conference in New York, New York, Apollo again stressed the importance of the online classroom.  In particular, Defendant Swartz stated that Apollo was "very, very focused on looking at both the service model as well as the learning model, upgrading our learning management system and *making sure that the process to learn for a student is seamless*" so that students are not "frustrated on how to move around" the online classroom.  Defendant Swartz emphasized that the Company was "working in a structured way" to accomplish that.

51.     On October 21, 2014, Cappelli stated during an investor conference call that the Company had experienced a mere "short-term disruption," *i.e.*, a "small hiccup" in transitioning to the new online classroom and there were only "a few bugs and things in the system that [we]re being worked out," that some students had been "stop[ped] out" only "temporarily," and that "[t]his [was] not a huge part of the student body by any means."  Defendants blamed the "short-term disruption" in part on students, equating the online classroom transition to the experience of upgrading from an analog phone to an iPhone, and stating that "there's additional training that needs to be done" for students and that Apollo was "beef[ing] up training" for them.

52.     During the October 21, 2014 conference call, analysts inquired whether the new online classroom transition was affecting retention and enrollments.  For instance, analyst Denny Galindo from Morgan Stanley inquired whether the Company's rising bad debt expense was "a sign of people getting frustrated with the new system and dropping out."  Swartz rejected the notion that students were getting frustrated and dropping out, stating that bad debt expense "ticked up just a little bit, very, very slightly, *simply because our new enrollment trends have improved*."[4]  Defendant Cappelli summarized that "it's a great platform" and emphasized that one benefit of the new platform is "customer satisfaction."

---

[4] Defendant Swartz stated during the October 22, 2013 investor conference call that "bad debts . . . occurs when a student drops [out]" and does not repay his or her debt.  "That oftentimes happens, obviously, when [Apollo is] in a period of growing new enrollments."

53.     On November 12, 2014, at the JPMorgan Ultimate Services Investor Conference, the Company continued to emphasize the importance of its online classroom to investors.  Apollo Vice President of Investor Relations Beth Coronelli stated that "retention is [Apollo's] number one priority" and that as part of improving retention, Apollo had "a new classroom that [it had] put in place."  Analyst Jeff Volshteyn from JP Morgan Chase & Co. followed up on these remarks, asking Coronelli about the classroom and noting that Coronelli had mentioned it during her presentation and that "your team mentioned . . . it on the last call" as well.  Volshteyn asked whether the new classroom was "really [a] differentiating kind of proposition for students."  Coronelli responded "Absolutely.  Yes, it is.  From a standpoint of the classroom it is – it's not just an upgrade.   It was a complete new classroom" that was "an overall improved experience."

**D.     Unknown to Investors At The Time, Apollo's New Online Classroom Was Dysfunctional And Suffered From Pervasive Disruptions**

**1.     The Online Classroom Was Consistently Dysfunctional Amid Widespread Outages**

54.     Contrary to Apollo's positive representations to investors, the new classroom experienced numerous, consistent, long-lasting disruptions, which never improved.  Students lodged complaints, dropped out of their classes, and stopped signing up for new classes, impacting Apollo's retention and enrollment metrics.  The impact of the new online classroom on retention, and enrollment of new students, was well-known internally at Apollo.  The disruptions were conveyed through "escalation reports," RATD reports, conference calls, "town hall" meetings, regularly-timed email reports, and "tech bridges."

55.     The new online classroom experienced frequent and numerous disruptions, starting from its inception.[5]  Apollo's Release Engineer from January 2012 to mid-

---

[5] As Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 (*see* footnote 7) explained, "disruption" meant that a technical issue with the new

October 2015 explained that the new classroom was problematic beginning in 2012 and continuing on a daily basis thereafter, from "the day we rolled it out," as the classroom was "constantly kept in turmoil" and "never got better" in his tenure at the Company.[6] Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 similarly confirmed that there was a steady stream of issues with getting the new online classroom in place, and his team started reporting issues with the new online classroom almost immediately.[7]  University of Phoenix's Enrollment Manager from October 2009 until June 2015 also confirmed that the new classroom problems started immediately after implementing the system.[8]

56.    Among the many disruptions were widespread blackouts.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 stated that sometimes a widespread blackout meant that logged-in users could continue working

---

classroom software impacted the students and changed something intrinsic as part of that impact.

[6] Apollo's Release Engineer from January 2012 to mid-October 2015 was directly involved in the deployment of Apollo's software.  He worked on deploying software related to Apollo's Learning Management System, and worked with engineers who were involved in developing the Learning Management System.  His experience before joining Apollo included 11 years as a Lead Release Engineer for Verizon.  Altogether, he had 20 years of experience doing direct release management.

[7] Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 led the release team, and was responsible for releasing the new classroom into production and Quality Assurance.  Anything that went into production and Quality Assurance would go through his team.  He was responsible for dealing with technical issues and problems that arose with software, and his team would encounter and address any issues with installation.  They would react to the issues that involved the installation of the new classroom, and his team was involved in rolling software back.

[8] University of Phoenix's Enrollment Manager from October 2009 until June 2015 was also a University of Phoenix Enrollment Counselor from July 2006 to September 2009, and an Enrollment Manager with the University until 2015.  She was responsible for the training and development of her team of enrollment advisors.  Her team spoke with potential and current students, and she would interact with students and help with the enrollment process if necessary.  Students who experienced difficulty with the new classroom called in and were upset about the new platform.  Because she interacted with students, she knew that they were complaining about the new classroom.

while logged in, while those trying to log in were precluded from doing so.  Other times, every user was disconnected from the new classroom and no one was allowed to log in. He confirmed that widespread outages such as these were more common with the new classroom and tended to be more widespread.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 has worked in information technology for approximately 30 years, many of them as a release engineer, and stated that the disruptions with the new classroom seemed to be coming at a higher rate than he would have expected.  There were a number of outages that lasted between 12 and 36 hours. Apollo's Release Engineer from January 2012 to mid-October 2015 confirmed that outages sometimes lasted for as long as a day or more.

57.    Apollo's Release Engineer from January 2012 to mid-October 2015 explained that the new online classroom suffered from recurring problems over the course of its deployment.  There were "pretty much constant problems."  It was "one thing after another."  The situation "never improved."  He described the Apollo employees as "constantly being bombarded with emergencies," and agreed that the Learning Management System amounted to "death by a thousand cuts."  According to him, in his decades of experience, the problems with the new classroom were unusually bad.  There were "[f]our to five emergencies every day and which took priority over everything else" and that was "new to me."  He further described how the disruptions were "common knowledge" within Apollo.  In fact, the new classroom was dysfunctional on such a frequent basis that it was an ongoing joke of "how many emergencies" would the new online classroom face in any given day.

58.    Apollo's Principal Systems Engineer from January 2012 to October 2015 also confirmed that there were severe outages, such as when the new classroom went down for a couple of days, students could not log in, and "it was ugly."[9]  She recalled, for

---

[9] Apollo's Principal Systems Engineer from January 2012 to October 2015 led a team of approximately 12 employees who were part of Apollo's release team and who handled all of the production releases and most of the Quality Assurance releases as well, including those for the new classroom.  She spent all of her time in the release group, was

instance, when the HP Hypervisor in charge of a major portion of the new classroom went down and took several days to get back up.  No one could access the new classroom during that time, so it affected pretty much the entire student body.  Anyone on the old classroom, however, was still able to work.[10]  Apollo's Director of Client Engagement from June 2012 to August 2013 similarly confirmed that there were incidents where the online classroom would crash, or where students could not log in.[11]

59.    In addition to widespread blackouts, there were other substantial disruptions for students.  As Apollo's Principal Systems Engineer from January 2012 to October 2015 explained, outages varied in severity.  Some outages meant that students could log in but could not use the library, or anyone in a specific degree program would not be able to work.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 recalled that there were quite a number of times in which the systems were down for repair or adjustments or releases took too long, which impacted the students' ability to meet their class deadlines.

60.    The online classroom's severe and unabated technical problems caused students to fail classes and drop out.  Apollo's National Defense Liaison from March 2012 to June 2014, who also took a class on the new classroom platform as a student from February 2014 through April 2014, stated that he experienced log in problems 50%

---

responsible for installing and updating, and reported to Apollo's IT Engineering Manager and Release Manager, identified at footnote 7 herein. Within the new release group, there were 6-7 people dedicated entirely to the new classroom for several years, and she managed employees who were solely dedicated to new classroom.

[10] Internally at Apollo, the new online classroom that was being developed was referred to as "new classroom," while the then-current online classroom it was replacing was referred to as "old classroom."

[11] Apollo's Director of Client Engagement from June 2012 to August 2013 was with Apollo from July 2009 through May 2015.  In June 2012, he became the Director of Client Engagement for Apollo Education Services, a group in which he and his colleagues attempted to sell Apollo's new online classroom platform to third parties.  He held that position until August 2013.

of the time that he tried to access the new classroom.[12]  There was a constant struggle to log in, and once he was logged in, the system was still "atrocious."  Technical problems such as these, he explained, led students to fail classes because the new classroom would not let them turn in assignments on time, and the University would then fail the students.  During a meeting, he was told that 40% of enrolled students would dis-enroll after their first class because of issues such as these on the "horrendous" platform.  The problem was not due to inadequate training of the students, but rather, it was due to the new classroom technology.  According to a University of Phoenix Military Enrollment Advisor and National Defense Liaison ("NDL") from April 2009 through June 2013, her friends who  took classes on the new classroom had major issues, including being unable to upload their homework.[13]

61.    Apollo's Software Release Engineer from 2011 until September 2015 similarly confirmed that students were dropping out of University of Phoenix due to the new classroom's dysfunction.[14]  She stated that Apollo's employees knew that students

[12] Apollo's NDL from March 2012 to June 2014 personally tried a class on the new classroom platform between February 2014 and April 2014, and the Company asked him to perform an audit of the course and provide feedback.  He found the new classroom to be "horrendous."

[13] University of Phoenix's Military Enrollment Advisor and NDL from April 2009 through June 2013 served as an enrollment officer from April 2009 until April 2010, then worked as an NDL from April 2010 until June 2013.  The NDL's territory was New England, which included air bases, National Guard units, and reserve units in Massachusetts, Vermont, New Hampshire, Maine, and sometimes Rhode Island.  The NDL reported to Ryan Harkey, the NDL Manager for New England.  Harkey reported to Ryan Harrah, whom University of Phoenix's Military Enrollment Advisor and NDL from April 2009 through June 2013 believes was the NDL Manager for all of the territories.

[14] Apollo's Software Release Engineer from 2011 until September 2015 worked in Apollo's IT department, where she deployed code for the online classroom platform into production and worked under Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014, described above at footnote 7.  During 2012 to 2014, she was responsible for database management, internal applications for employees, and deploying the code for the online classroom as online classroom moved through different test and certification environments.  She had about three to four years of similar experience before joining Apollo.

were dropping out of the University due to new classroom dysfunction "basically from the second of the roll out," and within a couple weeks or a couple months it was "very evident" that the numbers had changed a lot.  Apollo knew links were broken, and students could not get to text books, she stated.  She experienced this herself because she took classes through University of Phoenix's legacy and new online classrooms for approximately two years until spring 2015.  When she took her first class on the new online platform, it was so dysfunctional that she spent approximately 10 to 20 hours per week for the first couple of weeks talking to the Help Desk trying to work around the technical problems.  She stated that she could not get textbooks or find a syllabus.  Online links were broken, and students could not find textbooks or figure out where to post responses to get participation.  The software was so dysfunctional that she eventually gave up and dis-enrolled in spring 2015, even though she paid no tuition as an Apollo employee.  By early 2015, Apollo still had not fixed the broken links.  She stated that the online classroom issues that caused her to dis-enroll were the same issues that had been occurring from 2013 to 2015, that the design of the new classroom was not user friendly, and this was never addressed while she remained employed at Apollo.

62.     Several former Apollo employees recounted how the new online classroom was viewed by Company insiders, students, and instructors as inferior to the legacy product.  Apollo's Software Release Engineer from 2011 until September 2015 took classes on both the legacy platform and the new classroom, and concluded that the new online classroom was "by far" worse than the legacy system.  As explained further below in ¶¶75-76, she and fellow employees asked Apollo to go back to the legacy platform since the new classroom was not working.  She stated that it was not a fair statement to say that the new classroom was greatly enhanced and provided a user friendly experience.  Apollo's Principal Systems Engineer from January 2012 to October 2015 similarly stated that one of her colleagues on her team, a long-time Apollo employee who had gone back to school, quit going to the University of Phoenix because she "couldn't stand the new classroom; it took her longer to do everything; she couldn't find access to everything she

needed."   This colleague was familiar with the old classroom and, thus, was able to compare the two.   Apollo's Director of Client Engagement from June 2012 to August 2013 stated that there were a number of general complaints about the online classroom feature sets compared to how the legacy platform had worked.   He stated that he knew there were reliability issues with the new classroom, there was a lack of consistency, and Apollo was not able to target the deliverables that they were looking at.   It was behind on functionality and feature set, and it was behind schedule.

### 2.   Ongoing Layoffs In Apollo's IT Department Exacerbated The New Classroom's Failures

63.   The numerous technological failures with the new classroom were exacerbated by several rounds of layoffs in Apollo's information technology department. According to Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014, there were rounds of significant layoffs in his last 12 to 18 months with Apollo, in 2013 and 2014, during which his release team was reduced from 27 release engineers down to about 21 at the end of 2013, then reduced further to about 14 to 17 release engineers when he left the Company in July 2014.   After his departure, he kept in touch with engineers on his team, and his team was cut twice more, so that by about mid-2015 Apollo had laid off nearly the entirety of his team and the team was basically eliminated.

64.   Apollo's Director of Client Engagement from June 2012 to August 2013 corroborates that there were several waves of layoffs in his department between 2013 and 2015.   Apollo's Principal Systems Engineer from January 2012 to October 2015 also confirmed that there were layoffs in 2013 and 2014.   She stated that Cappelli and senior management knew of the layoffs.   Companies, not just Apollo, always hold "a survivors' meeting" after they do these types of layoffs.   Cappelli attended at least one of the "survivors' meetings" where the Company discussed the layoffs.

65.   Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 further confirmed that the layoffs "cut across everybody" in the IT

1   department.   "There were teams that were hit harder than us, but they were pretty

2   significant, and they cut pretty deep," he explained.  The layoffs affected the Company's

3   ability to respond to issues, as it did not have the horsepower, and in some cases, Apollo

4   had lost specific intelligence about parts of the system.   Apollo lost database people,

5   engineers, software developers, and project managers in the layoffs.  He specified that

6   there was a round of layoffs in the IT department in September or October of 2013, and

7   "the cuts were deep even before I left [in July 2014] and, of course, much deeper after I

8   left."  He explained that the layoffs led to loss of institutional knowledge, and that his

9   team became "so decimated."

