**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Rameses Te Lomingkit, et al.,

Plaintiffs,

v.

Apollo Education Group Incorporated, et al.,

Defendants.

No. CV-16-00689-PHX-JAT

**ORDER**

Pending before the Court are: Defendants' Motion to Dismiss [Plaintiffs'] Second Amended Complaint (the "Motion") for failure to state a claim pursuant to Federal Rules of Civil Procedure (the "Federal Rules") 8(a), 9(b), and 12(b)(6), (Doc. 88), and Defendants' Request for Judicial Notice in Support of Moving Defendants' Motion to Dismiss, (the "Request," Doc. 88 at 7 n.3; *see also* Docs. 63; 64). Plaintiffs have filed their Response, (Doc. 90), and Defendants have filed their Reply, (Doc. 91). The Court now rules on Defendants' Motion and Request.

## I. BACKGROUND[1]

[1] Defendants have again submitted a request for judicial notice of the following: (1) documents filed with the SEC; (2) investor communications, including transcripts from investor conference calls and conferences; and (3) publicly available news reports. (Docs. 63; 64). While a motion to dismiss is ordinarily limited to the allegations in the complaint, other documents may be considered if their "'authenticity . . . is not contested' and the plaintiff's complaint necessarily relies on them." *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998)). Plaintiffs do not dispute the authenticity of Defendants' aforementioned submitted exhibits; however, not all exhibits are referenced in Plaintiffs' SAC, and, thus, the SAC does not necessarily rely on many of the exhibits. Therefore, the Court will only consider, under the incorporation-by-reference doctrine, Defendants' Exhibits 2–9, 11–

This is a consolidated class action proceeding. Defendant Apollo Education Group, Inc. ("Apollo") is an Arizona-based company that owns and operates proprietary postsecondary educational institutions and is one of the largest private education providers in the world. (Doc. 82, Plaintiffs' [Second] Amended Class Action Complaint for Violations of the Federal Securities Laws, ("SAC"), at ¶ 1). In particular, University of Phoenix ("UOP") is Apollo's largest university, accounting for approximately 90% of Apollo's total enrollment and revenues. (*Id.*). The remaining Defendants are various individuals who served as Apollo's officers and directors between November 13, 2013 and October 21, 2015 (the "Class Period"). In particular, Defendant Peter Sperling served as Chairman of the Apollo Board of Directors throughout the Class Period, (*id.* at ¶ 20); Defendant Gregory Cappelli served as Apollo's CEO and a member of Apollo's Board of Directors throughout the Class Period, (*id.* at ¶ 18); and Defendant Brian Swartz served as a Senior Vice President and the CFO of Apollo until May 15, 2015, (*id.* at ¶ 19). Plaintiffs purchased Apollo stock during the Class Period. (*Id.* at ¶¶ 14–16).

The Court previously dismissed Plaintiffs' Consolidated Class Action Complaint (the "CAC"), finding that Plaintiffs failed to state a claim upon which relief could be granted because they failed to meet the standard for pleading securities fraud. (*See* Doc. 80). Specifically, the Court found that Plaintiffs failed to adequately plead that Defendants made a false or misleading statement. Plaintiffs then amended their CAC, (Doc. 82), and Defendants now seek to dismiss Plaintiffs' SAC. (Doc. 88).

In 2009, Apollo determined that UOP's software for students was outdated and formulated plans to "rebuild" UOP's "online learning environment from scratch." (SAC at ¶ 30). This software—referred to as the "online classroom"—was used by all UOP students, whom relied on the platform to "access their [UOP] accounts,

13, and 15–21, each of which the SAC references. (*See* Docs. 64-1 at 195–1190; 64-2 at 1–21, 50–223). The Court will also take judicial notice of Defendants' Exhibit 1, (Doc. 64-1 at 1–194). (*See* Doc. 80 at 1 n.1); *see also City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1107–08 (E.D. Wash. 2013) (describing the differences between the incorporation-by-reference doctrine and the concept of judicial notice).

receive . . . educational content for their courses, and turn in their assignments." (*Id.* at ¶ 29). Plaintiffs allege that the successful upgrade of the online classroom platform was "critically important" to Apollo's financial success, and Apollo had plans to sell the technology to other universities.[2] (*Id.* at ¶¶ 29, 32).

However, the upgrades experienced multiple disruptions "from mid-2012 to mid-2014." (*Id.* at ¶¶ 4, 73). These disruptions included widespread blackouts, in which users were unable to login to the platform. (*Id.* at ¶¶ 4, 56). The online classroom disruptions were further "exacerbated" by "rounds of significant layoffs" within Apollo's IT department from 2013 to 2015. (*Id.* at ¶¶ 63–69). Plaintiffs allege that Defendants and Apollo representatives made a number of false and/or misleading statements during and after the rollout of Apollo's online classroom upgrades.

### A. Statements on November 13, 2013

On November 13, 2013, Apollo presented at the JPMorgan Ultimate Services Investor Conference. (*Id.* at ¶ 126). During the presentation, Defendant Swartz stated the following:

> Beyond our Education of Careers initiative, we've also made some significant enhancements to the student experience. I want to talk about two of those. The first is our new classroom, or our new learning platform, as we refer to, and secondly Adaptive Learning, in just a moment. Regarding the new classroom, we want to offer a superior classroom experience for the student. We want it to be second to none. Just as an example, the new classroom as exist[s] today . . . actually delivers personalized learning to individual students, and it allows us to gather data on what's working, and as importantly what's not working for students. . . . We watch very closely for attendance and how student behavior occurs after each assignment within each class. The new platform is actually rolled out to all of our graduate students today. We have a staggered roll out for all of our undergraduates over the course of fiscal 2014. . . .
>
> In the last few years, we have invested over $1 billion in our learning and service platforms and data platforms at the

[2] For simplicity, the Court refers to the legacy online classroom as the "old classroom" and the replacement online classroom as the "new classroom." (*See* SAC at ¶ 58 n.10 ("Internally at Apollo, the new online classroom that was being developed was referred to as 'new classroom,' while the then-current online classroom it was replacing was referred to as 'old classroom.'")).

> [UOP].

(*Id.* (emphasis omitted)).

Defendant Swartz also promoted the online classroom in a slide presentation, which highlighted the online classroom's "management and delivery of course materials" to students and characterized the classroom as "simple," "efficient," and "personal." (*Id.* at ¶ 129). A slide in the presentation also stated that the new classroom provided "[i]ndividualized learning pathways, reports, notifications and recommendations" and possessed "[c]apabilities and features to keep students on track and motivated." (*Id.*).

**B. Statements on March 11, 2014**

On March 11, 2014, Apollo presented at the Credit Suisse Global Services Conference. (*Id.* at ¶ 132). During the presentation, Beth Coronelli, Apollo's Vice President of Investor Relations, described the new classroom as follows:

> [I]f there seems to be an issue through the new classroom, they can – if a student is having issue[s] – the faculty member or the student advisor can step in and see what's happening. So it's – like I said, it's a lot of different things that are pulled together to create an ecosystem or a culture around retention.

(*Id.* (emphasis omitted)). Ms. Coronelli also promoted the new classroom in a slide presentation, featuring a slide that included much of the same content as the slide utilized by Defendant Swartz in his November 13, 2013 presentation. (*Id.* at ¶ 135).

**C. Statements on April 8, 2014**

On April 8, 2014, Apollo held an investor meeting. (*Id.* at ¶ 138). During the meeting:

> (1) Defendant Cappelli stated that Apollo was "rolling out a new learning platform. It's exciting. It has tools that faculty members and students have never had before and other new retention initiatives to support the success of our students." (*Id.* (emphasis omitted)).
>
> (2) Jerrad Tausz, UOP's Chief Operating Officer, stated, "I really think [the new classroom] makes things simple for the students. It is an intuitive system that we allow a lot more multimedia, a lot more engagement and interaction in the online classroom as well its components can be used in the ground classroom as well to interact with both the faculty members as well as other students." (*Id.* (emphasis omitted)).

**D. Statements on June 25, 2014**

On June 25, 2014, Apollo published a press release announcing the company's financial results for the third quarter of 2014. (*Id.* at ¶ 141). The press release quoted Defendant Cappelli as stating that "[d]uring the third quarter, we . . . completed the rollout of our new learning platform across the university." (*Id.* (emphasis omitted)). Apollo also held an investor conference call, in which Defendant Cappelli stated, "We're also pleased to report that nearly all students in the [UOP] are now being served by our new learning platform, which has been greatly enhanced and provides a more efficient and user friendly experience." (*Id.* at ¶ 142 (emphasis omitted)).