10          66.   Apollo's IT Engineering Manager and Release Manager from October 2011

11   to July 2014 also explained how the layoffs that occurred during his time at the Company

12   in 2014 made it difficult to keep in place controls, and because those controls were no

13   longer in place, more problems were introduced into the software's production than

14   otherwise would have been introduced.  The layoffs not only affected the release team,

15   but also the "development" team, which included the coders who developed the system

16   before it was implemented.  As he explained, the development team was on a timeline to

17   deliver certain pieces of the new classroom, and critical people for developing these

18   pieces were no longer there.  The development team repeatedly warned that they needed

19   more time, and these warnings went up to executives, including Apollo's Chief

20   Information Office, Mike Sajor.  Apollo's IT Engineering Manager and Release Manager

21   from October 2011 to July 2014 stated that he heard both before and after leaving Apollo

22   that, in addition to the release team initiating reports, "the development side," *i.e.*, the

23   coders who developed system features before they were implemented, "was pushing

24   warnings upward."

25          67.   Apollo's layoffs not only introduced new failures into production, but also

26   depleted the Company's ability to respond to disruptions with the new classroom.  As

27   Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014

28   explained, when disruptions occurred, a "war room" would be called immediately.  The

war room would include at least 1-2 people from the release team, members of the development team, members of the database team, and probably one or two people from operations.  The war rooms were created under Sajor's mandate, Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 explained.  As time went on and as a result of the layoffs, Apollo could not fully staff a war room.  There were simply not enough people, making it difficult to address the technical issues of the new classroom.  As Apollo was no longer able to staff the war rooms, it became more difficult to find the source of the technical issue and more challenging to get a solution moved into production.

68.     Apollo's Principal Systems Engineer from January 2012 to October 2015 similarly confirmed that the layoffs "of course" harmed the Company's ability to respond to all the disruptions the online classroom was having.  She stated that the layoffs "were sabotaging [Apollo's] ability to operate as a company."  University of Phoenix's Manager of Operational Development, Business Technology Integration, from February 2012 to January 2016 also confirmed that the layoffs in the technology department "definitely" negatively impacted the Company's ability to properly roll out the new classroom and to respond to issues with the classroom.[15]  Apollo's Director of Client Engagement from June 2012 to August 2013 also agreed that the layoffs affected the Company's ability to respond to issues with the online classroom.  People who worked on projects were no longer there, and the ones who were left were asked to do more.

69.     Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 left the Company in July 2014 because "the cuts were so deep and my team could no longer function."  When he turned in his resignation, he told management that such cuts were the reason for his resignation.  His information was turned over to Sajor,

---

[15] University of Phoenix's Manager of Operational Development, Business Technology Integration, from February 2012 to January 2016 worked for Apollo for 11 years before resigning.  She was involved in a lot of the focus groups in regards to the new online classroom, and assisted with running enrollment strategies and recruitments.  Any technology related project went through her department, the Business Technology, Integration, and Optimization Department.

1   and he had an exit interview with Sajor.  Sajor stated that Apollo was "trim[ming] the fat"

2   due to declining revenue and declining enrollment.  As Apollo's IT Engineering Manager

3   and Release Manager from October 2011 to July 2014 explained, these decision "to trim

4   the fat" would have come from the CFO or the CEO.

5              **3.      The Online Classroom Was Not Competitive,**
                         **Rampant Disruptions Hurt Enrollment, And Employees**
6                        **Were Calling For A Return To The Legacy Platform**

7         70.    As explained above (*see* ¶¶54-62), the online classroom's dysfunction was

8   apparent to Apollo's employees early on and was constant thereafter.  By the start of the

9   Class Period, Apollo had already conducted an internal study and concluded that the

10  online classroom was not competitive or sufficient to positively differentiate University

11  of Phoenix from its competition, and in response to the study, Apollo concluded in 2013

12  that it would not take the necessary steps to improve the classroom for marketing.  The

13  disruptions grew more severe in late 2013 and early 2014, resulting in Apollo's

14  employees calling on Defendant Cappelli to return the Company to the legacy classroom

15  and put deployment of the online classroom on hold given its systemic dysfunction.

16        71.    In late 2012, Apollo conducted an internal study that showed deficiencies in

17  the online classroom.  Apollo employed its Director of Client Engagement from June

18  2012 to August 2013 to try to sell the new online classroom to other universities, but

19  potential purchasers of the software told him that the online classroom did not work,

20  choosing a competing product instead.  He stated that he did not believe that Apollo was

21  ever able to sell the platform.

22        72.    Apollo's Director of Client Engagement from June 2012 to August 2013

23  stated that the group in which he worked, Apollo Education Services, decided to perform

24  a competitive analysis themselves so they could take it to Apollo leadership and describe

25  why they could not sell the new online classroom.   In December 2012, his team

26  concluded a high-level analysis of Apollo's online classroom versus competing online

27  classrooms in the marketplace, and presented its findings to his managers, who in turn

28  gave the information to Apollo's executives.  Apollo's Director of Client Engagement

from June 2012 to August 2013 stated that the analysis showed that various components were not ready yet, that there were issues with faculty tools, building the classroom, and student rosters.  "Was it full featured and similar to competitive solutions?  Definitely not," he stated.  He explained that "a major component and conclusion of our team" was that the software was not selling because it did not work.  The platform was not "mature," and it also "couldn't compete with what was already in the market, or provide differentiation."  He stated that his team compared Apollo's online classroom to the third-party-produced "Blackboard" online classroom, and in doing so, his team realized that there was a big gap.  He confirmed that by August 2013 at the latest, Apollo had abandoned the idea of selling the platform.  He explained that Apollo did not commit to bridging the gap between the online classroom's shortcomings and the feedback from the Company's external clients.

73.    Meanwhile, the disruptions on Apollo's online classroom that preceded the Class Period continued during the Class Period.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 estimated that there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014, but that the actual number was probably higher.  He confirmed that long-lasting disruptions were most prevalent in late 2013 and early 2014 when there was the big push on the online classroom.  He reiterated that the really major disruptions hit in late 2013, maybe into January 2014, and it was basically "an all stop" until they could address all of those issues.  Apollo's Software Release Engineer from 2011 until September 2015 similarly confirmed that when the online classroom was rolled out to graduate students, Apollo kept having to redeploy the code.  She confirmed that when the program was rolled out to graduate students, it allowed the Company to see problems with the software since Apollo was receiving a lot of feedback.

74.    Apollo's Software Release Engineer from 2011 until September 2015 further agreed that it was misleading for Apollo to state in March 2014 that there was an ecosystem or culture around retention.  She agreed that having a culture around retention

means having an online classroom that is not so incredibly frustrating that people do not want to use it.  "You have to be able to use it, and not dread logging in."  While retention was an early Company goal with the online classroom, "by March 2014 they did not achieve that goal by any stretch of the imagination."  Apollo was still saying the "same stuff in the marketing materials from two years ago" and "spitting out the same thing they've been saying forever, but it's not true anymore" and the Company had to change the message.  There "may have been a goal, but you missed it," she stated.  According to Apollo's Software Release Engineer from 2011 until September 2015, Apollo was in damage control by March 2014.

75.    By mid-2014, the problems with the online classroom were so severe that employees were calling on Cappelli to bring the legacy program back.  Apollo's Software Release Engineer from 2011 until September 2015 stated that in 2013 and 2014, Cappelli led quarterly internal town hall meetings at which he was joined by rotating VPs.  There was a question and answer period, as well as a "state of the union"-type speech by Cappelli, during each town hall.  She confirmed that she attended the town hall meeting in person at times, and at other times by calling in; in each instance she confirmed that Cappelli was leading the town hall either by seeing him, or by hearing him speak.  Apollo's Business Intelligence Development Manager from November 2012 to February 2015 similarly confirmed that Cappelli was definitely at the town hall meetings.[16]

76.    Apollo's Software Release Engineer from 2011 until September 2015 stated that the new classroom was brought up a lot during these town hall meetings, with employees asking pointed questions.  She recalled that around May 2014, employees in the town halls led by Cappelli were asking that the Company go back to the legacy classroom because the new classroom was broken.  She further stated that she also asked

---

[16] Apollo's Business Intelligence Development Manager from November 2012 to February 2015 managed a team of Business Intelligence developers within the Apollo data warehousing group.  His group built analytic reports for different groups within University of Phoenix and supported the various groups within different sections of the Company, primarily around student population.  He was based in Apollo's corporate offices in Phoenix.

Apollo to go back to the legacy platform since the new classroom was not working, and did so by speaking with the Help Desk and her personal management.  Apollo's Release Engineer from January 2012 to mid-October 2015 similarly recalled that the new classroom was "going to hell" in or around the summer of 2014.

77.     In June 2014, Defendants promoted the supposed success of the new platform and stated that Apollo had "completed the rollout of [the] new learning platform across the university" in the third quarter of fiscal 2014 (*i.e.*, by the end of May 2014). University of Phoenix's Manager of Operational Development, Business Technology Integration, from February 2012 to January 2016, who was involved in the planning meetings for the new classroom, recalled that the Company announced that the new classroom was going live to undergraduate students.  "I think it was misleading," she said.  She was working with Joe Broyles, who let her know that Apollo was still in beta groups within a couple of days of the announcement that the new classroom was going live.[17]  She heard, watched, and learned of different focus groups that the new classroom was still going through.  They were still testing it, and it was not hooked up to the program Salesforce at the time of the announcement.  University of Phoenix's Manager of Operational Development, Business Technology Integration, from February 2012 to January 2016 stated that the new online classroom was actually rolled out to all students months after Apollo made the announcement.  The message internally at Apollo was that they had already invested a lot of money and had to show something because the stock price was decreasing.

78.     Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 similarly stated that the new online classroom "was not fully rolled out" to all undergraduates by June 2014.  He stated that there were definitely still undergrads using the old classroom at that time, and that the new classroom did not have all the

---

[17] Joe Broyles was Senior Director, Product Management - Online Services & Student Self Service at the University of Phoenix from March 2002 to February 2017, as well as Senior Director, Learning and Development Officer - Financial Services, Apollo Group, from March 2002 to December 2009.

1   functionality of the old classroom.  He further confirmed that Apollo was maintaining

2   both the legacy and new classrooms through the time he left the Company in July 2014,

3   and his team was releasing software updates very often to both the legacy and new

4   classrooms on a weekly basis.

5        79.    Apollo's Release Engineer from January 2012 to mid-October 2015

6   similarly stated that Apollo's statements in June 2014 that the Company had completed

7   the rollout of the new learning platform across the University "sound false to me."  As he

8   explained, there were a number of problems and emergencies after rolling it out.  "Just

9   because of the number of issues we had, we knew there were problems with it."  He

10  further agreed that the problems were still rampant at the times of these rollouts,

11  commenting, "I don't know of a time when the problems were not rampant."  "This thing

12  was consistently having issues – it never stopped having issues," and the problems were

13  constantly occurring from the time it was released.

14       80.    Apollo's Software Release Engineer from 2011 until September 2015

15  agreed that it was misleading when, in June 2014, the Company stated that the new

16  learning platform had been greatly enhanced and provided a more efficient and user

17  friendly experience.  She explained that the industry meaning for the term "user friendly"

18  relates to how easy to navigate the product is.  If a program is user friendly, then one

19  could figure out where the searches are and where to click, and one does not have to be

20  "tech savvy" to figure it out.  According to Apollo's Software Release Engineer from

21  2011 until September 2015, "none of that existed with the new classroom."  One couldn't

22  figure out where to go and couldn't find weekly questions or where to post.  By contrast,

23  Apollo's legacy platform was "very easy to figure out."  She confirmed that people

24  involved in this industry would understand "user friendly" to mean what she had

25  described about being able to find where to go.  She similarly described what "efficiency"

26  means in relation to Apollo's online classroom, and explained that the industry definition

27  of efficiency is how fast a user can get to what he or she needs.  She explained that the

28  program is efficient if, instead of clicking four times to find a textbook, it is instead right

there for the user to access.  She stated that efficiency did not exist with the new online classroom.  It was hard to find things, and when one clicked on links to find a document or worksheet, the links did not work.  According to Apollo's Software Release Engineer from 2011 until September 2015, terms like "efficiency" and "user friendly" were commonly used in the industry.  Apollo employees would ask when Apollo would be getting the redesign to be more user friendly.  She confirmed that management would know what employees meant when they said "user friendly experience."

81.   By September 2014, Apollo's Software Release Engineer from 2011 until September 2015 confirmed that a lot of students were on the platform.  She agreed that it was misleading for the Company to say they were making sure the process for students to learn was seamless, and it was misleading for the Company to state in October 2014 that it had experienced a short term disruption or a small hiccup.  She recalled employees rolling their eyes and thinking it was a PR spin.  The Company was trying to play down what was happening, she stated.

### 4.   Apollo's Senior Management Also Knew Of The New Classroom's Deficiencies And Serial Disruptions Through Reports, Complaints, And Conference Calls

82.   Apollo's senior management, including Defendant Cappelli, were not only notified of the online classroom's pervasive dysfunction at the town hall meetings described above (*see* ¶¶75-76), but also through additional channels, including escalation reports, quarterly emails, student complaints, and conference calls.

83.   For instance, Apollo's Principal Systems Engineer from January 2012 to October 2015, who stated that she was one of the people actively working on trying to fix the new classroom outages, explained that "there was no doubt [Cappelli] knew about the disruptions."   Apollo's upper management "absolutely" knew about the major disturbances when the new classroom went down for a couple of days, causing a substantial disruption for students.  Apollo had to do a root cause analysis and had a process around any type of outage.  She explained that the CEO of Apollo would be aware when these disruptions occurred, and that when you have a system down,

escalation procedures drop into play automatically.  Everyone from the CEO on down would be informed on a half hour to hourly basis of what is down, for how long, how many students were affected, and estimated time to recovery.  In general, everyone would get an email on a regular basis on the status of the outage.  At times, there were also "tech bridges" that were started immediately.  Apollo's Release Engineer from January 2012 to mid-October 2015 attempted to quantify the number of escalations, stating that the release team was tasked to handle five to ten escalations per week, of which at least a third, and probably closer to half, related to the new classroom.  He referred to escalations as "emergencies" that had "priority focus" because they were problems that needed to be resolved right away.

84.    Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 similarly confirmed the escalation reports relating to disruptions on the new classroom.  Part of his role was to initiate such a report if there needed to be an escalation about a release.  The person experiencing the issue would inform his supervisor or manager, who would then create the report with a timeline on it.  Issues that were sufficiently severe would be elevated to the attention of the Chief Information Officer and the CEO, Defendant Cappelli.  When multi-hour disruptions occurred, Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 explained, usually Sajor would request information from the group led by Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014, with a statement that Sajor needed to provide it upward.  This group would receive emails or calls from Sajor, looking for facts about what is wrong, what they are doing, and when it is going to be fixed.  Sajor would indicate that he needed the information to provide an executive summary upwards.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 saw Sajor's emails because the emails from Sajor would go to his director, who would forward them to Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 explained that these email requests were

occurring in late 2013/early 2014.   He also explained that it was up to the Chief Information Officer to inform the CEO of such issues.   He stated that he knew there were occasions when the CEO would be informed of disruptions.   As Apollo's Release Engineer from January 2012 to mid-October 2015 recalled, the extent of the new classroom's problems was "no big secret" within the Company.

85.   In addition to escalation reports, there were quarterly emails discussing the new classroom issues.   Apollo's Software Release Engineer from 2011 until September 2015 confirmed that problems with the new classroom and discussions on drops in enrollments were acknowledged in quarterly emails in 2014.   These emails usually came from either a senior VP or Greg Cappelli's office.