**E. Statement on September 18, 2014**

On September 18, 2014, Apollo presented at the BMO Capital Markets 14th Annual Back to School Education Conference. (*Id.* at ¶ 145). During the conference, Defendant Swartz stated that Apollo was "very, very focused on looking at both the service model as well as the learning model, upgrading our learning management system and making sure that the process to learn for a student is seamless." (*Id.* (emphasis omitted)).

**F. Statements on October 21, 2014**

On October 21, 2014, Apollo held an investor conference call. (*Id.* at ¶ 148). During the call:

> (1) Defendant Cappelli informed investors that Apollo "recently experienced a short-term disruption with the massive student conversion from our old online classroom to our new significantly updated learning platform." (*Id.* (emphasis omitted)).
>
> (2) Defendant Cappelli stated that "there's additional training that needs to be done" and "[t]here's a few bugs and things in the system that are being worked out." (*Id.* (emphasis omitted)).
>
> (3) Defendant Cappelli also stated that Apollo "probably had some students stop out temporarily because of some of the issues. This is not a huge part of the student body by any means. It's reasonable. We have a team on it. We expect it will get fixed over the near term." (*Id.* (emphasis omitted)).
>
> (4) Defendant Cappelli finally stated that

> "retention[] . . . [has] been our number one goal. It's interesting, so many good things happening on retention, you can have a small hiccup in something like the platform to get a temporary setback." (*Id.* at ¶ 150 (emphasis omitted)).

On the same day, Apollo filed its Form 10-K for 2014 with the SEC. (*Id.* at ¶ 153). The Form 10-K included the following risk warnings:

> (1) "From time to time we experience intermittent outages of the information technology systems used by our students and by our employees, including system-wide outages. Any computer system error or failure, regardless of cause, could result in a substantial outage that materially disrupts our online and ground operations." (*Id.*).
>
> (2) "Although these new systems are expected to improve the productivity, scalability, reliability and sustainability of our IT infrastructure, the transition from the legacy systems entails risk of unanticipated disruption or failure to fully replicate all necessary data processing and reporting functions, including in our core business functions." (*Id.* (emphasis omitted)).
>
> (3) "Any disruption in our IT systems, including any disruptions and system malfunctions that may arise from our upgrade initiative, could significantly impact our operations, reduce student and prospective student confidence in our educational institutions, adversely affect our compliance with applicable regulations and accrediting body standards and have a material adverse effect on our business and financial condition." (*Id.* (emphasis omitted)).
>
> (4) "[T]he transition from the legacy systems entails risk of unanticipated disruption or failure to fully replicate all necessary data processing and reporting functions, including in our core business functions, that could adversely impact our business." (*Id.* (emphasis omitted)).

### G. Statement on November 12, 2014

On November 12, 2014, Apollo presented at the JPMorgan Ultimate Services Investor Conference. (*Id.* at ¶ 156). During the presentation, in response to a question regarding whether the online classroom upgrades were "really [a] differentiating kind of proposition for students," Ms. Coronelli responded, "Absolutely. Yes, it is. From a standpoint of the classroom it is -- it is not just an upgrade. It was a complete new classroom" that was "an overall improved experience from that perspective." (*Id.* (emphasis omitted)).

**H. Statements on January 8, 2015**

On January 8, 2015, Apollo announced a larger-than-expected drop in enrollment, attributable, in part, to the online classroom disruptions. (*Id.* at ¶ 7). That same day, the price of Apollo's stock fell by approximately 13.5% to close at $27.55 per share. (*Id.* at ¶¶ 7, 175). Also on January 8, 2015, Apollo held an investor conference call. (*Id.* at ¶ 159). During the call:

> (1) Defendant Cappelli stated that Apollo was "100% committed to fixing all the issues relative to the new classroom as quickly as possible, and, in fact our teams have already made substantial progress. We're on track with our plan to aggressively address the technical issues related to the classroom and have also accelerated future enhancements." (*Id.* (emphasis omitted)).
>
> (2) Defendant Cappelli stated, "[w]e, obviously, learned some valuable lessons along the way, but we put every necessary asset on [the online classroom upgrade]. It's our number one area of focus, it has, obviously, caused disruption." (*Id.* (emphasis omitted)).
>
> (3) Defendant Cappelli, referencing the problems of the new classroom upgrade, stated, "[w]e are not guessing in terms of how this emanated, where the problems are, what it did to NPS scores or student disruption. We have lots of communications going out to faculty and students about timelines and data so that they feel comfortable that this has been addressed, fixed and it won't be disrupted going forward. . . . [W]e are not guessing, we have a lot of data as to what caused the disruption. We know the timing of when students dropped out." (*Id.* (emphasis omitted)).
>
> (4) Defendant Cappelli further stated, "[s]o, again, we are using lots of data and analytics to track down the issues, to make sure we understand what the issues are, and we will certainly continue to do everything necessary to remediate that." (*Id.* (emphasis omitted)).
>
> (5) Defendant Cappelli finally stated "the majority of this disruption we feel very confident is from the explanation of the classroom." (*Id.* (emphasis omitted)).

On the same day, Apollo filed its Form 10-Q with the SEC. (*Id.* at ¶ 163). The Form 10-Q stated that "[UOP's] new online student classroom, which was fully implemented in late June 2014, has experienced technical challenges that in many cases have adversely impacted the user experience for our students." (*Id.* (emphasis omitted)).

## II. LEGAL STANDARD

To survive a Federal Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Federal Rule 8(a)(2). Federal Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facial plausibility exists if the pleader sets forth factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Plausibility does not equal "probability," but requires more than a sheer possibility that a defendant acted unlawfully. *Id*. "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (citing *Twombly*, 550 U.S. at 557).

Although a complaint attacked for failure to state a claim does not need detailed factual allegations, the pleader's obligation to provide the grounds for relief requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Federal Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief," as "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id*. at 555 n.3 (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1202, at 94–95 (3d ed. 2004)). Thus, Federal Rule 8's pleading standard demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In ruling on a Federal Rule 12(b)(6) motion to dismiss, a court must construe the

facts alleged in the complaint in the light most favorable to the drafter and must accept all well-pleaded factual allegations as true. *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000); *see also Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1053 (9th Cir. 2011). However, a court need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III. ANALYSIS

Defendants move to dismiss Plaintiffs' Section 10(b) claims because the SAC fails to adequately plead any actionable misstatements and scienter. (Docs. 88; 91). Defendants also move to dismiss Plaintiffs' Section 20(a) claims on the grounds that the SAC fails to adequately allege a primary violation under Section 10(b).

### A. Section 10(b) Claims

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (2012), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2017), prohibit fraudulent activities in connection with securities transactions. Specifically, Section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 describes certain types of behavior proscribed by the statute, including:

> mak[ing] any untrue statement of a material fact or [omitting] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b-5(b).

Plaintiffs asserting a claim under Section 10(b) and Rule 10b-5 must adequately allege six elements: (1) a material misrepresentation or omission by the defendants; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)). Moreover, plaintiffs must satisfy the significantly heightened pleading requirements of Federal Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u (2012). *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014). Federal Rule 9(b) requires that complaints "state with particularity the circumstances constituting fraud or mistake." In other words, the complaint must specifically "identify[] the statements at issue[,] what is false or misleading about [each] statement[,] and why the statements were false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). The PSLRA requires plaintiffs to plead both falsity and scienter with particularity. *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1200 (2013); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). In particular, a complaint alleging that defendants made false or misleading statements must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' [*id.*] § 78u-4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).

**1. False and/or Misleading Statements**

Plaintiffs' underlying theory is that Defendants allegedly misled investors regarding the implementation of Apollo's online classroom upgrades by withholding information Defendants knew when they made various statements. (SAC at ¶¶ 27–81). Because of this misleading and/or omitted information, Plaintiffs allege that they purchased Apollo common stock at artificially inflated prices. (*Id.* at ¶ 2).

Plaintiffs must allege falsity in light of "specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545

(9th Cir. 1994)). "A court evaluates defendants' alleged false statements in the context in which they were made, especially in regard to contemporaneous qualifying or clarifying language." *Xu v. Chinacache Int'l Holdings Ltd.*, No. 2:15-cv-7952-CAS (RAOx), 2016 WL 4370030, at *5 (C.D. Cal. Aug. 15, 2016) (citing *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996)). In other words, plaintiffs must "demonstrate that a particular statement, when read in light of all the information then available to the market . . . conveyed a false or misleading impression." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any or all material information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011). Rather, disclosure is required under these provisions only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). In other words, plaintiffs cannot simply allege that an omission was material to properly allege falsity; rather, plaintiffs must show that the omission actually renders *other* statements misleading. *In re Rigel Pharms.*, 697 F.3d at 880 n.8. "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45. Alternatively, various statutes or regulations may create an affirmative duty to disclose information even when no statements made by a defendant are false and misleading. *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1480 (N.D. Cal. 1992).