86.   There were also RATD reports.   Apollo's Release Engineer from January 2012 to mid-October 2015 explained that Apollo had a proprietary software called RATD that was used to track and install various applications, which also included a built-in reporting function of the applications that failed.   He stated that he was sure that Apollo directors received RATD reports.

87.   Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 explained that Apollo maintained a call center that received complaints from students and teachers regarding disruptions with the new classroom, and that the complaints arrived via phone calls and emails.   The complaints sometimes came in to be part of the war room.   In addition, issues regarding the new classroom would be forwarded to specific directors who would either send them to the appropriate team or escalate them upwards.   He stated that, generally, the flow of communication was fairly direct, and directors would cross departmental boundaries.

88.   University of Phoenix's Enrollment Manager from October 2009 until June 2015 explained that in her role as an enrollment manager, she interacted with students and was aware that they were complaining about the new online classroom.   Similarly, University of Phoenix's Compliance Officer and Director of Operations, Financial & Student Services from January 2008 to November 2013 described that she had friends

and family members who were also students, who withdrew because new online classroom was so horrible.[18]   University of Phoenix's Executive Enrollment Sales Representative from September 2006 until November 2015 recalled receiving complaints about the new classroom from students whom she had enrolled, and a few of those students dropped out of the University of Phoenix entirely.[19]   Her impression from these conversations was that the system never worked correctly.

89.     University of Phoenix students who were unable to log into the new classroom, had trouble using it, and suffered trying to work around the classroom's constant dysfunction authored numerous written complaints.  For example, a complaint dated June 25, 2013, states:

> University of Phoenix just released a new online classroom environment that is **_horrible to navigate, and very little of it works_**. I am taking my last class there for the MBA program and do not believe I will follow up with anymore to complete a concentration.  First, their program is mundane. You have to write in the classroom environment a minimum of four days a week, twice each of those four days. Why they make you write twice each of those four days I don't know, but I was getting tired of it. They could have required a minimum of eight total posts a week over a minimum of four days, which would give you more flexibility, but they didn't.
>
> My main complaint is with the new environment.  They completely revamped the look and function of their website. I do not believe they tested it well enough because **_when they released it, many links did not work, tests would not start, finding posts is more difficult now_**.  Some students like me didn't have access to the student materials links.  You can't

---

[18] University of Phoenix's Compliance Officer and Director of Operations, Financial & Student Services from January 2008 to November 2013 held numerous positions during her employment at University of Phoenix from 2000 until 2013, including Director of Operations, Financial & Student Services; Compliance Officer; Project Lead/Manager; Adjunct Faculty; Associate Director of Student Services; and Manager of Academics. She was based in Houston, Texas, and managed six campuses in Houston, one in Austin, and one in McAllen.  She was responsible for the management of the students from their enrollment through matriculation.  She also performed audits for military financial aid and managed the financial aid process.

[19] University of Phoenix's Executive Enrollment Sales Representative from September 2006 until November 2015 was a team leader at the call center in Phoenix.

download the books you pay for anymore or the course syllabus, and it is not intuitive to navigate.

Basically, *they made us the beta testers for them without asking us*, paying us, or reducing our tuition. *I spent hours on the phone with IT* about the issues, as does the instructor too, and issues are still not resolved. I tried to start the Capstone 1 test (fancy word for end of program midterm) and it would not start. I contacted IT and they said the instructor had to set it. I contacted the instructor and he said IT had to reset. By the time it was finally set for me, it was the following week and the period had passed for me to take the test. *I got a zero because of their technical issues.*[20]

90.    A complaint dated April 12, 2014 similarly stated:

My first two weeks were such that *my web-based coursework would not load. Tech support eventually got to the issue but I'd already gotten failing grades.* My facilitator told me that technical issues were not acceptable means for turning []in late work and thus I received a failing grade.[21]

91.    A May 19, 2014 complaint filed with the Better Business Bureau similarly recounted a student's frustration with the online classroom, an excerpt of which is here below:

I have recently started attending UoP as of December of 2013. [When] I first started the online classroom environment was simple and easy to use. They recently rolled me over into a new class room environment and . . . [e]very single component of this class room is complicated. *The original one was simple and easy to use. On the UoP forums hundreds and hundreds of listed complaints are available to read about how terrible the new classroom is*. I asked my Academic advisor about the classroom if I could possibly revert to old format and I was simply told "Its here to stay." This is a poor business choice for a University, even a for-profit one. The new format was to add a touch of social networking in and modernize the UI. *It lacks practicality and is difficult to do everything from just reading assignments, to discussion posts*. UoP is terribly expensive and is no longer worth the time and energy spent.[22]

---

[20] https://www.consumeraffairs.com/education/phoenix.html.

[21] *Id.*

[22] https://www.bbb.org/phoenix/business-reviews/schools-academic-colleges-and-universities/university-of-phoenix-in-phoenix-az-15634/reviews-and-complaints.

92.   Similarly, a website titled "Is It Down Right Now,"[23] collected complaints regarding the University of Phoenix system.  Examples follow:

- (January 30, 2014): I'm having problems getting on. . . .  I can log on any other site. It's just University of Phoenix says the following: "Error - Currently, we are experiencing technical difficulties with our system. Please try again later."

- (February 10, 2014): I am getting so frickin' sick and damn tired of the constant BS with new platform, is this ever going to be fixed or should I just drop out now and save myself the constant stress of a website that never works properly?

- (August 12, 2014): I called the tech line and it said students and faculty cannot log in right now.  One is either notified by an error message or "extreme slowness."

- (November 1, 2015): They will simply say "it's not our fault." That's the tech teams [*sic*] mantra, lol. It doesn't matter what the problem is, by now, they should *know what caused it. It started on Saturday and has been on-going, only getting worse, ever since. It's not some that are locked out, ALL are.

93.   Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 and Apollo's Principal Systems Engineer from January 2012 to October 2015 confirmed that the Chief Information Officer, Mike Sajor, was informed of disruptions on the new classroom through conference calls.  Apollo's Principal Systems Engineer from January 2012 to October 2015 recalled that during the conference calls – which were also attended by various Apollo vice presidents – Sajor expressed the sentiment that the Company had to "get the damn thing back up," although not in those exact words.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 also recalled conference calls involving Apollo vice presidents and Sajor.

**5.    Apollo's Senior Management
Decided To Scrap The New
Classroom Long Before Informing Investors**

94.   Apollo's internal reaction to the systemic disruptions afflicting the new classroom, and the numerous reports and complaints related to these issues, further

---

[23] http://www.isitdownrightnow.com/phoenix.edu.html#morecomments2.

showed its awareness that the new classroom was dysfunctional.  Amid Apollo's rolling layoffs of information technology employees and ongoing serious disruptions to the new classroom (*see* ¶¶54-93), in late 2013 and early 2014 Apollo took steps to scrap the new classroom entirely.  Apollo eventually disclosed in June 2015 that it had ***already*** signed an agreement with an outside company for them to provide an "off-the-shelf" technology instead.  But according to Apollo's former employees, and an online learning analyst who interviewed Apollo's executives, the decision to make that drastic change occurred long before June 2015.

95.     As Apollo's Principal Systems Engineer from January 2012 to October 2015 explained, when Apollo's new Chief Information Officer, Sajor, arrived at Apollo, he determined "This is crap, and I'm not dealing with it anymore; find me a better solution."[24]  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 stated that Apollo's decision to transition from the new classroom to a product from a third-party provider (which was ultimately revealed to be the "Blackboard" online classroom system) was "clearly made long before it was announced" in June 2015, explaining that before making the announcement, Apollo needed to have already had a prototype of the new system in place, and they must have already performed a "proof of concept."  Given his experience, it takes several months to six months at a minimum for all of that to occur, as Apollo's switch to the new Blackboard system was a drastic change.

96.     Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 further explained the "proof of concept" for such a large change.  The proof of concept involves implementing the new platform for some classrooms and is aimed at showing that the new system will work, prior to full implementation of the new system. It involved, for instance, gathering feedback from students and professors, and would have to confirm that the new system will interact with some of the backend systems and enrollment systems that are not directly tied to the classroom.  A significant amount of

---

[24] Sajor arrived at Apollo in 2012.

touch points and proof of concept work would have had to be done.  A proof of concept is not fully customized, but all of the essential parts are there.

97.    Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 stated that Apollo was talking to third-party providers of online classroom software, including Blackboard, while he was at the Company.  His director confirmed to him personally that those conversations were occurring.  In addition, employees from the third parties were showing up for meetings and being recognized by Apollo's employees.  Before Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 left Apollo in July 2014, former Blackboard employees and former employees of the other companies that currently worked for Apollo would recognize representatives from these companies present at Apollo.   The Apollo employees would see these representatives having appointments with Apollo VPs because the VP's office was near the rest of their offices.  Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014 could not say definitively when these talks started, but he started hearing about it in early 2014, probably in January, February, and March.

98.    University of Phoenix's Manager of Operational Development, Business Technology Integration, from February 2012 to January 2016 similarly described 2014 as an important year for Apollo's discussions with Blackboard.  She stated that Apollo hired a third party to come in and perform an analysis of Blackboard in 2013, and in 2014 Apollo really started considering Blackboard.

99.    Apollo's Principal Systems Engineer from January 2012 to October 2015 also recounted how the decision to replace the new classroom with Blackboard was made early, and resulted in numerous layoffs.  She stated that she woke up one day in April or May 2015 to an email saying that the Company was shutting down Apollo's San Jose office, and she later realized that the transition to Blackboard was the reason for that office closure.  She explained that Apollo shut down the entire San Jose building with well over 100 people working in that office, and the employees in the San Jose office were either relocated to Phoenix or laid off.  Apollo's Release Engineer from January

2012 to mid-October 2015 explained that in January or February of 2015, and possibly as far back as late 2014, he heard from other Apollo employees that Apollo's Learning Management System would be "going away."

100.   Online learning analyst Phil Hill, who interviewed Apollo's CIO Mike Sajor and Apollo's Senior Director of Academic and Instructional Technology, David Fraser, regarding Apollo's June 2015 announcement that it was moving away from the new online classroom (*see* ¶¶114-18), similarly concluded that Apollo's senior management had to be aware of the new classroom falling apart long before Apollo signed the contract that was disclosed in June 2015. According to Hill, there had to have been known issues with the online classroom well before the decision was made to find a commercial partner, and the issues were likely known to Apollo's executives at least a year before that decision. Hill stated that as of the point of this decision to find a commercial partner, the top executives had to have been in the loop with such a major strategic change. In addition, Hill specified that prior to the signing of the contract disclosed in June 2015, based on typical project selections and experience in the market, these types of selections between third-party providers typically take at least 4-6 months.

101.   Apollo's employees confirmed the large magnitude of the decision to abandon the new classroom. Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014, for instance, felt that it was a huge decision to scrap the new classroom (as well as the old classroom) and go with a third-party provider, and summarized it as an opportunity for Apollo to cast off a lot of its information technology budget. In his view, part of what set Apollo and University of Phoenix apart was their approach to classrooms, "and essentially that was a decision to negate all of that" as "essentially Apollo gave up on any differentiation." As University of Phoenix's Executive Enrollment Sales Representative from September 2006 until November 2015 stated, one of the pitches that enrollment advisors were supposed to make to prospective students was that the University's system was better than Blackboard, which was supposedly "ancient."

**E.     Apollo Revealed The Truth About Its
         Online Classroom Through Partial Disclosures**

102.    As explained above, in late 2013 and throughout 2014, Defendants continued providing status updates and performance evaluations of the online classroom to investors during the Class Period (*see* ¶¶43-53) despite the truth about the online classroom known internally at the Company (*see* ¶¶54-101).  In early 2015, Defendants began making partial disclosures of the truth as they secretly worked to scrap the online classroom project due to its persistent dysfunction.  These disclosures paved the way for the June 29, 2015 disclosure that Apollo had already signed a contract to replace the online classroom entirely.

103.    On January 8, 2015, during an investor conference call, Defendant Cappelli made a purported effort to provide "additional clarity" regarding his earlier statements on October 21, 2014 regarding a "short-term disruption" or "small hiccup" with the online classroom that was not affecting "a huge part of the student body by any means." Cappelli disclosed that the disruption was due in part to the online classroom's flawed browser compatibility.  In response to a question by Jerry Herman, an analyst at the firm Stifel Nicolaus, about how the new online platform had caused students to "drop out," Defendant Cappelli stated that, instead of students needing "training" on the system as Cappelli had stated in October 2014, in truth students were simply not "able to access the content, the course work, [or] the syllabus."  Defendants also filed a Form 10-Q on January 8, 2015 stating for the first time that "University of Phoenix's new online student classroom, which was fully implemented in late June 2014, has experienced technical challenges that in many cases have adversely impacted the user experience for our students."

104.    Defendant Cappelli noted that the disruption had "impacted enrollment, and obviously our business outlook for 2015."  Swartz stated that the "disruption . . . ha[d] impacted enrollment" by a large number: "approximately 7,000 incremental students."  Swartz also explained that revenue per student was down 8.5%, this figure being

1  "impacted by the increased number of students who withdrew or did not attend class in

2  the quarter due to the disruption related to the new online classroom rollout."

3      105.   In a question and answer session with analysts during the January 8, 2015

4  investor conference call, Defendants reassured investors about the status of the online

5  classroom, citing extensive data at their disposal.  In response to a question from Sara

6  Gubins, an analyst at BofA Merrill Lynch, Defendant Cappelli stated that based on

7  "pretty specific data to show the timelines" of the online classroom disruption, including

8  "information from our technical assistance center of when things spiked up . . . [and] why

9  there was frustration," Cappelli and his team was "very confident" about the cause of the

10  disruption.  Defendants assured investors that while certain issues were already "fixed,"

11  other issues were "being fixed."  Cappelli assured analysts and investors that the new

12  classroom was "our number one area of focus," Apollo had "put every necessary asset on

13  it," and the Company "ha[d] a lot of data" regarding the disruption, including the

14  communications with faculty and students.  Cappelli stated that Apollo was "not guessing

15  in terms of how this emanated . . . [and] where the problems are."

16      106.   Cappelli also reassured investors that the Company had "accelerated [the]

17  future enhancements" to the new classroom including "ensuring the classroom [was]

18  compatible with a broader range of browsers and other operating systems at all times; and

19  that course content [was] more readily accessible."  In addition, according to Cappelli,

20  the Company had already, "[b]eginning in January [2015], . . . started to roll out a

21  focused effort to help bring some of those students impacted by the classroom back to the

22  University."  Instead of fully admitting that the issues with the new classroom were

23  serious and widespread technology issues, Cappelli maintained that "the majority of this

24  disruption we feel very confident is from the explanation of the classroom" to users.

25      107.   Investors and analysts reacted to the news.  In a January 12, 2015 analyst

26  report, analysts at Wells Fargo noted that there was "investor frustration" around the

27  "platform-related dropout issue," but that "management is insistent that it has the

28  information and early evidence to suggest it can turn its platform-related dropout issue

around."  The Wells Fargo analysts reported that "[m]anagement is equally insistent that the platform issue seems not to be affecting new student enrollment."  A January 8, 2015 analyst report by Barrington Research noted that Apollo's surprisingly negative results "appear[ed] to be driven by [Apollo's] new classroom conversion rollout, which . . . had a greater-than-expected negative impact on retention."