Defendants seek to dismiss the SAC because Plaintiffs have failed to properly allege that Defendants made any false and/or misleading statement. In particular, Defendants argue that each alleged statement is inactionable for one or more of the following reasons: (1) the statements are generally not false or misleading based on Plaintiffs' factual allegations; (2) the statements are corporate puffery; (3) the statements

are risk warnings; and (4) Defendants had no duty to disclose omitted information because no statement was false or misleading by itself. (*See* Docs. 88; 91). The Court analyzes the alleged misrepresentations included in the SAC to determine whether the SAC includes detailed allegations compelling the inference that each statement was false or misleading. *See Lloyd*, 811 F.3d at 1206.

Before analyzing each alleged false or misleading statement, however, the Court notes that Plaintiffs, in amending their CAC, failed to comply completely with the Court's February 16, 2017 Order. (*See* Doc. 80). In granting Plaintiffs leave to amend, the Court cautioned Plaintiffs as follows:

> The Court notes that the CAC in this case alleges over 115 assertions that Plaintiffs seemingly purport to put in the false and misleading category. If Plaintiffs choose to amend, Plaintiffs must distinguish on a factual-assertion-by-factual-assertion basis why each expressly alleged assertion is false and misleading. In other words, Plaintiffs must distinguish between statements they have included as background or context and actionable assertions. For each statement Plaintiffs claim (on an assertion-by-assertion basis) to be false and misleading, Plaintiffs must allege with particularity how that specific statement is false and misleading.

(*Id.* at 43). The Court's warning was a response to Plaintiffs' pleading strategy, "which merge[d] a variety of statements by Defendants or Apollo representatives into one paragraph and then formulaically list[ed] the information omitted from such statements." (*Id.* at 19). Such a pleading strategy—in which Plaintiffs only stated why a statement was *incomplete* rather than false or misleading—"fail[ed] to meet the heightened pleading standards of the PSLRA." (*Id.*). The Court further informed Plaintiffs that "[i]t is not the Court's responsibility to determine why each statement was false and misleading, potentially giving rise to Defendants' duty to disclose additional information." (*Id.*).

In the SAC, Plaintiffs have largely abandoned the erroneous pleading strategy present in the CAC; however, Plaintiffs continue to allege purportedly actionable statements while failing to provide explicit reasons why the statements are false or misleading. For example, Plaintiffs allege that the following statements were misleading:

> The industry has changed a lot in the last five years for sure. We at Apollo have changed as well. We've become them

> [*sic*] much more leaner, nimbler organization, and we're introducing new products to market faster. ***In the last few years, we have invested over $1 billion in our learning and service platforms and data platforms at the [UOP]***.

(SAC at ¶¶ 126, 127 (emphasis in original)). Plaintiffs provide no explanation why these statements—especially the bolded and italicized sentence—are misleading beyond an allegation that the statement "omitted material facts."[3] (*Id.* at ¶¶ 127, 128). Given the Court's specific instructions that Plaintiffs must state why each assertion is false or misleading, *see Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (recognizing that Rule 10b-5 has no "freestanding completeness requirement"), and that Plaintiffs must "distinguish between statements they have included as background or context and actionable assertions," (Doc. 80 at 43), the Court finds Plaintiffs have not entirely complied with its earlier instructions. The Court will not attempt to *sua sponte* propose reasons why any of Defendants' statements are false or misleading and, thus, will not consider whether statements are actionable unless Plaintiffs explicitly provided a basis for why a statement was false or misleading.[4]

---

[3] Plaintiffs note in their Response that many statements included in the SAC "provide complete ***context*** for the actual misstatements (as instructed in the [Court's] Order)." (Doc. 90 at 9). Because it is puzzling why contextual statements would be bolded and italicized in the SAC—as the language in ¶ 126 is—the Court is left to guess what statements Plaintiffs intend to be actionable and what statements Plaintiffs intend to be mere context. Thus, the only way the Court can determine whether Plaintiffs intended for a statement to be actionable—versus contextual—is whether Plaintiffs actually provided a basis for why a statement was false or misleading.

[4] Plaintiffs fail to provide a specific basis for why many of the other alleged statements—all of which are partially or fully bolded and italicized in the SAC—are false or misleading. (*See, e.g.*, SAC at ¶¶ 132 ("The bottom line, ***back to looking at our strategy about differentiation***, it all comes to, at the end of the day, down to the student learning experience. And what that means is, how do you create a personalized, simple – we provide – ***we're rolling out a new classroom tied around the syllabus***."), 149 ("Yes, no it's really related – it ticked up just a little bit, very, very slightly, ***simply because our new enrollment trends have improved***."), 159 ("***I'll also provide clarity on the disruption related to the implementation of our new classroom, which has impacted enrollment, and obviously our business outlook for 2015. I'll then provide a bit more color on the substantial progress we've made fixing the issues*** and turn the call over to Brian."), 159 ("***As I mentioned last quarter, the [UOP] recently completed and rolled out a new modernized classroom which was a massive undertaking***."), 159 ("***It's our number one area of focus, it has, obviously, caused disruption***."), 159 ("***We're meeting the timeliness of the deadlines we've set to fix the issues at hand and expect better results going forward and we have a lot of data***."), 159 ("***We have information from***

**a. Deficiencies in Underlying Factual Allegations**

Defendants first argue that Plaintiffs' identified statements are not false or misleading because of deficiencies in Plaintiffs' underlying factual allegations.

Plaintiffs rely on statements from 12 witnesses[5] to support their allegations that Defendants falsely misled investors regarding problems with the online classroom. However, many of these witness statements fail to render any of Defendants' statements false or misleading. *See, e.g., In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 761–62 (D. Ariz. 2006) (noting a securities fraud "complaint *must* allege specific facts regarding the fraudulent activity, such as the time, date, place and content of the alleged fraudulent representation, *how or why* the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud" (emphasis added) (quoting *In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 WL 966291, at *8 (N.D. Cal. Apr. 29, 2004))). Particularly, many witness statements lack clarity and objective indicators by which the Court can determine compliance with the PSLRA's pleading requirements. *See Zucco Partners*, 552 F.3d

---

***our technical assistance center of when things spiked up, what that information was about, why there was frustration***."), 159 ("***It's hard to say exactly if it has had any impact on new students. You're talking about the classroom issue, but most of the impact, Trace, we believe has come with existing students who are actually pretty well into their courses***.")).

[5] Confidential Witness ("CW") 1 was Apollo's Release Engineer from January 2012 to mid-October 2015, (SAC at ¶ 55 n.6); CW 2 was Apollo's IT Engineering Manager and Release Manager from October 2011 to July 2014, (*id.* at ¶ 55 n.7); CW 3 was UOP's Enrollment Manager from October 2009 to June 2015 and a UOP Enrollment Counselor from July 2006 to September 2009, (*id.* at ¶ 55 n.8); CW 4 was Apollo's Principal Systems Engineer from January 2012 to October 2015, (*id.* at ¶ 58 n.9); CW 5 was Apollo's Director of Client Engagement from June 2012 to August 2013, (*id.* at ¶ 58 n.11); CW 6 was Apollo's National Defense Liaison from March 2012 to June 2014, (*id.* at ¶ 60 n.12); CW 7 was UOP's Military Enrollment Advisor and National Defense Liaison from April 2009 to June 2013, (*id.* at ¶ 60 n.13); CW 8 was Apollo's Software Release Engineer from 2011 to September 2015, (*id.* at ¶ 61 n.14); CW 9 was UOP's Manager of Operational Development, Business Technology Integration from February 2012 to January 2016, (*id.* at ¶ 68 n.15); CW 10 was Apollo's Business Intelligence Development Manager from November 2012 to February 2015, (*id.* at ¶ 75 n.16); CW 11 was UOP's Compliance Officer and Director of Operations, Financial and Student Services from January 2008 to November 2013, (*id.* at ¶ 88 n.18); CW 12 was UOP's Executive Enrollment Sales Representative from September 2006 to November 2015, (*id.* at ¶ 88 n.19).

at 995 (requiring courts to "look to 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia'" (quoting *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005))); *see also Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008) (requiring a plaintiff to allege "objective indicators" to bolster the plausibility of a confidential witness's observations when those observations are conclusory).