108.  In response to Defendants' partial disclosures regarding the online classroom, on January 18, 2015, the price of Apollo stock dropped 13.5% to close at $27.55 per share on abnormally high volume, erasing over $465 million in shareholder value.

109.  On March 25, 2015, during an Apollo investor conference call, Defendant Cappelli referred again to the online classroom disruption that he had previously discussed on October 21, 2014, and that was "discussed last quarter" on January 8, 2015. Cappelli disclosed that this particular disruption was "significant," that "the technology platform issues . . . reduced the effect of [Apollo's] retention initiatives," and that the technology disruption was largely or wholly responsible for the drop in retentions, with Defendant Cappelli stating: "***Are there other things that are driving decreases in retention?  We don't think so*** . . . ."

110.  During the March 25, 2015 call, Defendant Cappelli also revealed that the technology disruption impacted not just student retention and total enrollments, but also new enrollments.  In response to a question from analyst Denny Galindo from Morgan Stanley as to whether the new online platform "ha[d] any impact on starts," Defendant Cappelli disclosed that Apollo had cut its advertising spending in response to the problems: "What you don't want to do when you have an issue that's impacting students is run out and spend a whole lot of money on advertising to attract more students into a classroom where there's been some problems."  Defendant Cappelli explained that reduced advertising "impacted new enrollments."

111.  Apollo's Form 10-Q for the second quarter of 2015, filed with the SEC on March 25, 2015, reported a decline of approximately 12.9% in new degreed enrollment

from the same quarter in 2014.   The Company also disclosed that total degreed enrollment fell by 14.6% and revenue per student decreased 4.3%, and that the "Average Degreed Enrollment decreased 13.8% in the six months ended February 28, 2015 compared to the prior year period," which the Company attributed in part to the disturbance in the new classroom platform.   The Company explained that "[t]he disruptions experienced by our students using the University's new online classroom contributed to the decline in student retention we experienced during the six months ended February 28, 2015."

112.   Analysts attributed the decrease in total degreed enrollment and new degreed enrollment to the continuing problems with the new classroom.   Analysts from Barrington Research noted that, although "[m]anagement's implied guidance called for an improvement [in enrollment] throughout 2015," the March 25, 2015 financial results showed that new degreed enrollment fell 12.9% and total degreed enrollment fell 14.6%, and concluded that "[t]he miss appears to be driven by [Apollo's] new classroom conversion rollout, which impacted Q1/15 results as well, and lowered starts versus expectations."   Barrington also noted that "[m]anagement lowered FY/15 guidance *as a result of the classroom rollout issues and lower-than-expected enrollment starts*."

113.   In response to Defendants' partial disclosures regarding the online classroom, the price of Apollo stock dropped on March 25 and March 26, 2015, falling over 30% to close at $19.21 per share on abnormally high volume, and erasing over $940 million in shareholder value.   Bloomberg noted "[s]oftware compatibility problems with Apollo's online classroom" and "disruption[s]" in a March 25, 2015 article entitled "Apollo Drops Most in More Than 20 Years as New Enrollment Slumps."   The article noted Cappelli's statement that Apollo's management was "on track to fix the technology platform issues, which we believe adversely impacted retention."

114.   On June 29, 2015, Apollo filed with the SEC its Form 10-Q regarding financial results for the third quarter of 2015.   The Form 10-Q revealed for the first time that just one year after the completion of the $1 billion online classroom's

implementation, Apollo was junking it for a different, new learning management system designed by a third party.  Recognizing that the new online platform had "experienced technical challenges that adversely impacted the user experience for our students and, we believe, student retention," Apollo announced that in June 2015, the Company had entered into an agreement with a third-party provider of learning management systems to implement a new system, which would "phase in" for new students in calendar year 2016.  The Company further reported a decrease in average degreed enrollment at the University of Phoenix of 13.9% for the nine months ended May 31, 2015, attributing the decrease in part to "[l]ower student retention due in part to the disruptions experienced by our students using the University's new online classroom during fiscal year 2015."

115.   After the market closed on June 29, 2015, Defendants held an investor conference call to discuss recent financial results.  Defendant Cappelli told investors that Apollo was "mov[ing] away from certain proprietary and legacy IT systems," stating that the Company's online classroom was, contrary to prior representations, simply "not as efficient" as using a third-party provider of "off-the-shelf" products.

116.   Analysts and journalists responded to Apollo's announcement that it was scrapping a project to which it had devoted many years and hundreds of millions of dollars.  A June 30, 2015 article in the *Chronicle of Higher Education* noted the Company's "deep cuts" and summarized that "after spending years and untold millions on developing its own digital course platform that it said would revolutionize online learning, Mr. Cappelli said the university would drop its proprietary learning systems in favor of commercially available products.  Many Apollo watchers had long expected that it would try to license its system to other colleges, but that never came to pass."

117.   Analysts from Morgan Stanley similarly noted in a June 30, 2015 report that the Company's decision to use "off the shelf (vs proprietary) technology" was a "large change" for the Company.  Morgan Stanley expressed skepticism about Apollo's drastic new strategy including the use of "off the shelf" technology, concluding that it was "cautious on the strategy" and "see[ing] a real risk that cost cuts reduce revenue and

leave the company in a worse position."  Piper Jaffray similarly noted Apollo's "drastic cuts" in a June 30, 2015 analyst report and stated that "[n]ew scale reductions could shrink the business by up to 25% over the next 12-18 months and demonstrate that we have yet to find the bottom for [Apollo]."  A June 30, 2015 article by online learning analyst Phil Hill entitled "U of Phoenix: Losing hundreds of millions of dollars on adaptive-learning LMS bet" summarized that "even with a budget of hundreds of millions of dollars and adjunct faculty with centralized course design, the University of Phoenix did not succeed in building the next generation learning platform."

118.    In response to Defendants' disclosures regarding the online classroom, the price of Apollo's stock fell precipitously.  On June 30 and July 1, 2015, Apollo's stock price declined nearly 20% on abnormally high volume as the market absorbed the Company's disclosures.  In total, over $331 million in shareholder value was eliminated during these three trading days.

119.    On October 22, 2015, before the open of trading, Apollo filed its Form 10-K for 4Q 2015 and fiscal year 2015 ending August 31, 2015.  It reported that new enrollment at the University of Phoenix had fallen by nearly one-third in the quarter and total enrollment was almost 20% lower than in the same period in 2014.  These declines were worse than analyst expectations and in part due to the previously undisclosed dysfunction of the online classroom.  With this background, Apollo disclosed in its 2015 Form 10-K that it was now undergoing a "[t]ransformation," "working to stabilize enrollment and eventually return to growth by," among other things, "[t]ransitioning technology systems from proprietary and legacy systems, including the University's online classroom, to commercial software . . . ."  The Company also disclosed that the "transition" away from the new classroom to commercial software was expected to "accelerate the current rate of decline in enrollment at University of Phoenix, perhaps significantly, during the near term."

120.    Also on October 22, 2015, the Company held a conference call with investors and analysts.    During the conference call, Defendant Cappelli provided

additional detail about the Company's plans to abandon its $1 billion investment in its built-from-scratch new online classroom in favor of a platform produced by a different company:

> Finally, as we discussed last quarter, we continue to build self-service capabilities for many of our student service applications.  And we're making progress in moving away from more costly, proprietary, and legacy IT systems.  That will greatly improve costs and efficiency.  We're still on track to begin to roll out the new Learning Management System for incoming students in partnership with a leading provider using their newly designed state-of-the-art LMS by the end of [fiscal] 2016.

121.   Under a section titled "*University of Phoenix Transformation*," Apollo's Form 10-K for fiscal 2015 reported the decline in enrollment suffered by the University of Phoenix during the fiscal year: namely, an 18% decline.   Under a section titled "Analysis of Operating Results by Reportable Segment," the Form 10-K detailed the operating results for University of Phoenix, revealing that the segment had experienced decreases in enrollment and revenue during fiscal years 2014 and 2015:

> University of Phoenix's net revenue decreased $484.6 million and $671.5 million, or 18.4% and 20.3%, in fiscal years 2015 and 2014, respectively, compared to the prior years. The decreases were principally attributable to lower enrollment from the continued decline in New Degreed Enrollment, ***as detailed and defined below***, and a decline in student retention in fiscal year 2015.

122.   The decline in New Degreed Enrollment referenced in the above statement was described in the 2015 Form 10-K as being based on 1) "The University's reduced advertising in fiscal year 2015, [which] contributed to the 15.6% decline in Aggregate New Degreed Enrollment"; and 2) "Lower student retention due in part to the disruptions in the University's online classroom during fiscal year 2015."

123.   Following these disclosures, the price of Apollo Class A common stock fell further, closing down $3.42 per share – or more than 32% – from a close of $10.60 per share on October 21, 2015, to a close of $7.19 per share on October 22, 2015, on unusually high volume of more than 14.2 million shares traded.  In total, the Company's share price declined approximately 80% from its Class Period high of nearly $36 per

share, erasing nearly $3 billion in market capitalization.

124.   In December 2015, Apollo revealed that the contract with a third-party software provider that the Company disclosed on June 29, 2015, was a contract with Blackboard Inc., and that Apollo's new third-party-provided online classroom was the "Blackboard Learn Ultra" system.   In an article dated December 5, 2015, online learning analyst Phil Hill reported on his recent interview of Apollo's CIO Mike Sajor and Apollo's Senior Director of Academic and Instructional Technology, David Fraser, regarding the change to Blackboard's technology.   The article stated that Apollo's online classroom was "no longer viewed as worthy of internal development and investment," that Sajor was "under no illusions that there would be no customizations" with the Blackboard system, and that Apollo "will be likely using the commercial, standard version" of the off-the-shelf software.   According to Fraser, this was "a disruptive change," and Sajor and Fraser agreed that it was "a major change in company strategy compared to recent investments in a homegrown learning platform" – a change Apollo made because "the continuing LMS investment was not worth it."   The article reported that the "University of Phoenix selected Blackboard's Learn Ultra as their new LMS based on two primary factors – *a comprehensive set of functionality and the redesigned user experience of Ultra*."   The article further summarized that Apollo's change to Blackboard showed that "*one of the world's largest educational institutions was unable to successfully develop and deploy a custom learning platform despite massive investment*."

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

125.   Defendants made materially false and misleading statements during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.   In particular, Defendants misrepresented the status and performance of the Company's important online classroom.   At the same time, Defendants omitted material facts that were necessary in order to make their statements

about the online classroom not misleading in light of the circumstances under which they were made.

**Statements on November 13, 2013**

126.   On November 13, 2013, Apollo presented at the JPMorgan Ultimate Services Investor Conference.  During the presentation, Defendant Swartz discussed the Company's new classroom, stating that:

> Beyond our Education of Careers initiative, ***we've also made some significant enhancements to the student experience. I want to talk about two of those.  The first is our new classroom, or our new learning platform***, as we refer to, and secondly Adaptive Learning, in just a moment. Regarding the new classroom, we want to offer a superior classroom experience for the student.  We want it to be second to none.  ***Just as an example, the new classroom*** <u>***as exist today***</u> ***[sic] actually delivers personalized learning to individual students, and it allows us to gather data on what's working, and as importantly what's not working for students.***  As students progress through a particular course, if there's a particular assignment that's very challenging for many of the students, perhaps the academics will look at that and move it around in the curriculum.  Maybe it's introduced too early, and should be pushed back. ***We watch very closely for attendance and how student behavior occurs after each assignment within each class.  The new platform is actually rolled out to all of our graduate students today.***  We have a staggered roll out for all of our undergraduates over the course of fiscal 2014. We're very excited about that.
>
> The industry has changed a lot in the last five years for sure.  We at Apollo have changed as well.   We've become them [*sic*] much more leaner, nimbler organization, and we're introducing new products to market faster. ***In the last few years, we have invested over $1 billion in our learning and service platforms and data platforms at the University of Phoenix.***

127.   The statements in ¶126 were misleading.  Statements that the online classroom had "actually rolled out to all of [University of Phoenix's] graduate students" and had made "significant enhancements to the student experience" gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  In truth, the student experience was at this time severely harmed by widespread, material, undisclosed disruptions, and was inferior to the student

experience on the legacy platform or competing platforms.  *See* ¶¶54-62, 70-73, 88-89.
Moreover, students to whom the online classroom was made available were unable to log
in and use the classroom due to login failures, broken links, and additional issues.  *See id.*
Defendants' statements that the new classroom "allow[ed Apollo] to gather data on
what's working . . . [and] not working for students," and that Apollo "watch[ed] very
closely for attendance and how student behavior occurs after each assignment within each
class," in combination with Defendants' positive assurances regarding the rollout, were
misleading because, in truth, students lodged complaints, failed classes, and dropped out
at this time due to the online classroom's pervasive dysfunction.  *E.g.*, ¶¶54-62, 73, 88-
89.

128.   Defendants' statements above in ¶126 were also misleading at the time
because they omitted material facts that they were required to provide in order to make
their statements, in light of the circumstances under which they were made, not
misleading.  Defendants omitted, among other things, (i) the facts from the December
2012 internal report that the online classroom could not compete with what was already
in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50
disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73);
(iii) the online classroom was experiencing widespread outages, and students were
prevented from logging in, receiving course work and turning in assignments as early as
2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online
classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in
late 2013 and early 2014 when there was the big push on the online classroom, and it was
basically "an all stop" until Apollo could address all of those issues (¶73); and (vi) the
Company's ability to roll out the online classroom, and resolve disruptions and other
technical failures with the classroom, was compromised by Apollo's ongoing layoffs in
the IT department (¶¶63-69).   Defendants omitted that the "data" that Apollo had
gathered from Defendants' "watch[ing] very closely" the student reactions to the online
classroom showed that students were dissatisfied with the online classroom and lodging

1   numerous complaints about the classroom, and that the classroom's dysfunction failed

2   students and caused them to drop out, damaging Apollo's business. *See* ¶¶54-62, 73, 88-

3   89.

4        129.   During the November 13, 2013 presentation, Swartz promoted the online

5   classroom in a slide presentation.   The slide highlighted the online classroom's

6   "management and delivery of course materials" to students.   In addition to statements

7   emphasizing the online classroom's ability to deliver course materials, the slide

8   presentation also discussed the students' purported experience on the platform, stating

9   that students benefited from a "simple," "efficient," and "personal" new classroom.