The Ninth Circuit Court of Appeals (the "Ninth Circuit") discussed the required level of particularity in factual allegations in *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086–87 (9th Cir. 2002), *partially abrogated on other grounds as recognized in S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). The *Vantive* court held that the plaintiffs failed to sufficiently allege any of the defendant's statements were false or misleading; in particular, with regard to whether the defendant's statement that "the growth and performance of its direct sales force was 'on plan,'" *id.* at 1086, the *Vantive* court noted the following:

> [T]he complaint leaves unclear what it would mean for [the defendant] to 'adequately train' an employee, what 'sufficient numbers' of hires would be, or what it means for 'a substantial percentage' of people to quit. Nor does the complaint indicate how these facts would necessarily show that [the defendant's] statement that its hiring was 'on plan' was misleading and deliberately reckless at the time it was made. The complaint also does not indicate what it means for a management team to be 'extremely strong,' what the 'continual' disagreements that supposedly 'plagued' the managerial team consisted of, or why such disagreements would make it misleading for the company to have characterized its management as being 'strong.'

*Id.* at 1086–87 (footnote omitted) (citing *Ronconi*, 253 F.3d at 432). The *Vantive* court concluded, "[i]n the absence of greater particularity, 'we have no way of distinguishing [the plaintiffs'] allegations from the countless 'fishing expeditions' which the PSLRA was designed to deter.'" *Id.* at 1087 (quoting *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)).

Here, Plaintiffs' factual allegations suffer from the same deficiencies as the *Vantive* plaintiffs. Particularly, Plaintiffs' allegations fail because of three types of deficiencies: (1) general failure of factual allegations to render Defendants' alleged misstatements false or misleading; (2) lack of precise meaning in terms used by Defendants and Plaintiffs' witnesses; and (3) lack of sufficient temporal proximity between witness observations and Defendants' statements. The Court will analyze statements falling under each deficiency in turn.

**i. Deficient Factual Allegations**

First, Plaintiffs' factual allegations fail to render a number of Defendants' statements false or misleading. For example, Plaintiffs allege that Defendant Swartz misleadingly stated that the new classroom was a "significant enhancement[] to the student experience." (SAC at ¶¶ 126, 127). For this statement to be misleading, Plaintiffs must plead particular facts related to the student experience at UOP *before* the implementation of the new classroom to support a conclusion that the new classroom was not a "significant enhancement."[6] *See In re Daou*, 411 F.3d at 1016.

Plaintiffs cite indiscriminately to 15 paragraphs in the SAC to support their allegations that Defendant Swartz's statement was misleading. (*See* SAC at ¶ 127 (citing *id.* at ¶¶ 54–62, 70–73, 88–89)). The Court will summarize the relevant factual allegations. CW 8 alleges that she took classes on both the "legacy platform" and the "new classroom" and "concluded that the new online classroom was 'by far' worse than the legacy system." (*Id.* at ¶ 62). CW 8 also concluded that it was "not a fair statement" to say that the new classroom was "greatly enhanced." (*Id.*). CW 4 took classes on both platforms and stated "it took her longer to do everything" on the new classroom. (*Id.*). Further, CW 4 recalled a time when the new classroom "went down for a couple of days" while anyone "on the old classroom . . . was still able to work." (*Id.* at ¶ 58). Finally, CW 5 stated "there were a number of general complaints about the online classroom

[6] The Court notes that it also finds this statement inactionable because the term "significant enhancement" is corporate puffery. *See infra* Section III.A.1.b.

feature sets compared to how the legacy platform had worked." (*Id.* at ¶ 62).

None of these statements, individually or in aggregate, renders the statement that the new classroom was a "significant enhancement" to the student experience misleading. Plaintiffs allege mere conclusory opinions by two students and "general complaints" about the new system. Missing from the SAC is comparative information, such as the number and substance of "general complaints" about the old classroom or any other objective data that could allow the Court to conclude Plaintiffs plausibly alleged that the new classroom was *not* a "significant enhancement" to the student experience. Even the alleged incident of the new classroom being "down" while the old classroom was available fails to address that the new classroom might have still been a "significant enhancement[] to the student experience" despite the downtime. Further, elsewhere in the SAC, CW 2 appears to state that *both* the new classroom and old classroom were down "quite a number of times." (*See id.* at ¶ 59). Thus, similar to the plaintiffs in *Vantive*, Plaintiffs must plead greater particularity for the Court to find that the SAC plausibly alleges that Defendants' statements were false or misleading.[7]

A second example of this pleading deficiency relates to Defendant Cappelli's statement that "there's additional training that needs to be done." (*Id.* at ¶ 148; *see also id.* at ¶ 159 ("[T]he majority of this disruption we feel very confident is from the explanation of the classroom.")). Plaintiffs insist that no amount of training could fix the problems with the new classroom and, instead, this statement misleadingly attributed the

---

[7] The Court similarly finds additional statements that Plaintiffs fail to properly allege were false or misleading. (*See, e.g.*, SAC at ¶¶ 127 (failing to allege that the new classroom did *not* allow Defendants to "gather data"), 127 (failing to allege that Defendants did not "watch very closely"), 133 (failing to allege that a faculty member or student advisor could not "step in and see what's happening"), 139 (failing to allege that the new classroom did not have "tools" or "new retention initiatives"), 139 (failing to allege that new classroom did not make things "simple" for students or allow "more engagement" or "multimedia"), 160 (failing to allege how Defendant Cappelli's statements foreclosed Apollo seeking out a replacement system), 161 (failing to adequately allege how Defendant Cappelli's statement about fixing various issues with the new classroom gave the impression that *all* issues were fixed), 161 (failing to allege why stating Apollo had "specific data to show the timelines" would require Defendant Cappelli to reveal detailed information about the timelines), 163 (failing to allege how "technical challenges" is an objectively inappropriate term for the issues Apollo experienced with the online classroom)).

new classroom's problems to a user learning curve. (*Id.* at ¶ 152). However, within the context of the statement, Defendant Cappelli mentioned technical problems, unrelated to training. *See Chinacache*, 2016 WL 4370030, at *5 ("A court evaluates defendants' alleged false statements in the context in which they were made, especially in regard to contemporaneous qualifying or clarifying language." (citing *In re Syntex*, 95 F.3d at 929)). Further, Plaintiffs' own factual allegations imply that users needed to be "tech savvy" to use the new classroom, (SAC at ¶ 80), and that users could not simply rely on their "intuiti[on] to navigate" the new classroom, (*id.* at ¶ 89). Thus, the Court finds that Plaintiffs have failed to allege that it was false or misleading for Defendant Cappelli to attribute some of the problems with the new classroom to a lack of training.

Plaintiffs, citing to *Carlton v. Cannon*, 184 F. Supp. 3d 428 (S.D. Tex. 2016), argue that Federal Rule 9(b) does not require such a high degree of particularization to state a claim under Rule 10b-5. (Doc. 90 at 18–19). In *Carlton*, the defendants stated that their core technology was "fundamentally sound, that [a manufacturing] plant operated successfully on a commercial scale, and that any problems were normal, start-up glitches rather than fundamental structural defects." 184 F. Supp. 3d at 472. The *Carlton* court ruled that confidential witnesses provided enough particularity in their allegations to "explain why and on what basis [the defendants' statements] were misleading." *Id.* at 472–73. In particular, the witnesses detailed issues that "[s]tart-up costs and net-operating losses consistently increased" and "yields were lower, and costs higher, than represented." *Id.* at 472. Such facts provided an objectively verifiable method that allowed the court to understand *how* and *why* the defendants' statements were false and misleading. Here, unlike in *Carlton*, Plaintiffs ask the Court to infer facts from subjectively-based allegations. The Court declines Plaintiffs' request to pursue the type of 'fishing expeditions' that the Ninth Circuit has condemned. *See Vantive*, 283 F.3d at 1087; *see also, e.g., Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) (holding a statement inactionable where the plaintiff alleged the statement was misleading because it disclosed that profitability would increase rather than *dramatically*

increase because the "allegation merely squabbles about the adverbs . . . and fails to indicate the language used was false"); *In re Daou*, 411 F.3d at 1020 (holding as "adequately misleading" a statement by the defendants that "attrition within the technical ranks of employees was only 6.8%" when a witness specifically stated that "employee turnover, especially among Field Service engineers, exceeded 40%").