10  According to Defendants' presentation, the new classroom not only provided

11  "[i]ndividualized learning pathways, reports, notifications, and recommendations," but

12  also had additional "[c]apabilities and features to keep students on track and motivated":

130.   Statements in the slide presentation in ¶129 were false.   The online classroom was not "Simple.  Efficient.  Personal."  The online classroom was plagued by consistent disruptions and dysfunction since its inception that required students and teachers to devote additional time and effort to log in, participate in classes, and turn in assignments, and that required the Company to devote additional resources to resolving the disruptions and system malfunctions, and to responding to student complaints.  *See* ¶¶54-62, 70, 88-89.   As explained above in ¶80, terms like "efficient" have a clear meaning in the industry, and the new classroom was not efficient.  The slide reproduced above in ¶129 also includes misleading statements.   The slide's highlighting of the software's purported "management and delivery of course materials" and "[c]apabilities and features to keep students on track," as well as the additional focus on "communication and social interaction tools" each, and in aggregate, gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  In truth, the online classroom had pervasive problems delivering course materials to students due to technical malfunction such as broken links and system outages, and students were not "kept on track and motivated," as they failed classes and dropped out entirely.  *E.g.*, ¶¶54-62, 73, 88-89.

131.   Defendants' statements above in ¶129 were also misleading at the time because they omitted material facts that they were required to provide in order to make their statements, in light of the circumstances under which they were made, not misleading.  Defendants omitted, among other things, (i) the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in

late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶73); and (vi) the Company's ability to roll out the online classroom, and resolve disruptions and other technical failures with the classroom, was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69).  Defendants omitted that students were dissatisfied with the online classroom and lodging numerous complaints about the classroom, and that the classroom's dysfunction failed students and caused them to drop out, materially damaging Apollo's business.  *E.g.*, ¶¶54-62, 73, 88-89.

**Statements on March 11, 2014**

132.   On March 11, 2014, Apollo presented at the Credit Suisse Global Services Conference, in Scottsdale, Arizona.  During the presentation, Coronelli stated:

> The bottom line, ***back to looking at our strategy about differentiation***, it all comes to, at the end of the day, down to the student learning experience. And what that means is, how do you create a personalized, simple -- we provide -- ***we're rolling out a new classroom tied around the syllabus***.
>
> . . . .
>
> We are tying to adding in [*sic*] full-time faculty, assessments, when there -- ***if there seems to be an issue through the new classroom, they can -- if a student is having issue and go -- the faculty member or the student advisor can step in and see what's happening. So it's -- like I said, it's a lot of different things that are pulled together to create an ecosystem or a culture around retention.***  And it really is -- that is our top priority is, how do we get the students to stay?

133.   The statements above in ¶132 were misleading.  The statements that "if a student is having [an] issue," the "faculty member or the student advisor can step in and see what's happening" as part of a purported "ecosystem or a culture around retention" each, and in aggregate, gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  The statements gave the impression that the online classroom had overall enhanced capabilities to monitor and promote retention, and that with online classroom there was now a positive "ecosystem or a culture around retention."  In truth, the rollout was at this time plagued

by widespread, material, undisclosed disruptions and other system malfunctions that had material, undisclosed negative effects on retention.  *See* ¶¶54-62, 73-74, 88-89, 92. Moreover, as Apollo's Software Release Engineer from 2011 until September 2015 explained, Apollo's statements about the online classroom and retention were "not true anymore," Apollo was in damage control by March 2014, and it was misleading for Apollo to state in March 2014 that there was an ecosystem or culture around retention. ¶74.

134.   Defendants' statements above in ¶132 were also misleading at the time because Defendants omitted material facts that they were required to provide to make their statements, in light of the circumstances under which they were made, not misleading.  Defendants omitted, among other things, (i) the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (vi) the Company's ability to roll out the online classroom, and resolve disruptions and other technical failures with the classroom, was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (vii) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101).  While Apollo stated that the "faculty member[s] or the student advisor[s] can step in and see what's happening" related to retention issues, the Company omitted these issues, and that both students and faculty were frustrated by the online classroom's widespread dysfunction, and that when Apollo's IT team were "see[ing] what's happening," they were seeing that the

1   classroom's dysfunction failed students and caused them to drop out.

2   135.   During the March 11, 2014 presentation, Coronelli promoted the new

3   classroom through a slide presentation.   The slide highlighted the online classroom's

4   "management and delivery of course materials" to students.  In addition to statements

5   emphasizing the online classroom's ability to deliver course materials, the slide

6   presentation also discussed the students' purported experience on the platform, stating

7   that students benefited from a "simple," "efficient," and "personal" new classroom.

8   According to Defendants' presentation, the new classroom not only provided

9   "[i]ndividualized learning pathways, reports, notifications, and recommendations," but

10  also had additional "[c]apabilities and features to keep students on track and motivated":



136.   Statements in the slide presentation in ¶135 were false.   The online classroom was not "Simple. Efficient. Personal."   The online classroom was plagued by consistent disruptions and dysfunction since its inception that required students and teachers to devote additional time and effort to log in, participate in classes, and turn in assignments, and that required the Company to devote additional resources to resolving the disruptions and system malfunctions, and to responding to student complaints.   *See* ¶¶54-62, 70, 88-89. As explained above in ¶80, terms like "efficient" have a clear meaning in the industry, and the new classroom was not efficient.   The slide reproduced above in ¶135 also includes misleading statements.   The slide's highlighting of the software's purported "management and delivery of course materials" and "[c]apabilities and features to keep students on track," as well as the additional focus on "communication and social interaction tools" each, and in aggregate, gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.   In truth, the online classroom had pervasive problems delivering course materials to students due to technical malfunction such as broken links and system outages, and students were not "kept on track," as they failed classes and dropped out entirely.

137.   Defendants' statements above in ¶135 were also misleading at the time because they omitted material facts that they were required to provide in order to make their statements, in light of the circumstances under which they were made, not misleading.  Defendants omitted, among other things, (i) the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in

late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (vi) the Company's ability to roll out the online classroom, and resolve disruptions and other technical failures with the classroom, was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (vii) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101).  Defendants omitted that students were dissatisfied with the online classroom and lodging numerous complaints about the classroom, and that the classroom's dysfunction failed students and caused them to drop out, materially damaging Apollo's business.  *E.g.*, ¶¶54-62, 73, 88-89.

**Statements on April 8, 2014**

138.   On April 8, 2014, Apollo held its "2014 Investor & Analyst Meeting," which Apollo's top executives (*see* ¶47 and footnote 3) attended and in which they participated.  During the meeting, Defendant Cappelli stated:

> Let me just take a few minutes to talk about our strategic objectives.  You can see them listed here.  First, look at the outer ranks, differentiation is a big key.  This is a very crowded world in education today, both on the postsecondary and higher education levels.  Differentiated career-oriented education delivering educational experiences that directly prepare students for in-demand jobs and employability is a big key for us.

> Our top goal of these five is completion and career outcome. We want to further strengthen our academic experience with addition of new programs which we're doing.  We want to expand the use of adaptive learning which we're doing and you'll hear examples of today.

> ***We're rolling out a new learning platform.***  It's exciting.  ***It has tools that faculty members and students have never had before and other new retention initiatives to support the success of our students.***

University of Phoenix's Chief Operating Officer, Jerrad Tausz, stated:

> I know both Mitch [Bowling] and Greg [Cappelli] had talked little bit about the learning platform that is the next key element and what this new learning platform does?  ***I really think it makes things simple for the students.  It is an intuitive system that we allow a lot more multimedia, a lot more engagement and interaction in the online classroom*** as well its components can be used in the ground classroom as well to interact with both the faculty members as well as other students.

139.   The statements in ¶138 were false.  The online classroom did not "make[] things simple for the students," and was not "an intuitive system."  The online classroom was plagued by consistent disruptions and dysfunction since its inception that required students to devote additional time and effort to log in, participate in classes, and turn in assignments.  *See* ¶¶54-62, 70-74, 88-89, 92.  The statements above in ¶138 were also misleading.  The statement that the classroom allowed for "a lot more engagement and interaction" gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  In truth, students were "engaged" and "interacting" with the online classroom in the sense that they were spending extra time and effort to log in, resolve technical failures, and accomplish the basic tasks of obtaining course materials, turning in assignments, and obtaining credit for their coursework.  *See id.*  Instead of "support[ing] the success of . . . students," the classroom's technical failures caused students to fail classes, and to drop out from University of Phoenix, materially harming students' success rates and Apollo's key retention figures. *See id.*

140.   Defendants' statements above in ¶138 were also misleading at the time because Defendants omitted material facts that they were required to provide to make their statements, in light of the circumstances under which they were made, not misleading.  Defendants omitted, among other things, (i) the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (vi) the

Company's ability to roll out the online classroom, and resolve disruptions and other technical failures with the classroom, was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (vii) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101).  Defendants omitted that students were dissatisfied with the online classroom and lodging numerous complaints about the classroom, and that the classroom's dysfunction failed students and caused them to drop out, materially damaging Apollo's business.  *E.g.*, ¶¶54-62, 73, 88-89.

**Statements on June 25, 2014**

141.   On June 25, 2014, Apollo published a press release announcing its financial results for the third quarter of 2014.  The press release stated:

> "We have made meaningful progress on our strategy to differentiate University of Phoenix and all of our institutions, diversify Apollo Education Group, and build a more efficient organization focused on operational excellence," said Greg Cappelli, Chief Executive Officer, Apollo Education Group.  "***During the third quarter, we … completed the rollout of our new learning platform across the university***.

142.   Also on June 25, 2014, Apollo held an investor conference call, in which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated.  During the call, Defendant Cappelli stated:

> ***We're also pleased to report that nearly all students in the University are now being served by our new learning platform, which has been greatly enhanced and provides a more efficient and user friendly experience.***

143.   The statements in ¶142 were false and misleading.  The Company had not "completed the rollout of [its] new learning platform across the university" by the end of the third quarter of 2014, *i.e.*, by May 31, 2014.  The online classroom was actually rolled out to all students months after Apollo made the announcement.  *See* ¶¶77-80.  Moreover, students to whom the online classroom was made available were unable to log in and use the classroom due to login failures, broken links, and other issues.  *E.g.*, ¶¶54-62, 73-76, 88-92.  In addition, the online classroom had not "been greatly enhanced" and did not "provide[] a more efficient and user friendly experience."  While such statements gave

investors the impression of a successful rollout, in truth, the rollout was at this time plagued by widespread, material, undisclosed disruptions that had material, undisclosed negative effects on key business metrics such as retention, enrollment, and new enrollment. *E.g.*, *id.* As explained above in ¶¶80 and 124, terms such as "efficient" and "user friendly" have a clear meaning in the industry, the new classroom was neither efficient nor user friendly, and Apollo's former employees agree that it was misleading when, in June 2014, the Company stated that the new learning platform had been greatly enhanced and provided a more efficient and user friendly experience.

144. Defendants' statements above in ¶142 were also misleading at the time because they omitted material facts that they were required to provide in order to make their statements, in light of the circumstances under which they were made, not misleading. Defendants omitted, among other things, (i) the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (vi) by mid-2014, the problems with the online classroom were so severe that employees called on Cappelli to bring the legacy program back (¶¶75-76); (vii) the rollout of Apollo's new learning platform was not, in fact, completed as of May or June 2014 (¶¶77-80); (viii) the Company's ability to roll out the online classroom, and resolve disruptions and other technical failures with the classroom, was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (ix) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101). Defendants omitted that

students were dissatisfied with the online classroom and lodging numerous complaints about the classroom, and that the classroom's dysfunction failed students and caused them to drop out, materially damaging Apollo's business.  *E.g.*, ¶¶54-62, 73-80, 88-92.

**Statements on September 18, 2014**

145.   On September 18, 2014, during the BMO Capital Markets 14th Annual Back To School Education Conference in New York, New York, the following exchange occurred between Defendant Swartz and analyst Jeff Silber from BMO Capital Markets:

> **Jeff Silber, BMO Capital Markets – Analyst:**
>
> In your remarks you mentioned retention.  I want to drill down a bit further on that.  Can you give us some examples of what the Company is doing in terms of improving retention?  How do you make sure that once you get students in they stick around?
>
> **Brian Swartz, Apollo Education Group, Inc. - SVP and CFO:**
>
> . . . .
>
> [W]e have been very, very focused on looking at both the service model as well as the learning model, ***upgrading our learning management system and making sure that the process to learn for a student is seamless***.  We don't want them to spend a lot of time being frustrated on how to move around the learning management system or the service model or how they get questions answered.  We want them focused in the classroom.  So really working in a structured way to do that.

146.   The statements above in ¶145 were misleading.   The statement that Defendants were "very, very focused on . . . upgrading our learning management system and making sure that the process to learn for a student is seamless" gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  In truth, the online classroom was far from "seamless," as students experienced difficulties with logging in, obtaining course materials, turning in assignments, and obtaining credit for their coursework.  *E.g.*, ¶¶54-62, 73-76, 88-92.  The classroom's technical failures caused students to fail classes, and to drop out of University of Phoenix, materially harming Apollo's business.   *See id.*   As Apollo's

1    Software Release Engineer from 2011 until September 2015 confirmed, it was misleading

2    for the Company to say they were making sure the process for students to learn was

3    seamless.  *See* ¶81.

4        147.   Defendants' statements above in ¶145 were also misleading at the time

5    because they omitted material facts that they were required to provide in order to make

6    their statements, in light of the circumstances under which they were made, not

7    misleading.  While Defendants claimed to be "very, very focused" on whether the student

8    experience was "seamless," and in making sure that students were not "frustrated" with

9    online classroom, Defendants omitted, among other things, (i) the facts from the

10   December 2012 internal report that the online classroom could not compete with what

11   was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-

12   50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73);

13   (iii) the online classroom was experiencing widespread outages, and students were

14   prevented from logging in, receiving course work and turning in assignments as early as

15   2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online

16   classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in

17   late 2013 and early 2014 when there was the big push on the online classroom, and it was

18   basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (vi) by

19   mid-2014, the problems with the online classroom were so severe that employees called

20   on Cappelli to bring the legacy program back (¶¶75-76); (vii) the rollout of Apollo's new

21   learning platform was not, in fact, completed as of May or June 2014 (¶¶77-80); (viii) the

22   online classroom's dysfunction continued throughout the Class Period (¶¶55, 57, 61, 81);

23   (ix) the Company's ability to resolve disruptions and other technical failures with the

24   online classroom was compromised by Apollo's ongoing layoffs in the IT department

25   (¶¶63-69); and (x) Defendants secretly sought to find an alternative system to replace the

26   online classroom entirely (¶¶94-101).  Defendants omitted that students were dissatisfied

27   with the online classroom and lodging numerous complaints about the classroom, and

28   that the classroom's dysfunction failed students and caused them to drop out, materially

damaging Apollo's business.  *E.g.*, ¶¶54-62, 73-81, 88-92.

**Statements on October 21, 2014**

148.   On October 21, 2014, Apollo held an investor conference call, in which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated.   In his prepared remarks, Defendant Cappelli stated that Apollo had experienced "a short-term disruption" with the online classroom:

> With that said, ***we recently experienced a short-term disruption with the massive student conversion from our old online classroom to our new significantly updated learning platform.***   Brian's going to share some additional details around this in his comments . . . .