**ii. Precise Meanings of Terms in the SAC**

Next, some of Plaintiffs' factual allegations fail to use consistent or precise definitions of material terms. Such inconsistency in definitions prevents the Court from finding that Plaintiffs plausibly pleaded that Defendants made false or misleading statements.

For example, Plaintiffs allege that Defendants misleadingly stated that, on November 13, 2013, "[t]he new platform is actually rolled out to all of our graduate students today." (SAC at ¶¶ 126, 127). Plaintiffs maintain that the new classroom was not "rolled out" because "students to whom the online classroom was made available were unable to log in and use the classroom due to login failures, broken links, and additional issues." (*Id.* at ¶ 127). Similarly, Plaintiffs allege that Defendants falsely and misleadingly stated that, on June 25, 2014, "[d]uring the third quarter, we . . . completed the rollout of our new learning platform across the university." (*Id.* at ¶¶ 141, 143; *see also id.* at ¶ 163). Plaintiffs maintain that "[t]he online classroom was actually rolled out to all students months after Apollo made the announcement." (*Id.* at ¶ 143). Plaintiffs' relevant factual allegations are as follows: CW 9 stated she thought Defendants' statement was misleading because Defendants were still testing the new classroom and the new classroom "was not hooked up to the program Salesforce," (*id.* at ¶ 77); CW 2 based his belief that the new classroom was not yet rolled out on the fact "there were definitely still undergrads using the old classroom [in June 2014], and . . . the new classroom did not have all the functionality of the old classroom," (*id.* at ¶ 78); and CW 1 opined that Defendants' statement "sound[ed] false to me" because "there were a number of problems and emergencies *after* rolling it out," (*id.* at ¶ 79 (emphasis added)).

The various definitions of "rollout" embedded in the SAC contradict one another and make it impossible for the Court to conclude that Plaintiffs have plausibly pleaded falsity. The Oxford English Dictionary defines "rollout" as "[t]he introduction or official launch of a new product, service, etc." *Rollout*, Oxford English Dictionary (3d ed. 2010). By the dictionary definition, Defendants' statements indicated they had simply introduced or launched the new classroom to various groups of students. However, Plaintiffs allegations fail to dispute that Defendants introduced the new classroom and, instead, only dispute whether the new classroom was without technical glitches, "hooked up" to Salesforce, no longer being tested, or actively in-use by all students. The Court fails to find that, by Defendants' use of the term "rollout," a reasonable investor would perceive that the new classroom was "hooked up" to Salesforce, let alone the witnesses' other inferences. Because Plaintiffs have failed to provide a recognized industry definition—or even a consistent definition—of rollout, the Court is inclined to examine Defendants' statements using the dictionary definition. *See, e.g., Kelly v. Elec. Arts, Inc.*, Case No. 13-cv-05837-SI, 2015 WL 1967233, at *7–8 (N.D. Cal. Apr. 30, 2015) (treating as inactionable corporate puffery the statement "de-risk" because the defendant's use of the term carried no precise meaning); *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1121 (N.D. Cal. 2013) (holding no actionable material misstatement existed where the defendant's "description of the LPR program comports with the dictionary definition of a beta program and does not give an impression that the LPR program was anything other than such a program"). As a result, Plaintiffs have failed to plausibly allege that Defendants' statements regarding the rollout were false or misleading.[8]

---

[8] The Court similarly finds that that Plaintiffs failed to plead that a statement in Apollo's 2015 Form 10-Q that "[UOP's] new online student classroom, which was fully implemented in late June 2014 . . ." was false or misleading. (*See* SAC at ¶ 163). Plaintiffs—citing the factual allegations previously discussed—allege this statement was false because "[the new classroom's] rollout was delayed until later." (*Id.* at ¶ 164). However, similar to the ambiguity surrounding the various definitions of "rollout," Plaintiffs have failed to allege that Defendants' statement regarding "full implementation" was false or misleading.

**iii. Temporal Proximity**

Finally, some of Plaintiffs' factual allegations fail to allege proper temporal proximity between the witness observations and Defendants' purportedly false or misleading statements. The Ninth Circuit requires that plaintiffs allege "why the disputed statement was untrue or misleading *when made*." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (emphasis added); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (requiring a plaintiff to allege "specific contemporaneous statements" to show falsity); *Sterling Fin. Corp.*, 963 F. Supp. 2d at 1109 ("Without evidence of contemporaneous falsity, an allegation of a misleading representation, which entirely rests on later contradictory statements [or state of affairs], constitutes an impermissible attempt to plead fraud by hindsight." (citation omitted)).

Here, Plaintiffs allege that Defendant Cappelli's statements from October 21, 2014 describing "a short-term disruption" and "a small hiccup" with the new classroom were false and misleading. (SAC at ¶¶ 149–51). Among the SAC's allegations involving the timing of the new classroom disruptions, CW 2 estimated between 30 and 50 disruptions "during the rollout of the new classroom from mid-2012 to mid-2014," with "long-lasting disruptions [being] most prevalent in late 2013 and early 2014 . . . ." (*Id.* at ¶ 73). However, the Court previously ruled that CW 2's statements cannot provide a basis for Defendant Cappelli's statements to be false or misleading because "it is impossible for the Court to determine whether Defendant Cappelli's characterization of the disruption was false and misleading without additional information regarding the temporal proximity between CW 2['s] . . . observed outages and Defendant Cappelli's statements." (Doc. 80 at 21). Plaintiffs have failed to add any allegations regarding the temporal proximity between CW 2's observations and Defendant Cappelli's statements; instead, the SAC includes conclusory statements from CW 1 and CW 4 that the problems were "pretty much constant," it was "one thing after another," and the situation "never improved." (*See* SAC at ¶¶ 55–59). Using such broad phrasing does not meet the

particularized temporal proximity requirements of the PSLRA.

The only allegations that Plaintiffs add to address the Court's temporal proximity concerns are observations from CW 8. CW 8 described "severe" problems with the new classroom in mid-2014 and characterized the new classroom as "'going to hell' in or around the summer of 2014." (*Id.* at ¶¶ 75–76). Thus, CW 8 believed that "it was misleading for [Defendants] to state in October 2014 that it had experienced a short term disruption or a small hiccup[, and] [s]he recalled employees rolling their eyes and thinking it was PR spin." (*Id.* at ¶ 81). CW 8's observations fail to plausibly render Defendant Cappelli's statements that Apollo experienced "a short-term disruption" or "a small hiccup" false or misleading. CW 8's observations that the new classroom was "going to hell" and encountered "severe" problems fail to state the nature of these problems. It is unclear whether her observations refer to the disruptions discussed by CW 2 or the functionality, efficiency, and user-friendliness issues CW 8 discusses elsewhere in the SAC. (*See id.* at ¶ 80). Further, alleging that other, undisclosed employees "rolled their eyes" does not meet the PSLRA's requirement that Plaintiffs must state *how* and *why* a statement is false or misleading. Therefore, the Court finds that Plaintiffs' new factual allegations have again failed to state a claim for securities fraud as to Defendant Cappelli's statements.[9]

**b. Non-actionable Puffery**

Defendants next argue many of the statements Plaintiffs allege to be false or misleading are not actionable because they constitute mere puffery. (Docs. 88 at 9–18; 91 at 12–14). Plaintiffs rejoin that the puffery exception is "narrowly drawn," and the exception does not include the alleged statements. (*See* Doc. 90 at 23–26). In its prior Order, the Court found many of Plaintiffs' alleged statements to be mere puffery and,

[9] The Court similarly finds Plaintiffs have failed to plausibly allege other statements were false or misleading due to a lack of temporal proximity in allegations. (*See, e.g.*, SAC at ¶¶ 151 (failing to allege sufficient temporal proximity between the technical issue that Defendant Cappelli stated affected "not a huge part of the student body" and witness observations about various technical issues affecting many students), 160 (relying on pure speculation that Defendants decided "at least a year before" to replace the new classroom with the third-party system)).

thus, non-actionable. (Doc. 80 at 26–29).

Statements are not actionable if they are "generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242 (9th Cir. 1990)); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."). As a result, "[t]o be misleading, a statement must be 'capable of objective verification.'" *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). The Ninth Circuit has further recognized that phrases like "significant events," "advantages," "high priority," and those beginning with "we believe" are puffery because they are vague and subjective. *Apollo Grp. Inc.*, 774 F.3d at 606–07; *see also Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036–37 (N.D. Cal. 2012) (holding that "generalized statements" like "[w]e are very pleased with the learning from our pilot launch," "getting really great feedback," "we are very pleased with our progress to date," and "[w]e are confident the improved features in user experience . . . will increase and sustain utilization" constituted "non-actionable puffing").