Analyst Jeff Volshteyn from JP Morgan Chase & Co. followed up on this statement:

> **Question – Jeff Volshteyn:**
>
> You mentioned there was a technical issue with the old platform and the new platform, and there was a shift to the new platform.  Can you give a little more color on how that impacts mathematically revenue per student?
>
> **Answer – Greg Cappelli:**
>
> Sure, Jeff.  This is Greg.  Thanks for the question.  ***The easiest way to explain the new platform, it's like going to the iPhone 6 from an analog cell phone model, from a number of years ago.***   There is a very large student body that is transitioning onto this system, and there's a lot of tremendous good things about the new platform that we're very excited about, including a ton of data that we're going to have before that we never had, that we'll be able to put analytics around and have more real-time interaction in terms of things we can do with students, faculty, and the University in general.  However, ***there's additional training that needs to be done.  There's a few bugs and things in the system that are being worked out.***  It's a big priority for us.  ***We probably had some students stop out temporarily because of some of the issues.***
>
> ***This is not a huge part of the student body by any means.  It's reasonable. We have a team on it.  We expect it will get fixed over the near term***.

149.   Also during the October 21, 2014 investor conference call, analyst Denny Galindo from Morgan Stanley inquired about the online classroom:

**Question – Denny Galindo:**

Hi. I had a question following up on the new system.  The bad debt expense was a little -- up a little bit in the quarter.  Is this a sign of people getting frustrated with the new system and dropping out, or maybe it's something to do with the mix of incoming students?  Could you give a little color on that?

**Answer – Brian Swartz:**

Yes, no it's really related -- it ticked up just a little bit, very, very slightly, *simply because our new enrollment trends have improved.*  So as our new enrollment trends improve, we do expect that to happen.  Going forward, I would expect the 2% level, which is kind of where it's at, to be a good number for bad debt expense.

150.   Also during the October 21, 2014 investor conference call, analyst Corey Greendale from First Analysis Securities inquired about the online classroom:

**Question – Corey Greendale:**

First, wanted to ask about the guidance on enrollment.  If -- by my calculation, to get to about flat total enrollment by the end of the year, you need to see a significant pick-up in new students, like high single digit, even low double-digit beyond Q1.  Is that -- is my calculation right and is that consistent with your expectation?

**Answer – Greg Cappelli:**

Corey, total enrollment is a reflection of a number of things; new students are certainly a part of it.  As I said before, we are continuing to drive to improve that metric for all the right reasons to responsibly grow University of Phoenix again.  But also retention's a big part of that as well, and it's been our number one goal.  It's interesting, so many good things happening on retention, you can have *a small hiccup in something like the platform to get a temporary setback.*

151.   The statements in ¶150 were false and misleading.  The online classroom was not experiencing merely "a short-term disruption," a "small hiccup," or a "temporary setback" caused by "a few bugs" that did "not [affect] a huge part of the student body by any means."   The online classroom was plagued by consistent disruptions and dysfunction since its inception that required students to devote additional time and effort

to log in, participate in classes, and turn in assignments, and that caused students to fail classes and drop out of the University. *E.g.*, ¶¶54-62, 73-81, 88-92. As Apollo's Software Release Engineer from 2011 until September 2015 explained, it was misleading for the Company to state in October 2014 that it had experienced a short term disruption or a small hiccup, given the pervasive problems with the new classroom. *See* ¶81. Moreover, the technical issues were not focused on whether students needed more "training" with the online classroom. Instead, the technical issues were part of the online classroom's software, regardless of user training. Defendants' statement that "new enrollment trends have improved" was also false and misleading. The online classroom's dysfunction and outages were so severe that they materially damaged Apollo's business.

152. Defendants' statements above in ¶150 were also misleading at the time because they omitted material facts that they were required to provide in order to make their statements, in light of the circumstances under which they were made, not misleading. While Defendants stated that there had been "a short-term disruption," *i.e.*, "a small hiccup," they omitted, among other things, (i) the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (vi) by mid-2014, the problems with the online classroom were so severe that employees called on Cappelli to bring the legacy program back (¶¶75-76); (vii) the rollout of Apollo's new learning platform was not, in fact, completed as of May or June 2014 (¶¶77-80); (viii) the online classroom's dysfunction continued throughout the Class Period (¶¶55, 57, 61, 81); (ix)

the Company's ability to resolve disruptions and other technical failures with the online classroom was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (x) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101).

153.   On October 21, 2014, Apollo also filed with the SEC its 2014 Form 10-K. In a section titled "Risks Related To Our Business," the Form 10-K stated:

> **System disruptions and security threats to our computer networks or phone systems could have a material adverse effect on our business.**
>
> The performance and reliability of our computer network and phone systems infrastructure at our schools, including our online programs, is critical to our operations, reputation and ability to attract and retain students.  From time to time we experience intermittent outages of the information technology systems used by our students and by our employees, including system-wide outages. Any computer system error or failure, regardless of cause, could result in a substantial outage that materially disrupts our online and ground operations. . . .
>
> We have upgraded or are in the process of upgrading a substantial portion of our key IT systems, including our online student classroom, student relationship and communications management platform, and corporate applications, and retiring the related legacy systems. Although these new systems are expected to improve the productivity, scalability, reliability and sustainability of our IT infrastructure, the transition from the legacy systems *entails risk of unanticipated disruption or failure* to fully replicate all necessary data processing and reporting functions, including in our core business functions.
>
> Any disruption in our IT systems, including any disruptions and system malfunctions *that may arise* from our upgrade initiative, could significantly impact our operations, reduce student and prospective student confidence in our educational institutions, adversely affect our compliance with applicable regulations and accrediting body standards and have a material adverse effect on our business and financial condition. . . .

In a section titled "Key Trends, Developments and Challenges," the Form 10-K stated:

> *Information Technology.* We have upgraded or are in the process of upgrading a substantial portion of our key IT systems, including our online student classroom, student relationship and communications management platform, and corporate applications, and retiring the related legacy systems.  We believe that these new systems will improve the productivity,

scalability, reliability and sustainability of our IT infrastructure and improve the student experience. However, ***the transition from the legacy systems entails risk of unanticipated disruption or failure to fully replicate all necessary data processing and reporting functions, including in our core business functions, that could adversely impact our business.*** . . .

154.    The statements in ¶153 were misleading.  The statements that "[a]ny computer system error or failure, regardless of cause, ***could*** result in a substantial outage that materially disrupts our online and ground operations"; "the transition from the legacy systems entails ***risk*** of unanticipated disruption"; "any disruption . . . ***could*** significantly impact" the Company "and have a material adverse impact" on the Company; and "the transition from our legacy systems entails ***risk*** of unanticipated disruption, including disruption in our core business functions that ***could*** adversely impact our business," each, and in aggregate, gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  In truth, the transition from the legacy systems not only had future risk of such disruptions, but had repeatedly caused and was causing at this time an ongoing and material number of undisclosed disruptions related to the new online classroom.  *E.g.*, ¶¶54-62, 73-81, 88-92. These disruptions had material, adverse, undisclosed negative effects on Apollo's business.  The Form 10-K's reference to "intermittent outages of the information technology systems" was boilerplate, and unlike other statements in the paragraph above, was not specific to the online classroom.[25]

155.    Defendants' statements above in ¶153 were also misleading at the time because they omitted material facts that they were required to provide in order to make their statements, in light of the circumstances under which they were made, not misleading.  Defendants omitted, among other things, (i) there were at least 30-50

---

[25] Apollo routinely included the "intermittent outages" boilerplate in its quarterly and annual filings with the SEC, including in each Form 10-K since October 2011, and in its Form 10-Qs filed on June 30, 2011, January 5, 2012, March 26, 2012, and June 25, 2012. The Company failed to update the purported risk disclosure during the Class Period to reflect the new, severe, and constant disruptions suffered by the new classroom.

disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (ii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iii) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (iv) long-lasting disruptions were most prevalent in late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (v) by mid-2014, the problems with the online classroom were so severe that employees called on Cappelli to bring the legacy program back, and the problems persisted in late 2014 (¶¶75-81); (vi) the online classroom's dysfunction continued throughout the Class Period (¶¶55, 57, 61); (vii) the Company's ability to resolve disruptions and other technical failures with the online classroom was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (viii) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101).

**Statements on November 12, 2014**

156.   On November 12, 2014, at the JPMorgan Ultimate Services Investor Conference in New York, New York, Apollo's Coronelli answered a question from analyst Jeff Volshteyn from JP Morgan Chase & Co. regarding the online classroom:

**Question – Jeff Volshteyn:**

Let me kick it off with a few questions, if I may.  New classroom -- you mentioned it, and your team mentioned about it on the last call.  And you just give us a little more of a nitty gritty?  How is it different?  Is that a really differentiating kind of proposition for students?  What technological changes are taking place in the classroom?

**Answer – Beth Coronelli:**

***Absolutely.  Yes, it is. From a standpoint of the classroom it is -- it's not just an upgrade.  It was a complete new classroom putting in place.***  And from that perspective it's adding, like I mentioned, gamification.  There gives the ability for the faculty members to connect to the syllabus and create it around the syllabus and how they work that.  And also, with the

1
2
teams, learning teams, the communication between the teams.   Just ***an overall improved experience from that perspective****.* . . .

3
4
5
6
7
8
9
10
11
12
13
14
157.   The statements in ¶156 were misleading. The online classroom did not offer "an overall improved experience" and was not a successful "upgrade."  These statements gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  Despite Defendants' statements, the student's experience with the online classroom was far from "improved," as students experienced difficulties with logging in, obtaining course materials, turning in assignments, and obtaining credit for their coursework.  *E.g.*, ¶¶54-62, 73-81, 88-92.  As Apollo's former employees and students explain, the new online classroom provided a far worse experience than the legacy system did.  *E.g.*, ¶¶62, 75-76, 89-92.  In truth, the classroom's technical failures had caused and were causing students to fail classes, and to drop out of University of Phoenix, materially harming students' success rates and Apollo's business.

15
16
17
18
19
20
21
22
23
24
25
26
27
28
158.   Defendants' statements above in ¶156 were also misleading at the time because they omitted material facts that they were required to provide in order to make their statements, in light of the circumstances under which they were made, not misleading.  Defendants omitted, among other things, (i) the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom was experiencing widespread outages, and students were prevented from logging in, receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv) students were dropping out because of frustration with the online classroom as early as 2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in late 2013 and early 2014 when there was the big push on the online classroom, and it was basically "an all stop" until Apollo could address all of those issues (¶¶73-74); (vi) by mid-2014, the problems with the online classroom were so severe that employees called

on Cappelli to bring the legacy program back (¶¶75-76); (vii) the rollout of Apollo's new learning platform was not, in fact, completed as of May or June 2014 (¶¶77-81); (viii) the online classroom's dysfunction continued throughout the Class Period (¶¶55, 57, 61, 81); (ix) the Company's ability to resolve disruptions and other technical failures with the online classroom was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (x) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101).

**Statements on January 8, 2015**

159.   On January 8, 2015, Apollo held an investor conference call, in which Defendants Cappelli and Swartz, and Vice President of Investor Relations Beth Coronelli, participated.  In his prepared remarks, Defendant Cappelli stated:

> As we talk about our first quarter results, I'll share an update on the progress we're making on our strategy.  ***I'll also provide clarity on the disruption related to the implementation of our new classroom, which has impacted enrollment, and obviously our business outlook for 2015.  I'll then provide a bit more color on the substantial progress we've made fixing the issues*** and turn the call over to Brian. . .

> [L]et me provide some additional clarity around the near-term disruption from our new online classroom at the University of Phoenix.  ***As I mentioned last quarter, the University recently completed and rolled out a new modernized classroom which was a massive undertaking.***  This platform overall will be an enormous upgrade to students and faculty as it is significantly more advanced in functionality and learning capabilities.  It will allow us to capture and analyze data around the science of learning which we can then use to further improve the student experience and outcomes.

> Unfortunately, the conversion to a brand new platform was more challenging than we had originally anticipated, specifically given the size and scale of the implementation.  That resulted in a greater than expected impact on retention.  Again, Brian will address the financial impact on that in just a moment.

> ***We're 100% committed to fixing all the issues relative to the new classroom as quickly as possible, and, in fact our teams have already made substantial progress.  We're on track with our plan to aggressively address the technical issues related to the classroom and have also accelerated future enhancements.***

During the January 8, 2015 investor conference call, analysts Peter Appert from Piper Jaffray & Co., Sara Gubins from BofA Merrill Lynch, and Trace Urdan from Wells Fargo Securities inquired about the online classroom:

**Question – Peter Appert:**

Greg, can you give us anything more tangible or specific in terms of the steps being taken to address the problems, and maybe just what gives you confidence that you can get this thing fixed on a relatively near-term basis?

**Answer – Greg Cappelli:**

Thanks, Peter. We're going to get it fixed. The very structure of the University of Phoenix, continuous enrollment, 25,000-plus faculty, obviously, thousands of courses across nine colleges make developing anything new a pretty healthy challenge. And, as I said, they haven't had this kind of major platform upgrade in years to the online classroom.

We've been assured that the structure in the architecture and platform is solid from outside experts, but we've moved from a system that generally used centrally developed content, was completely controlled from the inside, to one that, frankly, is much more dynamic. It allows faculty and students to access and bring in all kinds of exciting new content from third parties and outside providers. And every time there's an update to a browser, a third party link, or other areas that the can change, our own system has to be capable of upgrading along way.

Basically in every course we offer, and those are the major fixes that have been being made, our teams thought they had it covered. ***We, obviously, learned some valuable lessons along the way, but we put every necessary asset on it. It's our number one area of focus, it has, obviously, caused disruption.***

***We're meeting the timeliness of the deadlines we've set to fix the issues at hand and expect better results going forward and we have a lot of data. We are not guessing in terms of how this emanated, where the problems are, what it did to NPS scores or student disruption.*** We have lots of communications going out to faculty and students about timelines and data so that they feel comfortable that this has been addressed, fixed and it won't be disrupted going forward.

**Question – Peter Appert:**

Got it, okay. And I guess a concern might be that perhaps this is masking to some extent just the competitive issues or competitive pressures that

might be exacerbating the start and enrollment performance. What do you think about that?

**Answer – Greg Cappelli:**

Well, look, I'm certainly pleased that the intakes are improved from prior quarters with significantly less spending, the overall environment, as I said before, will improve. It's choppy in this industry with some weeks better than others. We continue to execute on our plan to differentiate our schools so that we can stand out. ***But we are not guessing, we have a lot of data as to what caused the disruption.***

***We know the timing of when students dropped out.*** Generally speaking, if it's more competitive type issues that happens very early on in courses, Peter, and these are students that have been pretty well into their courses where there's been disruption. ***So, again, we are using lots of data and analytics to track down the issues, to make sure we understand what the issues are, and we will certainly continue to do everything necessary to remediate that.***

. . . .

**Question – Sara Gubins:**

Thanks, good morning. First, do you think that any of the disruption is related to moving to the new college model, or is it really all related to the new learning management system?

**Answer – Greg Cappelli:**

Sara, I think there is some related to that, but ***we have pretty specific data to show the timelines. We have information from our technical assistance center of when things spiked up, what that information was about, why there was frustration.*** So, yes, there's, of course, we had expected some from moving to another college operating model. We think it's the right thing to do for the long term and are excited about that from a competitive standpoint. On the quality of what I'm seeing there is very substantially improved and exciting, but *the majority of this disruption we feel very confident is from the explanation of the classroom.*

. . . .