However, statements disguised as opinions but containing objectively determinable representations are still actionable as material misrepresentations. *See, e.g.*, *Brickman v. Fitbit, Inc.*, No. 15-cv-02077-JD, 2016 WL 3844327, at *3 (N.D. Cal. July 15, 2016) (holding that representations on a package that a device will "'TRACK YOUR NIGHT,' including 'Hours slept,' 'Times woken up,' and 'Sleep quality,'" are not the kind of "vague and empty taglines like 'KNOW YOURSELF, LIVE BETTER' that courts have treated as non-actionable" (citing *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1011–12 (N.D. Cal. 2014))). To determine whether a statement constitutes puffery, a court "must analyze the context in which the statements were

made." *In re Bridgepoint Educ. Inc. Sec. Litig.*, No. 3:12-CV-1737 JM (WMC), 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

Several of Plaintiffs' identified statements constitute non-actionable puffing. For example, Plaintiffs highlight a slide that was presented by both Defendant Swartz and Ms. Coronelli that touted the new classroom's "management and delivery of course materials," "[c]apabilities and features to keep students on track," and focus on "communication and social interaction tools." (SAC at ¶¶ 129, 130, 135, 136). The slide also labelled the classroom as "simple," "efficient," and "personal." (*Id.*).

Terms and phrases like "simple," "efficient," "personal," "[c]apabilities and features to keep students on track," and "communication and social interaction tools" are unspecific and generalized statements and constitute classic examples of puffery.[10] *See, e.g.*, *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010) ("Defendants' description of the Company's underwriting, appraisal, and credit standards as 'strict,' 'stringent,'

---

[10] The Court similarly finds additional statements that constitute non-actionable puffery. (*See, e.g.*, SAC at ¶¶ 126 ("Beyond our Education of Careers initiative, we've also made some significant enhancements to the student experience." (emphasis omitted)), 132 ("So it's -- like I said, it's a lot of different that are pulled together to create an ecosystem or a culture around retention" (emphasis omitted)), 138 ("We're rolling out a new learning platform. It's exciting." (emphasis omitted)), 138 ("I really think [the upgraded online classroom] makes things simple for the students. It is an intuitive system . . . ." (emphasis omitted)), 142 ("[O]ur new learning platform . . . has been greatly enhanced and provides a more efficient and user friendly experience." (emphasis omitted)), 145 ("We have been very, very focused on looking at both the service model as well as the learning model, upgrading our learning management system and making sure that the process to learn for a student is seamless." (emphasis omitted)), 156 ("From a standpoint of the classroom it is -- it's not just an upgrade. . . . Just an overall improved experience from that perspective." (emphasis omitted)), 159 ("We're 100% committed to fixing all the issues relative to the new classroom as quickly as possible . . . ." (emphasis omitted)), 159 ("[W]e put every necessary asset on it." (emphasis omitted)), 159 ("[W]e will certainly continue to do everything necessary to remediate that." (emphasis omitted))).

'conservative,' and 'strong', is immaterial because these commonplace statements of corporate puffery could not influence a reasonable investor's investment decision."); *see also EarthCam, Inc. v. OxBlue Corp.*, No. 1:11-cv-02278-WSD, 2012 WL 12836518, at *6 (N.D. Ga. Mar. 26, 2012) ("The phrases 'the most reliable,' 'highest performance,' and 'simple to use' are vague and subjective . . . .").

Similarly, Plaintiffs allege that Defendant Cappelli's statement that "[t]here's a few bugs and things in the system that are being worked out" was false and misleading. (*Id.* at ¶¶ 148, 151).[11] However, the statement "and things" provides the archetype for puffery. *See, e.g.*, *Thing*, Oxford English Dictionary (3d ed. 2010) ("An entity of *any* kind." (emphasis added)); *see also Long v. Graco Children's Prods., Inc.*, No. 13-cv-01257-WHO, 2013 WL 4655763, at *5 (N.D. Cal. Aug. 26, 2013) ("Even if the challenged statement is not a 'product superiority claim,' it hardly describes (or 'misdescribes') a 'specific' or 'absolute' characteristic and still remains puffery because it is not 'a specific factual assertion which could be established or disproved through discovery.'" (quoting *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1141 (C.D. Cal. 2005))); *Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1125, 1134 (N.D. Cal. 2013) (holding that an advertisement of a "'faster, higher performance, more powerful and/or upgraded' computer component . . . [was] devoid of any factual assertions that are capable of being proved false").

Plaintiffs provide multiple arguments as to why the statements are not puffery. First, Plaintiffs argue that the statements in their full context provide for a greater, objectively-determinable message. (Doc. 90 at 24–25). For example, in *Mulligan v. Impax Labs., Inc.*, the U.S. District Court for the Northern District of California found statements that "appropriate responses were 'well underway' or nearly completed" were actionable because of the context of the statements. 36 F. Supp. 3d 942, 968 (2014). The

---

[11] The Court notes that paragraphs 141 and 148 in the SAC lack any corresponding paragraph that refers to the statements contained therein as false or misleading. The Court infers this is Plaintiffs' oversight, and Plaintiffs intended paragraphs 143–44 to refer to both paragraphs 141 and 142 and paragraphs 150–51 to refer to both paragraphs 148 and 149.

*Mulligan* defendants made various misstatements about cleaning their manufacturing facilities following FDA warnings. *Id.* at 946–61. The court held that such ordinarily vague statements were given a more specific meaning because they were made to investors "in the pharmaceutical industry — an industry where regulatory compliance, not to mention consistency and sanitation in production, is essential." *Id.* at 968. In other words, because the FDA—after issuing multiple warnings to a company—could shut down the primary operations of the pharmaceutical company, the *Mulligan* court found additional meaning that a reasonable investor would attach to statements involving the company's sanitation of manufacturing facilities. *See id.*; *see also Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (finding an objective meaning to ordinarily vague statements about the defendants' safety and training efforts "[i]n an industry as dangerous as deepwater drilling").

Here, Plaintiffs attempt to argue that terms like "efficiency" and "simplicity" are so connected to the higher education industry that additional context is superimposed on the ordinarily vague statements. (Doc. 90 at 24). However, the Court is unpersuaded that generalized statements about an online classroom have any additional meaning. Unlike in *Mulligan*, Plaintiffs allege no initial event—akin to the FDA warnings—that would prompt a reasonable investor to attach additional meanings to Defendants' generalized statements. Further, while the statements about sanitation in *Mulligan* were tethered to the cleanliness standards set by the FDA, *see* 36 F. Supp. 3d at 957–59, here, there was no comparable context that provided objective standards to which investors could tether the vague statements. *See In re iPass, Inc. Sec. Litig.*, No. C 05-00228 MHP, 2006 WL 496046, at *4 (N.D. Cal. Feb. 28, 2006) ("[G]eneralized statements of optimism . . . 'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'" (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997))). Thus, considering the greater context, Defendants' statements are non-actionable puffery.

Second, Plaintiffs argue that because Apollo's stock price declined after the

disclosure of decreased student enrollment and the transition to a third-party platform, the statements are not puffery. (Doc. 90 at 25). Plaintiffs' argument confuses the concepts of materiality and misrepresentation. To constitute a material misrepresentation, a statement must be *both* material and misleading. The Ninth Circuit has reiterated that if a statement is mere puffery, it "is not misleading." *Hewlett-Packard*, 845 F.3d at 1275 (citing *Apollo Grp. Inc.*, 774 F.3d at 606; *Lloyd*, 811 F.3d at 1206–07; *In re Cutera*, 610 F.3d at 1111). Further, the Ninth Circuit often bifurcates its analysis as to whether a statement was objectively false or misleading and whether the statement was material. *See id.* at 1275–78. Thus, just because a disclosure is material—as strongly evidenced by decreases in a stock's price following disclosure—does not mean that Defendants made a material misrepresentation.

Third, and relatedly, Plaintiffs argue that many of the statements are not puffery because Defendants "highlighted them to investors in PowerPoint slides" and otherwise frequently repeated them. (Doc. 90 at 25–26). These arguments are a variation of the previous two that the Court has already rejected. The Court has analyzed each statement in its context—including each time Plaintiffs have alleged a statement was repeated—and concludes that the statements remain vague and generalized. *See, e.g.*, *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (noting "the frequency with which [the d]efendants emphasized [a company's] underwriting policies" was evidence of *materiality*—not of a statement's falsity). Similarly, while repetition or conspicuous placement of a statement may be indicative of materiality, they are oftentimes irrelevant as to whether a statement was false or misleading. *See, e.g.*, *Frenzel*, 76 F. Supp. 3d at 1018–19 (holding as "mere puffery" a tagline that appeared on every box of a product). Thus, the repetition and conspicuous placement of the statements does not make them any less generalized or vague.