**Question – Trace Urdan:**

[I]n terms of the new classroom issues, just so I understand this clearly, the drop in RPS is reflecting students scaling back on their course load, and, I

guess, I gather also, reflecting some students dropping out altogether? Is it having any kind of an impact on new student starts from your perspective?

**Answer – Greg Cappelli:**

*It's hard to say exactly if it has had any impact on new students. You're talking about the classroom issue, but most of the impact, Trace, we believe has come with existing students who are actually pretty well into their courses.*

160.    While a partial disclosure of the truth (*see* ¶¶103-04, 107-08), additional statements in ¶159 were false.  Defendants had not "put every necessary asset" to work fixing the online classroom, were not "100% committed to fixing all the issues relative to the new classroom as quickly as possible," and were not "do[ing] everything necessary to remediate online classroom."  In truth, for years Defendants had been engaging in rounds of layoffs of IT personnel needed to fix the online classroom's disruptions, and those disruptions had been constant for years.  *See* ¶¶63-69.  In addition to having depleted these necessary Company assets, Defendants also secretly sought to find an alternative system to replace the online classroom entirely.  *See* ¶¶94-101.

161.    Statements in ¶159 were also misleading.  The statements that Defendants were "using lots of data and analytics to track down the issues, to make sure [they] underst[oo]d what the issues" were; were "not guessing . . . as to what caused the disruption," "how this emanated," or "where the problems are"; had "a lot of data as to what caused the disruption" and "kn[e]w of the timing of when students dropped out"; and had "lots of communications going out to faculty and students about timelines and data so that they feel comfortable that this has been addressed, fixed and it won't be disrupted going forward" each, and in aggregate, gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.  Defendants' statements gave the impression that the disruptions were as recent and limited as Defendants stated publicly in October 2014 and January 2015, that "the majority of this disruption" was from "the explanation of the classroom," and that by January 2015 the issues were sufficiently resolved such that Defendants were

1    informing students and faculty that they had been "addressed" and "fixed."   In truth, the

2    disruptions had been constant and severe for years; the software was itself dysfunctional

3    and had been for years, as the issue was not merely the "explanation" of it to students;

4    and the chronic, unabated issues were so severe that Apollo was seeking to scrap the

5    online classroom entirely.  *E.g.*, ¶¶54-62, 70-81, 88-101.

6        162.   Defendants' statements above in ¶159 were also misleading at the time

7    because they omitted material facts that they were required to provide in order to make

8    their statements, in light of the circumstances under which they were made, not

9    misleading.  While Defendants represented that they had "specific data to show the

10   timelines" of the disruption and "kn[e]w the timing of when students dropped out," they

11   omitted that the timeline established material disruptions and dysfunction since the

12   inception of the new classroom that had been severe and unabated throughout the Class

13   Period, causing students to drop out for years before the January 8, 2015 statements.  *See*

14   ¶¶54-62, 70-81.  Defendants omitted the true severity of the disruptions, and continued to

15   omit the material negative effects of those disruptions on students and the Company.

16   Among other things, Defendants omitted (i) the facts from the December 2012 internal

17   report that the online classroom could not compete with what was already in the market,

18   or provide differentiation (¶¶71-72); (ii) there were at least 30-50 disruptions during the

19   rollout of the new classroom from mid-2012 to mid-2014 (¶73); (iii) the online classroom

20   was experiencing widespread outages, and students were prevented from logging in,

21   receiving course work and turning in assignments as early as 2013 (¶¶54-59); (iv)

22   students were dropping out because of frustration with the online classroom as early as

23   2013 (¶¶60-62); (v) long-lasting disruptions were most prevalent in late 2013 and early

24   2014 when there was the big push on the online classroom, and it was basically "an all

25   stop" until Apollo could address all of those issues (¶¶73-74); (vi) by mid-2014, the

26   problems with the online classroom were so severe that employees called on Cappelli to

27   bring the legacy program back (¶¶75-76); (vii) the rollout of Apollo's new learning

28   platform was not, in fact, completed as of May or June 2014 (¶¶77-80); (viii) the

Company's ability to resolve disruptions and other technical failures with the online classroom was compromised by Apollo's ongoing layoffs in the IT department (¶¶63-69); and (ix) Defendants secretly sought to find an alternative system to replace the online classroom entirely (¶¶94-101).

163.   Also on January 8, 2015, Apollo filed a Form 10-Q that included these statements:

> *Information Technology*. We have upgraded or are in the process of upgrading a substantial portion of our key IT systems, including our online student classroom, student relationship and communications management platform, and corporate applications, and retiring the related legacy systems. The transition from the legacy systems entails risk of unanticipated disruption, including in our core business functions. **University of Phoenix's new online student classroom, which was fully implemented in late June 2014**, has experienced technical challenges that in many cases have adversely impacted the user experience for our students.

164.   Statements in ¶163 were false.   As described above, the online classroom had not been "fully implemented in late June 2014"; instead, its rollout was delayed until later.   *See* ¶¶77-80.   Statements in ¶163 were also misleading.   The statement that the online classroom had experienced mere "technical challenges" gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at Apollo.   The online classroom had not merely had certain "technical challenges," but suffered from widespread, material, undisclosed disruptions and other failures such as broken links.

165.   Defendants' statements above in ¶163 were also misleading at the time because they omitted material facts that they were required to provide in order to make their statements, in light of the circumstances under which they were made, not misleading.   While Defendants represented the purported timing of the rollout, they omitted that the timeline established material disruptions and dysfunction since the inception of the new classroom that had been severe and unabated throughout the Class Period, causing students to drop out long before the January 8, 2015 statements, as

1  described above in ¶162.

2  **VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER**

3  166.   Numerous facts raise a strong inference that Defendants knew or were

4  deliberately reckless in disregarding the true facts when making the false and misleading

5  statements identified above.

6  167.   *The Individual Defendants spoke repeatedly about the Company's new*

7  *online classroom platform, assuring investors that they knew what they were talking*

8  *about.*   On numerous occasions both before and during the Class Period, Defendants

9  Cappelli and Swartz publicly spoke to investors and analysts about the Company's new

10  online classroom platform, providing purported status updates and assessments of the

11  online classroom's performance.   Defendants Cappelli and Swartz addressed investors on

12  this topic through a variety of media, including during investor conference calls, in SEC

13  filings, at industry events, and in press releases.   They repeatedly stated that the Company

14  had invested hundreds of millions of dollars in the new online classroom, and that they

15  were monitoring it with a wealth of available data.   Defendants' repeated emphasis on the

16  new classroom and assurances regarding its status show that they knew, or were

17  deliberately reckless in not knowing, that the problems with the new online classroom

18  were far worse than they represented, that the new classroom was riddled with technical

19  issues that negatively impacted student recruitment and retention, that the classroom was

20  not released on the schedule Defendants claimed, and that the Company took steps to

21  scrap the new classroom long before Apollo's choice of a third-party provider was

22  announced on June 29, 2015.

23  168.   *Defendants stated that they were personally focused on the new online*

24  *classroom, including the status and effects of its dysfunction.*   Before and during the Class

25  Period, Defendants stated that they closely monitored the Company's purported progress

26  in implementing the new online classroom, emphasizing how important the project was

27  to University of Phoenix.   For instance, Defendant Cappelli stated that the online

28  classroom was "our number one area of focus," and Defendant Swartz stated that senior

management was "very, very focused on . . . upgrading our learning management system and making sure that the process to learn for a student is seamless." Between October 2014 and March 2015, in particular, Defendants purported to provide up-to-date information on the current status of the new classroom and its impact on retention and new enrollments. On January 8, 2015, after over a year and a half of deep layoffs in the IT department, and after Apollo had taken substantial steps to scrap the new classroom entirely in favor of an off-the-shelf, third-party platform, Cappelli told investors that Defendants were deploying "every necessary asset" for the benefit of the new classroom. The Individual Defendants' personal "focus" on the new classroom further shows their knowledge of the true, undisclosed status of the dysfunctional new classroom during the Class Period.

169.   *Defendants received reports, data and extensive complaints regarding the new online classroom's pervasive dysfunction and impacts on student retention and enrollments.* As described above, the online classroom's dysfunction was not limited to a minor portion of the online classroom, but severely impacted the ability of thousands of students to participate in the University of Phoenix educational programs on a daily basis, leading to student dropouts. These widespread issues, including system blackouts, prompted students to submit numerous complaints, and prompted Apollo's technical teams to issue reports, including escalation reports, that were sent to Apollo's senior management, including Cappelli and Swartz. *See* ¶¶82-93, above. The problems with the online classroom were so severe that by mid-2014, Apollo employees were asking Cappelli directly at town hall meetings to return the Company to the legacy platform in lieu of the new online classroom. The Individual Defendants also admitted publicly that they received related "information from our technical assistance center," "pretty specific data to show the timelines" of the system dysfunction, and "a lot of data" about the issue. The Individual Defendants further stated that they used frequent, detailed data and "metrics" to monitor the "number one priority" of retention that was being impacted by the new classroom dysfunction, including updated "KPIs [*i.e.*, key performance

indicators] that we are on every single week with our team" and "cohort completion rates."  In addition, Defendants claimed in April 2014 that they had "recently put tools in place" to monitor dropouts and retention, including "a warning system" to detect and work to mitigate potential dropouts.

170.   *Defendants took undisclosed steps to replace the online classroom with a third-party off-the-shelf product*.  Defendants planned to replace the online classroom and took affirmative steps to replace it with the off-the-shelf Blackboard system in late 2013 and early 2014, long before the June 2015 disclosure of the replacement system.  *See* ¶¶94-101.  Apollo's executives admitted that the Company took such steps because the new online classroom was "no longer viewed as worthy of internal development and investment."  ¶124.  Apollo characterized the Blackboard system internally as "ancient" (*see* ¶101), but was forced to adopt Blackboard because of its "functionality" and "user experience" (¶124) – two areas in which Apollo's online classroom continued to experience widespread dysfunction.  These steps amounted to a drastic change in strategy after spending years and hundreds of millions of dollars on Apollo's proprietary online classroom.  Apollo's undisclosed steps to replace the new classroom with the Blackboard product further show that Defendants knew, or were deliberately reckless in not knowing, that their Class Period statements were false and misleading, and omitted material facts.

171.   *The new online classroom was critical to Apollo's core business.*  In its public filings with the SEC during the Class Period, Apollo consistently maintained that "[t]he majority of University of Phoenix students study exclusively online," and stated that "the proportion of the University's online students has increased over recent years." Moreover, Defendants recognized that the online classroom was crucial for each student, as "[a]ll of our students today, regardless if they are ground students or online students, get all of their content and all of their textbooks through our online learning management system."  Given the core importance of online students to Apollo's financial condition, the Company needed to "have new innovations that are available in the marketplace to differentiate [itself]" and the new online platform was a key initiative that Apollo planned

to use to differentiate itself amid increased competition.  *See, e.g.*, ¶¶27-42.  The amount of resources that Apollo devoted to the new online classroom further emphasizes how the online classroom was a "core" aspect of Apollo's business that Defendants monitored. On December 7, 2011, Defendant Cappelli emphasized to investors that "I told you we're spending $1 billion on the classroom of the future.  That's in our financials.  We've been pouring that money in there."  Apollo's huge monetary investment in the critical online classroom further shows that Defendants knew, or were deliberately reckless in not knowing, that their representations about the new online platform were false and omitted material facts.

172.  *Investor and analyst attention was focused on the Company's rollout of its new online classroom during the Class Period.*  During the Class Period, the Individual Defendants provided updates to analysts about the new online classroom because they knew that investors and analysts were acutely interested in the topic and frequently reported on it.  For example, on March 5, 2013, analysts from Deutsche Bank opined that Apollo had a "hidden tech asset . . . worth $2 to $6 per share," or as much as 37% of the Company's valuation.  After Defendants' disclosures on January 8, 2015, analysts reacted to the news, noting "investor frustration" around the "platform-related dropout issue." Analysts also reacted to Apollo's abandonment of the online classroom in favor of a third-party solution, noting that the Company's decision to use "off the shelf (vs proprietary) technology" was a "large change" for the Company and posed a "real risk that cost cuts reduce revenue and leave the company in a worse position."  With investor and analyst attention focused on the online classroom issues, Defendants had a heightened awareness of the issues and knew or were deliberately reckless in not knowing that their Class Period statements were false and misleading and omitted materials facts.

173.  *Defendant Swartz profited by selling an unusual amount of Company stock early at artificially inflated prices.*  On January 10, 2014, mere days before Apollo's stock price reached its Class Period high of $35.92 on January 22, 2014, Defendant

Swartz sold 50,500 shares of Apollo common stock for over $1.5 million. Following these sales, the price of Apollo's common stock declined, falling by approximately 80% to close at $7.19 at the end of the Class Period. In addition, Defendant Swartz reported no other sales of Apollo stock during the Class Period or at any time in the nearly two years prior to the Class Period.

## VII.   LOSS CAUSATION

174.   Defendants' materially false and misleading statements and omissions artificially inflated the price of Apollo common stock and maintained inflation in the stock price. Certain disclosures revealed to the market, on a piecemeal basis, the false and misleading nature of Defendants' statements and omissions.

175.   First, On January 8, 2015, new facts were revealed to the market that partially corrected Defendants' prior misrepresentations. During an investor conference call that day, Defendant Cappelli referred to his statements during the October 21, 2014 investor conference call, during which he had characterized a disruption in the online classroom as a "hiccup" and only "temporarily" "stopping out" some students due to a "few bugs" that did not affect a large part of the student body. On January 8, however, Cappelli stated that the disruption was due in part to the online classroom's flawed browser compatibility. In response to a question by Jerry Herman, an analyst at the firm Stifel Nicolaus, about how the new online platform had caused students to "drop out," Defendant Cappelli stated that, instead of students needing "training" on the system as Cappelli had previously stated, students were simply not "able to access the content, the course work, [or] the syllabus." Defendant Swartz stated that the "disruption . . . ha[d] impacted enrollment" by a large number: "approximately 7,000 incremental students." The Company also disclosed that its net revenue had declined "due to technical challenges associated with the new online student classroom." The price of the Company's securities declined in response to this news. On January 8, 2015, the price of Apollo stock dropped 13.5% to close at $27.55 per share on abnormally high volume, erasing over $465 million in shareholder value.

176.   <u>Second</u>, on March 25, 2015, new facts were revealed to the market that further corrected Defendants' prior misrepresentations.   During a March 25, 2015 investor conference call, Defendants provided additional information to investors about the disruption caused by the Company's new online platform that the Defendants had previously discussed on October 21, 2014 and January 8, 2015.   Defendants admitted that the disruption caused by the new online classroom was "significant."   Defendant Cappelli also told investors that "the technology platform issues . . . adversely impacted retention, and reduced the effect of [Apollo's] retention initiatives."   Defendants represented that the technology disruption was largely or wholly responsible for the drop in retentions, with Defendant Cappelli stating: "Are there other things that are driving decreases in retention?   We don't think so . . . ."   Defendant Cappelli further revealed that the technology disruption was impacting not just student retention, but also new enrollments. Apollo's Form 10-Q for the second quarter of 2015, filed with the SEC on March 25, 2015, reported the impact of the online platform disruption on Apollo's financial results. *See* ¶111.