Fourth, Plaintiffs argue that because Defendants used the same terms to describe the new classroom as they used to explain how they selected the third-party replacement for the new classroom, these statements cannot be puffery. (Doc. 90 at 24). For example,

an article reporting Apollo's switch from the new classroom to the third-party system cites "two primary factors – a comprehensive set of functionality and the redesigned user experience of [the third-party system]." (SAC at ¶ 124 (emphasis omitted)). This argument is misguided. Just because a new system is *more* "user friendly" or "efficient" does not mean it was false or misleading to call an older system "user friendly" or "efficient." More importantly, using vague and generalized terms to describe multiple systems does not automatically make those terms objectively verifiable; in fact, the mass and potentially meaningless attribution of a term can make that term more vague and generalized. *See, e.g.*, *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-cv-04883-BLF, 2017 WL 1508991, *12 (N.D. Cal. Apr. 27, 2017) (classifying statements as puffery because they were the "'kind of rosy affirmation[s] . . . numbingly familiar to the marketplace'" (quoting *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012))). In addition, the Court must look at the context existing at the time the statements were made to determine whether a statement is actionable—not Plaintiff's post-hoc analysis. *Ronconi*, 253 F.3d at 430 n.12 (reiterating "[f]raud by hindsight is not actionable" (quotation marks omitted)).

Finally, Plaintiffs argue that some terms, like "user friendly" and "efficiency" had objectively verifiable meanings within Apollo's industry. (Doc. 90 at 24–25). In particular, CW 8 stated that the industry definition for "user friendly" was "how easy to navigate the product is" and whether a system "[allowed] one [to] figure out where the searches are and where to click." (SAC at ¶ 80). CW 8 also stated that the industry definition for "efficiency" is "how fast a user can get to what he or she needs." (*Id.*). CW 8's definitions lack any qualitative meaning or significance and only underscores the vagueness of the terms she attempted to define. Plaintiffs' ability to have a former Apollo employee attempt to construct objectively verifiable meanings where none exist fails rid the statements of their vagueness. *See, e.g.*, *Sterling Fin. Corp.*, 963 F. Supp. 2d at 1121 (rejecting an attempt by the plaintiff to formulate a specific definition for "safe and sound" in the banking sector because "safe and sound" continued to lack "a specific and

well-understood meaning by investors”). Further, CW 8’s definitions rely on similarly vague terms like “easy” and “fast.” Thus, the Court concludes that many of the alleged statements constitute non-actionable corporate puffery.

**c. Omissions**

Plaintiffs’ SAC alleges that many of statements were false or misleading for omitting relevant information. “Absent a duty to disclose, an omission does not give rise to a cause of action under [Section] 10(b) and Rule 10b-5.” *Hewlett-Packard Co.*, 845 F.3d at 1278 (citing *Basic*, 485 U.S. at 239 n.17). Despite this general rule, Plaintiffs allege that Defendants’ risk warnings gave rise to a duty to disclose specific information, and Defendants misleadingly failed to disclose pertinent information.

**i. Risk Warnings**

Plaintiffs first appear to argue that the Ninth Circuit recognizes a special class of omissions related to risk warnings. (*See* Doc. 90 at 19). In Apollo’s 2014 Form 10-K, Defendants made statements that included “[f]rom time to time we experience intermittent outages of the information technology systems used by our students and by our employees” and “the transition from the legacy systems entails risks of unanticipated disruption or failure to fully replicate all necessary data processing and reporting functions . . . .” (SAC at ¶ 153). Plaintiffs argue that because these risk warnings, among others, are boilerplate, an inherent duty to disclose attaches to Defendants. (Doc. 90 at 19). Plaintiffs’ argument relies on the assumption that boilerplate is equivalent to deceit. (*Id.* (citing *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009))). Defendants argue that the risk warnings were meaningful and merely acknowledge the disclosure—which occurred on the same day Defendants filed the Form 10-K, (SAC at ¶¶ 148–50)—of the new classroom’s technical issues, (Doc. 91 at 11).

The Ninth Circuit has recognized that risk warnings may be actionable as material omissions when the warning speaks to “entirely . . . as-yet-unrealized risks and contingencies” and fails to alert “the reader that some of these risks may already have come to fruition.” *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008); *see*

*also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27. In other words, where a party states that something *might* occur, that warning may be actionable because it omits that 'that something' has already occurred.

Here, Plaintiffs rely on *In re Towne Services, Inc., Securities Litigation*, a case from the U.S. District Court for the Northern District of Georgia in making their arguments. 184 F. Supp. 2d 1308 (2001). The *Towne* plaintiffs alleged warnings that "unanticipated problems could halt our services" and "negatively affect our business" were false and misleading because the defendants contemporaneously experienced "problems and resulting customer losses." *Id.* at 1314–15, 1319. The court agreed, holding that the discrepancy between the "open-ended, general, and future-oriented warnings" and the reality of the defendant's "severe" system disruptions and "massive" customer losses rendered the warnings misleading. *Id.* at 1319–20.

Although Plaintiffs argue that this case is akin to *Towne*, the Court finds the facts presented here distinguishable. Here, unlike in *Towne*, Defendants announced technical difficulties and the negative effects of these difficulties. (*See* SAC at ¶¶ 148, 150; *see also* Doc. 64-2 at 129 ("[I]t's because students posting attendance throughout Q1 -- well Q4 and into the first half of 2015, they'll be posting less nights of attendance. . . . Again, it's a transition issue. Once we address the online transition issues through the first half of 2015, we expect that to stabilize as the year moves on.")). Further, unlike the "open-ended, general and future-oriented warnings" in *Towne*, Defendants' warnings disclosed "[f]rom time to time we *experience* intermittent outages . . . , including system-wide outages." (*Id.* at ¶ 153). These warnings are not "future-oriented warnings" but, rather, warnings that related to the issues Apollo was experiencing. In this sense, Defendants' risk warnings were not misleading, and to require Defendants to disclose all related information is no different than an all-encompassing duty to complete. *See Brody*, 280 F.3d at 1006 (recognizing that "[o]ften, a statement will not mislead even if it is incomplete or does not include all relevant facts"); *see also id.* at 1006 n.8 ("For example, if a company reports that its sales have risen from one year to the next, that statement is

not misleading even though it does not include a detailed breakdown of the company's region by region or month by month sales."). The Court finds unpersuasive Plaintiffs' attempt to construe the Ninth Circuit's narrow duty to complete for misleading risk warnings as an independent completeness requirement.

For the same reasons that this case differs from the facts in *Towne*, the other cases Plaintiffs cite are distinguishable. For example, in *Berson*, the warning spoke "*entirely of* as-yet-unrealized risks and contingencies" and "[n]othing alert[ed] the reader that some of these risks may already have come to fruition." 527 F.3d at 986 (emphasis added). Here, Defendants' risk warning—as well as other statements made on the day the Form 10-K was filed—provided notice to investors that some of the warned-of events had already occurred. *See Matrixx Initiatives*, 585 F.3d at 1181 (emphasizing that the warnings solely spoke of future risks); *see also Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 WL 3360676, at *12 (C.D. Cal. June 9, 2016) (same).

**ii. Omissions Generally**

Based on the above analysis, the Court finds that no statement alleged by Plaintiffs to be false or misleading meets the pleading standard of the PSLRA and Federal Rule 9(b). Nonetheless, Plaintiffs allege that each statement is "also misleading . . . because [Defendants] omitted material facts that they were required to provide to make their statements, in light of the circumstances under which they were made, not misleading." (*See* SAC at ¶¶ 128, 131, 134, 137, 140, 144, 147, 152, 155, 158, 162, 165). In particular, Plaintiffs provide up to ten different omissions, "among other things," per statement that made each statement misleading. (*See, e.g.*, *id.* at ¶¶ 147, 152, 155).

The Court reiterates from its prior Order that it is insufficient to simply allege that a statement is false or misleading because it is *incomplete* rather than affirmatively alleging what specifically makes a statement false or misleading. (*See* Doc. 80 at 19 (citing *Brody*, 280 F.3d at 1006; *Ronconi*, 253 F.3d at 429)). Because the Court has held

that none of Defendants' statements are false or misleading by themselves, Plaintiffs' contingent false or misleading omissions allegations necessarily fail. *See Hewlett-Packard*, 845 F.3d at 1278 (holding "there was no duty to disclose because [the defendants'] failure to speak did not 'affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists'" (quoting *Brody*, 280 F.3d at 1006)).