177.   The additional revelations during the March 25, 2015 investor conference call and in the Company's Form 10-Q caused Apollo's stock price to decline further.   On March 25, 2015 and March 26, 2015, Apollo's stock price dropped over 30% to close at $19.21 per share, and the Company lost another $940 million of market capitalization.

178.   <u>Third</u>, after the market closed on June 29, 2015, new facts were revealed to the market that further corrected Defendants' prior misrepresentations.   On June 29, 2015, after the close of trading, Apollo filed with the SEC its Form 10-Q regarding financial results for the third quarter of 2015 and held an investor conference call to discuss those results.   Apollo disclosed for the first time that it planned to transition away from the new online classroom, and had instead contracted with a third party for an "off-the-shelf" platform.   The Company further reported a decrease in average degreed enrollment at the University of Phoenix of 13.9% for the nine months ended May 31, 2015, attributing the decrease in part to "[l]ower student retention due in part to the disruptions experienced by

our students using the University's new online classroom during fiscal year 2015."

179.   In response to the disclosures regarding the online classroom, the price of Apollo's stock fell precipitously.   On June 30 and July 1, 2015, Apollo's stock price declined nearly 20% on abnormally high volume as the market absorbed the Company's disclosures. In total, over $330 million in shareholder value was eliminated during these two trading days.

180.   Fourth, during an October 22, 2015 investor conference call, Defendants revealed the enrollment declines at the University of Phoenix, due in part to the dysfunction of the Company's online classroom.   Apollo further disclosed in its 2015 Form 10-K Annual Report, filed October 22, 2015, the impact that the disruption in the new online classroom had on New Degreed Enrollment, which dropped 15.6% in the quarter "due in part to the disruptions in the University's online classroom during fiscal year 2015."   Defendant Cappelli also provided additional detail about the Company's plans to abandon its $1 billion investment in its new online classroom in favor of a platform produced by a different company.

181.   Following these disclosures, the price of Apollo Class A common stock fell further, closing down $3.42 per share – or more than 32% – from a close of $10.60 per share on October 21, 2015 to a close of $7.19 per share on October 22, 2015, on unusually high volume of more than 14.2 million shares traded.

## VIII.   PRESUMPTION OF RELIANCE

182.   At all relevant times, the market for Apollo's common stock was efficient for the following reasons, among others:

   (a)   Apollo's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Exchange, a highly efficient and automated market;

   (b)   As a regulated issuer, Apollo filed periodic reports with the SEC and the NADAQ Stock Exchange;

   (c)   Apollo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Apollo was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

183.    As a result of the foregoing, the market for Apollo's common stock reasonably promptly digested current information regarding Apollo from all publicly available sources and reflected such information in the price of Apollo's common stock. All purchasers of Apollo common stock during the Class Period suffered similar injury through their purchase of Apollo common stock at artificially inflated prices, and a presumption of reliance applies.

184.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    **DEFENDANTS' DUTY TO DISCLOSE**

185.    As described above, Defendants Apollo, Cappelli, and Swartz had a duty to disclose the truth about Apollo's online classroom when speaking about it.  Before and throughout the Class Period, Defendants made a series of statements regarding the status and performance of Apollo's online classroom, and regarding the Company's devotion of resources to the online classroom.  Having chosen to speak positively about the online classroom's status, functionality, and resources, Defendants had a duty to disclose material facts necessary to make their statements not misleading.

### X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

186.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

187.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Apollo's online education software platform, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Apollo were not sufficient to insulate Defendants from liability for their materially false and misleading statements. Defendants' risk statements were also meaningless boilerplate, repeated verbatim and unchanged for years despite the undisclosed and developing facts regarding Apollo's online platform.  In addition, as described above, Defendants' risk statements were themselves misleading, including because they warned of certain events occurring that were, in truth, already occurring and harming Apollo's business.  *See* ¶¶153-55.

188.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Apollo who knew that the statement was false when made.

XI.    **CLASS ACTION ALLEGATIONS**

189.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Apollo between November 13, 2013 and October 21, 2015, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Apollo at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, including but not limited to Apollo's employee retirement and benefit plans, and any entity in which Defendants or their immediate families have or had a controlling interest.

190.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Apollo shares were actively traded on the NASDAQ Stock Exchange.  As of October 22, 2015, there were over 107 million shares of Apollo common stock outstanding.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of thousands of members of the proposed Class. Class members who purchased Apollo common stock may be identified from records maintained by Apollo or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

191.    Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

192.    Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

193.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c)     whether Defendants acted with scienter; and

(d)     the proper way to measure damages.

194.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act
And SEC Rule 10b-5 Promulgated Thereunder
(Against Defendants Apollo, Cappelli, And Swartz)**

195.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

196.    This Count is asserted on behalf of all members of the Class against Defendants Apollo, Cappelli, and Swartz for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

197.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

198.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:   (a) employed devices, schemes, and artifices to defraud; (b) made untrue

1    statements of material facts or omitted to state material facts necessary in order to make

2    the statements made, in light of the circumstances under which they were made, not

3    misleading; and/or (c) engaged in acts, practices, and a course of business that operated

4    as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their

5    purchases of Apollo common stock during the Class Period.

6            199.    Defendants, individually and in concert, directly and indirectly, by the use

7    of means or instrumentalities of interstate commerce and/or of the mails, engaged and

8    participated in a continuous course of conduct that operated as a fraud and deceit upon

9    Plaintiffs and the Class; made various untrue and/or misleading statements of material

10   facts and omitted to state material facts necessary in order to make the statements made,

11   in light of the circumstances under which they were made, not misleading; made the

12   above statements intentionally or with a deliberately reckless disregard for the truth; and

13   employed devices and artifices to defraud in connection with the purchase and sale of

14   Apollo common stock, which were intended to, and did: (a) deceive the investing public,

15   including Plaintiffs and the Class, regarding, among other things, Apollo's online

16   educational platform; (b) artificially inflate and maintain the market price of Apollo

17   common stock; and (c) cause Plaintiffs and other members of the Class to purchase

18   Apollo common stock at artificially inflated prices and suffer losses when the true facts

19   became known.

20           200.    Defendants Apollo, Cappelli, and Swartz are liable for all materially false

21   and misleading statements made during the Class Period, as alleged above.

22           201.    As described above, Defendants acted with scienter throughout the Class

23   Period, in that they acted either with intent to deceive, manipulate, or defraud, or with

24   deliberate recklessness.  The misrepresentations and omissions of material facts set forth

25   herein, which presented a danger of misleading buyers or sellers of Apollo stock, were

26   either known to the Defendants or were so obvious that the Defendants should have been

27   aware of them.

28           202.    Plaintiffs and the Class have suffered damages in that, in reliance on the

integrity of the market, they paid artificially inflated prices for Apollo common stock, which inflation was removed from its price when the true facts became known.  Plaintiffs and the Class would not have purchased Apollo common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

203.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Apollo common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Cappelli, Swartz, And Sperling)

204.   This Count is asserted on behalf of all members of the Class against Defendants Cappelli, Swartz, and Sperling for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

205.   During their tenures as officers and/or directors of Apollo, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶18-20.  By reason of their positions of control and authority as officers and/or directors of Apollo, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Apollo during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

206.   In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶18-20, Defendants Cappelli and Swartz had direct involvement in the day-to-day operations of the Company, in reviewing and managing its

regulatory and legal compliance, and in its reporting functions.  Defendants Cappelli and Swartz signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by Apollo during the Class Period.  Likewise, Defendant Sperling was Chairman of the Apollo Board of Directors and signed the Company's annual reports filed with the SEC on Form 10-K during the Class Period.  Mr. Sperling also held a majority of the Company's voting stock during the Class Period.  As a result of the foregoing, Defendants Cappelli, Swartz, and Sperling, as a group and individually, were controlling persons of Apollo within the meaning of Section 20(a) of the Exchange Act.

207.   As set forth above, Apollo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

208.   By virtue of their positions as controlling persons of Apollo and as a result of their own aforementioned conduct, Defendants Cappelli, Swartz, and Sperling are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Apollo securities.  As detailed above, during the respective times these Defendants served as officers and/or directors of Apollo, each of these Defendants was culpable for the material misstatements and omissions made by Apollo.

209.   As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Apollo common stock.

## XIII.  PRAYER FOR RELIEF

210.   WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

211.   Plaintiffs hereby demand a trial by jury.

Dated: March 9, 2017                    Respectfully submitted,

By: */s/ David R. Stickney*
           David R. Stickney

Blair A. Nicholas (*pro hac vice*)
David R. Stickney (*pro hac vice*)
Brandon Marsh (*pro hac vice*)
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
blairn@blbglaw.com
davids@blbglaw.com
brandon.marsh@blbglaw.com

*Counsel for Lead Plaintiff Government of Guam
Retirement Fund, and Lead Counsel for the Class*

Richard G. Himelrick
TIFFANY & BOSCO P.A.
2525 East Camelback Road, Seventh Floor
Phoenix, AZ 85016
Tel:    (602) 255-6000
rgh@tblaw.com

*Local Counsel for Lead Plaintiff Government
of Guam Retirement Fund and the Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonah H. Goldstein
Robert R. Henssler Jr.
Matthew Balotta
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel:    (619) 231-1058
jonahg@rgrdlaw.com
bhenssler@rgrdlaw.com
mbalotta@rgrdlaw.com

*Counsel for Additional Plaintiffs Rameses Te
Lomingkit and National Shopmen Pension Fund*

1

## CERTIFICATE OF SERVICE

2

    I hereby certify that on March 9, 2017, I electronically filed the foregoing paper

3

with the Clerk of the Court using the ECF system which will send notification of such

4

filing to the email addresses denoted in the Electronic Mail Notice List.

5

6                                             */s/ Ashley Lee*
                                              ASHLEY LEE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Joe T. San Agustin, on behalf of the Government of Guam Retirement Fund ("GGRF"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Chairman of GGRF.  I have reviewed a complaint filed in this matter.

2.  GGRF did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  GGRF is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. GGRF fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  GGRF's transactions in the Apollo Education Group, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.  GGRF has sought to serve and was appointed as a lead plaintiff on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of GGRF's prior Certification in this case dated May 3, 2016 (*see* ECF No. 36-1):

*Government of Guam Retirement Fund v. Invacare Corp.*, No. 13-cv-1165 (N.D. Ohio)

6.  GGRF will not accept any payment for serving as a representative party on behalf of the Class beyond GGRF's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this  8th  day of March, 2017.

Joe J San Agustin

Joe T. San Agustin
Chairman
*Government of Guam Retirement Fund*

**Government of Guam Retirement Fund**
**Transactions in Apollo Education Group, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 1/14/2014 | 416 | $31.2285 |
| Purchase | 1/15/2014 | 2,769 | $31.8421 |
| Purchase | 1/15/2014 | 484 | $31.9750 |
| Purchase | 1/16/2014 | 2,741 | $32.9989 |
| Purchase | 1/17/2014 | 1,864 | $33.6953 |
| Purchase | 1/21/2014 | 1,782 | $34.8697 |
| Purchase | 1/21/2014 | 1,367 | $35.0755 |
| Purchase | 1/22/2014 | 842 | $35.2862 |
| Purchase | 1/22/2014 | 1,919 | $35.2959 |
| Purchase | 1/23/2014 | 1,975 | $34.9103 |
| Purchase | 1/24/2014 | 2,313 | $33.7759 |
| Purchase | 1/24/2014 | 351 | $34.1587 |
| Purchase | 1/27/2014 | 2,737 | $32.9615 |
| Purchase | 1/27/2014 | 1,801 | $33.0515 |
| Purchase | 1/28/2014 | 1,464 | $33.1306 |
| Purchase | 1/29/2014 | 2,179 | $32.6446 |
| Purchase | 4/24/2014 | 700 | $28.0405 |
| Purchase | 8/26/2014 | 1,126 | $27.7260 |
| Purchase | 8/26/2014 | 785 | $27.7302 |
| Purchase | 8/27/2014 | 397 | $27.5317 |
| Purchase | 8/27/2014 | 408 | $27.5244 |
| Purchase | 8/28/2014 | 754 | $27.5504 |
| Purchase | 8/29/2014 | 1,424 | $27.7741 |
| Purchase | 9/2/2014 | 1,551 | $28.1481 |
| Purchase | 11/13/2014 | 803 | $29.3715 |
| Purchase | 11/14/2014 | 28 | $29.5400 |
| Purchase | 11/14/2014 | 42 | $29.5632 |
| Purchase | 11/17/2014 | 65 | $29.4998 |
| Purchase | 11/17/2014 | 299 | $29.4750 |
| Purchase | 11/18/2014 | 1,202 | $29.4900 |
| Sale | 4/8/2015 | (81) | $17.7250 |
| Sale | 4/8/2015 | (615) | $17.7620 |
| Sale | 4/8/2015 | (319) | $17.7585 |
| Sale | 4/9/2015 | (2,029) | $17.4997 |
| Sale | 4/10/2015 | (3,607) | $17.1145 |
| Sale | 4/13/2015 | (3,817) | $16.7639 |
| Sale | 5/8/2015 | (195) | $17.3214 |
| Sale | 5/8/2015 | (194) | $17.2673 |
| Sale | 5/8/2015 | (988) | $17.2750 |
| Sale | 5/8/2015 | (618) | $17.1445 |
| Sale | 5/11/2015 | (2,136) | $17.2884 |
| Sale | 5/11/2015 | (1,237) | $17.3250 |
| Sale | 5/11/2015 | (1,088) | $17.2707 |
| Sale | 5/12/2015 | (1,878) | $16.9173 |

**Government of Guam Retirement Fund**
**Transactions in Apollo Education Group, Inc.**

| Transaction | Date | Shares | Price |
| --- | --- | --- | --- |
| Sale | 5/13/2015 | (1,236) | $16.9165 |
| Sale | 5/13/2015 | (208) | $17.0009 |
| Sale | 5/14/2015 | (1,029) | $16.7557 |
| Sale | 5/18/2015 | (109) | $16.5739 |
| Sale | 5/19/2015 | (99) | $16.5550 |
| Sale | 5/19/2015 | (85) | $16.5000 |
| Sale | 5/20/2015 | (575) | $16.3134 |
| Sale | 5/21/2015 | (1,052) | $16.4718 |
| Sale | 5/22/2015 | (458) | $16.5088 |
| Sale | 5/26/2015 | (546) | $16.1862 |
| Sale | 5/26/2015 | (115) | $16.1750 |
| Sale | 5/27/2015 | (698) | $16.4617 |
| Sale | 5/28/2015 | (711) | $16.5679 |
| Sale | 5/29/2015 | (1,090) | $16.6049 |
| Sale | 6/1/2015 | (197) | $16.8522 |
| Sale | 6/3/2015 | (288) | $17.1709 |
| Sale | 6/4/2015 | (1,530) | $16.7112 |
| Sale | 6/4/2015 | (960) | $16.7754 |
| Sale | 6/5/2015 | (2,038) | $16.6475 |
| Sale | 6/8/2015 | (1,279) | $16.6140 |
| Sale | 6/9/2015 | (1,804) | $16.6174 |
| Sale | 6/10/2015 | (1,679) | $16.6142 |