However, even if the Court had reason to examine the omission allegations, Plaintiffs have failed to follow the spirit of the Court's order in pleading what specific omissions made each statement false or misleading. (*See* Doc. 80 at 19). Absent a separate statutory duty to disclose, omissions are only actionable where they cause the statements actually made to be misleading. (*Id.*). Thus, even if a statement is false or misleading, it does not give rise to a duty to disclose collateral information that does not cause the statement to be misleading. However, Plaintiffs largely fail to adhere to this rule and instead claim that Defendants were under a duty to disclose collateral information unrelated to Plaintiffs' basis for alleging why or how a statement was false or misleading.

For example, Plaintiffs allege that the statement "[d]uring the third quarter, we . . . completed the rollout of our new learning platform across the university" was false and misleading because Apollo "had not 'completed the rollout of [its] new learning platform across the university' by the end of the third quarter . . . ." (SAC at ¶¶ 141, 143). However, Plaintiffs next allege that those same statements were misleading for omitting, along with other information, "the facts from the December 2012 internal report that the online classroom could not compete with what was already in the market, or provide differentiation." (*Id.* at ¶ 144). Even if Defendants' statement was false or misleading, the Court does not understand how disclosure of the December 2012 report would cure the alleged falsity of Defendants' statements about the 2014 rollout.[12] Although Plaintiffs

[12] The Court finds the SAC is full of such improper pleading. (*See, e.g.*, SAC at ¶¶ 138 (vague relation between proffered false or misleading basis and omissions (i) and (vii) from ¶ 140), 141 (vague relation between proffered false or misleading basis

cite an out-of-circuit district court case for the proposition that the PSLRA allows a "somewhat attenuated relationship between th[e] . . . omission and statements *actually made*," (Doc. 90 at 17 (citing *Towne*, 184 F. Supp. 2d at 1319)), such "attenuated relationship" is not recognized in the Ninth Circuit, *see, e.g.*, *Berson*, 527 F.3d at 987 (holding that when a duty to disclose attached to the defendants after they "chose to tout the company's backlog," the duty only required defendants to disclose "what that backlog consisted of"); *Metzler*, 540 F.3d at 1071 ("The general statements the TAC identifies as false or misleading are [the defendant's] disclosures of its current revenue projections and

---

and omissions (i), (ii), (iii), (iv), (v), (vi), (viii), and (ix) from ¶ 144), 142 (vague relation between proffered false or misleading basis and omissions (i), (vii), (viii), and (ix) from ¶ 144), 145 (vague relation between proffered false or misleading basis for the statement "very, very focused" and omissions (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), (ix), and (x) from ¶ 147), 148 (vague relation between proffered false or misleading basis for the statement about a "short-term disruption" and omissions (i), (ii), (iii), (iv), (vi), (vii), (ix), and (x) from ¶ 152), 148 (vague relation between proffered false or misleading basis for the statements about "a few bugs and things" and "additional training" and omissions (i), (iv), (vi), (vii), (ix), and (x) from ¶ 152), 148 (vague relation between proffered false or misleading basis for the statement about "not a huge part of the student body by any means" and omissions (i), (ii), (iv), (vi), (vii), (viii), (ix), and (x) from ¶ 152), 150 (vague relation between proffered false or misleading basis and omissions (i), (ii), (iii), (iv), (vi), (vii), (ix), and (x) from ¶ 152), 153 (vague relation between proffered false or misleading basis for the statement about "we experience intermittent outages" and omissions (iii), (vii), and (viii) from ¶ 155), 153 (vague relation between proffered false or misleading basis for the statement about "entails risk of unanticipated disruption or failure" and omissions (iii), (vii), and (viii) from ¶ 155), 153 (vague relation between proffered false or misleading basis for statement about "system malfunctions that may arise" and omissions (iii), (vii), and (viii) from ¶ 155), 153 (vague relation between proffered false or misleading basis for statement about "could adversely impact our business" and omissions (iii), (vii), and (viii) from ¶ 155), 156 (vague relation between proffered false or misleading basis and omissions (i), (vi), (vii), and (x) from ¶ 158), 159 (vague relation between proffered false or misleading basis for statement about "100% committed" and omissions (i), (ii), (iii), (iv), (v), (vi), and (vii) from ¶ 162), 159 (vague relation between proffered false or misleading basis for statement about "put every necessary asset on it" and omissions (i), (ii), (iii), (iv), (v), (vi), and (vii) from ¶ 162), 159 (vague relation between proffered false or misleading basis for statement about "lots of communications going out" and omissions (i), (ii), (v), (vi), (vii), and (ix) from ¶ 162), 159 (vague relation between proffered false or misleading basis for statement about "[w]e are not guessing" and omissions (i), (ii), (iii), (iv), (v), (vi), (vii), and (ix) from ¶ 162), 159 (vague relation between proffered false or misleading basis for statement about "[w]e know the timing" and omissions (i), (ii), (iii), (iv), (v), (vi), (vii), and (ix) from ¶ 162), 159 (vague relation between proffered false or misleading basis for statement about "using lots of data and analytics" and omissions (i), (ii), (iii), (iv), (v), (vi), and (vii) from ¶ 162), 159 (vague relation between proffered false or misleading basis for the statement about "we have pretty specific data" and omissions (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), and (ix) from ¶ 162), 159 (vague relation between proffered false or misleading basis for statement about "the majority of this disruption" and omissions (i), (ii), (iii), (iv), (v), (vi), and (vii) from ¶ 162)).

anticipated growth. But the TAC's connection between the falsity of these statements and the [omitted information regarding] regulatory investigations is extraordinarily vague."); *Belodoff v. Netlist, Inc.*, No. SACV 07-00677, 2009 WL 1293690, at *8 (C.D. Cal. Apr. 17, 2009) (finding "no authority indicating that [the defendant] needed to provide a more detailed account of its inventory in order to make the disclosures [about excess inventory] not misleading").

**2. Scienter**

The Ninth Circuit treats falsity and scienter as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), *abrogated on other grounds by Killinger*, 542 F.3d at 784. However, because the Court concludes that Plaintiffs have failed to plausibly allege that Defendants made any false or misleading statement, the Court does not address scienter. (*See* Doc. 80 at 42).

**B. Section 20(a) Claims**

To state a claim under Section 20(a), a plaintiff must establish (1) a primary violation of federal securities law, and (2) that the defendant exercised actual power or control over the primary violator. *See No. 84 Emp'r–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003); *see also* 15 U.S.C. § 78t. Because the Court finds that Plaintiffs have failed to state a Section 10(b) and Rule 10b-5 claim, Plaintiffs' Section 20(a) claims necessarily fail. *See In re VeriFone*, 11 F.3d at 872.

**IV. LEAVE TO AMEND**

Plaintiffs "respectfully request leave to amend under [Federal] Rule 15." (Doc. 90 at 32). Defendants oppose this request. (Doc. 91 at 20).

The Court has already granted Plaintiffs leave to amend. (Doc. 80 at 43). In granting Plaintiffs' leave to amend, the Court cautioned that it had "advised Plaintiffs as to the standard under the PSLRA and Federal Rule 9(b) and expects Plaintiffs to comply in the next amended complaint, without seeking further amendment." (*Id.*). As noted

above, Plaintiffs failed to fully comply with the Court's Order. *See supra* Section III.A.1. Additionally, Plaintiffs point to no additional facts that they might allege to cure the addressed deficiencies, which persisted in a similar light between the CAC and SAC. Thus, the Court denies Plaintiffs' request to amend the SAC. *See In re Read-Rite Corp.*, 335 F.3d at 845 ("[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." (quotation marks omitted)); *Zucco Partners*, 552 F.3d at 1007 (holding that the "district court did not err when it dismissed [a private securities plaintiff's second amended putative class action complaint] with prejudice, since it was clear that the plaintiffs had made their best case and had been found wanting").

## V. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that the Request for Judicial Notice in Support of Moving Defendants' Motion to Dismiss, (Doc. 88 at 7 n.3; *see also* Docs. 63; 64), is **GRANTED** in part, consistent with the above reasoning.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss [Plaintiffs'] Second Amended Complaint, (Doc. 88), is **GRANTED**. The Clerk of the Court shall dismiss this case with prejudice and enter judgment accordingly.

Dated this 26th day of July, 2017.

James A. Teilborg
Senior United States District Judge